**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LUGO, *et al,.* | CIVIL ACTION NO. 07-CV-00749 |
| **Plaintiffs,** | **Honorable Michael M. Baylson** |
| **vs.** | |
| **FARMERS PRIDE, INC.,** | |
| **Defendant.** | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DECERTIFY THE COLLECTIVE ACTION CLASS**

Shanon J. Carson, Esq.
Russell D. Henkin, Esq.
Ellen T. Noteware, Esq.
**Berger & Montague, P.C.**
1622 Locust Street
Philadelphia, PA  19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
scarson@bm.net
rhenkin@bm.net
enoteware@bm.net

Todd M. Schneider, Esq.
Clint J. Brayton, Esq.
**Schneider Wallace Cottrell**
**Brayton Konecky LLP**
180 Montgomery Street, Suite 2000
San Francisco, CA  94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
ccottrell@schneiderwallace.com
cbrayton@schneiderwallace.com

Phillip Alexander Downey, Esq.
P.O. Box 736
Unionville, PA 19375
Telephone: (610) 324-2848
Facsimile: (610) 347-1073
downeyjustice@gmail.com

*Attorneys for Plaintiffs and the Class*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iv

I.    INTRODUCTION ......................................................................................1

II.    SUMMARY OF THE ARGUMENT .......................................................2

III.    PROCEDURAL HISTORY ......................................................................5

IV.    STATEMENT OF THE ISSUES .............................................................5

V.    STATEMENT OF THE FACTS ..............................................................6

    A.    From February 23, 2004 To December 2007, All Class Members Were Paid Pursuant To A Common Policy Or Practice – Defendant's Gang-Time System ................................................................7

    B.    Defendant Required Class Members To Wear And Use PPE And Related Clothing And Equipment That Was Integral And Indispensable To Their Work .............................................8

    C.    All Class Members Were Subject To The Same Terms And Conditions Of Employment And Defendant's Policies Concerning Timekeeping And PPE ..........9

        1.    Defendant Set Forth Its Mandatory Policies In Its Employee Handbook ................................................................9

        2.    Defendant Required All Of Its Hourly Production Workers To Participate In A Common Training And Orientation Program ..................12

    D.    Defendant Required All Class Members To Perform Unpaid Work At The Beginning And End Of Their Shifts And During Meal Breaks ............................12

        1.    Defendant Has Always Required Class Members To Punch In And Out At The Beginning And End Of Their Shifts, But Until December 2007 Paid On A Gang-Time Basis Without Regard To Actual Punch Times ................................................................12

        2.    Class Members Were Not Paid For Time Spent Retrieving PPE From Their Lockers And The Supply Room, Sanitizing Themselves And Their PPE, Donning Their PPE, And Walking To Their Workstations At The Beginning Of Their Shifts ............................13

            a.    All Class Members Performed Substantially The Same Beginning Of Shift Tasks ................................................13

b.   All Class Members Performed Compensable Work During
Their Unpaid 30 Minute Meal Period...........................................16

c.   All Class Members Performed The Same Meal Period
Procedures..................................................................................17

3.   Defendant Did Not Pay Class Members For Time Spent
Performing Post-Shift Donning and Doffing Activities ..........................19

a.   All Class Members Performed The Same End of Shift
Tasks ..........................................................................................19

b.   All Class Members Were Generally Paid Until An
Assigned Shift End Time That Did Not Take Into Account
Donning And Doffing Activities ...................................................20

E.   Defendant's Donning And Doffing Schedule Used During The Class
Period From February 23, 2004 to December 2007 Is A Sham............................22

1.   The Alleged Donning and Doffing Schedule Was Created Solely
To Avoid Backpay Liability Resulting From A DOL Investigation
Concluding That Defendant Violated The FLSA ......................................23

F.   Defendant Radically Alters Its Time-Keeping And Donning And Doffing
Policies In Fall 2007 (After This Lawsuit Was Filed)............................................25

VI.   APPLICABLE LAW ........................................................................................27

A.   Farmers Pride's Wage Payment System Violates The FLSA's "Whistle to
Whistle" Doctrine ................................................................................................28

B.   The Case Should Remain a FLSA Collective Action............................................30

1.   The "Similarly Situated" Requirement Is Clearly Met .............................30

2.   Third Circuit Precedents Favor Certification Of This Case.......................34

C.   Plaintiffs Here Are Similarly Situated .................................................................36

1.   Plaintiffs Are Similarly Situated Because They Are Subject To The
Same Employment Policies And Practices................................................36

2.   Plaintiffs Are Similarly Situated Because They Were All Subject
To The Same Practices Relating To Time Recording ...............................38

a.    There Are No Individualized Defenses, Defenses Are Common To All Plaintiffs ............................................................40

b.    Fairness And Procedural Considerations Heavily Support Moving Forward And Allowing A Trial Of This Collective Action.........................................................................................43

3.    Considerations Of Fairness Support Continuing This Collective Action.........................................................................................43

a.    The Court Has The Necessary Tools To Ensure A Manageable Trial ...........................................................44

b.    Representative Testimony Is Routinely Used In FLSA Trials ............................................................................44

c.    The Court May Use Subclasses To Manage The Trial .................45

d.    The Cases Cited By Defendant Are Inapposite ...........................46

VII.    CONCLUSION...............................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguilar v. Pilgrim's Pride,*
Case No. CV-06-1673 (N.D. Ala. Jan. 31, 2007) ...................................................33

*Alvarez v. IBP, Inc.,*
339 F.3d 894 (9th Cir. 2003) .....................................................................29, 30

*Anderson v. Cagle's, Inc.,*
488 F.3d 945 (11th Cir. 2007) .........................................................................46

*Anderson v. Mt. Clemens Pottery Co.,*
328 U.S. 680 (1946)........................................................................................45

*Anderson v. Pilgrim's Pride Corp.,*
147 F. Supp.2d 556 (E.D. Tex. 2001).............................................................42

*Ayers v. SGS Control Servs.,*
2007 WL 646326 (S.D.N.Y. Feb. 27, 2007)...................................................33

*Babineau v. Federal Express Corp.,*
576 F.3d 1183 (11th Cir. 2009) ......................................................................46

*Ballaris v. Wacker Siltronic Corp.,*
370 F.3d 901 (9th Cir. 2004) ..........................................................................29

*Bouaphakeo v. Tyson Foods, Inc.,*
564 F. Supp.2d 870 (N.D. Iowa 2008)......................................................27, 33

*Bradford v. Bed Bath & Beyond,*
184 F. Supp.2d 1342 (N.D. Ga. 2002) ...........................................................34

*Brennan v. Qwest Communications, Int'l, Inc.,*
2009 WL 1586721 (D. Minn. June 4, 2009)...................................................27

*Brooks v. Bellsouth Telecommunications, Inc.,*
164 F.R.D. 561 (1995)................................................................................2, 32

*Bunnion v. Consolidated Rail Corp.,*
1998 U.S. Dist. LEXIS 7727 (E.D. Pa. May 14, 1998) .............................34, 35

*Bunnion v. Consolidated Rail Corp.,*
1998 WL 372644 (E.D. Pa. May 14, 1998) ......................................................2

*Chabrier v. Wilmington Financial, Inc.*
  2008 U.S. Dist. LEXIS 27761 (Apr. 4, 2008) .............................................................. *passim*

*De Asencio v. Tyson Foods, Inc.,*
  500 F.3d 361 (3d Cir. 2007)........................................................................................29

*In re Delta Air Lines,*
  310 F.3d 953 (6th Cir. 2002) ......................................................................................45

*Donovan v. Bel-Loc Diner, Inc.,*
  780 F.2d 1113 (4th Cir. 1985) ....................................................................................45

*Donovan v. Brandel,*
  736 F.2d 1114 (6th Cir. 1984) ....................................................................................43

*Dunlop v. Carriage Carpet Co.,*
  548 F.2d 139 (6th Cir. 1977) ........................................................................................2

*Evans v. Lowe's Home Centers, Inc.,*
  2006 WL 1371073 (M.D. Pa. May 18, 2006) ...........................................................36

*Fast v. Applebee's Intern., Inc.,*
  2009 WL 2391921 (W.D. Mo. Aug. 3, 2009)............................................................40

*Fegley v. Higgins,*
  19 F.3d 1126 (6th Cir. 1994) ......................................................................................30

*Fox v. Tyson Foods, Inc.,*
  2006 WL 6012784 (N.D. Ala. Nov. 15, 2006) ..........................................................47

*Frank v. Gold'n Plump Poultry, Inc.,*
  2007 WL 2780504 (D. Minn. Sept. 24, 2007) .....................................................34, 42

*Garcia v. Tyson Foods, Inc.,*
  255 F.R.D. 678 (D. Kan. 2009)...................................................................................27

*Garcia v. Tyson Foods, Inc.,*
  474 F. Supp.2d 1240 (D. Kan. 2007) ..........................................................................29

*Hayes v. Laroy Thomas, Inc.,*
  2007 WL 1174313 (E.D. Tex. Apr. 19, 2007) ...........................................................33

*Hipp v. Liberty Nat. Life Ins. Co.,*
  252 F.3d 1208 (11th Cir. 2001) ..................................................................................31

*Hoffmann-La Roche, Inc. v. Sperling,*
  493 U.S. 165 (1989)........................................................................................30, 43, 44

v

*IBP v. Alvarez,*
    546 U.S. 21 (2005)...................................................................................1, 29, 30, 42

*Johnson v. Koch Foods, Inc.,*
    2009 WL 3088559 (E.D. Tenn. Sept. 25, 2009) ............................................. *passim*

*Jordan v. IBP, Inc.,*
    542 F. Supp.2d 790 (M.D. Tenn. 2008)...................................................................40

*Kasten v. St. Gobain Performance Plastics Corp.,*
    556 F. Supp.2d 941 (W.D. Wis. 2008) ...................................................................42

*Kelley v. Alamo,*
    964 F.2d 747 (8th Cir. 1992) ...................................................................................30

*Lemmon v. City of San Leandro,*
    538 F. Supp.2d 1200 (N.D. Cal. 2007) ...................................................................29

*Lockhart v. Westinghouse Credit Corp.,*
    879 F.2d 43 (3d Cir. 1989)................................................................................34, 36

*Lusardi v. Xerox Corp.,*
    118 F.R.D. 351 (D.N.J. 1987)..................................................................................31

*Mayan v. Rydbom Exp. Inc.*
    2009 WL 3152136 (E.D. Pa. Sept. 30, 2009) at *11 ..............................................36

*Mitchell v. King Packing Co.,*
    350 US 260 (1958).....................................................................................................29

*Montoya v. Rescue Industries, Inc.,*
    176 F.3d 489 (10th Cir. 1999) .................................................................................31

*Mooney v. Aramco Services Co.,*
    54 F.3d 1207 (5th Cir. 1995) ...............................................................................2, 31

*Morales v. Farmland Foods, Inc.,*
    2008 WL 2886278 (D. Neb. July 21, 2009) ...........................................................28

*Moss v. Crawford,*
    201 F.R.D. 398 (W.D. Pa. 2000) ........................................................2, 32, 35, 36

*Orvis v. Triple Ace Investments LLC,*
    2007 WL 1625763 (M.D. Fla. June 5, 2007)..........................................................34

*Perez v. Mountaire Farms, Inc.*
    Cite No. 08-00121 (AMD) (D. Md. Apr. 17, 2009) ...........................................28

*Posner v. Showroom, Inc.*,
   762 F.2d 1010 (6th Cir. 1985) ........................................................43

*Prickett v. DeKalb County*,
   349 F.3d 1294 (11th Cir. 2003) ......................................................44

*Rawls v. Augustine Home Health Care, Inc.*,
   2007 1952988 (D. Md. July 5, 2007)...............................................34

*Reich v. Gateway Press*,
   13 F.3d 685 (3d Cir. 1994)..............................................................45

*Reich v. IBP, Inc.*,
   38 F.3d 1123 (10th Cir. 1994) ........................................................29

*Robinson v. Empire Equity Group, Inc.*,
   2009 WL 4018560 (D. Md. Nov. 18, 2009) .....................................28

*Rodolico v. Unisys Corp.*,
   1999 F.R.D. 468 (E.D.N.Y. 2001)....................................................44

*Roman v. Korson*,
   152 F.R.D. 101 (W.D. Mich. Nov. 30, 1993) ..................................45

*Ruehl v. Viacom, Inc.*,
   500 F.3d 375 (3d Cir. 2007)........................................................34, 36

*Starceski v. Westinghouse Elec. Corp.*,
   54 F.3d 1089 (3d Cir. 1995).............................................................34

*Steiner v. Mitchell*,
   350 U.S. 247 (1956).........................................................................29

*Tennessee Coal, Iron & R.R. Cov. Materials Local No. 123*,
   321 US 590 (1944)............................................................................29

*Thiessen v. General Elec. Capitol Corp.*,
   267 F.3d 1095 (10th Cir. 2001) ...................................................31, 32

*Tumminello v. United States*,
   14 Cl. Ct. 693 (1988) .......................................................................31

*Turner v. Aldo U.S., Inc.*,
   2009 WL 2436583 (M.D. Fla. Aug. 6, 2009) ..................................33

*Valladon v. City of Oakland*,
   2009 WL 2591346 (N. D. Cal. Aug. 21, 2009) ................................33

*Vaszlavik v. Storage Tech Corp.*,
   175 F.R.D. 672 (D. Colo. 1997) ...........................................................................43

*Wilks v. Pepboys*,
   2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006)....................................................33

### STATUTES AND RULES

29 C.F.R. § 790.6(b) ....................................................................................................28

29 U.S.C. § 216(b) ............................................................................................ *passim*

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ............................................... *passim*

Fed. R. Civ. P. Rule 23(b)(3).......................................................................................44

### OTHER AUTHORITIES

7B Wright, Miller & Kane, § 1807 ...............................................................................32

I.      **INTRODUCTION**

Plaintiffs respectfully submit this Memorandum of Law in opposition to Defendant's Motion to Decertify the Collective Action Class.   Plaintiffs rely upon and incorporate the attached declarations, pleadings, discovery responses, documentary evidence, and excerpts from depositions in this case which are presented in the accompanying Index of Exhibits ("Index").[1]

The Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA") provides that employees must be paid for all hours worked.   In *IBP v. Alvarez*, 546 U.S. 21 (2005), the Supreme Court found that time employees spend performing pre-shift preparatory activities and post-shift concluding activities is compensable as hours worked.   At its Fredericksburg, Pennsylvania poultry processing plant, Defendant Farmers Pride, Inc.[2] follows a plant-wide policy that does not pay hourly production employees for all of the time they spend on pre- and post-shift work activities and unpaid meal periods.   Because Farmers Pride's pay policies are uniform and affect each class member similarly, Defendant's Motion must be denied.

Plaintiffs, those named and those that have "opted-in" to this lawsuit pursuant to 29 U.S.C. § 216(b),[3] are three hundred and twenty six current and former hourly production line workers who worked in Defendant's chicken plant.   Given the uniform nature of Plaintiffs'

---

[1] Included in the Index are excerpts from various depositions of the Plaintiffs and from Defendant's current and former executives, managers and employees.  Depositions are cited as "[last name of the deponent] Tr." followed by the referenced page number.  Exhibits in the Index are referred to as "Ex."  A listing of all deposition excerpts is contained in the Index.  The Index also contains documentary evidence produced in discovery by Defendant and Declarations from Class Members.  In addition, in order to assist the Court in reviewing the large volume of evidence submitted in support of this Motion, Ex. 1, the Brayton Opposition Declaration, aggregates all of the Class Member Declarations submitted with this Motion.

[2] Farmers Pride, Inc. is referred to herein as "Defendant,"  "Farmers Pride" or the "Company."

[3] Section 216(b) of the FLSA provides that: "An action to recover the liability prescribed … may be maintained against any employer … in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves ***and any other employees similarly situated.***" (Emphasis added).

claims, this Court approved the first stage certification of this case as a collective action on behalf of the following class (the "Class"):

> All current and former employees of Farmer's Pride, Inc., who worked as hourly production and support workers at Farmer's Pride, Inc's. Fredericksburg, Pennsylvania poultry processing facility at any time between February 23, 2004 and the present, who have not had their Fair Labor Standards Act ("FLSA") claim previously adjudicated by a court of law.

March 31, 2008 Agreed Order Concerning Notice.[4]

Following the opt-in period, the parties conducted discovery.  Defendant now asserts that the Plaintiffs – who worked in a single facility, were subject to the same policies at issue and who assert the same claims – are not "similarly situated" under the FLSA and that the opt-in class should be decertified.  Defendant is wrong.[5]  This case is ideally suited to be tried on a collective action basis because Plaintiffs were subject to common pay policies.  Further, any defenses that Defendant may assert are themselves common to the Class as a whole.  Thus, Defendant's Motion to Decertify the Class must be denied.

## II.   <u>SUMMARY OF THE ARGUMENT</u>

The FLSA "must not be interpreted or applied in a narrow, grudging manner." *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 144 (6th Cir. 1977).  Federal courts routinely hold that plaintiffs pursuing an FLSA action need not be identical in order to have their claims litigated collectively.  *See, e.g., Moss v. Crawford,* 201 F.R.D. 398, 409 (W.D. Pa. 2000).[6]  As discussed fully below, the law only requires that Plaintiffs are "similarly situated" in order to maintain certification of a collective action under the FLSA.  *See id.* at 409.

---

[4] *See* March 8, 2008 Order (Dkt. No. 62).

[5] Discovery has shown, however, that sanitation employees rarely work overtime.  According to Defendant, there are only nine opt-in Plaintiffs who worked solely in the Sanitation Department.  Because they rarely worked overtime, Plaintiffs agree that they should not be included in the Class.  This is reflected in Plaintiffs' Proposed Order.

[6] *See also Brooks v. Bellsouth Telecommunications, Inc.,* 164 F.R.D. 561, 567 (1995); *Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1212 (5th Cir. 1995); *Bunnion v. Consolidated Rail Corp.,* 1998 WL 372644, at *17 (E.D. Pa. May 14, 1998).

Here, the Class is similarly situated because "[Farmers Prides'] common policy or practice of paying plaintiffs **by production line time**[7] is the factor that binds them together." *Johnson v. Koch Foods, Inc.*, 2009 WL 3088559, at *4 (E.D. Tenn. Sept. 25, 2009) (denying a nearly identical decertification motion involving similar policies at another poultry processing plant).

Farmers Pride used two different uniform time keeping policies during the Class period. During the first part, from February 23, 2004 to December 2007, Class members were paid solely on the basis of modified "gang-time."   Under Defendant's version of the gang-time system, Plaintiffs were not paid for the time that they spent performing work activities before they arrived on their line.  Because all Class members were paid pursuant to the same gang-time policy, the legality of the policy and any damages stemming from it are subject to common questions and common proofs.

For example, in proving that tasks were performed off the clock during this time period, Plaintiffs will proffer testimony that:

1) All Class members received, donned, walked to collect and sanitized their required and/or permitted personal protective equipment ("PPE") and clothing at the start of their shift before the line starts.

2) All Class members sanitized themselves before the line started at the beginning of their shift and after eating lunch.

3) All Class members sanitized themselves after the line stopped at the end of their shifts, and before eating lunch.

4) All Class members doffed, discarded and stored their PPE and clothing after the line stopped in Company-assigned lockers.

5) All Class members waited in line to receive required tools and supplies for their activity on the production line before the line started.

---

[7] "Production line time" or "gang-time" is a policy by which employees are only paid for the time they spend on the production line, regardless of the activities that they are made to perform elsewhere in the plant.

     6)   Farmers Pride automatically deducted 30 minutes from each Class members' day for their lunch period regardless of how much compensable work was performed during the lunch period.

Farmers Pride will attempt to defend against Plaintiffs' claim by proffering evidence that it had a policy of paying each department a uniform number of extra minutes to account for time spent working when Plaintiffs were not on the production line.  In proving that this time was insufficient to reimburse Plaintiffs for their off the clock work (if it occurred at all), Plaintiffs will proffer:

     1)   Expert testimony that the study that Defendant used to estimate the amount of off the clock time underestimated such time.

     2)   Representative testimony of Class members regarding the amount of time that it actually took to perform their off the clock duties.

     3)   Representative testimony of Class members that Defendant in fact uniformly did not pay the extra minutes it set forth on its posted schedule.

During the second part of the Class Period from December 2007 to the present, Defendant moved from its gang-time system to a "punch to punch" system.  Under this system, Class members punch into a time clock prior to their shift and punch out at the end of their shift. In proving that the punch to punch system fails to pay Class members for all time worked, Plaintiffs will proffer testimony that they routinely perform work prior to their first punch of the day.  They obtain work gear from their lockers and the company supply room; they don PPE at these locations; they walk to their departments and wait at the departmental time clocks for the ability to punch in – all prior to their first punch of the day.

Plaintiffs also continue to perform work during their unpaid meal periods.  During their meal period, they walk to PPE storage locations, doff their PPE and hang it up at the start of their meal period.  At the end of the meal period, they go to the PPE storage stations, don their PPE

and walk to their work stations – all during their unpaid meal period. Likewise, Plaintiffs continue routinely to perform work after their last punch of the day, doffing any remaining, non-disposable PPE and stowing their PPE in their lockers.

## III. PROCEDURAL HISTORY

Plaintiffs Luz Lugo and Yesenia Marco filed this lawsuit on February 23, 2007, on behalf of themselves and similarly situated current and former employees seeking unpaid overtime compensation pursuant to Section 216(b) of the FLSA. (Dkt. No. 1). On July 20, 2007, Defendant filed a Motion to Dismiss, which this Court denied on October 15, 2008. (Dkt. No. 54). On January 23, 2008, thirty-eight Plaintiffs filed an Amended Representative Action Complaint. (Dkt. No. 55). On March 7, 2008, this Court granted Plaintiffs' Motion for Conditional Class Certification, ruling that "[f]rom the affidavits and filings, Plaintiffs have met their burden and the Court shall grant Plaintiff's Motion for conditional certification." (Dkt. No. 62). Each of the Plaintiffs who have opted in *gave their written consent* to have this case tried representatively on their behalf by the named Plaintiffs.

The parties conducted discovery, including written discovery responses, document productions and depositions. On October 15, 2009, Defendant filed this Motion asking the Court to decertify the conditionally-certified Class. (Dkt. No. 432). For the reasons set forth herein, the Court should deny the Motion.

## IV. STATEMENT OF THE ISSUES

The only issue before the Court is whether to permit Plaintiffs to try their case on a representative basis (using the various procedural tools available to the Court for that purpose), or whether to require each opt-in Plaintiff to file their own individual complaint (or group of

multiple plaintiff complaints) and try their FLSA claims with this Court separately.[8]  In making

that determination, the Court must decide whether to reverse its previous decision on March 7,

2008 that the opt-in Plaintiffs are "similarly-situated" for purposes of the FLSA.   Relying on

direct precedent of the U.S. Supreme Court and the Third Circuit, as well as the decisions of

numerous federal district courts around the country who have faced the same issues presented

here (including in donning and doffing actions), Plaintiffs respectfully request that the Court

continue to authorize the use of Section 216(b) to try this case as a collective action using

representative testimony under the FLSA.

## V.      STATEMENT OF THE FACTS

Class members are current and former hourly production employees who worked at a

single Pennsylvania poultry processing plant located in Fredericksburg, Pennsylvania.   Answer

(Dkt. 60) at ¶ 2.   Class members are and were responsible for killing, cleaning, cutting-up,

deboning and packaging chickens at the plant.[9]   Although each of these tasks is and was

accomplished by a separate department, all departments worked together along an integrated

production line.   *See* Def. Rog. at 2 (Ex. 3).   When one department finished processing a

chicken, that same chicken would move down the line to the next department so that all workers

on the same shift processed the same set of chickens.   *Id.*   Within each department, ***employees***

---

[8] The statute of limitations was tolled for every opt-in Plaintiff when they filed their consent form.  If this Motion is granted, it is expected that each opt-in Plaintiff would re-file their individual claim with this Court.  One of the major reasons for the collective action device is the judicial economy it affords for all litigants in FLSA litigation.  Denying this Motion will avoid the necessity of scheduling potentially hundreds of trials, all involving the same issues.

[9] The chickens are processed using an assembly line.  The line starts in the Live Receiving Department where live birds are killed and then hung on a single line.  *See* James Tobias, Sr. Declaration dated October 9, 2009 ("Tobias Decl.") at ¶ 5 (Ex. 65); Defendant Farmers Pride, Inc.'s Objections and Responses to Plaintiffs' First Set of Requests for Admission No. 14 ("Def. RFA") (Ex. 2).  The birds then travel to the Evisceration Department where they are cleaned and inspected.  *Id.* No. 15.  From there, the birds are hung on various lines as they are butchered and packed.  These lines run through the Deboning, Cut-up and Packing departments.  *Id.*  Defendant Farmers Pride, Inc.'s Objections and Responses to Plaintiffs' First Set of Interrogatories ("Def. Rog.") No. 2 (Ex. 3).

*rotated between positions, workstations and tasks*.  *See* Gundrum Tr. at 55-56 (Ex. 17).[10]

Typically, there were two production shifts each day,[11] and during most of the Class period full-time hourly production employees generally worked a five-day week.  *Id.* at 130.

### A.   From February 23, 2004 To December 2007, All Class Members Were Paid Pursuant To A Common Policy Or Practice – Defendant's Gang-Time System

Between February 23, 2004 and December 2007, all Class members were paid according to Defendant's gang-time system.  *See* Gruber Tr. at 46-55 (Ex. 16).[12]  Defendant asserts that it posted a schedule which included a start and end time for each department on each of the two shifts.  *See* Ythier Tr. at 142-43 (Ex. 39); Illuminada Ythier Declaration dated October 13, 2009 ("Ythier Decl.") at ¶ 5 (Ex. 66); Tobias Decl. at ¶ 6 (Ex. 65).  Defendant admits that it did not pay Class members on a punch to punch basis.  Rather, Class members were paid by Defendant from a set department start time until a set department end time *regardless of how long they actually worked*, less one-half hour of unpaid meal time.   Merrell Tr. at 245 (Ex. 25).[13] Although Defendant required Class members to punch in when they arrived at the plant and punch out when they left the plant, they were not paid according to these times.  *Id.* at 248 (Ex. 25).[14]  As Defendant's Human Resource Manager, Illuminada Ythier, testifying on behalf of Defendant, explained:

---

[10] *See also* Caba Tr. at 73 (Ex. 5); Castillo Tr. at 58 (Ex. 6); Vargas Gomez Tr. at 93 (Ex. 15); Hernandez Tr. at 42-43 (Ex. 18); Ranck Tr. at 173 (Ex. 27); Ythier Rule 30(b)(6) Tr. at 46 (Ex. 38).

[11] The first and third shifts were production shifts; the second shift between them was a maintenance shift. Gundrum Tr. at 10-11 (Ex. 17).

[12] Eby Tr. at 119-121 (Ex. 10); Seabold Tr. at 18, 58-59 (Ex. 31); Ythier Tr. at 13-14, 83, 142-43 (Ex. 38); Ythier Decl. at ¶ 5 (Ex. 66).

[13] *See* Eby Tr. at 119-121 (Ex.10); Seabold Tr. at 18, 58-59 (Ex. 31); Vargas Gomez Tr. 132 (Ex. 15); Ythier Tr. 13-14, 83 (Ex. 38).

[14]      Q:...But the pay ended at the end of the shift, right?
         A: Yes.
         Q...The pay didn't go to the punch, right?
         A: No.
Merrell Tr. 248 (Ex. 25).

> Q: Prior to the institution of the new system [after December 2007], if I had a start time of 7:00, would I start getting paid at 7:00, regardless of what time I punched in prior to that?
> A: Yes.
> ….
> Q: Under the old system, when would the employee stop getting paid?
> …
> A: To the best of my knowledge and understanding, is if the line stopped at 3:00 and I punched out at 3:30, I was only going to get paid to 3:00.

Ythier 30(b)(6) Tr. at 52-53 (Ex. 38); *see also* Ythier Tr. at 15-17, 83, 91 (Ex. 39).   Thus, according to Defendant, ***all Class members were paid uniformly according to the line stop and start times***.  Ythier 30(b)(6) Tr. at 51-53 (Ex. 38).

Additionally, Defendant had a common policy of deducting thirty minutes from every Class Members' daily total hours worked for an unpaid meal period regardless of whether Class members worked during all or part of the meal period. Tobias Tr. at 122-123 (Ex. 35); Boyer Tr. at 77 (Ex. 4); Seabold Tr. at 46 (Ex. 31); *see also* Employee Handbook at D-00007 (Ex. 43).  It is undisputed that the thirty-minute meal period deduction applied uniformly to all Class members regardless of department or shift.  *See* Tobias Tr. at 122-123 (Ex. 35).

### B.    Defendant Required Class Members To Wear And Use PPE And Related Clothing And Equipment That Was Integral And Indispensable To Their Work

Defendant required Class members to wear and use PPE and related clothing and equipment that was essential to the work that they performed.  *See* Def. RFA Nos. 30-33 (Ex.  2); *see also,* Tobias Decl. at ¶¶ 13-14 (Ex. 65); D30778-801 (Ex. 48); D011651-659 (Ex. 49).[15]  For instance, the temperature in the deboning room where many Plaintiffs worked averaged 55

---

[15] *See also* Merrell Tr. at 126-127 (Ex. 25) (reviewing document noting Defendant required clean PPE to ensure that processing was "sanitary" and to "prevent direct and cross-contamination"); D027427 (Ex. 47); Merrell Tr. at 113-114 (Ex. 25) (smock required "to ensure a sanitary outer garment" . . . "we're required to maintain a sanitary outer garment as part of our food safety program.").

degrees and required gloves to ensure efficient processing. *See* Gundrum Tr. at 99 (Ex. 17); Merrill Tr. at 219-220 (Ex. 25).

The use of earplugs, mesh gloves, rubber gloves, cotton gloves, hairnets, arm guards, plastic sleeves, rubber boots, safety glasses, plastic aprons, and smocks was required by sanitation and safety concerns and was standard in the poultry industry. *See* Def. RFA Nos. 30-34 (Ex. 2).[16]   The nature of poultry processing work required that Class members wear these similar PPE items.[17]   One of the purposes of the PPE was "to promote food safety" in addition to protecting the employee from injury. Def. RFA No. 34.[18]   Certain items of PPE were mandated by federal regulations.  Def. RFA No. 37 (Ex. 2).

### C.   All Class Members Were Subject To The Same Terms And Conditions Of Employment And Defendant's Policies Concerning Timekeeping And PPE

### 1.   Defendant Set Forth Its Mandatory Policies In Its Employee Handbook

Defendant maintained an Employee Handbook throughout the entire Class Period which set forth its mandatory policies which applied to all hourly production workers.  *See* Def. RFA Resp. 6 (Ex. 2).[19]   The Employee Handbook set policies regarding wages and hours of work (including detailed policies regarding straight time, overtime, lunch time and break time) as well

---

[16] *See also* Marco Vol. II Tr. at 85 (Ex. 22) (plastic gloves worn to keep "the meat from getting contaminated); Polanco Tr. at 132:9 (Ex. 26) (stating his hands would freeze without cotton gloves); Maldonado Tr. at 111-112, 122-123, 202-221 (Ex. 19); Caba Tr. at 83-84 (Ex. 5) (told to wear steel gloves, arm guard, earplugs, helmet, apron, plastic gloves, cotton gloves, apron); Gundrum Tr. at 54-55 (Ex. 17) (all knife-wielding deboning employees wore same PPE); Marco Vol. I Tr. at 10 (Ex. 21) (deboning line wore cotton gloves, nylon protection gloves, rubber gloves, coat, plastic sleeve, arm protector, apron, hairnet, boots, ear protection); *id.* at 16-19 (all deboning wore plastic sleeves, coats, and apron).

[17] *See* Marco Vol. II Tr. at 83-84 (Ex.22) (wore apron to "avoid the meat from having contact with the person's clothes"); Hernandez Tr. at 121 (Ex. 18) ("the only difference [in the PPE worn at his different positions] was the safety glove and the arm guard.").

[18] *See also* Custodio Tr. at 135 (Ex. 9).

[19] Different versions of its Employee Handbook were produced by Defendant and bear Bates Nos. D00001-25 revised February 2005 (Ex. 43); D030614-657 revised May 2008 (Ex. 44); D011103-138 revised December 2004 (Ex. 42); D011499-534 revised November 2003 (Ex. 40) and D011211-247 revised September 2004 (Ex. 41).

as safety, attendance and disciplinary policies.  The disciplinary policies included sanctions for refusing to wear PPE or appropriate clothing.  *See* Def. RFA Resp 4 (Ex. 2); Employee Handbook at D00021; *see, e.g.*, Employee Warning Report, D08822 (Ex. 68); Probationary Employee Progress Report, D050141 (Ex. 69) (evaluating whether probationary employee wears all PPE).[20]  At the start of employment, all hourly employees were given a copy of the Employee Handbook in English and Spanish (if this was their primary language).  *See* Def. RFA Resp. 6; Def. RFA Resp. 7.[21]  The Employee Handbook provided, in pertinent part:

### *Timekeeping policies*.

- *Each hourly employee* is provided a clock number/time card/badge and must punch in when he/she reports for work and punch out when leaving."  D00007 (Ex. 43); D030627 (Ex. 44); D011111 (Ex. 42); D011508 (Ex. 40).

- *All hourly production workers' time* will be computed in quarter (1/4) hour increments.  D011219 (Ex. 41); D011508 (Ex. 40).

- If *hourly employees* punched out eight minutes or more after a quarter hour, Defendant's policy was to round the time up to the next quarter hour.  Likewise, time punched seven minutes or less after a quarter hour would be rounded to the earlier quarter hour.  *See id.* D00007 (Ex. 43),[22] D011508 (Ex. 40), D011219 (Ex. 41), D011111 (Ex. 43).

### *Lunch Policy*.

- "*All employees* will be given thirty (30) minutes (unpaid) for lunch." D00008 (Ex. 43), D011508 (Ex. 40), D011220 (Ex. 41), D011112 (Ex. 42), D030628 (Ex.44).

---

[20] The Employee Handbook was developed, modified and overseen by a single person:  Illuminada Ythier, Human Resources Manager.  Def. Ans. Rog. 8 (Ex. 3).  The Employee Handbook was also reviewed by counsel.  *Id.*  At all relevant times, Defendant maintained a centralized Human Resources and Payroll Department that performed these functions for all Class members.  *Id.*

[21] Castillo Tr. at 67; 78 (Ex.7); Hernandez Tr. at 54 (Ex. 18); Marco Tr. Vol. I at 45-46 (Ex. 21); Blanca Maya Tr. at 73-74 (Ex. 23); Polanco Tr. at 76-78 (Ex. 26); Torres Tr. at 75-76; 80-81 (Ex. 36); Vicente Tr. at 99 (Ex. 37).

[22] Defendant's 2005 Employee Handbook fraudulently implied that employees would be paid based on the times that they punched in and out of the plant.  *See* Ex. 43 (the timekeeping system is used to ensure "compliance with Federal Wage and Hour Law"; violation of this "rule will subject you to disciplinary action up to and including immediate discharge.  You are responsible for the accuracy of time reported on your timesheet.").  Obviously, as demonstrated herein, this was completely untrue.

- "The company will deduct one-half (1/2) hour for lunch break, unless otherwise noted". This policy applied to **all hourly employees**. D00007 (Ex. 43), D011508 (Ex. 40), D011219 (Ex. 41), D011111 (Ex. 42), D030627 (Ex. 44).

### *Straight Time and Overtime.*

- "**All full-time hourly paid employees** … will receive overtime pay for all hours worked in excess of forty (40) hours on a weekly basis, under a normal five-day workweek. Overtime pay will be paid at one and one-half (1 1/2) times the employee's rate on the date the overtime was worked." *Id.* D011507 (Ex. 40), D011219 (Ex. 41), D011111 (Ex. 42), D030627 (Ex. 44).

### *Provision of Lockers*.

- "The Company will assign **employees** a locker…. Since the lockers are company property, the company reserves the right, upon notice to you, to enter any locker." D00015 (Ex. 43), D011520 (Ex. 40), D011232 (Ex. 41), D011123 (Ex 42); *see also* D030643 (Ex. 44).[23]

### *Dress Policy*.

- "It is the policy of the Company that **anyone working in the plant** and coming into contact with product must have good personal hygiene. For your safety, you will be expected to wear the following equipment in some of our work areas: hearing protection, hairnets, rubber gloves, mesh gloves, liners, rubber aprons, smocks, boots." *Id.* at D-00021 (Ex. 43), D011526 (Ex. 40), D011240 (Ex. 41), D011131 (Ex. 42); *see also* D030650 (Ex. 44).

- "Employees will receive a clean smock daily. One hairnet/beardnet will be issued to you at the beginning of the week. If an employee loses his/her hairnet he/she must purchase one. Rubber gloves may be exchanged in the supply room when needed. Liners will be exchanged at the beginning of the week only. Your supervisor when required will issue mesh gloves to you. Rubber boots are available for purchase unless you have a suitable pair." *See* D0011527 (Ex. 40); D011240 (Ex. 41); D011131 (Ex. 42); D00021 (Ex. 43); *see also* D030650 (Ex. 44) (noting existence of procedures but not providing information as to how more information can be obtained).

Significantly, although the Employee Handbook claimed that Defendant established a common policy with regard to payment for "donning and doffing" time, it did not explain how the policy worked, instead merely instructing employees to "see the bulletin board." *Id.*

---

[23] *See also* Custodio Tr. at 162 (Ex. 9); Gundrum Tr. at 165 (Ex. 17); Marco Vol. II. Tr. at 118 (Ex. 22).

Although Defendant attempts to manufacture differences between its hourly employees for the purpose of this Motion, its Handbook conclusively demonstrates that, in reality, it treated them the same.

**2.      Defendant Required All Of Its Hourly Production Workers To Participate In A Common Training And Orientation Program**

Defendant required all new hourly employees to undergo a uniform in-person training and orientation session with Defendant's Human Resources Department. Ythier Tr. at 161-162 (Ex. 39).  During this training, Defendant explained its rules to each new hourly employee, and showed them a standard set of DVD training films.  *Id.* at 190-191, 161-62.[24]  Defendant also discussed the topic of PPE and what equipment employees were required to wear.  Def. Ans. Rog.  7 (Ex. 3).[25]  Class members were instructed concerning how to use Defendant's time clocks, on standard safety training, and were "told what items of sanitary and protective clothing and equipment are required to be worn in various departments in the Fredericksburg Facility." Def. RFA 7-11 (Ex. 2).[26]

**D.      Defendant Required All Class Members To Perform Unpaid Work At The Beginning And End Of Their Shifts And During Meal Breaks**

**1.      Defendant Has Always Required Class Members To Punch In And Out At The Beginning And End Of Their Shifts, But Until December 2007 Paid On A Gang-Time Basis Without Regard To Actual Punch Times**

Defendant has always required all of its hourly production employees to punch in and out on time clocks, which, until late 2007, were located at the entrance of the plant.  *See* Def. RFA

---

[24] *See also* Caba Tr. at 78, 82 (Ex. 5); Castillo Tr. at 63-64; 78:10-12 (Ex. 7); Garcia Tr. at 58-59 (Ex. 11); Hernandez Tr. at 49-50 (Ex. 18); Blanco Maya Tr. at 70-71 (Ex. 23); Torres Tr. at 69-70 (Ex. 36).

[25] *See also* Vargas Gomez Tr. at 99-105 (Ex. 15); Hernandez Tr. at 65- 66 (Ex. 18); Maldonado Tr. at 111-113 (Ex  20); Blanco Maya Tr. at 80-82, 116-117, 120-121 (Ex. 23); Polanco Tr. at 73-75, 86-87 (Ex. 26); Torres Tr. at 70-72 (Ex. 36); Vicente Tr. at 90-91  (Ex. 37).

[26] *See also*  Garcia Tr. at 87-89 (Ex. 11); Vargas Gomez Tr. at 122-125 (Ex. 15).

Nos. 69-70 (Ex. 2);[27] Brayton Decl. at 9 (Ex. 1).  However, until December 2007, the time clocks

served no other purpose than to monitor attendance because Defendant paid employees on a

gang-time system that ignored the actual times that employees began and ended their work.  Def.

RFA Nos. 59, 68, 70 (Ex. 2) ("[D]efendant admits that, from February 2004 to Fall 2007, most

hourly production employees were not paid according to their clock-in and clock-out times.").

> **2.     Class Members Were Not Paid For Time Spent Retrieving PPE From
> Their Lockers And The Supply Room, Sanitizing Themselves And
> Their PPE, Donning Their PPE, And Walking To Their Workstations
> At The Beginning of Their Shifts**
>
> **a.     All Class Members Performed Substantially The Same
> Beginning of Shift Tasks**

All Class members performed the same standard and necessary tasks at the beginning of

their production shifts.  According to Defendant's policies, all hourly production employees were

required to punch in on a time-clock when they arrived at the plant and were also required to

obtain and don their PPE and other related clothing and equipment before taking their place and

starting work on the production line.  Def. RFA Nos. 69, 72 (Ex.2).[28]  Defendant concedes that

employees performed certain common tasks.  *See* Def. Rog. 10 (Ex. 3).

Specifically, after clocking in by the front entrance (before the time clocks were moved),

Class members generally proceeded to the locker area which was often crowded at the start and

end of shifts.  *See, e.g.,* Hernandez Tr. at 142-143 (Ex. 18), *id.* at 194 ("[A]t the lockers, there's

so many people around you, the lockers are too close.").[29]  Class members put their personal

---

[27] Custodio Tr. at 147, 152-155 (Ex. 9); Gardner Tr. at 109-112 (Ex. 12); Merrell Tr. at 69 (Ex. 25);
Seabold Tr. at 28 (Ex. 31); Vicente Tr. at 169 (Ex. 37).

[28] *See also* Hernandez Tr. at 84-85 (Ex. 18) ("[T]hey call the department about five minute[s] before 9
o'clock, make sure you're ready when you come in.  Because, you know, when you get in the department,
you have to start working right away"); Camasta Tr. at 70 (Ex. 8); Garcia Tr. at 17-29 (Ex. 11); Vicente
Tr. at 169 (Ex. 37).

[29] Custodio Tr. at 50, 166 (Ex. 9); Torres Maldonado Tr. at 300-303 (Ex. 20); Marco Vol. II Tr. at 122
(Ex. 22); Brayton Decl. at ¶¶ 10, 21 (Ex. 1).

items away in their lockers and took out various items they wore while working that were stored in the lockers. *See* Def. RFA Resp. 75 (Ex. 2).[30]  These items included, without limitation: boots, hairnets, beard-nets, ear plugs, plastic gloves, plastic arm sleeves, plastic aprons, and cloth gloves. *See, e.g.,* Polanco Tr. at 159 (Ex. 26).[31]  Class members would then don this PPE. *See, e.g.,* Marco Vol. II Tr. at 119 (Ex. 22) (gloves, sleeves, arm guard, hair net, apron and steel).[32]

Defendant also required Class members to go to a supply window located in the facility outside the production floor where Defendant distributed other various items of PPE, supplies, and knife-related equipment each day (the "Supply Room"). *See, e.g.,* Camasta Tr. at 79 (Ex. 8).[33]  For example, Class members were required to pick up a fresh smock every day from the Supply Room. *See, e.g.,* Tobias Tr. at 62, 66, 72-73 (Ex. 35).[34]  In addition, if an hourly production employee needed to replace a particular piece of equipment, they would go to the Supply Room to pick up their new equipment before the start of their shift. *See, e.g.,* Gundrum Tr. at 150 (Ex. 4).[35]

At the beginning of each shift, long lines often formed at the Supply Room window. *See, e.g.,* Gundrum Tr. at 119 (Ex. 17); D041774 (Ex. 53).[36]  The lines were particularly long on

---

[30] Hernandez Tr. at 165-166 (Ex. 18);  Blanco Maya Tr. at 128-129, 137 (Ex. 35);  Polanco Tr. at 143, 162 (Ex. 28); Brayton Decl. at ¶ 10 (Ex. 1).

[31] Hernandez Tr. at 166 (Ex. 18); Torres Tr. at 135-136, 138-139 (Ex. 36); Y. Marco Vol. II Tr. at 118-119 (Ex. 22); Brayton Decl. at ¶ 10 (Ex. 1).

[32] Torres Tr. 154, 157-159 (Ex. 36); Vicente Tr. at 158, 191-92 (Ex. 37); Custodio Tr. at 125 (Ex. 9); Brayton Decl. at ¶ 10 (Ex. 1).

[33] Mehalko Tr. at 123 (Ex. 24) (stating that everyone regardless of department came to supply room for cotton gloves, rubber gloves, and rubber aprons); Gundrum Tr. at 114-116 (Ex. 17). Custodio Tr. at 126 (Ex. 9) (smock, apron, sleeves, plastic and cloth gloves); Garcia Tr. at 88, 289, 108 (Ex. 11); Gardner Tr. at 54-55, 99 (Ex. 12); Marco Vol. I Tr. at 23, 24 (Ex. 21); Marco Vol. II at 122 (Ex. 22).

[34] Torres Tr. at 126 (Ex. 36); Ythier Tr. at 111 (Ex. 39); Def. RFA Nos. 77-78 (Ex. 2); Custodio Tr. at 56-57 (Ex. 9); Brayton Decl. at ¶ 11 (Ex. 1).

[35] Torres Tr. at 133-134 (Ex. 36); Vicente Tr. at 178 (Ex. 37); Brayton Decl. at ¶ 11 (Ex. 1).

[36] *See also* Marco Vol. II Tr. at 110, 114 (half hour each day) (Ex. 22); Custodio Tr. at 51, 118-119 (Ex. 9); Garcia Tr. at 51, 106, 117-118 (Ex. 11); Torres Maldonado Tr. at 242-243 (Ex. 19); Blanco Maya Tr. at 127-129, 135, 138 (Ex. 23); Polanco Tr. at 142:18-25 (Ex. 26); Torres Tr. at 129:3-13 (Ex. 36); Vicente Tr. at 176-177 (Ex. 37); Brayton Decl. at ¶ 11 (Ex. 1).

Sunday night, the first shift of the week for third shift workers, and on Monday morning, which was the first shift of the week for first shift employees.  *See, e.g.,* Def. RFA No. 84 (Ex. 2); Marco Vol. II Tr. at 114 (Ex. 22) (longer line Sunday night).[37]   At those times, Class members obtained certain items of PPE that usually lasted them a week.   Gundrum Tr. at 131-134 (Ex. 17) (hairnet, apron, gloves, arm guard on Mondays).[38]   Class members would remove most of their PPE from their assigned lockers and exchange it for new equipment before the start of their shift on those days.  Brayton Decl. at ¶ 12 (Ex. 1).  Because of the long lines, Class members often arrived at work even earlier on these first days of the week.  *Id.*; Torres Maldonado Tr. at 243 (Ex. 19).

After donning their PPE and getting ready for work, Class members would  walk to the entrance of their departments where Defendant required them to stand in line to wait for the department to be released by U.S. Department of Agriculture inspectors.  *See, e.g.,* Marco Vol. I Tr. at 56-57 (Ex. 21) ("after we make the line to get our equipment we wait 15 minutes. . . before the start of the shift").[39]   During this time period, Class members' supervisors inspected them to make sure that Class members had their PPE on properly and that it was clean.  *See, e.g.,* Garcia Tr. at 149 (Ex. 11) ("[Your PPE] had to be clean.  [Supervisors] would actually stand right [by the department], check the gloves.  Sometimes the USDA would be standing there, too, making sure boots didn't have chicken on there and your apron and the gloves and the sleeves").[40]   Supervisors would complain if Class members' PPE was not properly clean.  *See,*

---

[37] *See also* Garcia Tr. at 117 (Ex. 11); Torres Maldonado Tr. at 243 (Ex. 19); Blanco Maya Tr. at 135 (Ex. 23);  Brayton Decl. at ¶ 12 (Ex. 1).
[38] *See also* Torres Tr. at 133-134; 178 (Ex. 36) Brayton Decl. at ¶ 12 (Ex. 1).
[39] *See also* Garcia Tr. at 109-112, 149  (Ex. 11) Brayton Decl. at ¶ 13 (Ex. 1).
[40] *See also* Cedeno-Gibson Tr. at 235 (Ex. 13); Marco Vol. I Tr. at 12 (Ex. 21); Ranck Tr. at 86-87 (Ex. 27) (stating quality control inspectors of several employees entering the department); *cf.* Hernandez Tr. at 203 (Ex. 18) (stating the USDA watched employees enter the department to make sure equipment was sanitized); Brayton Decl. at ¶ 13 (Ex. 1).

*e.g.,* Custodio Tr. at 59 (Ex. 9) ("[I]f we would enter with our dirty smock [the supervisor] would yell."); Brayton Decl. at ¶ 13 (Ex. 1).  Employees could be removed from the line and disciplined for not wearing PPE.  *See* Gundrum Tr. at 138 (Ex. 17); Blanco Maya Tr. at 152-153 (Ex. 23).

Defendant's policy required all of its hourly production employees, regardless of their department or shift, to be present at their workstations, dressed and ready to work before the chickens reached their workstations. *See*, *e.g.*, Camasta Tr. at 104 (Ex. 8); Gundrum Tr. at 150-51 (Ex. 17) ("after they had all that on . . . it was time for them to start.").[41]

**b.     All Class Members Performed Compensable Work During Their Unpaid 30 Minute Meal Period**

Pursuant to policy, Defendant automatically deducted 30 minutes from each hourly production employee's workday during each full shift.  *See, e.g.,* Boyer Tr. at 77 (Ex. 4); Gundrum Tr. at 189, 211 (Ex. 17); Seabold Tr. at 46 (Ex. 31); Ythier Tr. at 20, 54 (Ex. 39).  Defendant's policy did not vary by department or shift; Defendant treated all hourly production employees exactly the same in this regard.  D00007 (Employee Handbook) (Ex. 43).

Defendant's common policy also provided that employees did not punch in or punch out when they took their meal break.  *See* Def RFA No. 87 (Ex. 2); Boyer Tr. at 76-77 (Ex. 4); Tobias Tr. at 122 (Ex. 35).   Accordingly, Defendant has no evidence demonstrating that employees were actually completely relieved of all duty for 30 minutes during their unpaid meal breaks.  In fact, they were not.  Boyer Tr. at 77 (Ex. 4).

The 30 minute meal period began running as soon as the production line stopped. *See, e.g.,* Blanco Maya Tr. at 89-91, 155-157 (Ex. 23).[42]  Class members were required to be back at

---

[41]Gundrum Tr. at 164 (Ex. 17) "as long as they could be in deboning and have their stuff on, they can arrive 15 seconds before [shift start time.]; Hernandez Tr. at 84-85 (Ex. 18); Torres Maldonado Tr. at 75-76 (Ex. 20); Garcia Tr. at 41-42, 48-49 (Ex. 11); Marco Vol. I Tr. at 31, 57 (Ex. 21); Marco Vol. II Tr. at 229-30 (Ex. 22); Blanco Maya Tr. at 135-136 (Ex. 23); Brayton Decl. at ¶ 14 (Ex. 1).
[42] *See also* Vargas Gomez Tr. at 142 (Ex. 15); Marco Vol. II Tr. at 140-141 (line stopped for 30 minutes);

their workstations, fully dressed when the 30 minutes expired.  *See, e.g.,* Garcia Tr. at 34; 83-84

(Ex. 11); *see also* Brayton Decl. at ¶ 16 (Ex. 1).  The line stopped for no more than 30 minutes

each day.  *See, e.g.,* Torres Maldonado Tr. at 142-147 (Ex. 20); Brayton Decl. at ¶ 17 (Ex. 1).

Class members were not completely relieved of all duty for the full 30 minute meal break each

day.  *See, e.g.,* Custodio Tr. at 179-82, (Ex. 9).[43]

> ### c.      All Class Members Performed The Same Meal Period Procedures

Defendant admits that the same meal period procedure was standard and applied

uniformly to all Class members in all departments:

> Q: Was the [lunch] procedure the same in all the departments?
> A: Um-hmm. Correct. Yeah, it's the same.
> Q: What is that procedure?
> A: They stop at … depending on the department they stop … the time they stop,
>      they stop …
> Q: And, currently, people punch out for lunch?
> A: No

Tobias Tr. at 122  (Ex. 35); *see also* Merrell Tr. at 178 (Ex. 25).

Thus, under the standard meal period procedure, department supervisors or their

designees notified Class members when they could leave the production line to prepare for the

start of their meal period.  *See* Def. RFA No. 95 (Ex. 2).[44]  Class members were not permitted,

pursuant to Defendant's policy, to go to the lunchroom or restroom with their PPE on.  *See*

Camasta Tr. at 216-217 (Ex. 8).[45]  Class members were required to take off their PPE.  *See*

---

141, 144 (Ex. 22)  Brayton Decl. at ¶ 15 (Ex. 1).
[43] *See also* Garcia Tr. at 34 (Ex. 11); Vargas Gomez Tr. at 232 (Ex. 15); Hernandez Tr. at 24, 221-24 (Ex. 18); Blanco Maya Tr. at 89-90, 170 (Ex. 23); Polanco Tr. at 212 (Ex. 26); Brayton Decl. at ¶¶ 18-24 (Ex. 1).
[44] Eby Tr. at 157 (Ex. 10); Garcia  Tr. at 34, 150 (Ex. 11); Vargas Gomez Tr. at 209-210 (Ex. 15); Hernandez Tr. at 102  (Ex. 18); Torres Maldonado Tr. at 254 (Ex. 19); Marco Vol. II  Tr. at 144 (Ex. 22); Blanco Maya Tr. at 154 (Ex. 23); Polanco Tr. at 190 (Ex. 26); Vicente Tr. at 224-25 (Ex. 37).
[45] *See also*  Garcia Tr. at 173 (Ex. 11); Vargas Gomez Tr. at 99, 226 (Ex. 15); Brayton Decl. at ¶ 19 (Ex. 1).

Garcia Tr. at 150, 153-157 (Ex. 11); Gundrum Tr. at 215 (Ex. 17); Marco Vol. II Tr. at 240 (Ex. 22) ("We couldn't leave the equipment to be mixed with the meat.  You had to take it out of the line.").[46]  There was often a line at the wash station where employees had to wash their PPE. *See, e.g.,* Garcia Tr. at 150, 155-157 (Ex. 11).[47]  After washing their PPE, Class members had to find a hook or other location on which to hang it.  Garcia Tr. at 153-154 (Ex. 11).[48]  Class members also had to clean their boots.  Torres Maldonado Tr. at 255 (Ex. 19); Brayton Decl. at ¶ 23 (Ex. 1).[49]

Before the end of the 30 minute meal period, supervisors notified Class members that it was time to return to the production line.  *See, e.g.* Garcia Tr. at 170-172 (Ex. 11).[50]  Class members were then required to sterilize their hands, retrieve their PPE, don their PPE, and walk back to their workstations within the 30 minute meal period.  Garcia Tr. at 175 (Ex. 11).[51]  If Class members were late getting back to the line after lunch, they were reprimanded or disciplined by their supervisors. Garcia Tr. at 83-84 (Ex. 11);  Cedeno Gibson Tr. at 253 (Ex. 13); Vicente Tr. at 123-124 (Ex. 37); Brayton Decl. at ¶ 25 (Ex. 1).

---

[46] Torres Tr. at 167-168, 170 (Ex. 36), Merrell Tr. at 174 (Ex. 25) ("We required them to leave their gloves in the room if they chose to wear them.  We required them to leave their aprons in the room if they chose to wear them."), Ex. 1 (Brayton Opposition Decl. at ¶ 20); Vargas Gomez Tr. at 210-211 (Ex. 15); Hernandez Tr. at 101:17-21 (Ex. 18); Blanco Maya Tr. at 157-158, 160-164 (Ex. 23); Polanco Tr. at 191 (Ex. 26).

[47] Cedeno Gibson Tr. at 240-242 (Ex. 13); Hernandez Tr. at 24 (Ex. 18); Torres Maldonado Tr. at 255-257, 303, 306 (Ex. 20); Marco Vol. I Tr. at 36, 40 (Ex. 21); Marco Vol. II Tr. at 149, 151-52 (Ex. 22) (30-40 seconds to wash); Blanco Maya Tr. at 164-165 (Ex. 23); Polanco Tr. at 194 (Ex. 26); Brayton Decl. at ¶ 21(Ex. 1).

[48] Vargas Gomez Tr. at 210-211 (Ex. 15); Torres Maldonado Tr. at 258 (Ex. 20); Polanco Tr. at 202 (Ex. 25);  Brayton Decl. at ¶ 22 (Ex. 1).

[49] On occasions, quality control inspectors required Plaintiffs to re-wash their equipment.  Marco Vol. I Tr. at 39 (Ex. 21).

[50] Cedeno Gibson at 236-237 (Ex. 13); Vargas Gomez 233-234 (Ex. 15); Hernandez 104-111 (Ex. 18); Torres Maldonado 88-89, 305-306 (Ex. 20); Marco Vol. II at 158 (Ex. 22); Blanco Maya 89, 170 (Ex. 23); Polanco 214 (Ex. 26).

[51]*See also* Torres Maldonado 269-276, 305-306 (Ex. 20); Blanco Maya 171 (Ex. 23); Polanco 218 (Ex. 26); C. Torres 193-194 (Ex. 36); Brayton Decl. at ¶ 24 (Ex. 1).

### 3.    Defendant Did Not Pay Class Members For Time Spent Performing Post-Shift Donning And Doffing Activities

After Defendant shut its production line down for the day, Defendant required all Class members to perform significant additional work in connection with their donning and doffing activities for which they received no compensation. Specifically, Defendant required or permitted hourly employees to remove their PPE, wait in line to use hoses and sinks, clean themselves, their boots, their aprons and other PPE, and put dirty PPE into laundry bags or return it to their lockers. *See, e.g.,* Custodio Tr. at 202, 206 (Ex. 9); Marco Vol. II Tr. at 170-71; 224 (Ex. 22).

### a.    All Class Members Performed The Same End Of Shift Tasks

All Class members performed substantially the same procedures at shift end. *See, e.g.,* Marco Vol. II Tr. at 170 and 172 (Ex. 22) ("we all had to do the same things, go to the line, wait, wash and go to the locker."). Specifically, when the production line stopped, Class members would take off their mesh gloves, rubber gloves, smock, arm guards, plastic aprons and sleeves and walk to a washing station, and then wait in line for access to the hose and/or the sink, so they could wash their PPE. *See, e.g.,* Custodio Tr. at 202, 206 (Ex. 9).[52] Class members would wash their PPE more thoroughly and longer at the end of the day than during their meal period because they had to store their PPE in their lockers overnight and the PPE had to be sterile. *See, e.g.,* Gruber Tr. at 154-156 (Ex. 16).[53] After washing their PPE, Class members would exit their department's work area, walk to the locker room area so that they could change and store other

---

[52] *See also* Garcia Tr. at 179-181, 183-186 (Ex. 11); Gruber Tr. at 154-156 (Ex. 16); Hernandez Tr. at 238 (Ex. 18); Torres Maldonado Tr. at 280-283, 306 (Ex. 19); Marco Vol. II Tr. at 175 (Ex. 22) (all waited for sinks); Polanco Tr. at 220-226 (Ex. 26); C. Torres Tr. at 200-205, 210-218 (Ex. 36); Vicente Tr. at 258-259 (Ex. 37); Brayton Decl. at ¶ 26 (Ex. 1).

[53] Vargas Gomez Tr. at 249 (Ex. 15); Hernandez Tr. 238-239 (Ex. 18); Blanco Maya Tr. at 173-176 (Ex. 23); Polanco Tr. at 220 (Ex. 26); C. Torres Tr. at 205-206 (Ex. 36); Vincente Tr. at 304-305 (Ex. 37) Brayton  Decl. at ¶ 27 (Ex. 1).

PPE in their locker, including, without limitation: plastic aprons, plastic gloves, plastic sleeves, cloth gloves, hairnets, beardnets, earplugs, and boots. *See, e.g.,* Custodio Tr. at 163-164 (Ex. 9).[54]  The locker area was often crowded. *See* Merrell Tr. at 171-72 (Ex. 25) (Company was concerned about lines forming after shift end); Torres Maldonado Tr. at 300-303 (Ex. 20); Brayton Decl. at ¶ 28 (Ex. 1). Class members placed smocks in a laundry bag or hamper located near the laundry area. Camasta Tr. at 249 (Ex. 8); Gundrum Tr. at 116 (Ex. 17); Hernandez Tr. at 241 (Ex. 18); Marco Vol. II Tr. at 180 (Ex. 22); Brayton Decl. at ¶ 29 (Ex. 1). Class members would then clock out sometime after the line stopped for the day. Seabold Tr. at 65-66 (Ex. 31); Garcia Tr. at 188-189 (Ex. 11); Polanco Tr. at 227 (Ex. 26) Brayton Decl. at ¶ 30 (Ex. 1).

> **b.     All Class Members Were Generally Paid Until An Assigned Shift End Time That Did Not Take Into Account Donning And Doffing Activities**

According to Defendant's compensation policy, on most days, when the line stopped according to the schedule submitted to the central Payroll Department, employees simply were paid until their department's end time. Seabold Tr. at 72-73 (Ex. 31); Tobias Tr. at 261 (Ex. 35); Ythier Tr. at 86-87 (Ex. 39). On those days, all employees in a department would be paid the exact same amount for the day. *See* Vargas Gomez Tr. at 244 (Ex. 15) ("When I got out. It could be 5:30, it might be 5:45, 5:48 or 5:46, it didn't matter. At 5:30, that was the time. No matter what time, how long it took us to wash, no wash, but we had to take our equipment clean.").

If a department worked longer than its scheduled end time due to production needs, Defendant still followed a standard practice pursuant to which its supervisors would notify the Payroll Department when the line actually stopped. *See* Boyer Tr. at 100 (Ex. 4); Ythier Tr. at

---

[54] *See also* Garcia Tr. at 186-189 (Ex. 11); Hernandez Tr. at 240 (Ex. 18); Marco Vol. I Tr. at 21 (Ex. 21); Marco Vol. I Tr. at 41-42 (Ex. 21) (kept all PPE but smock in her locker); Blanco Maya Tr. at 179 (Ex. 23); Merrell Tr. at 224 (Ex. 25); Polanco Tr. at 227 (Ex. 26); Brayton Decl. at ¶ 28 (Ex. 1).

100 (Ex. 39).  Although Defendant stated that its policy was to pay hourly production employees until they punched out on days they deviated from the schedule -- Boyer Tr. at 58 (Ex. 4); Seabold Tr. at 72-73 (Ex. 31); Tobias Tr. at 261-62 (Ex. 35) -- in reality, Defendant usually still paid its employees substantially the same.  *See* Custodio Tr. at 205 (Ex. 9).  Specifically, in these instances, the evidence shows that Defendant used its "rounding policy" and its policy to manipulate Class members' out-punches,[55] to essentially retain the gang-time compensation system.  For example, on January 24, 2005, Plaintiff Porfina Alvino worked until 3:09 according to her initial out-punch.  *See* D00653-708 at 693 (Ex. 52).  However, her time records show that her supervisor altered her out-punch to 3:05.  *See id.*; *see also* Seabold Tr. at 82-84 (Ex. 31).  Thus, Defendant did not "round up" Ms. Cedeno compensation to the above quarter hour pursuant to its own policy, but rather, violated its own policy and rounded down so that she was only paid until 3:00.  During the week of January 24, 2005 this occurred three times -- docking Ms. Alvino's pay a total of 45 minutes that week.  *Id.* at 179-184; *see also* D01745-78 at 01747-8 (Ex. 53).  As a result, even when Class members were supposed to be paid until their out-punches when departments worked late, Class members' out punches were "rounded down" or altered so that they were not paid until their true punch-out times, thus retaining the gang-time nature of the compensation that failed to compensate Class members for their PPE-related time. *See* Seabold Tr. at 82-85 (Ex. 31).  As Plaintiff Castillo explained:

> Q: [Y]ou feel that you stopped getting paid when the last chicken started on the line.
> A: Yes.
> ...
> A: When the last chicken goes up, downstairs they call and they say, "It's over."
> When the last chicken comes to the table, the supervisor says, "It's over" at 1:15-1:30. And if you punch at 1:45, that time will not be counted for you.

---

[55]*See* Boyer Tr. at 132 (Ex. 4); Camasta Tr. at 316 (Ex. 8); Seabold Tr. at 41-42 (Ex. 31); Ythier Tr. at 18 (Ex. 39).

Castillo Tr. at 41-42 (Ex. 7).

      E.    **Defendant's Donning And Doffing Schedule Used During The
Class Period From February 23, 2004 To December 2007 Is A Sham**

Defendant claims that since 2001, it set aside a uniform, common number of minutes for hourly production workers by department to perform donning and doffing activities at the start and end of their shift and during their meal break. *See* Shift Schedules D011023 (Ex. 54), D011091 (Ex. 55), D011090 (Ex. 56), D00431 (Ex. 58), D00432 (Ex. 59), D011078 (Ex. 57). This is false and Class members vigorously dispute this defense. *See, e.g.,* Castillo Tr. at 215 (Ex. 7) ("The document says one thing, and in the practice is a different story.").[56] At depositions, none of Defendant's representatives could explain how the supposed schedule worked in reality, what activities were covered by the schedule, or even how the schedule applied to compensation. *See, e.g.,* Gundrum Tr. at 312-313 (Ex. 17); Schmalhofer Tr. at 309-10 (Ex. 29); Ythier Tr. at 18, 89 and 179 (Ex. 39); Merrell Tr. at 201-202 (Ex. 25). Significantly, **Defendant's central Payroll department was *totally unaware* that the Company *even paid* hourly employees for donning and doffing**. Seabold Tr. at 14-16 (Ex. 31). This is because it did not.

Defendant could produce *no documentary evidence to support* its claim that it paid Class members for *any* donning and doffing activities. Defendant failed to maintain or produce any

---

[56] *See also* Castillo Tr. at 76-77 (Ex.7) ("The procedure that is explained in here is not the same that is used inside the work. It's very different."); Custodio Tr. at 107 (Ex.9) ("I didn't read them because it's a waste of time. It's what they say in the plant."); Custodio Tr. at 111 ( Ex.9) (Q: Have you ever understood that the company paid more minutes than the time the employees worked on the line? A: Yes, I know. But they don't pay it.); Marco Vol. II Tr. at 209 (Ex. 22) ("The paper says that they would call it two minutes before, but that's not the reality. That's what the paper says."); Marco Vol. I Tr. at 54 (Ex. 21) ("I worked there until 2005 and I didn't have no knowledge of the taking and putting on the equipment."); *Id.* at 55 ("The procedure may have been in the book but that was not what they were doing."); Gundrum Tr. at 315 (Ex. 17) (times "varied" in practice); Polanco Tr. at 81 (Ex. 26) ("Q. Did you ever understand that the company paid you more minutes than just the physical time you worked on the line? A. They didn't pay me even an extra minute.")

record of the actual production line start and stop times which could have been compared to actual punch-out records to have definitively showed whether hourly production employees were paid from the time the line started (in which case they did not get paid for any donning and doffing activities) or whether they were given a particular number of minutes to perform these tasks.[57]  It would also show whether the amount of time given was adequate or commensurate with their posted schedule which Class members dispute was actually used.  *See supra*, n.56.

Even if Defendant's claim that it implemented a schedule to capture certain donning and doffing activities could be credited (which it cannot), the very fact that Defendant claims that it calculated the common times for donning and doffing for its hourly production workers ***supports Class members' contention that this case can and should be handled as a collective action***.  Specifically, Defendant claims that it based its supposed "donning and doffing schedule" which it claims to have used until December 2007, on a time study that analyzed groups of production employees and then set out an amount of time that ***all production employees*** by department should be given.  *See* Gruber Tr. at 35-45, 74-119 (Ex 16); D027219-21 (Ex. 60); D031183-84 (Ex. 61); D031186-87 (Ex. 63); D031189-90 (Ex 62).   This is a stark admission that when not overseen by a federal court, Defendant actually believes that donning and doffing activities can be calculated on the basis of a representative sample.  This is extremely relevant evidence.

### 1. The Alleged Donning and Doffing Schedule Was Created Solely To Avoid Backpay Liability Resulting From A DOL Investigation Concluding That Defendant Violated The FLSA

In approximately March 2001, the U.S. Department of Labor ("DOL"), Wage and Hour Division conducted a 10-day on-site inspection of Defendant's Fredricksburg plant and discovered that Defendant was violating the FLSA by failing to pay employees for all time spent donning and doffing PPE.  *See* Schmalhofer Tr. at 55-60 (Ex. 29) and D047968-85 (Ex. 46);

---

[57] Defendant maintained other payroll records for 7 years 30(b)(6).  Seabold Tr. at 17 (Ex. 31).

Ythier Tr. at 32, 46-47 (Ex. 39); D047991 (Ex. 64); Ythier 30(b)(6) Tr. at 58 (Ex. 38).   DOL later informed Defendant of its intention to seek backpay on behalf of Defendant's hourly workforce.   *See* Schmalhofer Tr. at 116 (Ex. 29).   Defendant's then-CEO, Bruno Schmalhofer, estimated that Defendant was underpaying its approximately 600 production workers by approximately 10 minutes a day.   *Id.* at 76-77 and D047981 (Ex. 46).   Using the $8.50 prevailing wage at the time, Mr. Schmalhofer estimated that Defendant owed its employees approximately ***$214,000 per year in straight time wages plus any additional overtime earned.   Id.***

Defendant never agreed to compensate its employees for backpay based on DOL's findings.   *See* Schmalhofer Tr. at 117-118 (Ex. 29). Rather, in an apparent effort to challenge DOL's findings, Defendant concocted its "time study" to attempt to show that the amount of time employees used to don and doff their equipment was less than what he estimated Farmers Pride owed its employees.   *Id.* at 146-157, 163-166, 172-174, 208; D047992 (Ex. 64); (Ex. 29), D031186-87 (Ex. 63), D031189-90 (Ex. 62).   Although Defendant's "time study" supposedly served as the basis for adjustments to employees' schedules to take into account donning and doffing activities, Class members challenge the study as seriously flawed, incomplete, vague to the point of uselessness and completely inadequate to fulfill Defendant's obligations under the FLSA.   *See* Ythier Tr. at 88-119 (Ex. 39); Schmalhoffer Tr. at 163-174 (Ex. 29); Gruber Tr. at 35-45 (Ex. 16).   The donning and doffing "schedule" Defendant relies on here is based on this flawed and self-serving study. *Id.* Common evidence that will refute this study is common to all Class members.   Although conducted in 2001, the time study is relevant because Defendant claims it based its shift schedules in use until 2007 on this study.

**F.     Defendant Radically Alters Its Time-Keeping and Donning And Doffing Policies in Fall 2007 (After This Lawsuit was Filed)**

In late fall 2007, ***after this lawsuit was filed (in February 2007)***, Defendant radically changed its compensation and time-keeping procedures for its hourly production workers. *See* Ythier Tr. at 9 (Ex. 39). The time clocks located at its main entrance were taken out of service. Time clocks were instead installed at the entrance to each department in a vestibule area. *See* Def. Ans. Rog. 12 (Ex. 3); Def. RFA Nos. 102, 104 (Ex. 2); Seabold 30(b)(6) Tr. at 23 (Ex. 31).

Under the revised procedure, employees no longer clock in when entering the plant; employees now proceed to their lockers, the supply room or other areas to obtain and don items such as boots, hairnets, earplugs, cloth and plastic gloves, aprons, and sleeves. *See* Boyer Tr. at 16-18 (Ex. 4); Eby Tr. at 210 (Ex. 10); Tobias Tr. at 32 (Ex. 35). Under the new system, employees are permitted to punch in only two minutes before their scheduled department start time. Boyer Tr. at 17 (Ex. 4); Eby Tr. 207-208 (Ex. 10). Employees now wait in the cafeteria and when permitted by a supervisor, line up to clock-in at the vestibule area at the entrance to their department; after clocking-in, they proceed to the production floor and collect additional equipment from racks and tables set up inside the work area (aprons, smocks, gloves and arm protectors). *See* Boyer Tr. at 18-20 (Ex. 4); Eby Tr. at 208-09 (Ex. 10); *see also* Polanco Tr. at 178-179 (Ex. 26); Ythier Tr. at 29 (Ex. 39). Knives, scissors and sharpeners are already at each employee's workstation or are provided to them at their work stations. *See* Gundrum Tr. at 87-88 (Ex. 17); Merrell Tr. at 275 (Ex. 25).

The most significant change made by Defendant is that it now pays its hourly production workers on a punch to punch compensation system rather than on a gang-time system.[58] Seabold

---

[58] Payroll switched from the E-Time System to the Time-Saver System, both ADP, Inc. products. Seabold Tr. at 13 (Ex. 31). Payroll no longer prints out daily reports of employee time. *Id*. at 12. Supervisors may directly edit employee punches from their computers. *Id*. at 13, 117.

Tr. at 116 (Ex. 31).  These are all tacit admissions that Defendant was in serious violation of the FLSA prior to making these changes.  Moreover, they evidence a continuing course of conduct by Defendant to be reactive instead of proactive when it comes to complying with the FLSA on behalf of its workers.  It was only after this lawsuit was filed that Defendant changed its procedures, even though it had been put on notice as early as 2001 by DOL of its obligations under the law.

Notwithstanding the above changes pre-and post shift, Defendant continues to deduct 30 minutes from its employee meal periods.  *See* Boyer Tr. at 77 (Ex. 4); Seabold Tr. at 18 (Ex. 31).  Employees still do not punch in or out during their unpaid meal periods and continue to perform donning and doffing activities during that time.  *See* Expert Report of Kenneth S. Mericle, Ph.D. at Table 1 (Ex. 67).  In addition, it is clear that Class members continue to perform compensable work under the FLSA before they punch in, pre-shift and after they punch out post-shift.  *Id.; see also* Ythier Tr. at 49-50 (Ex. 39); Def. Rog. 12 (Ex. 3).

It also appears that Defendant's willfulness continues even after the 2007 changes.  On October 9, 2008, supervisor Anita Camasta wrote to other Farmers Pride employees informing them that Plaintiffs would be "in to do a time study again" and ordering them "to make sure **NO ONE** is getting their supplies before they are punched in. . . Willis you need to make sure that Eric is punching in before he goes for the supplies." D013254 (Ex. 45) (emphasis in original).  Thus, even though Plaintiff's expert discovered that Defendant was continuing to avoid paying employees for their donning and doffing activities, those findings may have been understated due to the fact that Defendant may have manipulated plant procedures to lower the amount of unpaid time observed. *See also* Polanco Tr. at 173-78 (Ex. 26) (discussing post-2007 donning and doffing activities performed before punching in: removal of boots and hairnet and fabric gloves;

picking up smock and cotton gloves from supply room and donning same); *see also* Decl. of J. Rubendall (Ex. 70) (discussing how Defendant provided extra meal time – a full 30 minutes – to hourly production employees when the plant was being observed in October 2009 for a time-study for this litigation).

## VI.   **APPLICABLE LAW**

The sole issue before the Court is whether it should decertify the class of over 300 current and former Farmers Pride hourly employees who were subject to common policies, practices and procedures and who all claim that they were not compensated for all of their work time, an issue which is subject to proof by common evidence.  In numerous recent cases, courts have rejected the arguments Farmers Pride asserts here: that insignificant differences between individual employees matter in an FLSA certification analysis.  *See, e.g., Johnson v. Koch Foods, Inc.*, 2009 WL 3088559 (E. D. Tenn. Sept. 25, 2009) (denying de-certification motion attacking classification of poultry workers as similarly situated); *Brennan v. Qwest Communications, Int'l, Inc.*, 2009 WL 1586721 (D. Minn. June 4, 2009) (denying de-certification motion; finding employee differences "inconsequential" and rejecting defendant's individualized defense arguments as one on ultimate merits of case and not whether employees were similarly situated); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp.2d 870, 879 (N.D. Iowa 2008) (certifying class of employees from pork processing plant paid on "gang time" basis); *Garcia v. Tyson Foods, Inc.*, 255 F.R.D. 678 (D. Kan. 2009) (certifying class paid by "gang time"); *Morales v. Farmland Foods, Inc.*, 2008 WL 2886278 (D. Neb. July 21, 2009) (certifying class of meat processing workers paid on "gang time" basis);  *Robinson v. Empire Equity Group, Inc.*, 2009 WL 4018560 (D. Md. Nov. 18, 2009) (certifying class of mortgage brokerage employees); *Chabrier v. Wilmington Financial, Inc.* 2008 U.S. Dist. LEXIS 27761, *8 (Apr. 4, 2008) (denying decertification motion).  *Perez v. Mountaire Farms, Inc.*, Cite No. 08-00121 (AMD) (D. Md.

Apr. 17, 2009) (results of bench trial of similarly situated, certified class of poultry workers resulted in plaintiff verdict).  This court should do the same.

Farmers Pride admits that a uniform, common approach to the question of how to pay production line workers for donning and doffing-related activities is appropriate.  *See* Defendant's Memorandum of Law in Support of Its Motion to Decertify the Collective Action Class ("Def. Br.") at 6-9; Ythier Decl. at ¶ 5.  Farmers Pride argues that it paid production line workers for donning and doffing time based on a time study it conducted of a tiny representative sample, thus conceding that the issues in this case can be resolved through common evidence. The question here is simply whether Plaintiffs' claims should be litigated collectively due to their inherent similarity.  This question is easily answered affirmatively.

A. **Farmers Pride's Wage Payment System Violates the FLSA's "Whistle to Whistle" Doctrine**

Although the merits of this litigation are not directly raised in this motion, it is important to note that the merits of Plaintiffs' case are exceptionally strong and that the elements of Plaintiffs' claims susceptible to common proof of violation.

Under the FLSA, the "whistle to whistle" doctrine defines the workday as "the period between the commencement and completion on the same workday of an employee's principal activity or activities."  29 C.F.R. § 790.6(b).  The workday "includes all time within that period ***whether or not the employee engages in work throughout all of that period.***"  *Id.* (emphasis added).  "Work," is defined as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer."  *See Reich v. IBP, Inc.*, 38 F.3d 1123, 1125-26 (10th Cir. 1994) (*citing Tenn. Coal, Iron & R.R. Cov. Materials Local No. 123*, 321 US 590, 598 (1944)).

28

Donning, doffing, sanitizing, waiting in lines and walking to obtain gear, and other tasks that Defendant requires of its production line workers are all "integral and indispensable" to Plaintiffs' performance of work and are therefore themselves principal work activities necessary for the performance of their job, subject to compensation.  *See Steiner v. Mitchell*, 350 U.S. 247, 252-53 (1956).  Furthermore, "during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of [the Portal-to-Portal Act], and as a result is covered by the FLSA."  *IBP v. Alvarez*, 546 U.S. 21, 36 (2005)*; see also De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361 (3d Cir. 2007) ("The undisputed facts established that the donning and doffing activity [at this poultry processing facility] constitutes 'work' as a matter of law.").[59]

Donning and doffing activities are integral and indispensible because they are "(1) necessary to the principal work performed; and (2) done for the benefit of the employer." *Lemmon v. City of San Leandro*, 538 F. Supp.2d 1200, 1204 (N.D. Cal. 2007) (*citing Alvarez v. IBP, Inc.*, 339 F.3d 894, 902-903 (9th Cir. 2003)).  Activities that are required "by the law, by rules of the employer, or by the nature of the work" are considered integral and indispensable to the principal activities."  *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004) (*citing Mitchell v. King Packing Co.*, 350 US 260, 262-63 (1958)).

As discussed above, Class members are required by Farmers Pride's rules and environment to wear PPE and there can be no dispute that the PPE is required by the nature of their work.  PPE protects employees from cutting or contaminating themselves or the chicken products.  Thus, donning, doffing and related activities are clearly in Farmers Pride's interests.

---

[59] The *Alvarez* Court also confirmed *Steiner's* holding that locker rooms where special safety gear is donned are the best place to perform the continuous workday's first principal activity.  *See also Garcia v. Tyson Foods, Inc.*, 474 F. Supp.2d 1240, 1247-49 (D. Kan. 2007) (donning and doffing of standard protective gear (that is integral and indispensable) is compensable under the FLSA, as is all donning following the performance of the continuous workday's first principal activity).

The Ninth Circuit explained in *Alvarez*, "it is beyond cavil that the donning, doffing, washing and retrieving of protective gear is, at both broad and basic levels, done for the benefit of [the employer]." *Alvarez*, 339 F.3d at 903. "These plaintiff-performed activities allow [the employer] to satisfy its requirements under the law, and these activities prevent unnecessary workplace injury and contamination." *Id.* These activities are therefore clearly integral and indispensable to Class members' work. As the Supreme Court held in the context of a meat-packing plant, "don[ning] ***the first piece of gear*** . . . marks the beginning of the continuous workday." *IBP*, 546 U.S. at 42 (emphasis added). Thus, Plaintiffs must be compensated from the time they start performing their first principal activity (*i.e.,* putting on a piece of PPE, picking up gloves at the supply room, etc.) until they finish performing their last principal activity that day.

**B.    This Case Should Remain An FLSA Collective Action**

The FLSA is a remedial statute and it "should be given a broad reading, in favor of coverage." *See, e.g., Kelley v. Alamo,* 964 F.2d 747, 749-50 (8th Cir. 1992); *Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994). Collective actions under Section 216(b) are designed to help lower the individualized costs to plaintiffs through the "pooling of resources" and to benefit the judicial system by efficient resolution in one proceeding of "common issues of law and fact". *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 171 (1989). The present case is properly certified as a collective action as the opt-in Plaintiffs are similarly situated and have been injured by common policies and procedures by Defendant.

**1.    The "Similarly Situated" Requirement Is Clearly Met**

The FLSA specifically allows plaintiffs to bring actions "for and on behalf of . . . themselves and other employees similarly situated." 29 U.S.C. § 216(b). Thus, "[t]he evident purpose of the [FLSA] is to provide one lawsuit in which the claims of ***different employees,***

***different in amount but all arising out of the same <u>character</u> of employment***, can be presented and adjudicated, regardless of the fact that they are separate and independent of each other." *Tumminello v. United States*, 14 Cl. Ct. 693, 696 n.4 (1988) (emphasis in original).

The FLSA does not define the term "similarly situated," and neither does the Third Circuit Court of Appeals.[60]  Under the line of cases established by *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), courts in this Circuit resolve the issue of whether employees are similarly situated by applying a two step analysis.  *Id.*  This Court determined at the initial stage that Plaintiffs were entitled to conditional certification. (Dkt. No. 62).  Once, as here, factual discovery is complete, the defendant may file a motion to decertify the class.  At this juncture, district courts consider three factors to determine whether opt-in plaintiffs are similarly situated:

(1)     the disparate factual and employment settings of the individual plaintiffs;

(2)     the various defenses available to [the] defendant which appear to be individual to each plaintiff; and

(3)     fairness and procedural considerations.

*See* 7B Wright, Miller & Kane, § 1807 n.65 at 497; *Thiessen*, 996 F.Supp. at 1080; *Moss*, 201 F.R.D. at 409.

The "less lenient" standard courts apply at the second stage merely requires that in establishing the "similarly situated" requirement, Plaintiffs must rely on more than the allegations in their complaint to show the existence of a common policy or practice.  Courts do

---

[60] Other courts of appeal have provided guidance.  *See, e.g., Montoya v. Rescue Industries, Inc.*, 176 F.3d 489 (10th Cir. 1999) (reversing district court's order granting decertification in an FLSA case); *Thiessen v. General Elec. Capitol Corp.*, 267 F.3d 1095, 1107-08 (10th Cir. 2001) (reversing the district court's order granting decertification in an ADEA collective action class, and holding: "Taking into consideration the 'pattern or practice' nature of plaintiffs' lawsuit, as discussed above, plaintiffs were, in fact, 'similarly situated' for purposes of … § 216(b)"); *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219-20 (11th Cir. 2001) (holding that the similarly situated requirement is "more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)" and that "[A] unified policy, plan, or scheme … may not be required to satisfy the more liberal 'similarly situated' requirement of § 216(b)").

not require prospective class members to be identical.  *Moss,* 201 F.R.D. at 409; *see also Brooks v. Bellsouth Telecom., Inc.,* 164 F.R.D. 561, 567 (1995) (requiring minimal evidence); *Chabrier,* 2008 WL 938872 at *3 ("Individual factual determination is not fatal to certification of FLSA collective action.").  Plaintiffs easily meet this standard here.

Of particular note, the district court in *Johnson v. Koch Foods* considered and rejected a decertification motion in a case ***almost identical to the present one***.  In that case, the defendant operated two chicken processing facilities in Tennessee.  Plaintiffs were production workers who filed suit seeking unpaid and overtime wages that they alleged they did not receive for time spent donning, doffing and sanitizing their protective equipment and clothing.  As here, the *Koch Foods* defendants tried to decertify the action arguing that the plaintiffs were dissimilar because they performed different tasks on the chicken processing line and there were "different departments, work and meal shifts, clothing items worn by employees, and donning and doffing practices of the various employees" and supervisors.  2009 WL 3088559 at *3.  They also argued that there were "individualized defenses" because some of the plaintiffs had allegedly already been paid for donning, doffing, washing and walking time or were not required to wear certain clothing items.  *Id.*

Plaintiffs in the *Koch Foods* case argued, and the Court agreed, that these differences were immaterial because "plaintiffs are all subject to a common policy or plan, payment by production line time, which they allege violates the FLSA."  *Id.* at *4.  The court recognized that "one of the factors material to many courts' analysis of the plaintiffs' factual and employment settings is whether they were all impacted by a 'single decision policy, or plan' [which] may

assuage concerns about plaintiffs' otherwise varied circumstances." *Koch Foods* at *4 (*citing Pep Boys,* 2006 WL 2821700, at *3).[61]

Similarly, in *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp.2d 870 (N.D. Iowa 2008), the district court also considered a donning and doffing case involving a pork processing plant whose hourly workers were paid on a gang time basis. Although the court found that there were "some very big factual differences" among the hourly employees because they were spread out across six departments and they performed different duties, the court concluded that the gang time pay system bound them together and that employees paid via gang time were similarly situated. *Id*. at 901; *see also Valladon v. City of Oakland*, 2009 WL 2591346 (N. D. Cal. Aug. 21, 2009) (where employees were subjected to common policies and worked under similar conditions, the high number of plaintiffs and the effectiveness of allowing them to pool resources favored collective treatment).[62]

---

[61] In *Koch Foods,* plaintiffs submitted evidence that they were paid by production "line time." 2009 WL 3088559 at *4. The court found that the common alleged policy of paying line time bound them together and thus, factual differences and variations in plaintiffs' employment settings were immaterial.

[62] *See also Turner v. Aldo U.S., Inc.*, 2009 WL 2436583 (M.D. Fla. Aug. 6, 2009) (denying decertification motion of store managers even though individualized defenses present); *Ayers v. SGS Control Servs.*, 2007 WL 646326 at *5 (S.D.N.Y. Feb. 27, 2007) (denying decertification: "on balance, the differences among the plaintiffs do not outweigh the similarities in the practices to which they claim to have been subjected"); *Hayes v. Laroy Thomas, Inc.*, 2007 WL 1174313 (E.D. Tex. Apr. 19, 2007) (plaintiffs' claims are based on a uniform, systematically applied practice that allegedly violates the FLSA and presents common issues of law and fact arising from the same alleged activity); *Wilks v. Pepboys*, 2006 WL 2821700 at *5 (M.D. Tenn. Sept. 26, 2006) ("given the plaintiffs' proffer of significant evidence supporting their contention that the defendant, despite its written policies, subjected them to impermissible time-keeping and overtime practices, the court finds that the plaintiffs have demonstrated their burden at the decertification stage of the proceedings."); *Bradford v. Bed Bath & Beyond*, 184 F. Supp.2d 1342, 1345 (N.D. Ga. 2002) (decertification denied because "the only determinative issue is whether Plaintiffs' job duties were similar"); *Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504 (D. Minn. Sept. 24, 2007) (decertification denied); *Orvis v. Triple Ace Investments LLC*, 2007 WL 1625763 (M.D. Fla. June 5, 2007) (same); *Rawls v. Augustine Home Health Care, Inc.*, 2007 1952988 (D. Md. July 5, 2007) (decertification denied).

## 2.      Third Circuit Precedents Favor Certification of this Case

In *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43 (3d Cir. 1989), *overruled on other grounds by Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089 (3d Cir. 1995), the Third Circuit applied Section 216(b)'s "similarly situated" requirement to an ADEA claim alleging that workers were discriminatorily terminated from their jobs.  Although individual class members were "from different divisions of the company" and "different areas of the country" and "reported to different managers" and, in opposing collective treatment, the company emphasized the "individualized explanations" for each plaintiff's termination, the Third Circuit held that the suit was properly tried as a collective action because there was "sufficient homogeneity among the plaintiffs," *id.* at 52, n.10, all of whom had alleged that they were terminated as a result of a ***"common pattern, plan, or practice"*** and sought the same type of relief.  *Id.* at 52.  In *Lockhart*, the Third Circuit held that a district court should consider whether all employees (1) were employed in the same corporate department, division or location; (2) advance similar claims; and (3) sought substantially the same form of relief, when determining if plaintiffs were similarly situated.  *Id.*; *see also Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 n.17 (3d Cir. 2007) (confirming those factors).

Likewise, in *Bunnion v. Consolidated Rail Corp.*, 1998 U.S. Dist. LEXIS 7727 (E.D. Pa. May 14, 1998), Chief Judge Bartle found employees similarly situated notwithstanding the employer's arguments that "the employees worked at various facilities in various jobs," that each "facility made its own individual decisions," and that its "defenses as to each individual plaintiff in the class would be individualized."  *Id.* at 17-18.  Even though each class member was subjected to individual factual circumstances, the court rejected the argument that such individual evidence precludes certification under Section 216(b).

In *Moss*, 201 F.R.D. 398, the court denied a decertification motion in which, as here, defendants "devoted much attention to the differences in the name and opt-in plaintiffs' job duties, geographic assignments and hourly billing rates." *Id.* at 409.  The *Moss* court found:

> Irrespective of these differences, ***each of the plaintiffs asserts a common claim***; i.e., that [defendant] violated the FLSA by failing to compensate them with overtime wages for their work during the Ashland and the Exxon Valdez oil spill projects. . . . ***Also, variations in the plaintiffs' duties, job locations and hourly billing rates do not differentiate the collective basis of the class*** to the extent that it defeats the primary objectives of a § 216(b) action.

*Id.* (emphasis added).   The *Moss* court also rejected defendant's claim that its statute of limitations defense required decertification.  Because decertification would require the court to perform a statute of limitations analysis in over seventy separate lawsuits, the court found that this would be an inefficient use of its limited time.  *Id.* at 23.

In *Chabrier*, 2008 WL 938872, a class of mortgage loan officers alleged they worked off-the-clock in violation of the FLSA's overtime mandate.  The defendant moved to decertify the FLSA class, arguing that "individual factual determinations" were needed which would make the case "unmanageable."  *Id.* at *8.  Judge Shapiro rejected the defense arguments after noting that class members were subjected to common pay practices.  *See id.* at *3-4.  The court observed that "[a] showing that there are elements of plaintiffs' claims that differ, or that a small number of current plaintiffs are excluded, cannot override the similarities present in most plaintiffs' claims and circumstances," and that "[t]here are means to aid in making individualized fact determinations such as bifurcation for liability and damages, designating subclasses, and appointment of a special master" that do not require decertification.[63]  *Id.*

---

[63] *See also Evans v. Lowe's Home Centers, Inc.*, 2006 WL 1371073 (M.D. Pa. May 18, 2006) (court rejected decertification motion involving 500 workers employed in 36 separate stores finding common issues of law and fact would be efficiently determined by certification); *Mayan v. Rydbom Exp. Inc.* 2009 WL 3152136 (E.D. Pa. Sept. 30, 2009) at *11 (rejecting decertification motion where "both court and litigants will benefit from the reduced litigation costs and judicial economy").

C. **Plaintiffs Here Are Similarly Situated**

Plaintiffs satisfy all of the *Lockhart* and *Ruehl* factors:  they are all employees at the same location; all advance similar claims; and all seek the same relief (wages withheld for work they performed).

### 1. Plaintiffs Are Similarly Situated Because They Are Subject To The Same Employment Policies And Practices

The first consideration in determining whether the similarly situated requirement is met here is whether Plaintiffs' factual and employment setting are the same or disparate. Under this factor, courts assess the "opt-in plaintiffs' job duties, geographic location, supervision and salary." *Moss*, 201 F.R.D. at 409 (denying defendant's motion for decertification).  Here, it has been conclusively established that Plaintiffs, all of whom worked in the same single facility, have been subject to the same employment policies, practices and settings.

Most significantly, all Plaintiffs were subject to Defendant's policy and  practice of failing to pay for donning, doffing, sanitizing, walking and waiting time at the beginning and end of their shifts and before and after their unpaid meal breaks.  All Plaintiffs:

- were required to wear similar types of PPE;

- were chicken processing hourly employees, and performed the same type of work;

- had the same compensation plan;

- used time clocks and punch-in methodology;

- were not paid "punch-to-punch" from 2004-2007;

- were paid "punch-to-punch" following fall 2007;

- were supplied with a company locker to store PPE and personal belongings;

- prior to fall 2007, collected PPE from a central supply room location;

- after 2007, received certain PPE from inside the departments;

- were subject to the same time-keeping policies and practices;

- were given the same training and orientation;

- were subject to the same policies contained in the same Employee Handbook;

- were subject to the exact same employment policies and practices;

- had 30 minutes automatically deducted from their daily work hours for their unpaid meal break;

- did not punch in or out for meal period;

- were subject to the same federal regulations regarding PPE;

- shared the exact same Human Resource department and personnel;

- shared the exact same Payroll department and personnel;

- were subject to the same time recording system;

- were subject to Defendant's illicit "rounding" of their hours;

- were subject to Defendant's time shaving practices; and

- will all rely on the same expert reports and have consented in writing to try their cases as a collective action under the FLSA.

Moreover, Defendant's decertification request is odd because the main defense raised by its current motion – that it paid Plaintiffs pursuant to a common schedule that had been based on a common "time study" – supports Plaintiffs' argument that all Plaintiffs' claims should proceed in a single collective action. There is, in a sense, no dispute on the most central issue to be determined concerning this motion: whether Defendant's time study and resulting practices were flawed.

## 2. Plaintiffs Are Similarly Situated Because They Were All Subject To The Same Practices Relating To Time Recording

As shown above, all Plaintiffs were subject to the same time-keeping systems that failed to compensate them for all hours worked. All production line employees at Farmers Pride were required to report to work by the time their shift started. Brayton Decl. at ¶¶ 7, 14 (Ex. 1). Prior to December 2007 (the bulk of the Class period), all production line workers were paid from a standard shift start time as communicated to the centralized Payroll Department. Despite this fact, employees were required to punch in prior to their shifts even though they were not paid based on these time punches at the start of the day. Brayton Decl. at ¶ 9 (Ex. 1). In all these most significant ways, all production line employees were treated exactly the same by the Company. The only variation of note is that the particular start times of each department differed. That "difference" is an insignificant one. The underlying policy of paying an entire department from the same start time is the relevant fact for this case and that will be what determines Farmers Pride's liability in this case.[64]

The similarities do not end there. Farmers Pride had a common policy of automatically deducting 30 minutes of time each day from *all* Plaintiffs' total daily line time to account for daily meal breaks. During meal breaks, the production line stopped for 30 minutes. Brayton Decl. at ¶ 17 (Ex.1). All Plaintiffs claim, however, that they were not provided with 30 non-working minutes to themselves at the meal break. Brayton Decl. at ¶¶ 18-24 (Ex. 1). No employees were required to punch in or punch out for lunch, so there is no documentary record of the amount of time, if any, in excess of the 30 unpaid minutes that Defendant provided to

---

[64] Individual differences concerning each employee's daily in-punches will appropriately be considered at the damage phase of the case. The amount of each Plaintiff's damages need not be identical in order to certify a collective action. In addition, as discussed below, the Court has various procedural devices at its disposal, including the use of subclasses, to deal with this issue. In their pretrial memorandum, Plaintiffs will propose that the jury consider the two parts of the liability period separately.

Plaintiffs to doff, sanitize and re-don their equipment and perform related tasks.  This Court is not required to determine who is correct about the length of the break at this juncture; it simply should observe that the claims for the entire Class, and the evidence used to support those claims, are common and based on common evidence.

All  Plaintiffs also punched out at the end of the day.  Brayton Decl. at ¶ 30 (Ex.1).  Yet, under Defendant's policies, all Plaintiffs were not paid according to those individual punches but were paid instead according to the set shift end time – a common time for each department as a whole.

As with the meal period, Defendant does not have data showing when the line ended that can be compared with the actual punch-out times reflected in the payroll records.  Any evidence or testimony concerning how much time was provided to Plaintiffs at the end of the day to doff, sanitize and store PPE will be entirely common to all Plaintiffs.  The issue is not an individual one.  Either all Plaintiffs were granted additional, sufficient, paid time to perform doffing tasks or they all were not.

The Company's policy to allow its Payroll Department and individual supervisors discretion to manipulate an employee's hours on the E-Time system also supports certification of a collective action.  This was confirmed by Barb Seabold during her deposition.  The E-Time records do not accurately reflect the hours worked by Plaintiffs and all Plaintiffs are similarly situated in that regard.[65]  Likewise, all Plaintiffs were uniformly subject to Farmers Pride's "rounding" policy which rounded punches to the nearest quarter hour.  All Plaintiffs were also

---

[65] Additionally, the issue of willfulness – whether Defendant willfully violated the FLSA willfully – is common to all Plaintiffs, which is relevant to the issue of liquidated damages under the FLSA, also presents issues of fact and law that are common to all Plaintiffs.

uniformly subject to, and affected by, the Defendant's general lack of transparency about timekeeping, donning and doffing, compensation and payroll issues.

Plaintiffs' meal period claim is based upon a single policy common to all Plaintiffs. Farmers Pride automatically deducts 30 minutes from all Plaintiffs' pay at its facility.   All Plaintiffs have (or had) 30 minutes per day deducted from their pay even though they may have spent some of that period donning, doffing, and sanitizing their gear.   This common issue predominates over any variations among Plaintiffs.  *See Jordan v. IBP, Inc.*, 542 F. Supp.2d 790, 813 (M.D. Tenn. 2008) noted: "Indeed, if one considers the meal period claim as a single claim, then the factual similarities among the plaintiffs become overwhelming, as the defendants do not dispute that all employees were required to don and doff their frocks and gear prior to and after eating."

### a.      There Are No Individualized Defenses, Defenses Are Common To All Plaintiffs

Liability in this case turns on class-wide claims and defenses.  *See Fast v. Applebee's Intern., Inc.*, 2009 WL 2391921 (W.D. Mo. Aug. 3, 2009).   Although Defendant claims that individualized defenses abound, the defenses they raise all involve issues that are common to all Plaintiffs and can be proved or refuted through common evidence.

Defendant's main defense centers around its claim that it used a common schedule that compensated Plaintiffs for donning and doffing-related tasks.  (Def. Br. at 39).  Defendant claims that this schedule was based upon time studies that it performed, timing small groups of hourly production employees by department to determine the average amount of time all employees should be given to perform donning and doffing tasks in their own departments.  ***According to Defendant, all Plaintiffs were paid pursuant to a common policy and a common schedule which was based on a common underlying time study.***  Defendant's schedule depicts the

amounts of time all Plaintiffs were supposedly given to perform donning and doffing related tasks. The underlying time studies used common evidence (the average amount of time employees purportedly used to perform the tasks based on sampling), rather than individual evidence (the amount of time each individual employee needed to perform the tasks). Thus, Defendant's main defense is not subject to any individualized inquiry. It supports a finding that this case should proceed as a collective action.

Plaintiffs dispute that Defendant actually ever implemented its purported donning and doffing schedule. Whether Defendant used the schedule, and, if so, whether it properly compensated Plaintiffs for their donning and doffing time, is not an issue in this Motion, but will be determined by reference to common evidence. Although Plaintiffs or Company representatives may testify on this topic, they will be testifying about whether the schedules were or were not used for *all Plaintiffs*, not whether they were applied to one particular individual.

Defendant also claims that the donning and doffing activities for which Plaintiffs are seeking compensation are not compensable work activities. There is no reason why the issue of whether a particular activity, for instance washing a plastic apron after a shift or waiting in line at the supply window to receive the day's PPE would be an individualized one. Either these tasks are compensable work for all Plaintiffs, or they are not. As shown in great detail previously, Plaintiffs are claiming to a large degree that they engaged in the same or substantially similar pre- and post- shift activities. Brayton Decl. at ¶¶ 8-14, 26-30 (Ex. 1).

Defendant argues that "courts have ruled differently on the Portal Act issue depending on the individual facts." (Def. Br. at 37). This argument demonstrates Defendant's misunderstanding of what an "individual issue" actually is. When courts have found that a particular activity is or is not integral and indispensable, that determination *applies to all*

***plaintiffs in a case that performed the challenged practice or conduct.***   The ruling may be individual to that case, but it is not the kind of "individualized one" that would prevent conditional certification of a class.  All plaintiffs in a particular case who performed the same activity would rise or fall on the ruling which would apply, collectively, to all of them.[66]

Variations between shifts, departments or workers occur in all collective actions.  Yet, in the myriad of other FLSA cases where decertification motions have been denied, it is exactly these types of "individual" arguments that are dismissed as irrelevant to the certification inquiry. *See, e.g., Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504 at *4 (D. Minn. Sept. 24, 2007) ("If one zooms in close enough on anything, differences will abound; even for a single employee doing a single job, the amount of time that she spends [working off-the-clock] … on Monday will differ, at least minutely, from the amount of time that she spends … on Tuesday. But plaintiffs' claims need to be considered at a higher level of abstraction."); *Kasten v. St. Gobain Performance Plastics Corp.*, 556 F. Supp.2d 941 (W.D. Wis. 2008) ("Regardless of whether plaintiffs work in different areas on different shifts and don and doff different amounts of protective gear, they are subject to defendant's general practice of not compensating employees for donning and doffing certain protective gear and walking to work areas in violation of the FLSA."); *see also cases cited supra.*  pp. 32-34.  The same defenses should be rejected here.

---

[66] Defendant cites the court's decision in *Anderson v. Pilgrim's Pride Corp.*, 147 F. Supp.2d 556 (E.D. Tex. 2001) in support of their argument (Def. Br. at 38).  In that case (which was wrongly decided prior to the Supreme Court's decision in *IBP v. Alvarez*), the court concluded that the sanitary clothing **poultry processing employees wore at that plant** was not compensable, thus demonstrating that the issue was common to the entire group of plaintiffs and did not call for an individualized inquiry.

> **b.**     **Fairness and Procedural Considerations Heavily Support Moving Forward And Allowing A Trial of This Collective Action**

The next factor in the certification analysis obviously favors Plaintiffs.  A decision to allow FLSA plaintiffs to proceed collectively is in line with the Congressional determination that defendants will not always have the opportunity to pursue individual defenses against FLSA plaintiffs but, instead, must collectively defend a suit that is so pursued.  *See* 29 U.S.C. § 216(b); *Koch,* 2009 WL 3088559, at *5.  Certification of the proposed Plaintiff class clearly conserves judicial resources by having a single case instead of more than 300 before this Court.

> **3.**     **Considerations Of Fairness Support Continuing This Collective Action**

As previously stated, the FLSA is a remedial statute.  *Posner v. Showroom, Inc.*, 762 F.2d 1010 (6th Cir. 1985).  It was "enacted by Congress to be a broadly remedial and humanitarian" and was designed to "correct labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers …." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984).  Certification of this case "would serve the purposes and putative benefits of a collective action under Section 216." *Vaszlavik v. Storage Tech Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997).  In *Hoffman-La Roche, Inc.*, 493 U.S. 165, 170 (1989), the United States Supreme Court clearly articulated that purpose:

> A collective action allows . . . Plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.  The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity.

*Id.*  Similarly, in *Prickett v. DeKalb County*, 349 F.3d 1294, 1297 (11th Cir. 2003) the court recognized that:

> Congress' purpose in authorizing § 216(b) class actions was to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer.

*Id.* Taken together, these purposes weigh heavily in favor of denying Defendant's motion to decertify the Class.   The large number of opt-in Plaintiffs in this case, which represents a significant percentage of the Farmers Pride workforce, is in itself a compelling argument in favor of certification.   By enacting Section 216(b), Congress intended that large numbers of employees would not be forced to litigate their claims individually in precisely this sort of circumstance. *See Rodolico v. Unisys Corp.*, 1999 F.R.D. 468, 484 (E.D.N.Y. 2001) (mindful of broad remedial purposes of ADEA, as well as fact that "similarly situated" requirement of Section 216(b) did not compel Plaintiffs to meet predominance prerequisite of Fed. R. Civ. P. Rule 23(b)(3), court viewed "picture painted by the Plaintiffs as a whole and finds that a collective action is appropriate for the liability phase of the Plaintiffs' claim").

### a.      The Court Has The Necessary Tools To Ensure A Manageable Trial

To the extent that the Court is concerned about managing the trial of this case, it certainly has the procedural tools at its disposal to make the case more manageable by using tools such as representative testimony, bifurcation and the creation of subclasses if it deems them necessary. *See*, *Chabrier*, 2008 WL 938872 at *3 ("bifurcating for liability and damages, designating subclass and appointment of special master" are available).   Decertification is a drastic remedy that, given the large number of individual actions that will ensue, would create far more logistical problems than it could possibly solve.

### b.      Representative Testimony Is Routinely Used In FLSA Trials

It is well-established in the Third Circuit and beyond that not all opt-in plaintiffs must testify in order to prove violations or to recoup back wages in an FLSA case; they may rely on representative testimony.   *See, e.g. Reich v. Gateway Press*, 13 F.3d 685, 701 (3d Cir. 1994). When considering how to appropriately manage an FLSA case, the questions are when, and in

what way, is representative testimony appropriate. Plaintiffs propose trying this case as a collective action, with representative testimony on the several key issues that relate to liability in all claims.  Plaintiffs' proposal would allow this Court to reasonably effect justice for all of the parties involved.

The reality is that any large FLSA case in which identifiable practices exist should be tried with representative testimony to conserve judicial resources.  *See, e.g., Reich v. Gateway Press*, 13 F.3d 685, 701 (3d Cir. 1994) (in FLSA cases, courts "commonly allow" representative actions to prove violations with respect to all plaintiffs."); *see also Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985) (noting widespread practice that "[c]ourts have frequently grant[ed] back wages under the FLSA to non-testifying employees based upon the representative testimony of a small percentage of the employees" and that testimony need only "be fair representations"); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-91 (1946) (testimony of 8 of approximately 300 employees was sufficient to establish entitlement to recovery under the FLSA).

### c.    The Court May Use Subclasses to Manage the Trial

The Court may also find it expeditious to create a separate subclass for any distinct groups that it foresees raising separate issues at the liability or damages stages of the trial.  *See, e.g., In re Delta Air Lines*, 310 F.3d 953, 956 (6th Cir. 2002) (district court certified undesignated subclasses); *Roman v. Korson*, 152 F.R.D. 101, 109 (W.D. Mich. Nov. 30, 1993) (considering plaintiff subclasses).  For example, the Court has the procedural safeguard available to sever the claims of the Plaintiffs who worked in a particular department, such as Deboning (in which the vast majority of the opt-in Plaintiffs were employed).  On balance, and in light of the facts set forth above that show that all Plaintiffs are similarly situated, Plaintiffs do not believe that such a decision needs to be made here.

45

### d.      The Cases Cited By Defendant Are Inapposite

The cases Defendant cites in support of its argument that Plaintiffs are not similarly situated are distinguishable and generally unhelpful because they are based on facts much different than those alleged in this case.

Defendant relies heavily on *Anderson v. Cagle's, Inc.*, 488 F.3d 945 (11th Cir. 2007). That case is distinguishable from the present one.  The district court's order indicates that the plaintiffs in *Anderson* were compensated through three independent methods.  Some were paid based on line time, but others were compensated by guaranteed incentive payments. Additionally, the opt-in plaintiffs in that case were not unionized while the named plaintiffs were unionized; thus, their interests conflicted.  Here, the Plaintiffs were compensated on the basis of a uniform and identical system and none of the named Plaintiffs or Class members were unionized.

Defendant also relies upon *Babineau v. Federal Express Corp.*, 576 F.3d 1183 (11th Cir. 2009).  That case did not involve certification under the FLSA,  it involved state law breach of contract and unjust enrichment claims.  Moreover, unlike Plaintiffs in this case, who were employed in a single factory and performed work on a single production line, *Babineau* involved allegations concerning all workers employed by FedEx in the state of Florida including couriers, handlers, and service agents -- an enormous and diverse group.  The suit did not involve donning and doffing claims.  Thus, the *Babineau* case too is entirely distinguishable.

*Fox v. Tyson Foods, Inc.*, 2006 WL 6012784 (N.D. Ala. Nov. 15, 2006) involved claims by 11 current or former Tyson employees at *eight* of Tyson's 54 chicken processing facilities. After that case was filed, more than 5,000 Tyson employees from 39 plants filed consents to join that action; the proposed class would have included approximately 250,000 members.  The Court found that the employees were distinct from each other because they were employed over a

period of nine years in different positions with different pay grades at different plants, on different lines, in multiple states.    For those reasons, and under those very different circumstances, the Alabama court found that adjudication as a collective action was not manageable or appropriate.  In sum, the Eleventh Circuit cases cited by Defendant do not apply here, particularly in light of the Supreme Court and Third Circuit case law cited above.

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs have met their burden of establishing that they are similarly situated for purposes of Section 216(b) of the FLSA.  Therefore, Plaintiffs respectfully request that the Court deny this Motion.

Dated: November 25, 2009                                 Respectfully submitted,

BERGER & MONTAGUE, P.C.


   __/s/_____
SHANON J. CARSON
RUSSELL D. HENKIN
ELLEN T. NOTEWARE
1622 Locust Street
Philadelphia, PA  19103
Telephone No.: (215) 875-3000
Facsimile No.: (215) 875-4604

SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
TODD M. SCHNEIDER
CLINT J. BRAYTON
180 Montgomery Street, Suite 2000
San Francisco, CA  94104
Telephone No.: (415) 421-7100
Facsimile No.: (415) 421-7105

PHILIP A. DOWNEY
P.O. Box 736
1555 Embreeville Road
Unionville, PA  19375
Telephone No.: (610) 324-2848
Facsimile No.: (610) 347-1073

*Attorneys for Plaintiffs and the Class*