# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA


LUZ LUGO, YESENIA MARCO, et al.     :     CIVIL ACTION

            v.                       :

FARMER'S PRIDE INC.            :     NO. 07-0749


## MEMORANDUM RE: DEFENDANT'S MOTION TO DECERTIFY

**Baylson, J.**                                                **August 25, 2010**

## I.    INTRODUCTION

Before the Court is defendant Farmers Pride, Inc.'s Motion to Decertify the Collective

Action Class. (Doc. 432.) Plaintiffs, current and former employees of defendant, have brought

suit under the Fair Labor Standards Act (FLSA) on behalf of themselves and others "similarly

situated," as provided for in 29 U.S.C. § 216(b). Plaintiffs allege that defendant has failed to

fully compensate them for the time spent putting on and taking off ("donning and doffing") items

of sanitary and protective clothing and equipment ("PPE") at the beginning and end of their shifts

and their meal period, as well as for time spent on related activities such as retrieving and

sanitizing the PPE and walking to and from their workstations.

Plaintiffs sought certification of a collective action with respect to these allegations,

which the Court conditionally granted, allowing for a period of discovery and for notice to be

sent to potential class members who may want to opt in to the collective action. Defendant now

seeks decertification of the collective action, contending that plaintiffs have failed to demonstrate

that they and the opt-in plaintiffs are "similarly situated" such that a collective action under the

FLSA may be maintained.

Having received briefing and heard argument on defendant's Motion to Decertify, the Court deemed it appropriate to hold a two-day evidentiary hearing to further explore the parties' contentions and the disputed facts underlying them. Plaintiffs and defendant were each afforded one day to present witnesses, with equal time given to the opposing side for cross-examination; the parties also were permitted to submit exhibits and file post-hearing briefs. After reviewing this evidence and briefing, as well as the record developed by the parties over the course of this certification process, the Court, for the reasons set forth below, will grant defendant's Motion to Decertify.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.     Facts[1]

---

[1]The Court derives these facts from the record developed by the parties over the course of their briefing, and also from the evidence submitted during the two-day evidentiary hearing mentioned above, which was held on May 17–18, 2010. In this Memorandum, exhibits received from plaintiffs and defendant during the hearing are referred to as "P. Ex." and "D. Ex.," respectively.

On the first day of the evidentiary hearing, plaintiffs presented testimony from the following witnesses: Yesenia Marco, a named plaintiff and former hourly production worker for defendant; Iluminada Ythier, Human Resources manager for defendant; Barbara Seabold, payroll administrator for defendant; and expert witnesses Dwight Steward, Ph.D. and Kenneth Mericle, Ph.D. Citation to testimony offered on this day is designated as "5/17 Tr."

On the second day of the evidentiary hearing, defendant presented testimony from the following witnesses: Bruno Schmalhofer, former CEO and CFO of defendant; John Michael Good, current CEO of defendant; Ythier; Seabold; Hasaan Hargett, current hourly production worker for defendant and former plaintiff in this lawsuit; Seferina Caba, a named plaintiff and current hourly production worker for defendant; James Tobias, plant manager for defendant; Matthew Molnar, production planner and account manager for defendant; Anita Camasta, first processing manager for defendant; and Barbara Rhoads, Human Resources supervisor for defendant. Citation to testimony offered on this day is designated as "5/18 Tr."

The Court found most of the witnesses credible as to their own experiences; any exceptions are noted in this Memorandum. The Court notes that, in general, plaintiffs' post-hearing briefs have not fairly described the evidence presented by defendant, and must be

### 1. Defendant's production operations

Plaintiffs were or are employed as hourly production workers at defendant's chicken-processing plant in Fredericksburg, Pennsylvania ("the plant"). Production operations at the plant are divided into multiple departments—including Live Receiving, Evisceration, Cut-Up, Packing, and Deboning—which, in turn, comprise various lines and positions, subdivided according to function. (Tobias 5/18 Tr. 201:5–11.) Workers in a given department would regularly rotate between different positions, workstations, and tasks. (Ythier Dep. 46, Feb. 5, 2008; Gundrum Dep. 55–56; Caba Dep. 73, June 8, 2009.) The Live Receiving and Evisceration departments perform what is referred to as the "first processing" stage of production, and the Cut-Up, Packing, and Deboning departments perform the "second processing" stage. (Tobias Decl. ¶ 5.) Production operations occur over the course of two shifts—the first shift and the third shift. For each of the two shifts, there is a supervisor overseeing each of the five production departments, as well as a "first processing manager" and a "second processing manager" overseeing the performance of the departments within those stages. (Tobias Decl. ¶ 5.) In addition to these production departments, the plant has a Sanitation department, which performs its work during the second shift, between the two production shifts. (Ythier 5/17 Tr. 82:6–10; Main Decl. ¶ 2.)

In order to perform the required work in the production departments, hourly production workers must wear various items of personal protective equipment and clothing ("PPE"). Workers who fail to wear the required PPE for their positions may be subject to disciplinary action. (See D. Ex. 2.) The items of PPE that a worker must wear vary by department and

discounted for this reason.

position, though the parties dispute the extent of these variations. Most hourly production workers are required to wear a smock, closed-toe shoes, a hairnet, and, if applicable, a beardnet when on the production floor. (Tobias Decl. ¶ 13; Garcia Dep. 133; Caba Dep. 137–38, June 8, 2009.) Some workers, however, are required to wear other items as well, such as safety glasses, hearing protection, and protective gloves and arm guards. (D. Ex. 2; Tobias Decl. ¶ 13.) Some hourly production positions also require the use of knives or scissors, along with additional PPE. (Molnar 5/18 Tr. 219:22–23:2; Camasta 5/18 Tr. 232:10–15, 232:21–233:4; Tobias Decl. ¶¶ 16–17; Garcia Dep. 84–85.) The type of knife, as well as the PPE required to be worn with the knife or scissors, vary by department. (Tobias Decl. ¶¶ 16–17; Tobias Dep. 44, 51, 75; Merrell Dep. 54–55; Eby Dep. 138–39.) Additionally, some workers opt to wear certain items of PPE that may be obtained from, but are not required by, defendant. (Tobias 5/18 Tr. 213:5–8.) For instance, some hourly production workers wear hearing protection not required for their position, and some choose to wear aprons, protective eyewear, plastic sleeves, cotton liners, and rubber gloves. (Molnar 5/18 Tr. 219:13–21; Camasta 5/18 Tr. 233:6–17; Tobias Decl. ¶ 15; Gundrum Dep. 192, 239–40; Camasta Dep. 247–49.) Some workers also choose to bring and wear extra clothing, such as sweaters and caps. (Marco 5/17 Tr. 11:9–10; Caba 5/18 Tr. 178:24–179:1, 186:3.) Defendant used to distribute items of PPE to hourly production workers primarily from a supply room (Tobias Decl. ¶ 18), but as discussed below, defendant altered its method of distributing PPE in December 2007. Defendant also provides lockers for workers to use at their option. (Ythier 5/17 Tr. 105:13–21; P. Ex. 4.)

When an hourly production worker begins his or her employment with defendant, he or she is required to attend two orientation sessions: one general session, which is directed to all

new employees of defendant, and one department-specific session, which is conducted by the worker's supervisor and addresses details of the worker's particular position, including what PPE is required for that position. (Ythier 5/17 Tr. 89:12–23; Rhoads 5/18 Tr. 245:8–249:16.) At the general orientation session, workers are provided with defendant's Employee Handbook, which lays out defendant's general employment policies. (Ythier 5/17 Tr. 82:11–83:9, 89:20–23; Rhoads 5/18 Tr. 249:10–11.) The general orientation session covers what PPE is, explains that PPE is required, and provides examples of what items of PPE are required for each production department. The worker is also informed that "[y]ou[r] supervisor will instruct you on the PPE required for your specific job." (D. Ex. 2; Rhoads 5/18 Tr. 247:9–248:25.) The Employee Handbook also addresses defendant's general practices regarding PPE: it provides an overview of defendant's PPE requirements in a section entitled "Dress Policy"; and, in a section entitled "Donning and Doffing," it explains that defendant "has procedures that are followed for Shift Start, Lunchtime and Shift End" regarding the donning and doffing of such equipment, and that workers should "see bulletin boards for times." (P. Exs. 1–3.) The Handbook, including defendant's donning-and-doffing policy, is reviewed during the general orientation. (Ythier 5/17 Tr. 89:20–91:1; Rhoads 5/18 Tr. 250:11–24.)

**2.      Defendant's compensation systems**

As noted above, at issue in this case are defendant's compensation practices for the time spent by hourly production workers at the plant performing activities related to donning and doffing. During the relevant time period, defendant employed two different systems for compensating employees: the first was in place between May 2001 and December 2007; the second, from December 2007 until present.

### a.    Pre-2007 system

Between May 2001 and December 2007, defendant's compensation system for the production departments[2] was based upon a schedule that, according to defendant, provided predetermined allowances for donning-and-doffing activities. The schedule listed the production departments operating in the third shift, and those operating in the first shift. For each listed department, the schedule specified eight times under the following headings: "Shift Punch In Time"; "Line Start"; "Line Stop For Lunch"; "Lunch Start"; "Lunch Stop"; "Line Start After Lunch"; "Line Stops End of Shift"; "Shift End Punch Out Time." (P. Ex. 4.) The schedule states that these times represent "the procedures that Farmers Pride will follow for Shift Start, Lunch Time and Shift End," and that they "will allow employees time for putting on their work equipment before entering departments." (P. Ex. 4.) Aside from the headings, the schedule does not expressly state what activities are to be performed at what times, nor does it specify what time periods are compensated. The times listed under the headings vary by shift and department, and the schedule also notes that "[t]hese times may vary depending on the employee['s] assigned position on line and our weekly production schedule." (P. Ex. 4.) As indicated in the Employee Handbook, this schedule was posted on bulletin boards in the plant. (Good 5/18 Tr. 108:6–22; Molnar 5/18 Tr. 215:12–14; Camasta 5/18 Tr. 223:25–224:3; Marco 5/17 Tr. 32:13–18; Caba Tr. 175:20–23; P. Exs. 1–3.)

The first version of this schedule was implemented in May 2001, and was derived from an internal time study regarding donning and doffing performed by management personnel for

---

[2]Defendant employed a different compensation system for workers in the Sanitation department. (See Main Decl. ¶¶ 3–4.)

defendant; defendant undertook that time study in response to an investigation by the Department of Labor indicating that defendant was not adequately compensating for donning and doffing activities at the plant. (See Schmalhofer 5/18 Tr. 8:13–29:20.) Between May 2001 and December 2007, this schedule was repeatedly revised and republished,[3] adjusting the various times listed to account for changes in the production process and renovations to the plant. (Ythier 5/18 Tr. 92:18–93:5, 5/18 Tr. 77:12–78:3; Tobias 5/18 Tr. 204:4–14; Ythier Dep. 150–52, Aug. 18, 2009; Tobias Dep. 102–04.)

According to defendant, the schedule operated as follows: The production lines would run between the "Line Start" and "Line Stop For Lunch" times, and between the "Line Start After Lunch" and "Line Stops End of Shift" times. Between "Lunch Start" and "Lunch Stop" was the workers' meal period; this was thirty minutes for all production departments and shifts, and was unpaid. All donning-and-doffing activities were to occur during the time provided between "Shift Punch In Time" and "Line Start," "Line Stop For Lunch" and "Lunch Start," "Lunch Stop" and "Line Start After Lunch," and "Line Stops End of Shift" and "Shift End Punch Out Time." (See Ythier Decl. ¶ 5, Oct. 13, 2009.) Under this understanding of the schedule, the cumulative amount of time provided for donning and doffing over a given day varied by shift and department, and also changed over time as the schedule was revised. (See P. Ex. 4.) While this

---

[3]The record reflects five revised versions of the original schedule, dated May 9, 2002, June 1, 2004, May 23, 2005, December 21, 2005, and December 10, 2006. (P. Ex. 4; Ythier Decl. Exs. B–F, Oct. 13, 2009.)

At the evidentiary hearing, John Michael Good, current CEO for defendant, made clear that the 2006 version contains an error in some of the times listed for the First Shift Cut-Up department; namely, the schedule provided a total of eight minutes for paid donning and doffing time surrounding the meal period, when it should only provide four total minutes. (Good 5/18 Tr. 116:20–117:25.)

schedule provided the general structure for the plant's operations, there were also deviations from it: for instance, each production department had workers paid to come in early to set up and stay late to clean up, and workers would occasionally have to work longer than scheduled or on additional days in order to meet production demands. (Camasta 5/18 Tr. 227:20–228:4; Tobias Decl. ¶¶ 7–8; Tobias Dep. 145, 198–99; Gundrum Dep. 273–75; Merrell Dep. 257.) Additionally, defendant notes, supervisors would sometimes depart from the times that the production line was scheduled to run, providing more time for donning and doffing. (See Molnar 5/18 Tr. 215:24–216:2, 216:16–21.) As discussed at length below, plaintiffs dispute that the schedule was implemented in this manner.

Between May 2001 and December 2007, this schedule, in its various revised versions, provided the primary basis for an hourly production worker's compensation. Hourly production workers were required to punch in and out at time clocks before and after their shifts, but these punch times were used primarily to track attendance and to account for unplanned deviations from the schedule. At some point before the worker's shift, he or she would punch in;[4] the employee's pay for that day, however, generally would commence at a predetermined time, which, according to defendant, matched with the "Shift Punch In Time" indicated on the schedule. (Seabold 5/17 Tr. 143:4–7, 5/18 Tr. 104:8–11; Ythier Decl. ¶ 5, Oct. 13, 2009.) Similarly, at some point before leaving the plant at the end of the shift, an hourly production worker was required to punch out; the worker, however, generally would be compensated

---

[4]At some point during the class period, a sign was posted indicating that workers were not to punch in more than fifteen minutes prior to their shift. (Ythier 5/17 Tr. 103:5–18.) Plaintiffs offer testimony that workers could, and often did, arrive earlier than required under defendant's schedule. As discussed below, however, the Court cannot conclude, based on the record before it, that these early arrivals constitute probative classwide evidence against defendant in this case.

according to the scheduled "Shift End Punch Out Time."[5]  (Ythier Decl. ¶ 5, Oct. 13, 2009.)

Compensation for workers who had to come in early or stay late for work would be adjusted to

account for this extra time (Seabold 5/18 Tr. 82:8–25), and workers who arrived late or left early

would be paid according to their punch-in or punch-out time, rounded to the nearest fifteen-

minute increment (Seabold 5/18 Tr. 83:4–8, 95:10–24).  Supervisors were responsible for

reviewing workers' punch reports each day and editing them to reflect the appropriate

compensation period for each worker.  (Seabold 5/17 Tr. 159:9–160:5; Camasta 5/18 Tr.

228:12–18; Molnar 5/18 Tr. 217:14–218:24.)  For example, if a worker punched out at some

point after the scheduled "Shift End Punch Out Time," the supervisor would check to ensure this

was because the worker stayed late to work: if so, the worker would be paid according to his

actual punch time, rounded to the nearest fifteen-minute increment; if not, the supervisor would

edit the punch report to match the scheduled "Shift End Punch Out Time."  (Camasta 5/18 Tr.

226:15–227:19, 228:12–230:22, 243:10–16.)  Similarly, if a worker began work before his or her

scheduled start time, the supervisor would edit the worker's report to reflect the extra work time.

(Seabold 5/18 Tr. 91:19–23.)  Workers were not required to punch in or out for the thirty-minute

unpaid meal period.  (Ythier 5/17 Tr. 119:25–120:2; Seabold 5/17 Tr. 154:2–21, 155:14–156:5.)

      b.      **Post-2007 system**

In December 2007, defendant changed its compensation system for hourly production

workers.  Under this new compensation system, workers were paid according to the times they

---

[5]Defendant explains that the payroll system would compensate the worker until his or her
punch-out time, rounded to the nearest fifteen-minute increment; supervisors would review the
punch-out times daily, however, and would edit them so that the worker's pay matched the
schedule, unless the worker left early or stayed late to work.  (Seabold 5/17 Tr. 144:23–145:1;
Ythier 5/17 Tr. 95:8–25; Camasta 5/18 Tr. 229:7–230:22.)

punched in at the beginning of the day and punched out at the end of the day.  (Good 5/18 Tr. 120:6–10; Tobias Decl. ¶ 9.)  Defendant did not alter its compensation system for the meal period, however, leaving the pre-2007 schedule posted and continuing to base its pay according to the predetermined allowances for meal-period donning and doffing set forth therein.  (Good 5/18 Tr. 121:23–122:9; Tobias Decl. ¶ 9.)

At the same time as this new compensation system went into effect, defendant also changed the location of time clocks where workers would punch in and out, moving them to the entrance of each production department.  (Good 5/18 Tr. 119:11–120:5; Tobias Decl. ¶ 9; Polanco Dep. 157–58; Gomez Dep. 181–82.)  Defendant also changed the manner in which it would distribute the required, and some optional, items of PPE to hourly production workers: rather than obtaining these items from the supply room, workers now would pick them up from racks and tables located inside or immediately outside of the entrances to each production department.  (Good 5/18 Tr. 120:17–121:10; Tobias Decl. ¶ 10; Caba Dep. 134; C. Torres Dep. 131–32.)  Defendant continued to use the supply room to distribute other items, such as cotton gloves.  (Polanco Dep. 176–77.)

**B.     The Instant Litigation**

**1.     Plaintiffs' Complaint**

On February 23, 2007, plaintiffs Luz Lugo and Yesenia Marco filed a Representative Action Complaint, claiming defendant's compensation practices violate the FLSA and seeking to proceed collectively under 29 U.S.C. § 216(b).  (Doc. 1.)  On July 20, 2007, defendant filed a Motion to Dismiss (Doc. 34), which the Court denied (Doc. 54).  On January 24, 2007, plaintiffs filed an amended Representative Action Complaint (Doc. 55), to which defendant filed an

Answer on February 11, 2008 (Doc. 60).

### 2. Conditional Certification and Opt-Ins

On December 20, 2007, plaintiffs filed a Motion (1) for Class Certification (or Alternatively for Conditional Certification) of the Plaintiff Class; (2) to Serve Notice of Suit Upon Potential Plaintiff Class Members; and (3) to Compel Defendant to Provide the Names and Last Known Addresses of Potential Class Members. (Doc. 50). On January 23, 2008, the Court held an unrecorded telephone conference call with the parties to discuss discovery. After receiving briefing from the parties regarding what discovery, if any, would be needed to adjudicate Plaintiffs' Motion for conditional certification (Docs. 57, 59), on March 7, 2008, the Court granted conditional certification under § 216(b) (Doc. 62). The conditionally certified opt-in class was defined as follows:

> All current and former employees of Farmer's Pride, Inc., who worked as hourly production and support workers at Farmer's Pride, Inc.'s Fredericksburg, Pennsylvania poultry processing facility at any time between February 23, 2004 and the present, who have not had their Fair Labor Standards Act ("FLSA") claim previously adjudicated by a court of law.

(Docs. 64, 68.) The Court then authorized notice of the collective-action lawsuit and opt-in consent forms to be sent to potential class members. (Doc. 68). Over 300 opt-in consent forms were returned (Docs. 72–264; 271–397); subsequently, four opt-in plaintiffs voluntarily withdrew from the suit. (Docs. 421, 422.)[6]

### 3. Motion to Decertify

On October 15, 2009, defendant filed the present Motion to Decertify the Collective

---

[6]Unless otherwise specified, the Court uses "plaintiffs" to refer to named and opt-in plaintiffs collectively.

Action Class (Docs. 432–33), followed by a Memorandum of Supplemental Authority (Doc. 436). On November 25, 2009, plaintiffs filed a Memorandum in Opposition (Doc. 448), to which defendant filed a Reply on December 29, 2009 (Doc. 453). With the Court's permission, on January 21, 2010 plaintiffs filed a Surreply (Doc. 455), a Motion for the Application of Anderson v. Mt. Clemens Pottery Burden-Shifting at Trial (Doc. 454), and a Proposed Trial Plan (Doc. 456). Defendant filed a Combined Response to these latter two motions on February 1, 2010. (Doc. 458.) On February 4, 2010, the Court held oral argument regarding these motions. (Doc. 461.) At the Court's request, the parties submitted supplemental briefing to address various questions raised during that argument. (Docs. 463, 464.)

As noted, following oral argument, the Court determined an evidentiary hearing would be appropriate and useful in elucidating whether collective adjudication of plaintiffs' claims was warranted. (Doc. 465.) This evidentiary hearing was held on May 17–18, 2010. The parties submitted additional briefing after the hearing. (Docs. 482–86, 489–90.)

### 4.      Modifications to the Scope of the Collective-Action Class

Over the course of the briefing on defendant's Motion to Decertify, plaintiffs have narrowed the scope of workers and claims for which they seek collective-action treatment. Initially, plaintiffs sought to certification as to defendant's compensation practices both before December 2007, when compensation was based on the predetermined allowances in the schedule, and after December 2007, when compensation was changed to a punch-to-punch system for the start and end of the shift. Plaintiffs now have made clear, however, that they only seek to collectively challenge defendant's compensation practices between February 23, 2004 and December 2007, as well as defendant's continued use of predetermined allowances for the

meal period in the post-2007 system.  (Pls.' Post-Hearing Br. 1 n.2, Doc. 483.)  Plaintiffs no

longer challenge defendant's post-2007 punch-to-punch system.  Plaintiffs have also indicated

that any plaintiffs who worked solely in the Sanitation Department of the plant should not be

included in the collective action.  (Pls.' Mem. in Opposition 2 n.5, Doc. 448.)  Accordingly, the

Court will analyze the question of certification with these restrictions on the collective action in

mind.

## III.  STANDARD GOVERNING CERTIFICATION OF FLSA COLLECTIVE ACTIONS

A collective action under the FLSA

> may be maintained against any employer . . . by any one or more employees for and in
> behalf of himself or themselves and other employees similarly situated.  No employee
> shall be a party plaintiff to any such action unless he gives his consent in writing to
> become such a party and such consent is filed in the court in which such action is
> brought.

29 U.S.C. § 216(b).  "Thus, the twin requirements for a class action to proceed under [§ 216(b)]

are that the employees in the class must be 'similarly situated' and that each class member must

file an individual consent."  Sperling v. Hoffman-La Roche, Inc., 862 F.2d 439, 444 (3d Cir.

1988).

As the Court noted in its Order granting conditional certification, the FLSA does not

define the term "similarly situated," and courts in the Third Circuit have adopted a two-step

framework for making this assessment and effectuating § 216(b)'s opt-in provision:

> The first step is conducted early in the litigation process, when the court has minimal
> evidence and consists of a preliminary inquiry into whether the plaintiff's proposed class
> consists of similarly situated employees who were collectively "the victims of a single
> decision, policy, or plan . . . ."  Ruehl[v. Viacom, Inc.], 500 F.3d [375, 388 (3d Cir.
> 2007)].  If the plaintiff meets this lenient standard, the court grants only conditional
> certification for the purpose of notice and discovery. [Chabrier v. Wilmington Fin., Inc.,

13

Civ. A. No. 06-4176, 2006 WL 3742774, at *2 (E.D. Pa. Dec. 13, 2006) (Shapiro, J.)];
see also Ruehl, 500 F.3d at 388 (labeling the standard for conditional certification at the
"notice stage" as "comparatively liberal").

   The second step of this process is usually conducted after merits discovery has
occurred, and consists of a specific factual analysis of each employee's claim to ensure
that each proposed plaintiff is an appropriate member of the collective action.  At this
second stage, the court will again make a certification decision based on the "similarly
situated" standard, but will require a higher level of proof than was necessary at the first
stage for conditional certification.  If the conditional group of plaintiffs does not meet this
standard at the second stage, the group is then decertified, the opt-in plaintiffs are
dismissed without prejudice and any remaining plaintiffs are permitted to move onto the
trial stage of litigation. [Chabrier, 2006 WL 3742774, at *2]; see also Ruehl, 500 F.3d at
389 n.17 . . . .

Lugo v. Farmer's Pride Inc., Civ. A. No. 07-749, 2008 WL 638237, at *3 (E.D. Pa. Mar. 7, 2008)

(Baylson, J.).  "Whether during the first step/notice stage or second step/final stage, the burden

remains on the plaintiffs to show that other employees are similarly situated."  Bouaphakeo v.

Tyson Foods, Inc., 564 F. Supp. 2d 870, 891 (N.D. Iowa 2008) (Bennett, J.) (internal quotation

marks and alteration marks omitted).  Courts utilizing this two-stage framework have made clear

that the FLSA's "similarly situated" standard for certification of opt-in collective actions is

distinct from the requirements set forth in Fed. R. Civ. P. 23 for opt-out classes.  See, e.g., De

Asencio v. Tyson Foods, Inc., 342 F.3d 301, 306 (3d Cir. 2003) ("Because the Portal-to-Portal

Act amendment changed participation in an FLSA class from 'opt-out' to 'opt-in,' FLSA

plaintiffs could not certify a class under Fed. R. Civ. P. 23, even though federal subject matter

jurisdiction obtained."); Grayson v. K Mart Corp., 79 F.3d 1086, 1096 n.12 (11th Cir. 1996)

("[T]he requirements for pursuing a § 216(b) class action are independent of, and unrelated to,

the requirements for class action under Rule 23 . . . ."); Lusardi v. Lechner, 855 F.2d 1062, 1068

n.8, 1074 n.15 (3d Cir. 1988) (noting that "[c]ourts have generally recognized that Rule 23 class

actions may not be used under FLSA § 16(b)," but that in some circumstances "Rule 23 cases can

be examined by analogy" when analyzing § 216(b) collective actions).

As noted, the Court previously found that plaintiffs satisfied the "very lenient burden" necessary for conditional certification of their collective action to be granted and notice to be issued. The Court now must perform a "specific factual analysis" of plaintiffs' claims in light of the subsequent discovery that has taken place and the workers that have opted into the collective action, and determine whether plaintiffs have satisfied the "higher level of proof" necessary to maintain certification.

In determining at this second stage whether a group of plaintiffs have demonstrated that they are "similarly situated" such that collective treatment of their claims is warranted, courts consider and balance a number of factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001) (quotation marks omitted); see, e.g., Ruehl, 500 F.3d at 388 n.17 ("A representative (but not exhaustive or mandatory) list of relevant factors includes whether the plaintiffs are employed in the same corporate department, division and location; advanced similar claims . . . ; sought substantially the same form of relief; and had similar salaries and circumstances of employment. Plaintiffs may also be found dissimilar on the basis of case management issues, including individualized defenses." (citations omitted)); Anderson v. Cagle's, Inc., 488 F.3d 945, 953 (11th Cir. 2007) (citing the Thiessen factors); see also Chabrier, 2006 WL 3742774, at *3 ("Final certification is not based on any . . . single factor in isolation, but on many factors."). As the court in Moss v. Crawford & Co., 201 F.R.D. 398 (W.D. Pa. 2000) (Caiazza, M.J.), elaborated,

> The first factor assesses the opt-in plaintiffs' job duties, geographic location, supervision and salary. Generally, allegations of an overarching policy are insufficient, and plaintiffs are required to produce substantial evidence of a single decision, policy or plan.
>
> The second factor raises the issue of whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual opt-in plaintiff. Because individualized defenses prevent an efficient proceeding with a representative class, several courts have granted motions for decertification on this basis. However, the district court has the discretion to determine whether the potential defenses would make the class unmanageable.
>
> Finally, the fairness and procedural factors direct the court to consider whether it can analyze the opt-in class with a broad scale approach. The court should consider that the primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity. The court must also determine whether it can coherently manage the class in a manner that will not prejudice any party.

Id. at 409–10 (internal quotation marks and citations omitted). In general, "[p]laintiffs in an FLSA collective action need not show that all class members are identically situated, but only that they are 'similarly situated.'" Chabrier, 2006 WL 3742774, at * 3. Nonetheless, "although the FLSA does not require potential class members to hold identical positions, the similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions." Anderson, 488 F.3d at 953 (internal quotation marks and citation omitted).[7]

## IV.    THE PARTIES' CONTENTIONS

---

[7]Although Fed. R. Civ. P. 23 does not govern the determination of whether the collective action may be certified in this case, the Court, in performing its "specific factual analysis" of plaintiffs' claims, has kept in mind some of the general concepts articulated by the Third Circuit in In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305 (3d Cir. 2008), regarding the need to ensure the rights of both plaintiffs and defendants are safeguarded and to look behind the pleadings and parties' contentions to determine whether a trial would be fair to both sides. Cf. Lusardi, 855 F.2d at 1074 n.15 (noting that, in some circumstances, "Rule 23 cases can be examined by analogy" when analyzing § 216(b) collective actions).

Defendant contends that plaintiffs do not satisfy § 216(b)'s "similarly situated" standard, and thus collective adjudication of their claims is not warranted. Defendant focuses on the following variations between plaintiffs: First, defendant notes that donning and doffing practices at defendant's plant vary by worker; different departments and positions require different items of PPE, and workers have different routines for donning and doffing these items. Additionally, the schedules under which plaintiffs were compensated provide different amounts of paid time for donning and doffing activities; these amounts vary by department and shift, and also changed over time as the schedule was revised. Furthermore, under the pre-2007 system, when workers would arrive to work late or leave early, or when they would arrive early or leave late due to work, their compensation would deviate from the schedule to reflect these differences. Lastly, defendant contends that, even though plaintiffs have conceded that the collective-action class should not include workers from the Sanitation department in light of the extensive differences between that department and the production departments, the putative class still includes plaintiffs who worked in both the production departments and the Sanitation department.

According to defendant, these variations indicate plaintiffs did not share similar factual and employment settings for the purposes of their FLSA claims, and they prevent collectively adjudicating critical questions of liability in this case—namely, whether the donning and doffing activities performed by plaintiffs constituted compensable work under the FLSA, whether plaintiffs were adequately compensated for such work under the predetermined allowances set forth in the schedules, and whether any undercompensation that may have occurred was de minimis. Defendant also points to various inconsistencies in plaintiffs' testimony regarding their donning and doffing activities and defendant's compensation policies, contending that such

17

contradictions undermine the potentially representative nature of any such testimony and highlight the need for cross-examination of each plaintiff to properly adjudicate their claims.

Plaintiffs counter that defendant overstates the variations between them. All plaintiffs worked at the same plant and in the same production departments, and, according to plaintiffs, they all performed substantially similar tasks and wore substantially similar PPE. While there were some differences in what items of PPE were required, plaintiffs contend that these are insignificant and do not prevent the Court from collectively determining, for instance, whether the donning and doffing performed by plaintiffs was compensable work under the FLSA, or whether the schedule allotted sufficient amounts of time for such work. Similarly, plaintiffs contend, all plaintiffs were subject to the same employment practices and policies—in particular, they were all paid according to the same, uniform compensation system. While there were minor variations between departments and positions as to how much time the schedule allotted for donning and doffing activities, plaintiffs maintain that these variations do not undermine the Court's ability to determine whether defendant systematically undercompensated plaintiffs. Plaintiffs assert that evidence common to all plaintiffs—in particular, expert testimony, as well as representative testimony by members of the putative class—will establish such undercompensation, and thus their claims are susceptible to collective treatment.

V.      **DISCUSSION**

Undertaking the "specific factual analysis" called for at this second stage of the certification process, the Court finds that plaintiffs have not sustained their burden of demonstrating that they are "similarly situated" under § 216(b) such that their claims can be adjudicated collectively. As plaintiffs correctly observe, the members of the putative collective-

action class in this case share certain characteristics: they all were employed at defendant's Fredericksburg plant; they all worked on an hourly basis in the production departments of that plant;[8] and they all were required to don and doff certain items of PPE in the course of their employment, though the exact items of PPE required and worn would vary to at least some extent based on department and position. Furthermore, as noted above, plaintiffs have narrowed the scope of the claims for which they seek certification to focus on a single type of compensation system: defendant's purported use of predetermined allowances to pay hourly production workers for donning and doffing activities.

Plaintiffs' contention that this compensation system was a "sham" lies at the core of their FLSA claims and provides the basis for defendant's alleged liability in this case; according to plaintiffs, it also provides the "tie that binds" the putative collective-action class together. Bouaphakeo, 564 F. Supp. 2d at 899; see id. at 898–899 (finding that, despite "some very big factual differences" among members of the putative class, "the employment and factual settings of plaintiffs support collective action certification if the collective action class is limited to those paid under a gang time compensation system").[9] This overarching contention comprises

---

[8]As defendant notes, however, some plaintiffs also performed work in the Sanitation department, which followed different practices and procedures than the production departments.

[9]See also Lewis v. Smithfield Packing Co., Civ. A. No. 7:07-166-H (E.D.N.C. Aug. 23, 2010) (Gates, M.J.) (recommending that defendant's motion to decertify a collective-action class should be denied, where all putative class members were paid according to a schedule providing predetermined allowances for donning and doffing); Parker v. Smithfield Packing Co., Civ. A. No. 7:07-176-H (E.D.N.C. Aug. 23, 2010) (Gates, M.J.) (same); cf. Cortez v. Nebraska Beef, Inc., 266 F.R.D. 275 (D. Neb. 2010) (Bataillon, J., adopting Thalken, M.J.) (granting certification under Fed. R. Civ. P. 23 of a class's state-law wage claims regarding donning-and-doffing pay, where class members were paid according to a schedule providing predetermined allowances for such activities).

numerous, more specific challenges to defendant's compensation system. In the Court's view, these challenges advance two basic theories of liability: (1) that defendant's compensation system did not operate and was not implemented in the manner defendant claims; and (2) that the system, even if implemented as defendant claims, nonetheless undercompensated for donning and doffing.

After hearing two days of testimony and reviewing the exhibits and briefs submitted by the parties, and having considered plaintiffs' theories of liability in light of the record before it, the Court finds that it would not be fair to either plaintiffs or defendant to have a collective action in this case. The evidence indicates that there may be some hourly production workers who have legitimate claims of undercompensation for time spent donning and doffing, and some who may not; the evidence does not demonstrate, however, that the question of undercompensation can be answered in manner common to all plaintiffs. If the present case were tried collectively and a verdict were reached for defendant, this result would be unfair to those plaintiffs who may have been denied pay owed them for donning and doffing; similarly, if a verdict were reached for plaintiffs, this would be unfair to defendant, who would be deemed liable as to the entire collective-action class when it may not have undercompensated all individual members of that class.

Thus, this case differs from those where liability can be proven on a classwide basis, and the only material difference among plaintiffs is the amount of damages owed to each of them, which is generally considered insufficient to deny class treatment.[10] Here, in contrast, the

---

[10]For instance, in the Rule 23 context, plaintiffs in an antitrust case may be able to show classwide liability through the existence of a price-fixing conspiracy that impacted all purchasers of the same item, and plaintiffs in a securities case may be able to do so through the presence of

liability of defendant depends on whether defendant failed to pay a particular plaintiff for compensable time spent performing donning-and-doffing activities. The Court finds that any such undercompensation was not suffered on a collective basis—i.e., according to a "single decision, policy or plan" applicable to all plaintiffs—but rather that defendant's policies and practices impacted individual plaintiffs in individual ways. See, e.g., Fox v. Tyson Foods, Inc., Civ. A. No. 99-1612, 2006 WL 6012784, at *6 (N.D. Ala. Nov. 15, 2006) (Hopkins, J.) ("While the Named Plaintiffs allege that they have each not been compensated for time spent donning and doffing safety gear, this alleged injury is not the result of a single decision or plan on Tyson's part; therefore, the members of the proposed collective action class cannot be similarly situated . . . .").

The Court reaches this conclusion for a number of reasons. First, while plaintiffs bear some general similarities to one another, the evidence indicates that plaintiffs worked in different positions and departments and on different shifts at defendant's plant, and that these positions and departments varied not only as to the PPE required and worn, but also as to the schedules followed and the amount of time provided for donning-and-doffing activities before and after the shifts and meal periods. Furthermore, the time study prepared by plaintiffs' expert, Dr. Kenneth Mericle, indicated significant variation among workers regarding the amount of time necessary to perform these tasks.

Plaintiffs downplay these variations and assert that the class members' experience can be demonstrated by representative testimony, such as that offered by named plaintiff Yesenia Marco at the evidentiary hearing. Although the Court finds that Marco testified credibly as to her own

fraud that impacted all purchasers of the securities.

experience, the Court cannot credit the argument of plaintiffs' counsel that this testimony establishes a viable theory of collective liability. Marco offered testimony that all hourly production workers shared her experience; the record, however, undermines the validity of this assertion, and indicates that it is based more on opinion than on firsthand knowledge.

Furthermore, testimony offered by defendant tends to show that there was general compliance, and certainly an attempt to comply, with defendant's compensation system for donning and doffing. Plaintiffs' briefing significantly overstates the evidence relevant to their contention that defendant did not monitor or care whether workers were being compensated for such activities. The Court credits the testimony from defendant's witnesses that defendant reviewed this issue and at least attempted to ensure that paid time was allowed for donning and doffing, and that supervisors followed defendant's policy.

Plaintiffs also contend that any donning-and-doffing pay provided under defendant's compensation system was uniformly inadequate, and offer testimony regarding the actual amounts of time such activities would take. The record does not, however, sufficiently demonstrate such uniform inadequacy. For instance, both Marco and another named plaintiff, Seferina Caba, testified that they would arrive significantly—and sometimes as much as one hour—before their shift in order to don their PPE and prepare for work. The evidence, however, does not indicate that defendant required them to arrive at these times, or that all workers required this amount of time to prepare. Workers certainly would need to arrive early enough to don the necessary PPE and prepare for the line to start in their department, but the evidence suggests that this could be done in a matter of minutes, with the precise amount of time varying by department and position. Based on such evidence, the Court cannot conclude that defendant's

liability for undercompensation can be collectively addressed in this case.

The Court will address these reasons in greater detail below, in the context of the theories of liability advanced by plaintiff.

## A.      Operation of, and compliance with, defendant's compensation system

Plaintiffs contend that defendant's compensation system did not operate in the manner in which defendant claims.  According to plaintiffs, "[d]efendant . . . follows a plant-wide policy that does not pay hourly production employees for all of the time they spend on pre- and post-shift work activities and unpaid meal periods," and these "pay policies are uniform and affect each class member similarly."  (Pls.' Mem. in Opposition 1, Doc. 448.)   In particular, plaintiffs contend that, rather than compensating hourly production workers for donning and doffing based upon the predetermined allowances set forth in the schedule, defendant actually compensated workers on a "gang-time" system, under which employees were only paid for time spent working while the production line was running.  Plaintiffs point to other donning-and-doffing cases where a collective action has been certified in light of the gang-time system under which all class members were paid, and contend a similar result should be reached here.  See, e.g., In re Tyson Foods, Inc., 694 F. Supp. 2d 1372, 1379–80 (M.D. Ga. 2010) (Land, J.); Johnson v. Koch Foods, Inc., 657 F. Supp. 2d 951, 955–56 (E.D. Tenn. 2009) (Jordan, J.); Bouaphakeo, 564 F. Supp. 2d at 898–99.

### 1.      Whether defendant's official policy was to compensate on a gang-time basis

At the outset, the Court notes that the record supports defendant's explanation of its compensation system—namely, that defendant's official policy during the relevant time period was not to compensate hourly production workers according to a gang-time system, but rather to

pay them the predetermined allowances for donning and doffing set forth in the schedule, with compensation departing from these scheduled times when workers arrived late or left early or when they were asked to come in early or stay late to work. In support of their claim that defendant's policy was to pay only for time spent working on the production line, plaintiffs refer to the deposition testimony of various defense witnesses, but these statements fail to support plaintiffs' position. For instance, plaintiffs rely upon deposition testimony offered by William Gruber, Vice President of Operations at the plant. (Gruber Dep. 46–55.) This testimony, however, does not state that defendant compensated on a gang-time basis, and regardless, as defendant correctly notes, the testimony describes defendant's practices before 2001—prior to the implementation of the compensation system at issue in this case.

As to that compensation system, plaintiffs observe that the schedules used by defendant do not make clear whether they contemplate compensation for donning-and-doffing activities, as they do not specify what activities are to occur during what time periods, nor do they indicate when compensation begins and ends. Defendant, however, has produced ample evidence demonstrating that the schedule was promulgated in order to provide compensation for donning and doffing. The schedules themselves state that they are designed to "allow employees time for putting on their work equipment before entering departments." (P. Ex. 4.) Bruno Schmalhofer, CEO of defendant at the time the schedule was first implemented, testified that the schedule was developed in order to address undercompensation for donning and doffing that was identified during a DOL investigation; the internal time study performed in 2001, and communications between management personnel at the plant regarding the development and implementation of the schedule, likewise indicate that the new compensation system was intended to incorporate

compensation for donning and doffing.  (D. Exs. 4–7; Schmalhofer 5/18 Tr. 8:13–29:20; Tobias 5/18 Tr. 201:24–202:7.)  Defendant's Employee Handbook reflects that the company's official policy was to abide by these schedules, stating that defendant has procedures to account for donning-and-doffing activities, and referring employees to bulletin boards—where defendant posted copies of the schedules—for times.[11]   Moreover, as detailed above, defendant has offered credible testimony that compensation generally tracked the schedules, and workers were paid based upon the times listed when appropriate.

### 2.  Whether defendant's compliance with its official policy can be adjudicated collectively

Plaintiffs' primary contention, however, is that, regardless of what defendant's stated policy may have been, defendant's schedules, and their purported incorporation of paid allowances for donning and doffing activities, do not reflect the actual practices at the plant: as named plaintiff Yesenia Marco testified at the evidentiary hearing, although "the schedule [said] one thing, what happened there was another thing."  (Marco 5/17 Tr. 72:9–10; see also Marco 5/17 Tr. 35:6–8, 75:22–76:1.)

### a.  Plaintiffs' Evidence and Contentions

In support of this contention, plaintiffs rely primarily upon their own testimony.  At the evidentiary hearing, Marco testified that, as an hourly production worker on the third shift in the

---

[11]Plaintiffs assert that defendant did not expressly state a policy prohibiting its employees from performing donning and doffing outside of the scheduled times, and points to Ythier's testimony that she was not aware of any such policy.  (Ythier 5/17 Tr. 88:20–89:11.)  While such language does not appear in the "Donning and Doffing" section of the Employee Handbook, the Handbook does elsewhere state that "[n]o employee should perform work before the commencement of his or her shift or after determination of normal work hours without the express permission of the employee's supervisor."  (P. Ex. 2 at 11.)

Deboning department, she would typically arrive at the plant at least forty-five minutes before the start of her shift in order to don the necessary PPE and get ready for work. (Marco 5/17 10:8–19). According to Marco, 9 p.m.—the "Shift Punch In Time" on the schedule—is when she needed to be dressed and ready for work, and at that time the chickens were in front of her and ready to be processed; her pay would not commence until that time, and thus she was not compensated for any pre-shift work. (Marco 5/17 Tr. 9:23–10:7, 17:1–20:22, 34:5–10, 61:13–62:9, 63:17–25, 37:10–12.) Similarly, Marco testified, no donning-and-doffing allowances were provided surrounding the meal period and at the end of the shift: the line stopped at 1:30 a.m. and resumed at 2 a.m. for the meal period, which meant that she donned and doffed her PPE during that time and was only actually relieved from work for approximately twenty of the thirty unpaid minutes (Marco 5/17 Tr. 22:4–13, 26:1–27:4, 34:11–24); and her pay stopped when the line stopped at 5:30 a.m.—the scheduled "Shift Punch Out Time"—leaving her to perform approximately twenty minutes of unpaid post-shift doffing activities (Marco 5/17 Tr. 27:7–14, 29:5–24, 35:3–5, 37:10-12).

Another named plaintiff, Seferina Caba, similarly testified at the evidentiary hearing that, as an hourly production worker on the first shift in the Cut-Up department, she would arrive approximately one hour in advance of the start of her shift to prepare for work. (Caba 5/18 Tr. 185:15–23.) She would need to be dressed and ready to work at 7:45 a.m.—the scheduled "Shift Punch-In Time"—which is when she would be let into the department and when her pay would commence. (Caba 5/18 Tr. 172:19–21, 187:6–24.) She also testified that she never received the full donning-and-doffing allowances scheduled for the meal period. (Caba 5/18 Tr. 175:12–19.) Both Marco and Caba testified that the schedules, and the donning-and-doffing allowances they

purportedly provided, were never explained to them (Marco 5/17 Tr. 32:3–33:5; Caba 5/18 Tr. 191:5–14), and that other workers had similar experiences as they did (Marco 5/17 Tr. 20:14–16, 30:1–4; Caba 5/18 Tr. 188:24–189:10, 194:11–13). Plaintiffs offer this testimony as representative of the class, pointing to other putative class members who likewise assert the schedules were not followed. (See Pls.' Mem. in Opposition 22 & n.56, Doc. 448 (providing citations to statements by various plaintiffs that schedules were not followed, and that extra time was not paid beyond the time the production line was running).)

Plaintiffs also highlight portions of testimony by certain management personnel at defendant's plant that suggest defendant's schedules did not operate as defendant now claims. First, plaintiffs point to a statement by Iluminada Ythier, Human Resources manager at defendant's plant, that "[t]o the best of my knowledge and understanding, . . . if the line stopped at 3:00 and I punched out at 3:30, I was going to only get paid to 3:00." (Ythier Dep. 53:6–8, Feb. 5, 2008).

Plaintiffs additionally note the evidentiary-hearing testimony of Anita Camasta, who is currently first processing manager at defendant's plant. Camasta testified that, during her time as assistant supervisor in the Cut-Up department from 2001–03, the start time was 7:00 a.m., and hourly production workers in that department had to be dressed and ready to work—having gone to the supply room, locker room, and time clock—at that time. (Camasta 5/18 Tr. 239:20–240:22.) Camasta testified that this procedure did not change when she served as supervisor for the Cut-Up department between 2003–05. (Camasta 5/18 Tr. 240:23–241:6.) Camasta further testified that, in 2005, when she became first processing manager, the start time for the Evisceration department was 5:00 a.m., which was the time at which hourly production

workers in that department would have to be dressed and ready to work, and that this procedure remained the same in 2006 and 2007. (Camasta 5/18 Tr. 241:7–242:5.) The schedule in effect in 2001 lists 7:00 a.m. as the "Shift Punch In Time" for the first shift in the Cut-Up department; the schedule in effect in 2005 lists 5:00 a.m. as the "Shift Punch In Time" for the first shift in the Evisceration department. Thus, according to plaintiffs, Camasta's testimony, taken together with these schedules, suggests that workers regularly performed donning-and-doffing activities prior the time that their pay was scheduled to commence.

In addition to this evidence, plaintiffs assert that defendant has failed to offer objective evidence of its own demonstrating compliance with the schedules. In particular, plaintiffs point to testimony by Ythier that defendant's Human Resources department did not conduct regular checks to ensure compliance with the schedules (Ythier 5/17 Tr. 119:3–13), and also to the undisputed fact that defendant did not maintain records of when the production lines actually started or stopped each day.

**b.** **Defendant's Evidence and Contentions**

Defendant responds that, although plaintiffs hold forth the testimony of Marco and Caba as representative, there is nothing to indicate that it is such, as not all members of the putative collective-action class have claimed that defendant did not follow the posted schedules, and there is no evidence of any formal complaints that the schedules were not being followed or that hourly production workers were not being compensated for donning and doffing. (Ythier 5/17 Tr. 131:21–132:3, 5/18 79:6–23; Schmalhofer 5/18 Tr. 32:14–19, 54:19–23; Good 5/18 Tr. 118:12–119:7.) Furthermore, defendant notes, in prior deposition testimony Caba indicated that she did not dispute the times listed on the schedule. (Caba Dep. 159:24–160:4.)

Defendant also identifies various discrepancies in the testimony offered by Caba and Marco regarding their version of operations at the plant. For instance, defendant notes that Marco testified at the evidentiary hearing that she had to be dressed and ready to work at 9:00 p.m., and the production line would start at that time, whereas in prior testimony she indicated she had to be dressed and ready at 8:45 p.m., would enter the department at 9 p.m., and would begin work on the line two minutes later. (Marco 5/17 Tr. at 17:1-6, 20:17-22; Specific Interrog. Answers of Marco 1–2; Marco Dep. 57:1–3.) Also, at the evidentiary hearing, defendant impeached Caba with inconsistencies between her present and prior testimony regarding numerous matters, such as when the line would start in her department and what donning-and-doffing routine she would follow, and also called into question the reasons for, and consistency of, her early arrival at the plant. (Caba 5/18 Tr. 173:19–174:12, 181:8–184:4, 196:4–199:15.) Defendant likewise impeached Marco with an employee warning report issued by defendant to an hourly production worker regarding tardiness, which was signed by Marco and which indicated that the meal period for that worker was "1:28 till 2:02," as the relevant schedule provided. (D. Ex. 1.) Defendant also questions the ability of Marco or Caba to speak to the practices and experiences of other hourly production workers, identifying statements in prior deposition testimony by Marco that she did not have knowledge of these facts (see Marco 5/17 Tr. 52:2–53:24, 55:10–56:23, 57:15–58:20, 68:6–25) and noting Caba's admission at the evidentiary hearing that she was "not paying attention to what other people [were] doing" (Caba 5/18 Tr. 188:8).

Defendant contends that the inconsistencies present in Marco and Caba's testimony are indicative of a more pervasive problem in the testimony that both named and opt-in plaintiffs

have offered over the course of this litigation. In support, defendant points to multiple instances where named or opt-in plaintiffs have provided inconsistent testimony or have admitted to inaccuracies in prior testimony or discovery responses. (See Defs.' Reply 15–16, Doc. 453 (compiling admissions by plaintiffs that prior interrogatory responses were inaccurate, and inconsistencies between opt-in declarations and named plaintiffs' deposition testimony as to what their donning-and-doffing requirements and routines were); Def.'s Notice of Admitted Inaccuracies, Doc. 482 (compiling admitted inconsistencies in the testimony of certain named and opt-in plaintiffs in their interrogatory responses, declarations, and state-court depositions).) Defendant also offers the testimony of Hasaan Hargett, a former plaintiff in this lawsuit and current hourly production worker at defendant's plant, who detailed at the evidentiary hearing how the facts in the interrogatory response submitted on his behalf were inaccurate, despite the fact that he brought these inaccuracies to the attention of plaintiffs' counsel prior to submission.[12] (See Hargett 5/18 Tr. 144:19–151:4; 153:10–157:15.) According to defendant, these numerous contradictions betray an attempt by plaintiffs to manufacture a level of similarity that is not in fact present, and undermine any notion that their testimony can be considered representative in this case.

As to the statements by management personnel that, according to plaintiffs, suggest defendant did not compensate for donning and doffing, defendant contends that plaintiffs are taking advantage of ambiguities in these statements and that, when they are properly considered in context and in light of the entire record, they do not demonstrate a policy of

---

[12]The Court finds this testimony very troubling, and plaintiffs' counsel will be given an opportunity to present factual rebuttal of it, if desired, before the Court acts further.

undercompensation. For instance, defendant notes, Ythier's statement was made in the context of discussing the switch to the punch-to-punch pay system initiated in December 2007, and other testimony she has offered makes clear that, under the pre-2007 system at issue here, pay did not end when the line stopped but rather at the "Shift End Punch Out Time" on the schedule. (See Ythier Decl. ¶¶ 4–7, Feb. 5, 2008 (indicating employees are paid according to the scheduled times for donning and doffing); Ythier Dep. 86:15–87:5, Aug. 18, 2009 (employees were paid until the "Shift End Punch Out Time" on the schedule); Ythier Dep. 15:24–16:6, Aug. 18, 2009 ("To the best of my knowledge, the line would stop—like, if it's 3:30, the line would stop—the line would stop a couple minutes prior for donning and doffing, and they would be paid until 3:30. So the line stop and the paid time are two different—").)

Defendant also points to testimony offered by numerous other personnel at defendant's plant confirming that defendant enforced its stated policy of compensating for donning and doffing. For instance, Michael Good, current CEO of defendant, testified that, upon becoming CEO in July 2007, he confirmed through investigation and observation that the schedules were being followed and allowances for donning and doffing were being provided. (Good 5/18 Tr. 106:22–116:19, 124:2–20). Bruno Schmalhofer, former CEO of defendant, testified that, after the first version of the schedule was implemented in May 2001, he would regularly have discussions with Ythier and Gruber about keeping schedules accurate and in force. (Schmalhofer 5/18 Tr. at 32:7–13.) Jim Tobias, plant manager for defendant, testified that, during the relevant time period, he spent time in the production departments to make sure the schedules were being followed and had oral and written conversations with supervisors about the schedules. (Tobias 5/18 Tr. 202:16–203:1). Both Tobias and Camasta testified that they performed a time study at

some point during the class period to ensure enough time was being provided for donning-and-doffing activities in all production departments. (Tobias 5/18 Tr. 204:15–205:7; Camasta 5/18 Tr. 225:24–226:14, 237:3–8, 237:14–16.)  Defendant also produced an email sent from Tobias to Ythier, Camasta, and the second processing manger for defendant asking that they "insure all departments are adhering to the donning & [d]offing times posted" (D. Ex. 15); Camasta testified that, to the best of knowledge, there had not been any issues with respect to the schedules being followed at the time of this email, and that, throughout her time with defendant—first as an hourly production worker, then as a supervisor, then as first processing manager—the schedules were followed and employees were paid for donning and doffing. (Camasta 5/18 Tr. 225:20–23, 223:10–16, 224:8–24, 233:18–234:19.)  Matthew Molnar, production planner and account manager for defendant, also testified that, as in his time working as a supervisor for defendant, hourly production workers were provided the allowances for donning and doffing set forth by the schedule, and frequently more time than was scheduled was provided for such tasks. (Molnar 5/18 Tr. 214:18–22, 215:24–216:2, 216:16–217:2.)

c.     **Discussion**

Based on this evidence, the Court finds that plaintiffs have not carried their burden of showing that their theory of noncompliance can be adjudicated collectively. While plaintiffs have offered evidence suggesting defendant's compensation system may not have been followed as written at times, the Court finds this evidence fails to demonstrate any "single decision, policy or plan" on behalf of defendant to not compensate for donning and doffing activities. Moss, 201 F.R.D. at 409.

Pacheco v. Boar's Head Provisions Co., 671 F. Supp. 2d 957 (W.D. Mich. 2009) (Bell,

J.), is illustrative in this regard.  At issue in Pacheco was a compensation system for donning and doffing that, like the one before the Court here, purportedly provided predetermined allowances for donning and doffing activities.  The plaintiffs in that case admitted that the compensation system, as written, was lawful and accounted for donning-and-doffing time, but argued that the system was not followed in practice.  Like plaintiffs in the present case, the Pacheco plaintiffs "assert[ed] that they have not been compensated for all of the time they spent donning and doffing their protective equipment because they were required to don their protective equipment and to be at their designated work fully dressed by the start of their scheduled shift, and that they were only allowed thirty minutes for their lunch break, without taking into consideration the time needed for doffing and donning their protective equipment."  Id. at 962–63.  The plaintiffs "offered no direct evidence that management instituted a policy to ignore the written policy," but instead "rel[ied] on circumstantial evidence to suggest that management condoned the practice of ignoring the written policy."  Id. at 962.

The court denied certification, finding that there was inadequate evidence to support collective treatment of the plaintiffs' theory of noncompliance.  The court noted that there was "no evidence that supervisors were simultaneously trained, advised, or encouraged **not** to follow the written policy," nor any "evidence . . . that a single complaint of a violation of the written policy was ever made to anyone outside of the employee's particular department."  Id. at 963. The court also called attention to the "numerous inconsistencies between [the plaintiffs'] affidavits and their deposition testimony."  Id. at 964.  These contradictions were of particular concern "because they show[ed] 'the importance of cross-examination of each plaintiff' and suggest[ed] 'the need for separate mini-trials to resolve each individual's claim,'" and "'[s]uch a

result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach.'" Id. at 965 (quoting Hinojos v. Home Depot, Inc., Civ. A. No. 06-108, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006) (Mahan, J.)).[13]

Similarly here, the Court finds the evidence before it is does not support plaintiffs' claim that defendant's noncompliance with its compensation system, and consequent undercompensation of plaintiffs, can be adjudicated collectively. There is no evidence that supervisors were trained or instructed not to follow the schedules, nor is there evidence of any complaints that the schedules were not followed or that workers were not being compensated in the manner in which defendant has explained. Plaintiffs offer testimony that the schedules were not explained to them, and also point to the absence of other indicia of compliance, such as defendant's failure to keep records regarding when the lines actually operated each day, and the admission that defendant's Human Resources department did not perform regular checks to ensure the schedules were being followed. These points, however, fall short of suggesting a policy of noncompliance on defendant's part, and defendant has produced substantial—and, in the Court's view, credible—evidence demonstrating that its policy was to follow the schedules, that it explained this policy to all workers during their orientation, and that it regularly updated the schedules and was mindful of their implementation and accuracy.

---

[13]Plaintiffs urge that Pacheco is inapposite because the plaintiffs in that case conceded that defendant's compensation system, as written, was legal, whereas plaintiffs here contest that point. The Court recognizes this distinction, and will address below plaintiffs' challenge to the adequacy of the compensation system as written. The Court does not agree, however, that this distinction renders the Pacheco court's analysis of the noncompliance challenge any less informative.

The testimony of Marco and Caba regarding the actual operations of the plant does not convince the Court otherwise. The Court finds the evidentiary-hearing testimony of Marco generally credible as to her personal experiences; although defendant identifies some inconsistencies between this testimony and statements made in pretrial discovery, the Court does not consider these sufficiently material to warrant complete rejection of her testimony. Caba, however, was significantly impeached on a number of points, such that the Court cannot credit her as a reliable witness. Furthermore, though plaintiffs tout the testimony of these plaintiffs as representative, neither Marco nor Caba provided a reliable basis which would warrant the Court's acceptance of their own personal facts as applying to others; rather, the Court finds that the record as a whole does not support the conclusion that their particular experiences were shared by all plaintiffs, or reflected a common practice or policy of defendant. Lastly, as defendant has effectively demonstrated, the testimony offered by plaintiffs in general is plagued by inconsistencies that diminish its reliability and "show the importance of cross-examination of each plaintiff." Pacheco, 671 F. Supp. 2d at 965 (quotation marks omitted).

More probative of plaintiffs' theory of noncompliance is the portions of testimony offered by Ythier and Camasta regarding operations at the plant, which can be read to suggest that hourly production workers' pay did not cover all of the donning-and-doffing activities they performed. The statements, however, are not particularly clear on this point, and lose persuasive value for plaintiffs when they are considered in the context of the witnesses' testimony as a whole and the other evidence offered by defendant. As such, the Court does not consider these statements sufficient to carry plaintiffs' burden of demonstrating that defendant, as a matter or general practice or policy, did not abide by the schedules it set forth and systematically failed to

compensate its hourly production workers for donning-and-doffing activities during the relevant time period.  Cf. In re Tyson, 694 F. Supp. 2d at 1379 (granting certification when "the record supports a finding that the general practice is not to pay employees for donning and doffing").

Accordingly, the Court finds that plaintiffs have failed to demonstrate that defendant's alleged noncompliance with the schedules can be adjudicated collectively.  The Court is not passing judgment on the merit of this theory of liability, nor determining whether individual plaintiffs may have a legitimate claim to relief with respect to it; rather, the Court is finding that, in light of the evidence before it, plaintiffs have not sustained their burden of showing collective treatment of this claim is warranted.  Plaintiffs contend that this burden of proof should not rest with them here, as defendant's failure to keep proper records of when the production line was running should shift the burden onto defendant to demonstrate that it complied with its schedules and properly compensated its workers.  Plaintiffs cite the framework set forth by the Supreme Court in Anderson v. Mt. Clemens Pottery, 328 U.S. 680 (1946), in support.  The Court, however, disagrees with plaintiffs' interpretation of this precedent.

In Mt. Clemens, the Supreme Court explained that, in circumstances where an employer has failed to keep accurate or adequate records regarding an employee's wages, hours, and other conditions and practices of employment,

> [t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. . . . In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the

36

employee, even though the result be only approximate.

Id. at 687–88; see Martin v. Selker Bros., Inc., 949 F.2d 1286, 1297 (3d Cir. 1991). As this passage indicates, even in circumstances where an employer's records are inadequate or inaccurate, the burden still rests with the plaintiff to "prove[] that he has in fact performed work for which he was improperly compensated." Mt. Clemens, 328 U.S. at 687. Only if such proof is offered does a burden shift upon the employer, with respect to the extent of work performed (and damages owed). Thus, even assuming that defendant's records in this case are inadequate as plaintiff claims, it remains plaintiff's burden to prove that they have not been properly compensated. Mt. Clemens does not excuse plaintiffs from this, nor does it alleviate the need for plaintiffs to demonstrate at this stage of the certification process that they can carry this burden collectively. For the reasons discussed above, the Court finds that plaintiffs have not demonstrated that their theory of defendant's noncompliance with its compensation system is susceptible to collective treatment.

**B.     Adequacy of compensation under defendant's compensation system**

Plaintiffs also contend that, even if defendant's compensation system were implemented as defendant claims, that system provided inadequate pay for plaintiffs' donning and doffing activities. According to plaintiffs, such undercompensation can be demonstrated by evidence common to all members of the putative collective-action class.

**1.     Plaintiffs' Evidence and Contentions**

Plaintiffs offer two primary forms of evidence in support of their claim that the inadequacy of compensation provided by defendant can be adjudicated collectively: their own testimony regarding both what donning and doffing activities they had to perform and how long

those activities actually took them, which they hold forth as representative of the class; and the reports and testimony of two experts—Dwight D. Steward, Ph.D., and Kenneth S. Mericle, Ph.D.—which, according to plaintiffs, demonstrate the uniform inadequacy of defendant's compensation system.

As detailed above, at the evidentiary hearing Marco testified regarding her daily donning-and-doffing routine and tasks. In particular, Marco testified that she would arrive at work approximately forty-five to sixty minutes before the start of her shift to don her PPE and prepare for work, and it would take about thirty minutes to perform the necessary pre-shift tasks. (Marco 5/17 Tr. 10:8-19, 20:6-13.) She would spend approximately ten of her thirty unpaid minutes of her meal period donning and doffing, and would spend approximately twenty minutes after her shift performing doffing activities. (Marco 5/17 Tr. 26:19–27:4, 29:5–24.) Altogether, she would spend approximately sixty to eighty minutes per day performing donning and doffing activities. (Marco 5/17 Tr. 37:1-9.) Caba likewise testified that she would arrive approximately one hour before the start of her shift to don her PPE and prepare for work, and that she would spend approximately ten of the thirty unpaid minutes of her meal period donning and doffing. (Marco 5/17 Tr. 185:15–23; 193:25–194:2.) According to plaintiffs, this testimony reflects the actual routines and amount of time spent by hourly production workers performing their donning and doffing tasks, and that it fairly represents the experiences of the members of the putative collective-action class. Marco testified that, based on her observation, hourly production workers, both in her department and in other departments, wore the same PPE and performed the same donning-and-doffing routines and tasks before and after their shifts and meal periods. (Marco 5/17 Tr. 12:15–16; 16:21–25; 20:14–16; 28:14–16; 30:1–4, 51:8–18, 55:1–8, 57:6–14;

59:3-59:8.) Caba offered similar testimony. (Caba 5/18 Tr. 188:11–189:6, 194:11–13.)

According to plaintiffs, the reports and testimony of their two experts, Mericle and Steward, further demonstrate that the inadequacy of defendant's compensation system can be adjudicated collectively. Mericle conducted a study of donning and doffing practices at defendant's plant by observing those practices at the plant over a three-day period (October 15, 2008, and October 20–21, 2009). (See P. Ex. 8.) Mericle broke down the various pre- and post-shift and pre- and post-meal period activities, filmed employees doing the activities, and compiled data regarding the amount of time taken.[14] His data is based on a representative sampling of employees, and he did not follow any one individual from start to finish of the day. (Mericle 5/17 Tr. 250:20–25.) Mericle then used this data to calculate averages regarding the amount of time taken to perform donning-and-doffing tasks, broken down by department and activity and also according to defendant's pre- and post-2007 compensation systems. (See P. Ex. 8.) These calculations, plaintiffs contend, can be compared with defendant's compensation system to demonstrate its uniform inadequacy relative to the actual practices at the plant.

Steward's testimony and report were premised on a comparison of the punch times and payroll records of 287 of the members of the putative collective action in this case. (See P. Ex. 7.) From this comparison, Steward calculated the difference between the amount of time from the punch records and the amount of time from the payroll records (i.e., the "gap time"), the total amount of time lost or gained as a result of the company's rounding policy, and the total amount of time lost or gained as a result of edits made by supervisors. (P. Ex. 7 ¶ 3.) Plaintiffs contend

---

[14]Mericle's calculations did not account for any time workers may have spent waiting to receive PPE at the supply room, as that procedure for distributing PPE was no longer in place when he conducted his study. (Mericle 5/17 Tr. 227:24–228:10.)

that these calculations can also be used to demonstrate that plaintiffs were consistently underpaid for donning and doffing activities under defendant's compensation system.

In addition to this evidence, plaintiffs criticize the internal time study performed by defendant in 2001—upon which defendant's initial schedule was based—as flawed and unreliable, and also take issue with the methodology used by Tobias and Camasta in their subsequent time study. (See Schmalhofer 5/18 Tr. 37:7–50:22; Tobias 5/18 Tr. 210:17–211:20.) As these studies provided the basis for defendant's donning-and-doffing schedules and compensation for hourly production workers, plaintiffs contend, the shortcomings of the studies provide common evidence of the inaccuracy of the schedules and inadequacy of the compensation.

### 2. Defendant's Evidence and Contentions

Defendant responds with evidence indicating variations among hourly production workers regarding their donning-and-doffing routines and requirements, and their compensation for such requirements; according to defendant, these variations are extensive and fatal to any attempt to collectively adjudicate whether plaintiffs were adequately compensated. First, defendant points to the schedules themselves, noting that they vary substantially by shift and department regarding the amount of time afforded for donning and doffing, and also that these amounts changed over time as the schedules were repeatedly revised to account for changes in the plant. (P. Ex. 4; Ythier 5/18 Tr. 77:8–78:3, Tobias 5/18 Tr. 204:4–14.) Furthermore, defendant notes, these schedules did not control the compensation of hourly production workers who came in early or stayed late for work. Nor did the schedules control the compensation of workers in the Sanitation department, and though the collective-action class no longer includes

40

employees who worked solely in that department, it still includes some employees who worked in both the production and Sanitation departments.

Defendant also offers testimony from multiple sources that the PPE required and chosen to be worn varies by department, position, and individual, and so too do the routines and the amounts of time taken to perform these tasks. (See Good 5/18 Tr. 122:10–125:16, 138:7–139:7; Ythier 5/17 Tr. 130:25–131:1, 132:7–20, 135:17–137:23; Camasta 5/18 Tr. 230:23–233:17; Tobias 5/18 Tr. 5/18 212:3–213:8; Molnar 5/18 Tr. 219:7–12; see also D Ex. 2.) Caba also testified to such variation, stating that she wore different PPE while working in different production departments and that some workers took longer than others to perform their donning-and-doffing tasks (Caba 5/18 Tr. 178:15–23, 188:4–10)—contrary to Marco's statements that such tasks and routines were uniform among hourly production workers. And Marco's testimony itself, defendant notes, was inconsistent as to this point. For instance, Marco admitted that the time spent donning and doffing can vary by individual (Marco 5/17 Tr. 50:10–21, 65:20–22) and testified that, as an assistant supervisor in her production department (which was an hourly position), her donning-and-doffing requirements and routines, and the amount of time she spent performing them, would vary from those she performed as a regular production worker. (Marco 5/17 Tr. 38:20–43:22, 45:8–15, 66:1–11). Defendant also impeached Marco with prior deposition testimony indicating that she did not know what donning-and-doffing routines and tasks were performed by hourly production workers on other shifts and in other departments. (Marco 5/17 Tr. at 52:2–53:24, 55:10–56:23, 57:15–58:20, 68:6–25.) Furthermore, as detailed above, defendant has identified numerous inconsistencies in the testimony offered by Marco, Caba, and other plaintiffs at various points in this litigation, which include inconsistencies

regarding what PPE was required and what donning-and-doffing routines and tasks were performed. (See, e.g., Def.'s Reply Br. 18–19, Doc. 453 (summarizing these inconsistencies); Caba 5/18 Tr. 181:8–184:4.) Such inconsistencies, according to defendant, only underscore the individualized nature of the inquiry into undercompensation, and undermine any attempt by plaintiffs to offer reliable representative testimony as to it.

As to plaintiffs' experts, defendant contends their reports and testimony likewise fail to demonstrate that the issue of undercompensation can be adjudicated collectively, and even underscore at times the variations which plaintiffs attempt to downplay. First, Steward's data fails to account for any number of variations relevant in the present case, including the distinctions between the pre- and post-2007 compensation systems, between workers in the Sanitation department and those in the production departments, or between how workers' punch times were used and edited when they were working according to their scheduled times and when they were working outside of those times. (Steward 5/17 Tr. 183:10–186:9.) Nor does the data reflect what activities were being performed during the times measured—i.e., whether a worker was actually working during whatever time he was punched in but not being paid. (Steward 5/17 Tr. 186:11–187:24, 191:5–8.) Additionally, defendant points out, even operating under the assumption that all time when a worker is punched in should be compensated, Steward's data does not indicate underpayment as to all workers. Some have no gap between their paid time and punch time, for instance, and as Steward acknowledged, his numbers reflected a variation across employees and across days. (Steward 5/17 Tr. 198:5–200:19.)

With respect to Mericle, defendant first notes that his study does not attempt to account for whether the donning-and-doffing times it measures have been compensated by defendant, nor

does he have any opinion on whether defendant has undercompensated plaintiffs.  (Mericle 5/17 Tr. 231:24–233:13.)  Furthermore, while his study offers average times, the observations upon which those averages are based reflect substantial disparities in the amounts of time it takes different workers to perform the same tasks, both within the same department and between different departments.  (See, e.g., Def.'s Reply Br. 18–19, Doc. 453 (providing examples of these disparities); Def.'s Post-Hearing Br. 23–25 & Ex. E, Doc. 484 (same).)  These disparities reinforce defendant's position that proper adjudication of the issue of undercompensation cannot be accomplished on a collective basis in this case.

Lastly, defendant notes that, while plaintiffs may take issue with the methodology used for its 2001 time study, this study only provided the basis for the first version of its schedule, and so any such criticism does not speak to the later versions in effect during the class period.  Furthermore, plaintiffs' criticism of defendant's time studies does not provide a solution to the extensive variations among plaintiffs regarding the adequacy of their compensation for donning and doffing.

### 3.    Discussion

Considering the record as a whole, the Court finds that plaintiffs have not demonstrated that the adequacy of pay provided under defendant's compensation system can be adjudicated collectively.  The evidence indicates that hourly production workers' donning-and-doffing schedules and requirements varied over time and according to department, position, and shift, and that as a result of these variations, as well as those in individual routines and behavior, how much time it may take a particular individual to perform his or her donning-and-doffing activities, and how of that time was paid under defendant's compensation system, is subject to

substantial disparity. According to plaintiffs, any such variations are relevant only to the determination of what damages may be due to each plaintiff, and do not impact the ability of the Court to fairly reach a common finding of liability as to all plaintiffs in this case. The Court disagrees with this characterization; rather, the evidence offered by both plaintiffs and defendant makes clear that these variations are relevant not only to the Court's assessment of how much compensation a given plaintiff may have been unlawfully denied, but also its determination of whether a plaintiff may have been undercompensated at all.

Plaintiffs contend the question of undercompensation can be collectively addressed through representative testimony, such as that offered by Marco at the evidentiary hearing; the record, however, does not adequately support this proposition. As noted above, the Court finds Marco's evidentiary-hearing testimony to be generally credible as to her own experiences as an hourly production worker, though it was not entirely consistent with prior statements she offered regarding the details of her donning-and-doffing routines and requirements. Nonetheless, the Court does not find a sufficient basis in Marco's testimony for assuming her experience can be fairly imputed to all plaintiffs; defendant effectively impeached the reliability of Marco's knowledge in this regard, and the testimony itself admits to the presence of notable variations in Marco's routine and requirements depending on the hourly production job she was performing. Caba, for her part, did not claim to have knowledge of other employees' tasks and routines, and was also impeached regarding the details of her own donning-and-doffing activities. (See Caba 5/18 Tr. 181:8–184:4; 188:8–9.) Lastly, as discussed above, the inconsistencies in the testimony offered by other plaintiffs—as to this topic and in general—undermine their credibility and value as common evidence of the experiences of the putative class members.

The reports and testimony of plaintiffs' experts also fail to demonstrate that defendant's liability to plaintiffs is susceptible to collective treatment. As the Court noted at the evidentiary hearing, Steward's data and calculations are of little probative value in this case due to the extensive methodological deficiencies summarized above. Cf. In re Tyson, 694 F. Supp. 2d at 1379 n.6 (finding that, "[g]iven the evidence that employees arrive at various times and that some engage in non-compensable activities, such as eating breakfast, after punching in and before [compensated] time begins, the 'gap time' method is not appropriate for collective adjudication" of compensable donning time). Furthermore, as defendant observes, even when the viability of Steward's data is assumed, analysis of this data indicates that undercompensation did not occur uniformly. Mericle's study is more probative, and provides useful insight into the donning-and-doffing practices at the plant. Nonetheless, this study provides no direct insight regarding the inherent adequacy or inadequacy of the compensation provided by defendant for donning and doffing. Plaintiffs suggest that the question of undercompensation can be collectively addressed by comparing the average times calculated by Mericle with the predetermined allowances provided by defendant's schedules. These average times, however, do not provide a viable measure against which the adequacy of these allowances can be collectively judged, as the averages necessarily conceal the variations among the individual observations on which they are based. As defendant observes, examination of these individual observations reveals the presence of notable disparities in the amounts of time needed and taken to perform different tasks, and thus reinforces the notion that liability requires an individualized inquiry in this case.

Plaintiffs' criticism of defendant's internal time studies likewise fails to demonstrate that defendant's liability can be determined collectively. First, defendant's 2001 time study only

provided the basis for the first version of defendant's schedule, which was revised repeatedly in the following years, and there is no indication that whatever flaws there may have been in the initial study were not corrected in the subsequent versions that were in effect during the class period. Furthermore, while plaintiffs may question the methodology and results of defendant's time studies, they do not offer proof that the studies and resulting schedules necessarily underestimated the amount of donning-and-doffing time each hourly production worker would require, or otherwise show how these criticisms may be used to reach a reliable determination of collective liability.[15]

Accordingly, while plaintiffs have submitted evidence supporting their claim that defendant's compensation system was inadequate, the Court finds that plaintiffs have failed to demonstrate that this claim can be adjudicated collectively; given the variations in the predetermined allowances provided by the schedules, as well as the variations in the amount of time workers may need to don and doff their PPE, too many individualized inquiries would be necessary to accurately determine whether defendant undercompensated, and thus is liable to, all plaintiffs in this case. Accordingly, the Court concludes certification as to this claim is not warranted.

## VI.    CONCLUSION

---

[15]In addition to this evidence, both plaintiffs and defendant have attempted to introduce various pieces of correspondence from the DOL regarding defendant's donning-and-doffing policies: plaintiffs seek to submit correspondence from the DOL that they believe support their claim that defendant did not adequately compensate for donning and doffing, and defendant seeks to submit correspondence indicating that its compensation system was designed to comply with the FLSA and pay for donning and doffing. Both parties object to the admissibility of the others' submissions. The Court agrees that these documents likely constitute inadmissible hearsay, and regardless, does not find them to be particularly probative of whether certification is warranted in this case.

For the foregoing reasons, defendant's Motion to Decertify will be granted. Although the Court concludes that, because of the factual record and legal precedents discussed above, decertification of plaintiffs' collective action is necessary, the Court also recognizes that Congress intended the FLSA to serve broad remedial purposes, see, e.g., De Asencio, 342 F.3d at 373, and that individual claims for relief in this case may not be significant enough for trial. Accordingly, the Court will not foreclose at this time the possibility of certifying some more precisely defined and smaller group, if plaintiffs can establish that the record warrants a collective action as to that group. This may require plaintiffs' counsel to further research the facts with their clients and to credit the testimony presented by defendant, which the Court considers generally credible and reliable. Plaintiffs' counsel shall advise the Court by letter to chambers within fourteen days. Defendant may then respond within fourteen days. A pretrial conference is scheduled for September 29, 2010, at 3:30 p.m., and will be held by teleconference unless all counsel prefer an in-court hearing.

An appropriate order follows.

O:\CIVIL 07-08\07-0749 Lugo v. Farmer's Pride\Lugo v. Farmer's Pride - Mem re Mot to Decertify.wpd