IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LUZ LUGO, YESENIA MARCO, et al.** | : |
| *Plaintiffs* | : CIVIL ACTION NO. 07-CV-00749 |
| v. | : |
| **FARMERS PRIDE, INC.** | : Honorable Michael M. Baylson |
| *Defendant* | : |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**[1]

**A.     Farmers Pride's Fredericksburg Processing Plant.**

1.     Farmers Pride, Inc. ("Farmers Pride") operates a chicken-processing plant in Fredericksburg, Pennsylvania. Tobias Decl. at ¶ 1 (Ex. 1)[2]. The plant receives live chickens from grow-out facilities, harvests the chickens, and, by virtue of the various processing departments at the facility, produces and packages uncooked chicken products (i.e., breasts, thighs, whole chickens) that are sold to grocery stores and restaurants. Id. at ¶ 2.

2.     Production operations at the facility occur on two shifts – First and Third Shift. Id. at ¶ 3. The facility is comprised of several different areas, including the Live Receiving Department, the Evisceration Department, the Cut-Up Department, the Packing Department, and the Deboning Department. Id. at ¶ 4.

---

[1] Pursuant to the Court's Standing Orders, Farmers Pride submits a separate Statement of Undisputed Material Facts. Farmers Pride presents the following material facts as undisputed for purposes of this Motion only and reserves the right to offer evidence or argument to the contrary in any further proceedings in this matter.

[2] The declarations ("Decl."), deposition excerpts ("Dep."), and other exhibits referenced herein are attached as Exhibits 1-62. Additionally, an Index of Exhibits is attached for the Court's convenience.

3. The typical hourly production employee at the Farmers Pride facility is not exposed to toxic or caustic substances during the workday. Id. at ¶ 12.

**B.      The Clothing And Equipment Worn By Plaintiffs.**

4. All Plaintiffs are required to wear a smock, hairnet, and beardnet (if applicable) when on the production floor. Id. at ¶ 7; Garcia Dep. at 133 (Ex. 2); Hernandez Dep. at 181-82 (Ex. 3); Lugo Dep. at 162 (Ex. 4).

5. The smock is functionally similar to smocks worn in a variety of other professions, such as lab coats and doctor's coats, with wide openings at the wrist. Tobias Decl. at ¶ 7. The smock benefits Plaintiffs by keeping their street clothes clean and dry. Garcia Dep. at 90-91; Tobias Decl. at ¶ 7.

6. Plaintiffs can wear their hairnet and beardnet to and from home. Caba Dep. at 115-16 (Ex. 5); Garcia Dep. at 104-05; Gomez Dep. at 171 (Ex. 6); Hernandez Dep. at 141, 170; Lugo Dep. at 128; Mercado Dep. at 112 (Ex. 7); C. Torres Dep. at 119-20 (Ex. 8). The hairnet and beardnet help keep chicken products out of Plaintiffs' hair and facial hair. Blanco Dep. at 125-26 (Ex. 9); Caba Dep. at 116-18; C. Torres Dep. at 120; Vicente Dep. at 156-58 (Ex. 10); Tobias Decl. at ¶ 7.

7. Plaintiffs working in the Live Receiving, Evisceration, Cut-Up, and Packing Departments are required to wear earplugs when on the production floor. Id. at ¶ 9; Caba Dep. at 116-18. Since approximately 2007, employees in the Deboning Department have not been required to wear earplugs due to the installation of quieter-running processing equipment. Vicente Dep. at 155; J. Torres Dep. at 194 (Ex. 11); Gomez Dep. at 158-59; Tobias Decl. at ¶ 9. The earplugs protect Plaintiffs' hearing and can be worn to and from home. Blanco Dep. at 125-26; Caba Dep. at 116-18; Collazo Dep. at 143 (Ex. 12); Gomez Dep. at 174; Hernandez Dep. at

122-23; Lugo Dep. at 131; Mercado Dep. at 112; Perez Dep. at 178 (Ex. 13); Polanco Dep. at 138-40 (Ex. 14); Rubendall Dep. at 145 (Ex. 15); C. Torres Dep. at 10; J. Torres Dep. at 211-13; Vicente Dep. at 156-58; Tobias Decl. at ¶ 9.

8. Plaintiffs working in the Live Hang portion of the Live Receiving Department are required to wear safety glasses and a disposable dust mask. Tobias Decl. at ¶ 10. The disposable dust mask is identical to masks worn by individuals with allergies and benefits Plaintiffs by keeping dust and other debris found in the Live Hang portion of the Live Receiving Department out of their mouth and nose. Id. The safety glasses benefit Plaintiffs by preventing foreign objects from entering Plaintiffs' eyes. Id.; Caba Dep. at 116-18; Vicente Dep. at 156-58.

9. Plaintiffs are required to wear closed-toe shoes. Tobias Decl. at ¶ 8. Some Plaintiffs wear tennis shoes and leather work boots, while other employees choose to purchase rubber boots from Farmers Pride. Caba Dep. at 98-99, 107-08, 111-12; Collazo Dep. at 134; Mercado Dep. at 107-09; Perez Dep. at 169-70; Polanco Dep. at 104. Plaintiffs can wear their shoes, including the rubber boots, to and from home. Caba Dep. at 113-14; Collazo Dep. at 142-43; Garcia Dep. at 104-05; Gomez Dep. at 160; Hernandez Dep. at 127-28; Lugo Dep. at 128, 198; Mercado Dep. at 107-09; Marco 1/24/08 Dep. at 21-22 (Ex. 16); Perez Dep. at 169-70; Polanco Dep. at 106; Rubendall Dep. at 128-29; C. Torres Dep. at 119; Tobias Decl. at ¶ 8; see also Ex. 17 at 39 ("[E]mployees can opt to take boots home if they so desire as long as boots are clean when entering department.").

10. Some Plaintiffs wear a plastic or vinyl apron, plastic sleeves, and/or rubber gloves. Tobias Decl. at ¶ 11. Some Plaintiffs claim that Farmers Pride required them to wear some or all of these items, whereas other Plaintiffs admit that Farmers Pride did not require them to wear these items. J. Torres Dep. at 216-18; Caba Dep. at 84, 95-99; 5/18/10 Tr. at 180-81

3

(Caba) (Ex. 18); Cruz De Leon Resp. to Interrogs. at ¶¶ 2, 3, and 8 (Ex. 19); Rivera Resp. to Interrogs. at ¶¶ 2, 3, and 8 (Ex. 20); Hernandez Dep. at 121-28, 131-36. Plaintiffs admit that these items kept them and their street clothes clean and dry. Blanco Dep. at 125-26; Caba Dep. at 84, 95-99, 103-04; Collazo Dep. at 136-37; Garcia Dep. at 90-93; Gomez Dep. at 163; Hernandez Dep. at 122-23, 130-32, 135-36; Lugo Dep. at 129-30; Perez Dep. at 173, 176; Polanco Dep. at 112, 138-40; Rubendall Dep. at 132; C. Torres Dep. at 113-14, 120; J. Torres Dep. at 219; Vicente Dep. at 131-32, 156-58. Farmers Pride derives no benefit from these items. Tobias Decl. at ¶ 11.

11. Some Plaintiffs in the Cut-Up, Packing, and Deboning Departments wear cotton gloves to keep their hands warm. Blanco Dep. at 125-26; Caba Dep. at 83-84, 98-99; Collazo Dep. at 135; Garcia Dep. at 90-91; Gomez Dep. at 167-68; Lugo Dep. at 131; Mercado Dep. at 107-09; Perez Dep. at 170-71; C. Torres Dep. at 108-09. Farmers Pride derives no benefit from the cotton gloves. Tobias Decl. at ¶ 11.

12. Plaintiffs who use knives or scissors are required to wear one or two additional, non-standard clothing and equipment items, such as a mesh cut-resistant glove, whizzard cut-resistant glove, and/or a plastic arm guard. See Tobias Decl. at ¶¶ 12-13.

## C. Total Amount Of Time It Allegedly Takes For Donning- And Doffing-Related Activities.

13. Plaintiffs retained a time study expert, Dr. Ken Mericle, to study the amount of time Plaintiffs spend engaged in donning, doffing, washing, and walking activities for which they seek compensation in this case. Exs. 21 and 22.

14. Dr. Mericle concluded that Plaintiffs in the Live Receiving Department spent an average of 27.32 minutes per day engaged in pre-shift, pre-meal period, post-meal period, and post-shift donning, doffing, walking, and washing activities. Ex. 21 at 16.

15. Dr. Mericle concluded that Plaintiffs in the Evisceration Department spent an average of 15.76 minutes per day engaged in pre-shift, pre-meal period, post-meal period, and post-shift donning, doffing, walking, and washing activities. <u>Id.</u>

16. Dr. Mericle concluded that Plaintiffs in the "Cut and Pack" Department spent an average of 12.13 minutes per day engaged in pre-shift, pre-meal period, post-meal period, and post-shift donning, doffing, walking, and washing activities. <u>Id.</u>

17. Dr. Mericle concluded that Plaintiffs in the Deboning Department spent an average of 17.44 minutes per day engaged in pre-shift, pre-meal period, post-meal period, and post-shift donning, doffing, walking, and washing activities. <u>Id.</u> Dr. Mericle prepared a supplemental report focused solely on Third Shift Deboning and concluded that Plaintiffs working the Third Shift in the Deboning Department spent an average of 19.04 minutes per day engaged in pre-shift, pre-meal period, post-meal period, and post-shift donning, doffing, walking, and washing activities. Ex. 22 at Table 8.

18. Plaintiffs' testimony confirms that they can don the standard clothing and equipment items such as earplugs, hairnet, smock, plastic sleeves, and gloves in mere seconds. <u>See, e.g.</u>, Blanco Dep. at 146-50 (3 to 4 seconds to don hairnet; 2 seconds to don beardnet; 4 to 5 seconds to don cloth gloves; 3 to 4 seconds to don rubber gloves; and 5 to 6 seconds to don plastic sleeves); Collazo Dep. at 180 (15 seconds to doff plastic gloves and cotton gloves); Garcia Dep. at 141-43, 151-53 (8 to 10 seconds to don earplugs; 5 to 6 seconds to don cotton gloves and plastic gloves; 12 to 15 seconds to don plastic sleeves and apron; 2 to 3 seconds to doff apron; 3 seconds to doff plastic sleeves; 5 to 7 seconds to doff plastic gloves; and 3 seconds to doff cotton gloves); Marco 1/24/08 Dep. at 11-13, 20, 22 (15 seconds to don cotton gloves; a few seconds to don plastic apron, earplugs, and hairnet).

5

19. Employees engaged in donning and doffing activities while walking and socializing. Blanco Dep. at 141-42 (walked while donning hairnet); Collazo Dep. at 210-11 (doffed earplugs and hairnet while walking to locker); Garcia Dep. at 127 (noting it was possible to don equipment while walking from locker to department); Perez Dep. at 193-95 (donned rubber gloves and earplugs while walking to department and could have donned smock and hairnet while walking); J. Torres Dep. at 251-53 (sometimes donned smock and hairnet while walking to the department); see also Ex. 23 at 18 (noting that "[i]t was observed that employees donned and doffed items while walking" and "while socializing").

D. **Plaintiffs' Meal Period Activities.**

20. Plaintiffs receive a 30-minute unpaid meal period every day. Vicente Dep. at 223-24; Tobias Decl. at ¶ 16.

21. During the 30-minute meal period, no additional chickens are placed on the production line, and Plaintiffs who work on the line are free to leave their workstations on the production lines as soon as they finish working on the last piece of product that passes in front of their workstations. Id.; Caba Dep. at 158; Blanco Dep. at 160; Custodio Dep. at 182 (Ex. 24).

22. Plaintiffs have testified that before and after the unpaid meal period, they must take off certain items of clothing and equipment before leaving the production floor for the meal period and put those items back on when they return from their meal period. Gomez Dep. at 210-17, 224-27, 236-37; Mercado Dep. at 148-51; Rubendall Dep. at 195-99. Plaintiffs have testified that, during the meal period, they do not have to remove all of their sanitary and protective items before leaving the production department floor or before entering the cafeteria. Caba Dep. at 175, 180; Garcia Dep. at 173; Gomez Dep. at 238; Hernandez Dep. at 211-12, 236-

37; Mercado Dep. at 163-64; Perez Dep. at 233; C. Torres Dep. at 192-93; <u>see also</u> Tobias Decl. at ¶ 15.

23.  Plaintiffs use their 30-minute meal period for their own purposes, including purchasing and eating food in the cafeteria or outside of the facility on picnic tables provided by Farmers Pride; using the vending machines; eating a meal they have brought into the cafeteria from outside the plant; socializing; smoking outside the plant; reading; playing cards, dominoes, or other games; using phones; hosting birthday parties or baby showers for co-workers; and going to their cars.  Blanco Dep. at 167-69 (smoked during meal break; observed others eating outside during meal break; used phone during meal break; observed employees reading during meal break); Caba Dep. at 187-90 (went outside during meal break; observed employees smoking and using phones during meal break; once the meal break started, it was uninterrupted); Collazo Dep. at 190-91 (ate meal outside; used phone during meal break); Garcia Dep. at 166-68 (left the facility during meal period; observed others leaving the facility during meal period; read a magazine during meal period; saw employees smoking during meal period; used phone during meal period); Hernandez Dep. at 217-20 (purchased meals from cafeteria during meal period; was allowed to leave the building during meal period; smoked during meal period); Lugo Dep. at 188-90 (ate in the cafeteria and talked with coworkers during meal period; observed employees leaving the building during meal period); Marco 10/8/09 Dep. at 153-55 (ate food, smoked, went to car, used phone, and talked with coworkers during meal period) (Ex. 25); Tobias Decl. at ¶ 17 (noting that employees routinely play dominoes and card games during their meal periods and also host birthday parties, baby showers, and other celebratory events for coworkers during the meal period).

24. Plaintiffs testified that they ate meals during their meal period. Blanco Dep. at 167-68; Caba Dep. at 169; Garcia Dep. at 165; Lugo Dep. at 188-90; C. Torres Dep. at 178-81; J. Torres Dep. at 261-62.

25. Plaintiffs do not perform production work during their meal period and are not "on-call" once they leave the production floor for their meal period. Caba Dep. at 190 (testifying that meal break was uninterrupted); C. Torres Dep. at 181-82 (noting that she has 30 minutes to herself at meal break); J. Torres Dep. at 268 (testifying that he had 25 minutes to himself during meal break); Tobias Decl. at ¶ 16.

26. Plaintiffs' time study expert, Dr. Mericle, has opined that the meal period activities for which Plaintiffs are seeking compensation take an average of 7.94 minutes in the Live Receiving Department, an average of 5.24 minutes in the Evisceration Department, an average of 4.89 minutes in the Cut-Up and Packing Departments, and an average of 7.47 minutes in the Deboning Department. Ex. 21 at 16. This calculation included time for washing clothing and equipment before and after the meal period. Id.

E. **History Of Farmers Pride's Compensation System And Its Efforts To Comply With DOL Investigation And The FLSA.**

27. In March of 2001, the United States Department of Labor ("DOL") conducted a 10-day investigation at the Farmers Pride production facility. 5/18/10 Tr. at 6-10 (Schmalhofer); Ythier Decl. at ¶ 2 (Ex. 26). Among other things, the DOL investigated Farmers Pride's compensation practices regarding donning and doffing. 5/18/10 Tr. at 8 (Schmalhofer). This investigation was part of the DOL's "Poultry Initiative," which involved on-site inspections of approximately 23 poultry-processing companies. Id. at 10; Ythier Decl. at ¶ 2.

28. On March 20, 2001, the DOL conducted a closing conference at the completion of its investigation at Farmers Pride. 5/18/10 Tr. at 8-9 (Schmalhofer); Ythier Decl. at ¶ 2. Mary

Ziegler, Diane Kapluski, and Amy Groff represented the DOL during the closing conference, and Bruno Schmalhofer (Chief Executive Officer) and Iluminada Ythier (Human Resources Manager) attended on behalf of Farmers Pride. 5/18/10 Tr. at 5 (Schmalhofer); Ythier Decl. at ¶ 2. During the closing conference, the DOL maintained that Farmers Pride was in violation of the FLSA with regards to the way it compensated employees for donning and doffing. 5/18/11 Tr. at 10-11 (Schmalhofer); Ythier Decl. at ¶ 2. The DOL requested that Farmers Pride develop a plan to remedy the alleged violations and report back to the DOL on that plan. 5/18/10 Tr. at 11-12 (Schmalhofer).

29. Following the closing conference, Farmers Pride management participated in a series of internal meetings to discuss what to do about the donning and doffing issues raised by the DOL. Id. at 12-18; Ythier Decl. at ¶ 3. Farmers Pride also sought the advice of outside counsel regarding these issues. Id.; 5/18/10 Tr. at 12 (Schmalhofer).

30. Farmers Pride ultimately decided to conduct a review of the five production departments to measure the amount of time employees spent engaged in donning and doffing-related activities before their shift, before their meal periods, after their meal periods, and at the end of their shift. Id. at 18-19; Ythier Decl. at ¶ 3.

31. At the direction of Bill Gruber, Vice President of Operations, the Quality Assurance Department randomly selected ten employees from each of the five production departments and measured the amount of time it took those employees at the beginning of their shift to obtain necessary clothing and equipment from the supply room, don the clothing and equipment, walk to their respective production departments, and sanitize their hands. They also randomly selected ten employees from each of the five production departments and measured the amount of time it took those employees at the beginning of their meal period to doff their

clothing and equipment and, where applicable, wash their hands. They also randomly selected ten employees from each of the five production departments and measured the amount of time it took those employees at the end of their meal period to re-don their clothing and equipment and sanitize their hands. They also randomly selected ten employees from each of the five production departments and measured the amount of time it took those employees at the end of their shift to doff their clothing and equipment, wash their hands and equipment (where applicable), and walk to their lockers to stow their equipment. Gruber Dep. at 41-42, 74-85, 88-93, 119-21 (Ex. 27); 5/18/10 Tr. at 202 (Tobias); 5/18/10 Tr. at 18-23 (Schmalhofer).

32. The results of the Quality Assurance Department's review were presented in an April 22, 2001 memorandum from Mr. Gruber to Mr. Schmalhofer and Ms. Ythier. Ex. 28.

33. Farmers Pride management reviewed the memorandum and discussed the results with outside counsel. 5/18/11 Tr. at 24-26 (Schmalhofer); Ythier Decl. at ¶ 4; see, e.g., Ex. 29 (discussing compliance plan with outside counsel).

34. Based on the average times reflected in the memorandum and subsequent discussions with legal counsel, Farmers Pride developed a compensation schedule that provided additional compensation to employees for donning- and doffing-related activities at the beginning and end of the shift and at the beginning and end of the thirty-minute unpaid meal period. Ythier Decl. at ¶ 4, Ex. A.

35. The schedule was broken down into two shifts (Third Shift and First Shift), and each shift was broken down by department. Ythier Decl. at Ex. A.

36. The schedule for each department on each shift contained eight specific times applicable to that department and shift. Id. The "Shift Punch In Time" indicated the time that the employees in that department and on that particular shift began to be paid. Ythier Decl. at

10

¶ 4; Tobias Dep. at 96-97, 261 (Ex. 30); Rhoads Dep. at 126-28 (Ex. 31); Ythier Dep. at 83 (Ex. 32). To be clear, hourly production employees were not required to clock in at the "Shift Punch In Time" for their particular department on their particular shift. Instead, employees could clock in at any time prior to when the production line in their particular department started because the time that an hourly production employee clocked in did not typically affect his or her compensation. Ythier Decl. at ¶ 4. Instead, with a few exceptions, an employee's pay began at the "Shift Punch In Time" regardless of when he or she clocked in. Id.

37. The "Line Start" time indicated the time that the production line in that department and on that particular shift was scheduled to begin operating. Id.; Tobias Dep. at 97-98; Rhoads Dep. at 126-28; Ythier Dep. at 85. There is a temporal gap between the "Shift Punch In Time" (i.e., when an employee in a particular department started getting paid) and the "Line Start" time (i.e., when the production line in a particular department actually began), which was designed to compensate employees in that particular department and on that particular shift for pre-shift donning, walking, waiting, and sanitizing activities. Ythier Decl. at ¶ 4; Tobias Dep. at 253-54.

38. The "Line Stop For Lunch" time indicated the time that the production line in that department and on that particular shift was scheduled to stop for the meal period. Ythier Decl. at ¶ 4; Rhoads Dep. at 126-28. The "Lunch Start" time indicated the time that the employees' thirty-minute meal period actually began for a particular department on a particular shift. Ythier Decl. at ¶ 4; Rhoads Dep. at 126-28. Again, there is a temporal gap between these two entries, which was designed to compensate employees in that particular department and on that particular shift for pre-meal period doffing, waiting, and washing activities and to ensure that employees received a full, uninterrupted thirty-minute meal period. Ythier Decl. at ¶ 4.

39. The "Lunch Stop" time indicated the time that the employees' thirty-minute meal period ended, and the "Line Start After Lunch" time indicated the time that the production line in a particular department was scheduled to begin after the meal period. Id.; Rhoads Dep. at 126-28. The temporal gap between the "Lunch Stop" time and the "Line Start After Lunch" time was designed to ensure that employees in that particular department and on that particular shift received compensation for post-meal period donning and washing activities. Ythier Decl. at ¶ 4.

40. Finally, the "Line Stops End of Shift" time was the time that the production line in a particular department on a particular shift was scheduled to stop at the end of the shift. Id.; Rhoads Dep. at 126-28. The "Shift End Punch Out Time" indicated the time that employees stopped being paid in that particular department on that particular shift. Ythier Decl. at ¶ 4; Tobias Dep. at 261; Rhoads Dep. at 126-28; Ythier 8/18/09 Dep. at 86-87 (Ex. 32). Again, there is a gap between the two entries, which compensated employees for post-shift doffing, waiting, washing, and walking activities. Ythier Decl. at ¶ 4. Much like the start of the shift, hourly production employees were not required to punch out on the time clocks at the "Shift End Punch Out Time." Instead, employees could punch out at any time after the production line in their particular department on their particular shift stopped for the day. Id.

41. Before implementing the schedule, Farmers Pride sought and obtained approval from the DOL. Specifically, on May 4, 2001, Mr. Schmalhofer had a telephone conference with Ms. Groff, a representative of the DOL's Pennsylvania regional office who had conducted the investigation and participated in the closing conference, and he reviewed Farmers Pride's compensation schedule and proposed changes. 5/18/10 Tr. at 23-26, 28-29 (Schmalhofer). Ms. Groff replied that the changes seemed okay to her and that she would review those changes with national DOL representatives. Id. Ms. Groff encouraged Farmers Pride to implement the

schedules "ASAP." Id. at 23-25, 28-29, 72-73; see also Ex. 33 (documenting conversation with Ms. Groff).

42. Farmers Pride first implemented the schedule nine days later on May 13, 2001. Ythier Decl. at ¶ 5. It posted the schedule on the bulletin board at the plant. 5/17/10 Tr. at 32 (Marco) and 127-28 (Ythier) (Ex. 34); 5/18/10 Tr. at 29 (Schmalhofer) and 175 (Caba); Ythier Decl. at ¶ 5.

43. Upon implementation of the schedule, Farmers Pride revised its employee handbook to reflect the fact that employees would now be receiving additional compensation for donning and doffing activities:

> **DONNING AND DOFFING**
>
> Farmers Pride has procedures that are followed for Shift Start, Lunchtime, and Shift End. These procedures are to allow employees time for putting on their work equipment before entering the departments. Some of these times may vary depending on the employees' assigned position on the line and our weekly production schedule. Farmers Pride provides lockers for the voluntary use by the employees, but employees can opt to take boots home if they so desire as long as boots are clean when entering department. (See bulletin boards for times.)

Ex. 17 at 39; 5/17/10 Tr. at 130-32 (Ythier).

44. The newly-implemented schedule and the DOL investigation were discussed during the Farmers Pride Executive Committee Meeting on June 6, 2001. Ex. 35 at 2; 5/18/10 Tr. at 31-33 (Schmalhofer). The meeting minutes reflect that "based on this change [i.e., the

implementation of the schedule] and two favorable court decisions we do not expect any USDOL back pay." Ex. 35 at 2.[3]

45. Thereafter, Farmers Pride periodically reviewed the compensation schedules to ensure that the start times and times allotted for donning- and doffing-related activities were accurate and sufficient in light of changes in the production process and renovations to the facility's layout. Ythier Dep. at 150-52, 156-57; Tobias Dep. at 102-03; 5/18/10 Tr. at 31-32 (Schmalhofer), 77-78 (Ythier), and 202-05 (Tobias); see Tobias Decl. at ¶ 5 and Tobias Dep. at 111-14, 133-37 (discussing renovations at the plant). As a result, Farmers Pride revised and republished the schedules on May 9, 2002, June 1, 2004, May 23, 2005, December 21, 2005, and December 10, 2006. See Ythier Decl. at ¶ 6, Exs. B-F.

46. Farmers Pride management also periodically observed each of the production departments to ensure that the supervisors were following the schedules. 5/18/10 Tr. at 113-16 (Good) and 202-04 (Tobias); Tobias Decl. at ¶ 18. Farmers Pride management sent written reminders to supervisors underscoring the importance of following the schedules. Tobias Decl. at ¶ 18; 5/18/10 Tr. at 202-04 (Tobias); see, e.g., Ex. 37 ("Please insure all departments are adhering to the donning and doffing times posted.").

47. After Farmers Pride implemented the new compensation schedule, the DOL's "Poultry Initiative Co-Coordinators" periodically corresponded with Farmers Pride using form

---

[3] The Court can take judicial notice of the only two court decisions in this period. See, e.g., Pressley v. Sanderson Farms, Inc., No. Civ. A. H-00-420, 2001 WL 850017, at *2-3 (S.D. Tex. Apr. 23, 2001) (granting poultry processor summary judgment on plaintiffs' claims for walk time and for donning, doffing, and cleaning their clothing and equipment on the grounds that such activities were not compensable work and were in any event *de minimis* because Plaintiffs claimed that they took 7 to 20 minutes per day) (Attached as Ex. 36); Anderson v. Pilgrim's Pride Corp., 147 F. Supp. 2d 556, 561-64 (E.D. Tex. Apr. 9, 2001) (ruling after bench trial that donning and doffing sanitary clothing and equipment by poultry processing plant employees was not work under the FLSA, was not integral and indispensable under the Portal-to-Portal Act, and was *de minimis*).

letters that they sent to all poultry processors covered by the Poultry Initiative. Specifically, on May 21, 2002, the Co-Coordinators sent Mr. Schmalhofer a letter, which accused Farmers Pride of failing to come into compliance with the DOL's view of the law regarding compensation for donning and doffing activities. Ex. 38. This letter was identical to a letter received by numerous other poultry processing companies covered by the Poultry Initiative, which is obvious given the letter's use of the words "plant(s)" and "investigation(s)" and its reference to a 2000 (instead of 2001) inspection. Id. Upon receipt of the letter, Mr. Schmalhofer and Farmers Pride attorney Michael Moore met with the DOL in Washington, D.C. where they again outlined for the DOL the compensation schedules that the Company had implemented in 2001. 5/18/10 Tr. at 67 (Schmalhofer); Schmalhofer Dep. at 213-14 (Ex. 39).

48. The Co-Coordinators sent Farmers Pride another form letter on April 12, 2006, again claiming that Farmers Pride had not made any changes to its compensation practices with regards to donning and doffing. Ex. 40. Farmers Pride's outside counsel, Barley Snyder LLC, responded on behalf of Farmers Pride, both in a telephone conversation and in a letter dated June 19, 2006. Ex. 41. In that letter, Barley Snyder attorney Jennifer Craighead reminded the DOL that Farmers Pride had been paying employees for donning and doffing activities since 2001. Id. The letter went on to inform the DOL that, upon completion of plant renovations, the Company would begin paying employees according to their pre-shift punch in and post-shift punch out times. Id.

49. At that time, the Fredericksburg facility was undergoing substantial renovations that were ultimately completed in December 2007. Tobias Decl. at ¶¶ 5, 6. As a result of the renovations, Farmers Pride began distributing all required (and most optional) sanitary and protective clothing and equipment inside each production department and also moved the

locations of the time clocks to the entrances of each department such that employees clocked in immediately prior to picking up and donning required clothing and equipment. Id. at ¶ 6; Polanco Dep. at 157-58, 228-29; Gomez Dep. at 181-82, 201, 203, 268. In conjunction with these changes, Farmers Pride also changed the manner in which it compensated hourly production employees. Specifically, Farmers Pride began paying production employees according to the time that the employees punched in and punched out on the time clocks. Tobias Decl. at ¶ 6; Tobias Dep. at 36; Ythier Dep. at 27-28; Merrell Dep. at 271-72 (Ex. 42); Camasta Dep. at 114-15 (Ex. 43); Gundrum Dep. at 41-42 (Ex. 44). Because employees clock in before picking up and donning required clothing and equipment, and because they clock out after doffing and washing such clothing and equipment, all such activities occur during paid time. Tobias Decl. at ¶ 6.

50. As was the case before December 2007, employees continue to receive additional time before and after the thirty-minute meal period for donning- and doffing-related activities. Id.

51. Since the Department of Labor's 2001 investigation regarding Farmers Pride's compensation practices related to donning and doffing, Farmers Pride has been continually represented by its outside counsel Barley Snyder LLC on this issue and has received advice from the firm regarding the compensability of these activities. Ythier Decl. at ¶ 7.

52. Since the Department of Labor's 2001 investigation, the Court can take judicial notice that there has been a substantial amount of litigation over this issue in various industries, including food processing, with mixed results. Farmers Pride and its legal counsel tracked this litigation in an effort to ensure that its compensation procedures were consistent with the results in those cases. Ythier Decl. at ¶ 7; Schmalhofer Dep. at 209. In one case in this district, De

16

Asencio v. Tyson Foods, Inc. (No. Civ. A. 00-cv-4294 (E.D. Pa.)), the employer obtained a complete defense verdict on the issue of compensability of donning, doffing, and cleaning sanitary outer garments and protective items similar to those at issue here (though that verdict was reversed on one ground on appeal and remanded for further proceedings on the employer's other defenses – the Portal-to-Portal Act and *de minimis* defense, DeAsencio v. Tyson Foods, Inc., 500 F.3d 361, 373-74 (3d Cir. 2007)). Farmers Pride's current Chief Executive Officer, J. Michael Good, was employed by Tyson Foods at the time of that case and appeared as a witness at that trial. 5/18/10 Tr. at 105-06 (Good). When Mr. Good became employed by Farmers Pride in July 2007, he learned that Farmers Pride was paying for donning and doffing under the compensation schedules and believed that the amount of additional compensation was generous and over and above what was required in light of the jury verdict in favor of his former employer in the DeAscencio trial. Id. at 109; 112-13.

Respectfully submitted this 31st day of March, 2011.

**FARMERS PRIDE, INC.**

*/s/ Ryan A. Glasgow*

George C. Werner (Pa. I.D. No. 28757)
Jill S. Welch (Pa. I.D. No 86232)
BARLEY  SNYDER LLC
126 East King Street
Lancaster, PA 17602-2893
Phone:  (717) 299-5201
Facsimile:  (717) 291-4660
*gwerner@barley.com*
*jwelch@barley.com*

Michael J. Mueller* (D.C. Bar # 412025)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC 20006
Phone: (202) 955-1500
Facsimile: (202) 778-2201
*mmueller@hunton.com*

Gregory B. Robertson* (Va. Bar # 15681)
Ryan A. Glasgow* (Va. Bar # 71023)
HUNTON & WILLIAMS LLP
951 East Byrd Street
Richmond, VA 23219
Phone:  (804) 788-8200
Facsimile:  (804) 788-8218
*grobertson@hunton.com*
*rglasgow@hunton.com*

* *Admitted pro hac vice*

Attorneys for Defendant Farmers Pride, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this the 31st day of March, 2011, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing (NEF) to the following:

BERGER & MONTAGUE, P.C.
Shanon J. Carson, Esq.
(scarson@bm.net)
1622 Locust Street
Philadelphia, PA 19103

Philip A. Downey
(downeyjustice@gmail.com)
1555 Embreeville Road
Unionville, PA 19375

SCHNEIDER WALLACE COTRELL
BRAYTON KONECKY LLP
Clint J. Brayton, Esq.
(cbrayton@schneiderwallace.com)
Andrew P. Lee, Esq.
(alee@schneiderwallace.com)
180 Montgomery Street, Suite 2000
San Francisco, CA 94104

*/s/ Ryan A. Glasgow*
Attorney for Defendant