**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|  |  |  |
|---|---|---|
| | : | |
| LUZ LUGO, *et al.*, | : | CIVIL ACTION NO. 07-CV-00749 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| FARMERS PRIDE, INC., | : | |
| | : | |
| Defendant. | : | |

---

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

**A.      Introduction**

1.      Defendant Farmers Pride operates a poultry processing plant in Fredericksburg, Pennsylvania.  Def.'s Ans. (Dkt. 60) at ¶ 2; *see also* Defendant's Objections and Responses to Plaintiffs' First Set of Requests for Admission ("Def. RFA") Nos. 1-2, Ex. 1; Ythier Testimony at Evidentiary Hearing ("Ythier Test.") at 79:3-6, Ex. 34.

2.      The "Class," as defined by the Court's December 10, 2010 Order consists of those Plaintiffs who worked in the Deboning Department on the Third Shift from the period of February 23, 2004 to December 31, 2007 (with respect to their claim for off-the-clock work before and after their shifts), as well as those Plaintiffs who worked in the Deboning Department on the Third Shift from the period of February 23, 2004 to the present, with respect to Plaintiffs' claim for not being paid for meal periods.  *See Lugo v. Farmers Pride, Inc.*, No. 07-CV-00749, Dkt. Nos. 504-505 (E.D. Pa. Dec. 10, 2010) (Memorandum and Order certifying subclass).

3.      Employees in the Deboning Department remove bones from chicken breasts, thighs and legs, trim the chicken, process the chicken, and package it for shipment to customers. The Department consists of breast deboning lines, a thigh deboning line and a leg deboning line.

## B.      The Employee Handbook and Training

4.      Defendant maintained an Employee Handbook throughout the relevant time period which set forth mandatory policies that applied to all workers.  Def. RFA Resp. 6, Ex. 1,[1] *see also* Ythier Test. at 82:25-83:2, Ex. 34.  All hourly employees are given a copy of the Employee Handbook in English (and Spanish if that is their primary language).  *See Def RFA Resp.* 6 & 7, Ex. 1; *see also* Castillo Tr. at 67, 78, Ex. 3; Hernandez Tr. at 54, Ex. 12; Marco Tr. Vol. I at 45-46, Ex. 14; Blanco Maya Tr. at 73-74, Ex. 16; Polanco Tr. at 76-78, Ex. 19; Torres Tr. at 75-76; 80-81, Ex. 23; Vicente Tr. at 99, Ex. 24.

5.      The Handbooks included detailed policies regarding straight time, overtime, lunch and break time, as well as safety, attendance, and disciplinary policies, including:

a)      All employees will be given thirty minutes (unpaid) for lunch.  D00008, Ex. 26; D011508, Ex. 28; D011220, Ex. 30; D011112, Ex. 27; D030628, Ex. 29.

b)      "The company will deduct one-half (1/2) hour for lunch break, unless otherwise noted."  D00007, Ex. 26; D011508, Ex. 28; D011219, Ex. 30; D011111, Ex. 27.

c)      "The Company will assign employees a locker."  D00015, Ex. 26; D011520, Ex. 28; D011232, Ex. 30; D011023, Ex. 30; *see also* D030643, Ex. 29; Custodio Tr. at 162, Ex. 5; Gundrum Tr. at 165, Ex. 11; Marco Vol. II. Tr. at 118, Ex. 15; Def. RFA No. 73, Ex. 1 (admitting lockers are made available to hourly production employees); Marco Test. at 12:7-11, Ex. 35; Ythier Test. Vol. I at 105:10-12, Ex. 34.

---

[1] Different versions of the Employee Handbook were produced by Defendant with Bates Nos. D00001-25, Ex.  26 (revised February 2005); D030614-657, Ex.  29 (revised May 2008); D011103-138, Ex.  27 (revised December 2004); D011499-534, Ex. 28 (revised November 2003); and D011211-247, Ex. 30 (revised September 2004).

    d)    "It is the policy of the Company that anyone working in the plant and coming into contact with product must have good personal hygiene.  For your safety, you will be expected to wear the following equipment in some of our work areas:  hearing protection, hairnets, rubber gloves, mesh gloves, liners, rubber aprons, smocks, boots."  D-00021, Ex. 26; D011526, Ex. 28; D011240, Ex. 30; D011131, Ex. 27; D030650, Ex. 29.

    e)    "Employees will receive a clean smock daily. One hairnet/beardnet will be issued to you at the beginning of the week. If an employee loses his/her hairnet he/she must purchase one. Rubber gloves may be exchanged in the supply room when needed. Liners will be exchanged at the beginning of the week only. Your supervisor when required will issue mesh gloves to you. Rubber boots are available for purchase unless you have a suitable pair." *See* D0011527, Ex. 28; D011240, Ex. 30; D011131, Ex. 27; D00021, Ex. 26; D030650, Ex. 29 (noting existence of procedures but not providing information as to how more information can be obtained).

6.    Defendant required all new hourly employees to undergo a uniform in-person training and orientation session with Defendant's Human Resources Department.  Ythier Tr. at 161-62, Ex. 25; Ythier Test. at 89:12-23, Ex. 34.

7.    During the training, Defendant discussed the topic of PPE and what equipment employees were required to wear.  Vargas Gomez Tr. at 99-105, Ex. 9; Hernandez Tr. at 65- 66, Ex. 12; Maldonado Tr. at 111-113, Ex. 13; Blanco Maya Tr. at 80-82, 116-117, 120-12, Ex. 16; Polanco Tr. at 73-75, 86-87, Ex. 19; Torres Tr. at 70-72, Ex. 23; Vicente Tr. at 90-91, Ex. 24.

8.    Plaintiffs were also given a standard safety training, instructed as to how to use Defendant's time clocks, and told "what items of sanitary and protective clothing and equipment are required to be worn in various departments in the Fredericksburg Facility."  Def. RFA Resp. 7-11, Ex. 1; *see also* Garcia Tr. at 87-89, Ex. 7; Vargas Gomez Tr. at 122-125, Ex. 9.

**C.**    **Personal Protective Equipment**

9.    Production line workers at the Fredericksburg facility were required to use PPE that was essential to the work they performed in their jobs.  *See* Def. RFA Nos. 30-33, Ex. 1; *see*

3

*also* Tobias Decl. at ¶¶ 13-14, Ex. 36; D30778-801, Ex. 29; D011651, Ex. 32; D011659, Ex. 33 (manager).

10.     Defendant's Employee Handbook contained a section entitled "Donning and Doffing" that set forth Defendant's donning and doffing policy for PPE. *See* Ythier Test. at 82:25-83:2, Ex. 35 (human resources manager discussing Employee handbook); *id.* at 91:4-13 (noting the donning and doffing section and policy).

11.     The use of mesh gloves, plastic gloves, cotton gloves, hairnets, arm guards, plastic sleeves, safety glasses, plastic aprons, and smocks was required by sanitation and safety concerns and **was standard in the poultry industry**. *See, e.g.,* Def. RFA Nos. 30-34, Ex. 1; *see also* Marco Vol. II Tr. at 85, Ex. 15 (plastic gloves worn to keep "the meat from getting contaminated); Polanco Tr. at 132, Ex. 19 (stating his hands would freeze without cotton gloves); Torres Maldonado Tr. at 111-112, 122-123, 202-221, Ex. 13; Garcia Tr. at 73-74, Ex. 7; Marco Vol. I Tr. at 10, Ex. 15 (deboning line wore cotton gloves, nylon protection gloves, rubber gloves, coat, plastic sleeve, arm protector, apron, hairnet, boots, ear protection); *id.* at 16-19 (all deboning employees wore plastic sleeves, coats, and apron); Gundrum Tr. at 54-55, Ex. 11 (Deboning supervisor testifying that all knife-wielding deboning employees wore same PPE); *id* at 54-55, 89-93 (Deboning supervisor testifying that employees wear protective mesh gloves, arm guards, smocks, latex gloves, cotton gloves and hairnets); Ranck Tr. at 206-209, Ex. 20 (Quality Assurance manager testifying that "Employees will maintain clean hands, aprons, boots, gloves, knives, scabbards, scissors, and smocks during work" was a non-optional standard for the plant and how PPE is part of "Good Manufacturing Practices" to prevent cross contamination).

12.     Defendant's own customers also required that Defendant's employees wear PPE **to protect the product from contamination**. These customers commission annual audits of

Defendant's facility and employees to ensure that the production process is sanitary.  Ranck Tr. at 234-235, 238-239, Ex. 20 (Quality Assurance manager testifying regarding annual audits); *see also* Merrell Tr. at 214-218, 229-231, Ex. 18 (manager testifying regarding audits and admitting that one customer's standards require employees to wear gloves when coming into contact with the product).

13.     Defendant required clean PPE to be worn **to ensure processing was "sanitary" and to "prevent direct and cross-contamination."**  *See* Def. RFA No. 34, Ex. 1; Merrell Tr. at 113-114, Ex. 18 (manager testifying that a smock is required "to ensure a sanitary outer garment . . . [employees are] required to maintain a sanitary outer garment as part of our food safety program."); *id* at 126-127, Ex. 18; Ranck Tr. at 196-199, Ex. 20 (Quality Assurance manager testifying regarding PPE used to avoid cross contaimination); Torres-Maldonado Tr. at 121-123, 207-208, 216-220, Ex. 13 (testifying that he was trained that PPE helps protect the product from contamination); Hernadez Tr. at 46-47, 133-134, Ex. 12 (testifying that employees could not work without plastic aprons, sleeves and gloves); Garcia Tr. at 90, Ex. 7 (testifying that he wore a plastic apron to avoid contamination); Blanco Maya Tr. at 117-119, 126, Ex. 16 (testifying he had to wear an apron and hairnet to protect the product); Gomez Vargas Tr. at 162-164, 166-167, Ex. 9 (testifying she had to wear the apron and sleeves to protect the product).

14.     Defendant's Quality Assurance manager, Susan Ranck, testified that federal standards required that items that are likely to come in contact with meat must be kept sanitary. Ranck Tr. at 38-39, 213-214, Ex. 20 (Quality Assurance manager testifying that from a "regulatory perspective" PPE likely to contact meat must be kept in a sanitary condition).  For instance, cotton gloves were not permitted to touch the product and were required to be covered by a plastic glove because cotton is not an easily sanitized or cleaned surface.  Ranck Tr. at 108-

110, 114, Ex. 20.  Members of the USDA's Food Safety Inspection Service (FSIS) were also

present at the plant and worked with the Quality Assurance department, supervisors and

managers to ensure that production was conducted in a clean and sanitary manner.  *Id.* at 118-

121.  Both Farmers Pride Quality Assurance department and members of the FSIS had the power

to stop the line if there were PPE violations.  *Id.* at 128 (testifying that both the USDA and

Quality assurance could stop the line if someone was not wearing a smock or hairnet).

15.     Defendant's supervisors and Quality Assurance employees inspected Plaintiffs to

make sure that they were wearing the proper PPE, that it was being worn correctly, and that it

was clean and sanitary.  *See* Garcia Tr. at 149, Ex. 7 ("[Your PPE] had to be clean.  [Supervisors]

would actually stand right [by the department], check the gloves.  Sometimes the USDA would

be standing there, too, making sure boots didn't have chicken on there and your apron and the

gloves and the sleeves."); Cedeno-Gibson Tr. at 235, Ex. 8; Marco Vol. I Tr. at 12, Ex. 15;

Hernandez Tr. at 203, Ex. 12 (stating the USDA watched employees enter the department to

make sure equipment was sanitized); Ranck Tr. at 86-87, 39-40, 45-46, Ex. 20 (Quality

Assurance manager testifying that there were two quality assurance inspectors assigned to the

Deboning Department who would inspect employees as they entered the department); Gundrum

Tr. at 32, Ex. 11 (Deboning supervisor testifying that when she worked in Quality Assurance,

she would stand at the entrance to the Deboning department at the beginning of the shift to

monitor "employee hygiene").

16.     Plaintiffs would be disciplined if they were not wearing the proper PPE, if it was

not being worn correctly, or if was not clean and sanitary.  *See, e.g.*, Custodio Tr. at 59, Ex. 5

("[I]f we would enter with our dirty smock [the supervisor] would yell."); Blanco Maya Tr. at

152-53, Ex. 16;  Gundrum Tr. at 138, 299, Ex. 11 (Deboning supervisor); Ranck Tr. at 86-87,

242-244, Ex. 20 (Quality Assurance manager testifying that "if an employee was noted to have

dirty boots, they would be asked to step off the line and wash their boots); Boyer Tr. at 191, Ex.

2 (Deboning supervisor testifying that she disciplined employees who were not wearing proper

PPE); Eby Tr. at 167-173, 218-223, Ex. 6 (assistant supervisors had the authority to have a

"discussion" with employees for not wearing proper PPE).

17.     Some items of PPE, including ear plugs, arm guards, and mesh gloves were

mandated by federal regulations.  Def RFA Nos. 37, 60, Ex. 1.

18.     The temperature in the deboning room was kept at 50 degrees Fahrenheit, and at

some point was raised to 52-55 degrees.  Gundrum Tr. at 99, Ex. 11 (Deboning supervisor

testifying that the temperature in the  Deboning room was not permitted to exceed 55 degrees);

Merrill Tr. at 219-220, Ex. 18 (manager); Ranck Tr. at 68-69, Ex. 20 (Quality Assurance

manager); *see also* Def. RFA No. 49, Ex. 1 (admitting "that the Packing, Cut-Up, and Deboning

Departments maintain a certain temperature").  Employees wore cotton gloves supplied by

Defendant to keep their hands warm and work efficiently during a normal eight hour shift.

Polanco Tr. at 132:9, Ex. 19 (stating his hands would freeze without cotton gloves).  Employees

also wear sweaters, jackets and sweatshirts to stay warm during their shift.  Gundrum Tr. at 240-

241, Ex. 11 (Deboning supervisor testifying that employees wear warm clothes "all the time");

Blanco-Maya Tr. at 121, Ex. 16 (testifying that he wore cotton gloves, sweater and sweatshirt to

stay warm).

19.     The nature of the poultry processing work environment also requires that

Plaintiffs wear the items of PPE.  For example, employees wore aprons to "avoid the meat from

having contact with the person's clothes."  Marco Vol. II Tr. at 83-85, Ex. 15 (plastic gloves

worn to keep "the meat from getting contaminated); Merrell Tr. at 113-114, Ex. 18 (manager

testifying that a smock required "to ensure a sanitary outer garment . . . [employees are] required to maintain a sanitary outer garment as part of our food safety program."); Eby Tr. at 60-63, Ex. 6 (Deboning supervisor discussing the wet conditions when she worked on the debone lines in 2004-2005).

20.     Defendant made available to hourly production employees the items worn throughout the plant such as: **smocks** (see Def. RFA Nos. 32, 78, Ex. 1), **rubber/latex (plastic) gloves** (see Def. RFA No. 43, *id.*), **plastic/vinyl aprons** (see Def. RFA Nos. 51, 61, *id.*), **plastic sleeves** (see Def. RFA No. 54, *id.*).  *See also* Def. RFA Nos. 30 & 64, Ex. 1 (admitting Defendant required employees to wear **hairnets** and, when applicable, **beard nets**); Def. RFA No. 31, 60, 66, Ex. 1 (admitting Defendant required employees to wear **earplugs**); Def. RFA No. 32, Ex. 1 (admitting Defendant required employees to wear **cut-resistant gloves** or **Whizzard gloves** and **hard plastic arm guards** when they used a knife); Def. RFA No. 67, Ex. 1 (admitting Defendant required certain hourly employees to wear **safety glasses**).

21.     Employees may be disciplined for failing to comply with work rules and hourly employees can be terminated for failure to comply with work rules.  *See* Def. RFA No. 110, Ex.1

## D.     <u>Pre-Shift Activities</u>

22.     Production line workers were required to "obtain and don the sanitary and protective clothing and equipment required by Farmers Pride and were supposed to clock in" prior to the start of their shift on the line.  *See* Def. RFA No. 72, Ex. 1; Marco Test. at 9:22-10:7, 63:17-25, Ex. 35; Hernandez Tr. at 84-85, Ex. 12; Comasta Tr. at 70 (manager), Ex. 4; Garcia Tr. at 17-29, Ex. 7; Vicente Tr. at 169, Ex. 24.

23.     Defendant's policy required Deboning employees to be dressed and ready to work by the start time of the department.  *See* Comasta Testimony at Evidentiary Hearing ("Comasta

Test.") Vol. II at 239-242, Ex. 37; Comasta Tr. at 104, Ex. 4; Gundrum Tr. at 150-51, 164, Ex. 11 (Deboning supervisor testifying that "[A]s long as they could be in deboning and have their stuff on, they can arrive 15 seconds before [shift start time.]"); Eby Tr. at 50-51, Ex. 6 (Deboning supervisor testifying that prior to 2007 "you can punch in anytime, but starting time was 9:00 o'clock"); Hernandez Tr. at 84-85, Ex. 12; Torres Maldonado Tr. at 75-76, Ex. 13; Garcia Tr. at 41-42, 48-49, Ex. 7; Marco Vol. I Tr. at 31, 57, Ex. 14; Marco Vol. II Tr. at 229-30, Ex. 15; Blanco Maya Tr. at 135-36, Ex. 16.

24.     Employees stored much of their PPE in their lockers and would go to the lockers **before their shift start time**. *See e.g.*, Marco Test. at 12-13, Ex. 35 (testifying she stored, cotton gloves, arm guard, plastic sleeves, plastic apron, and plastic gloves in her locker); Torres Maldonado Tr. at 241-243, Ex. 13; Garcia Tr. at 119-120, Ex. 7; Gundrum Tr. at 113, Ex. 11 (Deboning supervisor testifying that most employees kept their arm guards in their lockers prior to 2007). They had to retrieve these items and don them prior to the start of production and had to stow it in their lockers prior to leaving the plant. *See, e.g.,* Marco Test. at 13:20-14:18, Ex. 35; Garcia Tr. at 137-138, Ex. 7; Boyer Tr. at 22, Ex. 2 (supervisor testifying that all employees assigned a locker by the company); *see also* Def. RFA No. 75, Ex. 1 (admitting that hourly employees chose to store their PPE in their lockers); Def. RFA. No. 72, Ex. 1 (admitting employees had to obtain and don PPE prior to the start of their shift on the line); Def. RFA Nol. 109, Ex. 1 (admitting employees stored PPE in their lockers at the end of their shift except on the day before lockers were to be cleaned). The locker area was often crowded before the shift start time. Torres Maldonado Tr. at 300-301, Ex. 13; Garcia Tr. at 136-136, Ex. 7.

25.     Plaintiffs were also required to obtain clean smocks from a central supply room **before the start of every shift**. Eby Tr. at 84-85, Ex. 6 (Deboning supervisor); Gundrum Tr. at

112-116, Ex. 11 (Deboning supervisor testifying that employees obtained their smocks and other

PPE at the supply room at the start of the shift).   Plaintiffs would also exchange items at the

supply room such as plastic aprons, plastic gloves, plastic sleeves, cotton gloves, earplugs and

hairnets.  *See* Marco Test. 13:20-14:2, Ex. 35 (testifying she walked from her locker to a central

supply room to receive and exchange additional equipment needed for each work day).   These

items were used for several days, then had to be exchanged for new ones.  Torres Maldonado Tr.

at 166-167, Ex. 13;  Merrell Tr. at 70-80, Ex. 18 (Farmers Pride manager discussing what PPE

employees obtained from the supply room at the beginning of the shift); Boyer Tr. at 51-56, Ex.

2 (Deboning supervisor testifying that employees obtained and exchanged PPE at the supply

room prior to the shift); Mehalko Tr. at 108-111, Ex. 17 (supply room clerk describing

distribution of PPE at the beginning of the week); Gundrum Tr. at 131-136, Ex. 11 (Deboning

supervisor describing distribution of PPE at the beginning of the workweek); Def. RFA No. 77,

Ex. 1 (admitting that from February 2004 to February 2007 "most hourly production employees

obtained from the supply room some of the sanitary and protective clothing and equipment that

they were required to wear and/or chose to wear, but not necessarily every day"); *see also* Def.

RFA Nos. 78, 79, Ex. 1.

26.     The supply room area was usually crowded and employees were required to line

up outside the supply room to obtain the materials they would need for the day.  Marco Test. 13-

14, Ex. 35; Torres Maldonado Tr. at 241-242, Ex. 13; Garcia Tr. at 50-51, 117-118, Ex. 7;

Mehalko Tr. at 89-106, 123-124, Ex. 17 (supply room clerk describing the process for

distributing PPE to employees); Gundrum Tr. at 119, Ex. 11 (Deboning supervisor testifying that

"on occasion" it would get congested outside of the supply room).

27.     Only one person typically waited on employees from all production departments. Garcia Tr. at 50-51, 117-118, Ex. 7; Marco Test. 13:20-14:4, Ex. 35; Mehalko Tr. at 21-23, Ex. 17  (supply room clerk testifying that there was one attendant on duty at the beginning of the third shift).

28.     At the beginning of the workweek, lines were usually longer at the supply room because employees would collect PPE they would keep and use throughout the week.  Garcia Tr. at 117-118, Ex. 7; Torres Maldonado Tr. at 224-225, 241-242, Ex. 13; Hernandez Tr. at 23-24, Ex. 12; Mehalko Tr. at 16-20, 125-132, Ex. 17 (supply room clerk).

29.     In either 2005 or 2006, Defendant split the Deboning department into two groups: Breast Deboning and Thigh & Leg Deboning.  *See* D-00431 Ex. 39, D_011078, Ex. 41; Eby Tr. at 16-21, Ex. 6 (Deboning supervisor testifying as to split in the Deboning department).  In order to reduce crowding when employees were entering an leaving the department, Breast Deboning was put on a schedule fifteen minutes behind Thigh & Leg Deboning.  Boyer Tr. at 42-43, Ex. 2 (Deboning supervisor testifying that the departments were split to reduce crowds).

30.     In the Fall of 2007, after the filing of this suit, Defendant changed its policies and procedures such that "most of the sanitary and protective clothing and equipment worn by hourly production employees . . . is obtained inside the entrances to the various production departments [and not at the supply room] . . . ."  Def. RFA No. 103, Ex. 1.  Now, most PPE, including mesh gloves, arm protectors, plastic gloves, plastic sleeves, and plastic aprons are distributed inside the department at the start of the shift, and returned or discarded inside the department at the end of the shift.  *See* Boyer Tr. at 23-24, Ex. 2 (supervisor).  Employees no longer store most of their PPE in their lockers.  Gundrum Tr. at 102-112, Ex. 11 (Deboning supervisor describing how PPE has been distributed in Deboning since 2007).  These changes illustrate how Defendant has

always had control of the donning and doffing engaged in by Plaintiffs because Defendant provides the PPE at issue and sets company policies and procedures regarding the distribution, donning and doffing of PPE.  Defendant has amply demonstrated its ability to control these activities since the filing of this suit.

**E.**     **Unpaid Meal Period**

31.     Defendant deducted thirty minutes from Plaintiffs' daily total hours worked to account for an unpaid and allegedly *bona fide* meal period.  Tobias Tr. at 122-123, Ex. 22 (manager); Boyer Tr. at 77, Ex. 2 (Deboning supervisor); Seabold Tr. at 46, Ex. 21 (payroll clerk); Gundrum Tr. at 189, Ex. 11 (supervisor); Ythier Tr. at 20, 54, Ex. 25 (human resources manager); *see also* Employee Handbooks at D-00007, Ex. 26; D011508, Ex. 28; D011219, Ex. 30; D011111, Ex. 27.

32.     Employees did not clock out and back in during their unpaid meal period unless they were leaving the premises of the Fredericksburg Facility.  Def. RFA No. 87, Ex. 1; Boyer Tr. at 76-77, Ex. 2 (Deboning supervisor); Tobias Tr. at 122, Ex. 22 (manager).

33.     Defendant's supervisors or their designees notified hourly production employees when the production line would stop for the start of their meal periods.  Def. RFA No. 95, Ex. 1; *see also* Eby Tr. at 157, Ex. 6 (Deboning supervisor); Boyer Tr. at 36-37, Ex. 2 (Deboning supervisor testifying that either she or her assistant would call out to employees when the break started); Merrell Tr. at 116-117, Ex. 18 (manager testifying that supervisors controlled when the lines ran); Garcia Tr. at 34, 150, Ex. 7; Vargas Gomez Tr. at 209-210, Ex. 9; Hernandez Tr. at 102, Ex. 12; Torres Maldonado Tr. at 254, Ex. 13; Marco Vol. II Tr. at 144, Ex. 15; Marco Test. at 23-24, Ex. 35; Blanco Maya Tr. at 154, Ex. 16; Polanco Tr. at 190, Ex. 19; Vicente Tr. at 224-25, Ex. 24.

34.     The 30 minute meal period began running as soon as the production line stopped. *See* Blanco Maya Tr. at 89-91, 155-157, Ex. 16; Vargas Gomez Tr. at 142, Ex. 9; Marco Vol. II Tr. at 140-41, 144, Ex. 15 (line stopped for 30 minutes).

35.     Likewise, Defendant's supervisors or their designees notified hourly production employees when it was time to return to the production area and prepare for the recommencement of production.  *See, e.g.*, Garcia Tr. at 170-72, Ex. 7; Cedeno Gibson Tr. at 240-42, Ex.  8; Vargas Gomez Tr. at 233-34, Ex. 9; Hernandez Tr. at 104-11, Ex. 12; Torres Maldonado Tr. at 88-89, 305-06, Ex. 13; Marco Vol. II Tr. at 158, Ex. 15; Blanco Maya 89, 170, Ex. 16; Polanco Tr. at 214, Ex. 19.

36.     Defendant required employees to doff their PPE during their unpaid meal period. *See* Garcia Tr. at 150, 153-57, Ex. 7; Torres Tr. at 167-68, 170, Ex. 23; Vargas Gomez Tr. at 210-11, Ex.  9; Hernandez Tr. at 101, Ex. 12; Blanco Maya Tr. at 157-58, 160-64, Ex. 16; Polanco Tr. at 191, Ex. 19; Marco Test. 23-24, Ex. 35;  Marco Vol. II Tr. at 240, Ex. 15 ("We couldn't leave the equipment to be mixed with the meat.  You had to take it out of the line."); Gundrum Tr. at 215, Ex. 11 (supervisor); Merrell Tr. at 174, Ex. 18 (manager testifying that "We required them to leave their gloves in the room . . . .  We required them to leave aprons in the room . . . .").

37.     There was often a line at the wash station where employees would wash their PPE at the beginning of the lunch break.  *See, e.g.*, Garcia Tr. at 150-155-57, Ex. 7; Cedeno Gibson Tr. at 240-42, Ex. 8; Hernandez Tr. at 24, Ex. 12; Torres Maldonado Tr. at 255-57, 303, 306, Ex. 13 ; Marco Vol. I Tr. at 36, 40, Ex. 14; Marco Vol. II Tr. at 149, 151-52, Ex. 15; Blanco Maya Tr. at 164-65, Ex. 16; Polanco Tr. at 194, Ex. 19; Boyer Tr. at 155-156, Ex. 2 (Deboning supervisor testifying that employees could wash their mesh gloves at the beginning of the break);

Gundrum Tr. at 216, Ex. 11 (Deboning supervisor testifying that protective Whizzard gloves had to be washed at lunch break).

38.     After washing their PPE, Plaintiffs had to find a hook or other location on which to hang it.  Garcia Tr. at 153-54, Ex. 7; Vargas Gomez Tr. at 210-11, Ex. 9; Torres Maldonado Tr. at 258, Ex. 13; Polanco Tr. at 202, Ex. 19; *see also* Marco Test. at 24:11-25:5, Ex. 35 (testifying that workers had to put their equipment on hangers before they could take their breaks).

39.     Plaintiffs also had to clean their boots at lunch.  Torres Maldonado Tr. at 255, Ex. 13.  Quality control inspectors on occasion would require Plaintiffs to re-wash their equipment if its cleaning was unsatisfactory.  *See* Marco Vol. I Tr. at 39, Ex. 14; Ranck Tr. at 86-87, 242-244, Ex. 20 (Quality Assurance manager testifying that "if an employee was noted to have dirty boots, they would be asked to step off the line and wash their boots"); Gundrum Tr. at 34, Ex. 11(Deboning supervisor testifying that when she was in the Quality Assurance department, she checked employees' boots to make sure they did not have "hunks of chicken" or a "thick grease buildup").

40.     Defendant did not permit employees to wear mesh or protective gloves, arm guards, plastic aprons, plastic gloves, or plastic sleeves in the restrooms or cafeteria.  Def. RFA No. 107, Ex. 1; *see also* Comasta Tr. at 216-217, Ex. 4 (manager); Garcia Tr. at 173, Ex. 7; Vargas Gomez Tr. at 99, 226, Ex. 9.

41.     Employees could go to the supply room during the lunch break if they needed new PPE.  Garcia Tr. at 123-124, Ex. 7; Mehalko Tr. at 145-146, Ex. 17 (supply room clerk); Eby Tr. at 110-111, Ex. 6 (Deboning supervisor).

42.     At the end of the unpaid meal period, Plaintiffs were required to sterilize their hands, retrieve their PPE, re-don their PPE, and walk back to their workstations within the 30 minute meal period.  Garcia Tr. at 175, Ex. 7; Torres Maldonado Tr. at 269-76, 305-06, Ex. 13; Blanco Maya Tr. at 171, Ex. 16; Polanco Tr. at 218, Ex. 19; C. Torres Tr. at 193-94, Ex. 23; Marco Test. 25:23-27:4, Ex. 35.

43.     Quality Assurance inspectors observed employees as they re-entered the department after lunch.  Ranck Tr. at 97-98, 143-144, Ex. 20 (Quality Assurance manager).

44.     Plaintiffs were required to be back at their workstations, fully dressed when the 30 minute meal period expired.  *See, e.g.*, Garcia Tr. at 34, 83-84, Ex. 7; Marco Test. at 26:3-18, Ex. 35.  There was congestion in the department as employees donned their PPE at the end of the lunch period.  Gundrum Tr. at 249-256, Ex. 11(Deboning supervisor testifying that there was crowding at the end of the lunch period).

45.     If Plaintiffs were late getting back to the line after lunch, they were reprimanded or disciplined by their supervisors.  Garcia Tr. at 83-84, Ex. 7; Cedeno Gibson Tr. at 253, Ex. 8; Vicente Tr. at 123-24, Ex. 24; Gundrum Tr. at 307-308, Ex. 11 (Deboning supervisor testifying regarding discipline for tardiness at meal breaks).

## F.     Post-Shift Activities

46.     After Defendant stopped the production line for the day, Defendant required Plaintiffs to perform significant additional work in connection with their donning and doffing activities.

47.     Production line workers were notified by their supervisors that their shifts had concluded.  Marco Test. at 27:10-12, Ex. 35.

48.     At the end of the shift, Defendant required or permitted hourly employees to remove their PPE, wait in line to use hoses and sinks to clean themselves and their PPE, and put dirty PPE into laundry bags or return it to their lockers.  *See, e.g.*, Custodio Tr. at 202, 206. Ex. 5; Marco Vol. II Tr. at 170-71, 224, Ex. 15; *see also* Def. RFA No. 99, Ex. 1 (admitting Defendant required employees to clean some items of PPE they wore); Merrell Tr. at 242-243, Ex. 18 (manager admitting that employees were permitted to wash their PPE at the end of the shift, and that the company did not monitor this time); Boyer Tr. at 46-50, Ex.  2(Deboning supervisor testifying that employees were permitted to wash PPE at the end of the shift).

49.     Specifically, when the production line stopped, Plaintiffs walked to a washing station and waited in line for access to a hose or sink where they washed their mesh gloves, arm protectors, plastic aprons, plastic sleeves, plastic gloves and boots.  They then dried their PPE with paper towels so that it was not wet when they put it in their lockers.  *See* Custodio Tr. at 202, 206, Ex. 5; Garcia Tr. at 179-81, 183-86, Ex. 7; Hernandez Tr. at 238, 272, Ex. 12; Torres Maldonado Tr. at 280-83, 306, Ex. 13; Marco Vol. II Tr. at 175, Ex. 15; Polanco Tr. at 220-226, Ex. 19; C. Torres Tr. at 200-05, 210-18, Ex. 23; Vicente Tr. at 258-59, Ex. 24; Marco Test. at 27:15-28:30, Ex. 35; Gruber Tr. at 154-56 (manager), Ex. 10; Merrell Tr. at 198-200, Ex.  18 (manager confirming that employees were trained on washing PPE during orientation).

50.     Plaintiffs spent more time washing their PPE at the end of the shift than during their meal period because they washed it more thoroughly at the end of the day.  Since Plaintiffs stored their PPE in their lockers overnight and the PPE had to be sterile, Plaintiffs had to be more thorough in ensuring their PPE was completely clean and dried.  *See, e.g.*, Gruber Tr. at 154-56 (manager), Ex. 10; *see also* Vargas Gomez Tr. at 249, Ex. 9; Hernandez Tr. at 238-39, Ex. 12;

Blanco Maya Tr. at 173-76, Ex. 16; Polanco Tr. at 220, Ex. 19; C. Torres Tr. at 205-06, Ex. 23;

Vicente Tr. at 304-05, Ex. 24.

51.     Plaintiffs washed their equipment at the end of the shift because they were

required to have clean equipment when they re-entered the department at the beginning of their

next shift.  *See* Ranck Tr. at 163-168, Ex. 20  (Quality Assurance manager testifying that

employees washed their mesh gloves at sinks at the end of their shift, and that the mesh gloves

were individually inspected when employees entered the department at the beginning of the

shift); Garcia Tr. at 147-149, Ex. 7 (testifying that he had to wash his PPE at the end of the shift

so it would be clean at the start of the next shift).

52.     Plaintiffs placed smocks in a laundry bag or hamper located near the laundry area.

Gundrum Tr. at 116, Ex. 11  (Deboning supervisor); Hernandez Tr. at 241, Ex. 12; Marco Vol. II

Tr. at 180, Ex. 15.

53.     After washing and drying their PPE, Plaintiffs exited the department's production

area and walked to the locker room so they could change and store PPE in their locker,

including, without limitation:  mesh gloves, arm protectors, plastic aprons, plastic gloves, plastic

sleeves, cloth gloves, hairnets, beard nets, earplugs, and boots.  *See, e.g.*, Custodio Tr. at 163-64,

Ex. 5; Garcia Tr. at 186-89, Ex. 7; Hernandez Tr. at 240, Ex. 12; Marco Vol. I Tr. at 21, 41-42,

Ex. 14; Blanco Maya Tr. at 179, Ex. 16; Polanco Tr. at 227, Ex. 19; Marco Test. at 28:17-23, Ex.

35; Merrell Tr. at 224, Ex. 18 (manager).

54.     The locker area was often crowded during this time.  *See* Merrell Tr. at 171-72,

Ex. 18 (manager testifying that Farmers Pride was concerned about crowding at the end of the

shift); *see also* Torres Maldonado Tr. at 300-303, Ex. 13.

55.     Plaintiffs clocked out at some point after the line stopped for the day.  Seabold Tr.

at 65-66, Ex. 21 (payroll clerk); Garcia Tr. at 188-89, Ex. 7; Polanco Tr. at 227, Ex. 19.

Dated: March 31, 2011                              Respectfully submitted,

                                                   BERGER & MONTAGUE, P.C.


                                                      /s/
                                                   SHANON J. CARSON
                                                   JAMES A. WELLS
                                                   1622 Locust Street
                                                   Philadelphia, PA  19103
                                                   Telephone No.: (215) 875-3000
                                                   Facsimile No.: (215) 875-4604

                                                   SCHNEIDER WALLACE COTTRELL
                                                   BRAYTON KONECKY LLP
                                                   TODD M. SCHNEIDER
                                                   CLINT J. BRAYTON
                                                   180 Montgomery Street, Suite 2000
                                                   San Francisco, CA  94104
                                                   Telephone No.: (415) 421-7100
                                                   Facsimile No.: (415) 421-7105

                                                   PHILIP A. DOWNEY
                                                   The Downey Law Firm, LLC
                                                   P.O. Box 1021
                                                   Unionville, PA  19375
                                                   Telephone No.: (610) 324-2848
                                                   Facsimile No.: (610) 813-4579

                                                   *Attorneys for Plaintiffs and Opt-In Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2011, I served a true and correct copy of Plaintiffs'

Motion for Partial Summary Judgment, and all supporting papers, on the following:

### <u>By Electronic Mail and ECF</u>

George C. Werner, Esq.
Barley Snyder LLC
126 East King Street
Lancaster, PA 17602
Telephone: (717) 399-1511
Email: gwerner@barley.com

Jill S. Welch, Esq.
Barley Snyder LLC
126 East King Street
Lancaster, PA 17602
Telephone: (717) 399-1521
Email: jwelch@barley.com

Michael J. Mueller
Hunton & Williams LLP
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 419-2116
Email: mmueller@hunton.com

Ryan A. Glassgow
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8791
Email: rglassgow@hunton.com

_____/s/_____
James A. Wells