IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LUZ LUGO, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FARMERS PRIDE, INC.,<br><br>Defendant. | CIVIL ACTION NO.: 07-CV-00749<br><br><br><br>Honorable Michael M. Baylson |

**PLAINTIFFS' PRETRIAL MEMORANDUM**

**I.     INTRODUCTION**

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, Local Rule 16.1(c), and the rules of this Court as stated in the Handbook of Pre-Trial and Trial Practices and Procedures of the United States District Court for the Eastern District of Pennsylvania, Plaintiffs Luz Lugo and Yesenia Marco ("Plaintiffs"), on behalf of themselves and all other similarly situated employees of Farmers Pride, Inc. ("Defendant"), by and through their counsel of record, respectfully submit this Pretrial Memorandum. The information contained herein is based upon Plaintiffs' current knowledge and discovery produced to date. Plaintiffs expressly reserve all rights to modify or supplement this Pretrial Memorandum until the time of trial if new information is made known.

Because Plaintiffs are submitting their Pretrial Memorandum prior to the submission by Defendant of its Pretrial Memorandum, Plaintiffs also reserve the right to supplement this Pretrial Memorandum to include objections to any of Defendant's witnesses or exhibits

1

identified in their trial exhibit schedule. Finally, Plaintiffs respectfully request the opportunity to supplement this Pretrial Memorandum in response to any of this Court's rulings on motions filed prior to trial that have not yet been ruled upon by this Court.

## II. NATURE OF THE ACTION

Plaintiffs will prove that from February 23, 2004 (the beginning of the relevant statutory period) to December 2007, Defendant maintained a singular practice and compensation system – applicable to all Third Shift Deboning Plaintiffs – of uniformly violating the FLSA by failing to pay its hourly production employees for: a) time worked before their scheduled "shift punch in time"; b) time worked after the "shift end punch out time"; and c) time worked during their unpaid meal breaks. Plaintiffs will also prove that during the post-December 2007 period, Defendant had a practice of uniformly permitting its hourly production employees to work during their unpaid meal breaks without compensation.

The Court has subject-matter jurisdiction over this action pursuant to 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer ... in any Federal or State court of competent jurisdiction." Id. In addition, the Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendant maintains substantial contacts and conducts business here.

## III. FACTS OF THE CASE

### A. Introduction

1. Defendant Farmers Pride operates a poultry processing plant in Fredericksburg, Pennsylvania.

2. The "Class," as defined by the Court's December 10, 2010 Order consists of those Plaintiffs who worked in the Deboning Department on the Third Shift from the period of February 23, 2004 to December 31, 2007 (with respect to their claim for off-the-clock work before and after their shifts), as well as those Plaintiffs who worked in the Deboning Department on the Third Shift from the period of February 23, 2004 to the present, with respect to Plaintiffs' claim for not being paid for meal periods.

3. Employees in the Deboning Department remove bones from chicken breasts, thighs and legs, and trim and process the chicken for shipment to customers. The Department consists of four breast deboning lines, a thigh deboning line and a leg deboning line.

### B. The Employee Handbook and Training

4. Defendant maintained an Employee Handbook throughout the relevant time period which set forth mandatory policies that applied to all production workers. All hourly employees are given a copy of the Employee Handbook in English (and Spanish if that is their primary language).

5. The Handbooks included detailed policies regarding straight time, overtime, lunch and break time, as well as safety, attendance, and disciplinary policies, including:

   a) All employees will be given thirty minutes (unpaid) for lunch.

   b) "The company will deduct one-half (1/2) hour for lunch break, unless otherwise noted."

   c) "The Company will assign employees a locker."

   d) "It is the policy of the Company that anyone working in the plant and coming into contact with product must have good personal hygiene. For your safety, you will be expected to wear the following equipment in some of our work areas: hearing protection, hairnets, rubber gloves, mesh gloves, liners, rubber aprons, smocks, boots."

        e)    "Employees will receive a clean smock daily. One hairnet/beardnet will be issued to you at the beginning of the week. If an employee loses his/her hairnet he/she must purchase one. Rubber gloves may be exchanged in the supply room when needed. Liners will be exchanged at the beginning of the week only. Your supervisor when required will issue mesh gloves to you. Rubber boots are available for purchase unless you have a suitable pair."

6. Defendant required all new hourly employees to undergo a uniform in-person training and orientation session with Defendant's Human Resources Department.

7. During the training, Defendant discussed the topic of personal protective equipment ("PPE") and what equipment employees were required to wear.

8. Plaintiffs were also provided safety training, instructed as to how to use Defendant's time clocks, and told "what items of sanitary and protective clothing and equipment are required to be worn in various departments in the Fredericksburg Facility."

      **C.**    **Timekeeping and the "Schedules"**

9. From February 23, 2004 to December 2007, all Plaintiffs' pay began at the scheduled start time of their shift.

10. During this time period, all Plaintiffs' pay ended at the end time for their shift.

11. Defendant published a schedule each year from 2001 to 2006 with the start and end times for each department and lunch break times. Defendant made minor alterations to these times from year to year. In December of 2006, Defendant split the Deboning department into Thigh Deboning and Breast Deboning, with Breast Deboning starting and ending fifteen minutes after Thigh Deboning.

12. Defendant contends its schedules have built in "allowances" that it purports allows time for donning and doffing activities. For instance, in 2006, the Breast Deboning shift began at 9:15 p.m. but the line (and actual line production work) purportedly did not start until 9:17 p.m.

This two minute allowance is purported to give employees time to collect and don their PPE, prior to actually starting production work on the line.

13. Defendant does not have any records of *actual* line stop and start times for the entire relevant time period. The lines are not attached to any computerized system that records the actual start or stop times. Supervisors did not, and still do not, write down or record the actual times the lines stop and start on a daily basis. Defendant has absolutely no way to verify that the lines actually stopped and started at the times listed on the schedule on a daily basis.

14. Plaintiffs' paid time started at the "Shift Punch In Time" listed on the schedule. Despite this label on the schedule, Plaintiffs did not actually punch in at the time clocks at that time. Plaintiffs actually punched in at the time clocks before the "Shift Punch In Time" on the schedule.

15. Defendant's system of donning and doffing compensation is dependent upon the lines actually starting and stopping precisely at the times listed on the schedule. Plaintiffs dispute that the actual start and stop times of the lines conform to the schedule.

16. Plaintiffs were required to be fully dressed and ready to work before the "Shift Punch In Time" listed on the schedule. From 2004 to 2006 this time was 9:00 p.m. for the whole Deboning department. From 2006 to the present, that time is 9:00 p.m. for Thigh Deboning and 9:15 for Breast Deboning. Thus, Plaintiffs were required to clock in, obtain PPE from their lockers, obtain PPE from the supply room, , and don all of their PPE before the "Shift Punch In Time."

17. Defendant required its hourly production employees to punch in and out on time clocks, which, until late 2007, were located near the entrance of the plant. In 2007, Defendant relocated the time clocks to the entrances of the departments, including the Deboning Department.

18.     In fact, none of Defendant's staff, supervisors or managers could explain how the Schedules worked, what activities were covered by the schedules, or how the schedules applied to compensation.

19.     Defendant's central Payroll Department was unaware that the Company even paid hourly employees for donning and doffing.

### D. Personal Protective Equipment ("PPE")

20.     Production line workers at Defendant's facility were required to use PPE that was essential to the work they performed in their jobs.

21.     Defendant's Employee Handbook contained a section entitled "Donning and Doffing" that set forth Defendant's donning and doffing policy for PPE.

22.     The use of mesh gloves, plastic gloves, cotton gloves, hairnets, arm guards, plastic sleeves, safety glasses, plastic aprons, and smocks was required by sanitation and safety concerns and was standard in the poultry industry. Defendant's own customers also required that Defendant's employees wear PPE to protect the product from contamination. These customers commission annual audits of Defendant's facility and employees to ensure that the production process is sanitary.

23.     Defendant required clean PPE to be worn to ensure processing was "sanitary" and to "prevent direct and cross-contamination."

24.     Defendant's Quality Assurance manager, Susan Ranck, testified that federal standards required that items that are likely to come in contact with meat must be kept sanitary. For instance, cotton gloves were not permitted to touch the product and were required to be covered by a plastic glove because cotton is not an easily sanitized or cleaned surface. Members of the USDA's Food Safety Inspection Service (FSIS) were also present at the plant and worked with

the Quality Assurance department, supervisors and managers to ensure that production was conducted in a clean and sanitary manner.  Both Farmers Pride Quality Assurance department and members of the FSIS had the power to stop the line if there were PPE violations.

25. Defendant's supervisors and Quality Assurance employees inspected Plaintiffs to make sure that they were wearing the proper PPE, that it was being worn correctly, and that it was clean and sanitary.

26. Plaintiffs would be disciplined if they were not wearing the proper PPE, if it was not being worn correctly, or if was not clean and sanitary.

27. Some items of PPE, including ear plugs, arm guards, and mesh gloves were mandated by federal regulations.

28. The temperature in the deboning room was kept at 50 degrees Fahrenheit, and at some point was raised to 52-55 degrees.  Employees wore cotton gloves supplied by Defendant to keep their hands warm and work efficiently during a normal eight hour shift.  Employees also wear sweaters, jackets and sweatshirts to stay warm during their shift.

29. The nature of the poultry processing work environment also requires that Plaintiffs wear the items of PPE.  For example, employees wore aprons to "avoid the meat from having contact with the person's clothes."

30. Defendant made available to hourly production employees the items worn throughout the plant such as: smocks, rubber/latex/plastic gloves, rubber/plastic/vinyl aprons, plastic/vinyl sleeves, mesh gloves, cotton gloves, ear plugs, and hairnets.

31. Employees may be disciplined for failing to comply with work rules and hourly employees can be terminated for failure to comply with work rules.

### E. Pre-Shift Activities

32. Production line workers were required to "obtain and don the sanitary and protective clothing and equipment required by Farmers Pride and were supposed to clock in" prior to the start of their shift on the line.

33. Defendant's policy required Deboning employees to be dressed and ready to work by the Shift Punch In Time of the department.

34. Employees stored much of their PPE in their lockers and would go to the lockers before their shift start time. They had to retrieve these items and don them prior to the start of production and had to stow it in their lockers prior to leaving the plant.

35. Plaintiffs were also required to obtain clean smocks from a central supply room before the start of every shift. Plaintiffs would also exchange items at the supply room such as plastic aprons, plastic gloves, plastic sleeves, cotton gloves, earplugs and hairnets. These items were used for several days, then had to be exchanged for new ones.

36. The supply room area was usually crowded and employees were required to line up outside the supply room to obtain the materials they would need for the day.

37. Only one person typically worked in the supply room and waited on employees from all production departments.

38. At the beginning of the workweek, lines were usually longer at the supply room because employees would collect PPE they would keep and use throughout the week.

39. In either 2005 or 2006, Defendant split the Deboning department into two groups: Breast Deboning and Thigh & Leg Deboning.

40. In the Fall of 2007, after the filing of this suit, Defendant changed its policies and procedures such that "most of the sanitary and protective clothing and equipment worn by hourly

production employees . . . is obtained inside the entrances to the various production departments [and not at the supply room] . . . ." Now, most PPE, including mesh gloves, arm protectors, plastic gloves, plastic sleeves, and plastic aprons are distributed inside the department at the start of the shift, and returned or discarded inside the department at the end of the shift. These changes illustrate how Defendant has always had control of the donning and doffing engaged in by Plaintiffs because Defendant provides the PPE at issue and sets company policies and procedures regarding the distribution, donning and doffing of PPE. Defendant has amply demonstrated its ability to control these activities since the filing of this suit.

### F. Unpaid Meal Period

41. Defendant deducted thirty minutes from Plaintiffs' daily total hours worked to account for an unpaid and allegedly *bona fide* meal period.

42. Employees did not clock out and back in during their unpaid meal period unless they were leaving the premises of the Fredericksburg Facility.

43. Defendant's supervisors or their designees notified hourly production employees when the production line would stop for the start of their meal periods.

44. The meal period began running as soon as the production line stopped.

45. Defendant's supervisors or their designees notified hourly production employees when it was time to return to the production area and prepare for the recommencement of production.

46. Defendant required employees to doff their PPE during their unpaid meal period.

47. There was often a line at the wash station where employees would wash their PPE at the beginning of the meal period.

48. After washing their PPE, Plaintiffs had to find a hook or other location on which to hang it.

49.     Plaintiffs also had to clean their boots at lunch. Quality control inspectors on occasion would require Plaintiffs to re-wash their boots if the cleaning was unsatisfactory.

50.     Defendant did not permit employees to wear mesh or protective gloves, arm guards, plastic aprons, plastic gloves, or plastic sleeves in the restrooms or cafeteria.

51.     Employees could go to the supply room during the meal period if they needed new PPE.

52.     At the end of the unpaid meal period, Plaintiffs were required to sterilize their hands, retrieve their PPE, re-don their PPE, and walk back to their workstations.

53.     Quality Assurance inspectors observed employees as they re-entered the department after lunch.

54.     Plaintiffs were required to be back at their workstations, fully dressed when themeal period expired. There was congestion in the department as employees donned their PPE at the end of the lunch period.

55.     If Plaintiffs were late getting back to the line after lunch, they were reprimanded or disciplined by their supervisors.

      **G.     Post-Shift Activities**

56.     After Defendant stopped the production line for the day, Defendant required Plaintiffs to perform additional work in connection with their donning and doffing activities.

57.     Production line workers were notified by their supervisors that their shifts had concluded.

58.     At the end of the shift, Defendant required or permitted hourly employees to remove their PPE, wait in line to use hoses and sinks to clean themselves and their PPE, and put dirty PPE into laundry bags or return it to their lockers.

59.     Specifically, when the production line stopped, Plaintiffs walked to a washing station and waited in line for access to a hose or sink where they washed their mesh gloves, arm protectors,

plastic aprons, plastic sleeves, plastic gloves and boots.  They then dried their PPE with paper towels so that it was not wet when they put it in their lockers.

60. Plaintiffs spent more time washing their PPE at the end of the shift than during their meal period because they washed it more thoroughly at the end of the day.  Since Plaintiffs stored their PPE in their lockers overnight and the PPE had to be sterile, Plaintiffs had to be more thorough in ensuring their PPE was completely clean and dried.

61. Plaintiffs washed their equipment at the end of the shift because they were required to have clean equipment when they re-entered the department at the beginning of their next shift.

62. Plaintiffs placed smocks in a laundry bag or hamper located near the laundry area.

63. After washing and drying their PPE, Plaintiffs exited the department's production area and walked to the locker room so they could change and store PPE in their locker, including, mesh gloves, arm protectors, plastic aprons, plastic gloves, plastic sleeves, cloth gloves, hairnets, beard nets, earplugs, and boots.

64. The locker area was often crowded during this time.

65. Plaintiffs clocked out after the line stopped for the day.

## IV. DAMAGES

### A. Calculation of Damages

To establish damages, Plaintiffs will present Kenneth Mericle, Ph.D., and Andrew Verzilli, as expert witnesses.

- Dr. Kenneth Mericle is an industrial engineer, and has conducted multiple time and motion studies of the Farmers Pride plant to determine how long Plaintiffs spend performing various activities.

Dr. Mericle will also identify several reasons why his analysis underestimates the actual times, including changes in the plant procedures that have eliminated some of the donning and doffing activities employees used to perform.

Andrew Verzilli is an expert in economic damages calculation and has conducted an analysis of the Opt-In Plaintiffs' time and payroll records, among other materials. Mr. Verzilli will testify as to his calculations of the following five damage estimates:

- Estimate I- Pre-Shift Uncompensated Work Activities: $308,440;
- Estimate II- Meal Break Uncompensated Work Activities: $285,986;
- Estimate III- Uncompensated Work Activities Based on Mericle Report : $156,135;
- Estimate IV- Pre-Shift and Meal Period Uncompensated Work Activities Based on Mericle Report: $131,160;
- Estimate V- Uncompensated Work Activities Based on Mericle Report for Pre- and Post-Shift Plus a Thirty Minute Meal Period: $393,199.
- Estimate VI – Meal Period 2008 present based on 30 minutes - $67,583
- Estimate VII – Meal Period 2008 present based on Mericle Report - $11,498

**B.    Attorneys' Fees**

The FLSA provides that in an action for overtime wages, "[t]he court … shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorneys' fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). As discussed above, there is no question that Farmers Pride is liable for overtime violations. Because there is no question that Farmers Pride will be required to pay the opt-in Plaintiffs for unpaid overtime wages, it will also be liable for all attorneys' fees and costs incurred in the prosecution of this action. Use of the word "shall" in the Code makes recovery of attorneys' fees and costs for the prevailing plaintiff mandatory.

## V. WITNESSES

### A. Liability

#### 1. *Opt-In Plaintiff Liability Witnesses*

Plaintiffs intend to call the following Opt-In Plaintiffs as witnesses to establish Defendant's liability:

1. Edgar Barreiro Reading, PA
2. Wilfredo Blanco Reading, PA
3. Lazaro Cabello Reading, PA
4. Sheila Casseus Anneville, PA
5. Dianne Cedeno Reading, PA
6. Dominica Cedeno Reading, PA
7. Maria Cerda Reading, PA
8. Sussy Cisneros Lebanon, PA
9. Pedro Cruz Deleon Reading, PA
10. Wilma Cruz Deleon Reading, PA
11. Carmen Custodio Reading, PA
12. Milagros De La Cruz Annville, PA
13. Maritza Diaz Annville, PA
14. Amado Dipiton Reading, PA
15. Mariela Estrada Lebanon, PA
16. Raymond Garcia Reading, PA
17. Faridi Gomez Vargas Reading, PA
18. Leonel Gonzalez Reading, PA
19. Maria Guillen Reading, PA
20. Elliot Hernandez Reading, PA
21. Luz Lugo Boqueron, PR
22. Yesenia Marco Allentown, PA
23. Andinkson Marizan Reading, PA
24. Ibrain Marquez-Pacheco Lebanon, PA
25. Elsy Melgar Reading, PA
26. Nestor Mercedes Patterson, NJ
27. Mayra C. Montalvo Lebanon, PA
28. Rosa Morales Lebanon, PA
29. Digna Munoz Lebanon, PA
30. Adelaida Naranjo Reading, PA
31. Javier Pagan Glendale, NY
32. Maria Patino Reading, PA
33. Damaris Perez Reading, PA
34. Joselyn Rivera Lebanon, PA
35. Vicente Rosario Sabana Hoyos, PR

| | | | |
|---|---|---|---|
| 36. | Gladys | Santos | Reading, PA |
| 37. | Silvia | Tejada | Reading, PA |
| 38. | Johnny | Torres | Lebanon, PA |
| 39. | Luis | Vazquez | Reading, PA |

Plaintiffs may call the following Opt-In Plaintiffs as witnesses to establish Defendant's liability:

| | | | |
|---|---|---|---|
| 1. | Miguel | Alonso | Reading, PA |
| 2. | Barbara | Amaro | Reading, PA |
| 3. | Eulogia | Araujo | Reading, PA |
| 4. | Nelson | Araujo | Reading, PA |
| 5. | Isabel | Beltran | Reading, PA |
| 6. | Eugenio | Bonilla | Lebanon, PA |
| 7. | Oscar | Cabrera | Reading, PA |
| 8. | David | Caraballo | Reading, PA |
| 9. | Sheila | Casseus | Annville, PA |
| 10. | Argenis | Castillo | Reading, PA |
| 11. | Damian | Castillo | Reading, PA |
| 12. | Virgilio | Castillo | Reading, PA |
| 13. | Yojanssi | Castillo | Reading, PA |
| 14. | Elizabeth | Cirino Pizarro | Reading, PA |
| 15. | Rafael | Contrearas | Reading, PA |
| 16. | Joan | Coplin | Lebanon, PA |
| 17. | Juan | Coste | Reading, PA |
| 18. | Aida | Cuadrado Sanchez | Reading, PA |
| 19. | Ilda | Cubilete | Lebanon, PA |
| 20. | Maximo | Del Bois | Reading, PA |
| 21. | Rafael | Del Rosario | Reading, PA |
| 22. | Dayanis | Diaz | Reading, PA |
| 23. | Maria | Diaz | Reading, PA |
| 24. | Mario | Escano | Lebanon, PA |
| 25. | Sulay | Escarraman | Reading, PA |
| 26. | Felix | Familia | Reading, PA |
| 27. | Pedro | Familia Santana | Reading, PA |
| 28. | Fanny | Feliz | Reading, PA |
| 29. | Antonio | Fuentes | Lebanon, PA |
| 30. | Silvia | Garcia | Fleetwood, PA |
| 31. | Julio | Gendren | Reading, PA |
| 32. | Yohaira | Gomez | Reading, PA |
| 33. | Jacqueline | Gonzalez | Reading, PA |
| 34. | Martha | Gonzalez | Reading, PA |
| 35. | Yris | Gonzalez | Reading, PA |
| 36. | Jose | Grullart | Reading, PA |
| 37. | Amarili | Guerrero | Reading, PA |

| | | | |
|---|---|---|---|
| 38. | Angel | Guzman | Reading, PA |
| 39. | Ana | Hernandez | Reading, PA |
| 40. | Maria | Herrera | Reading, PA |
| 41. | Elias | Linares | West Lavon, PA |
| 42. | Josefa | Manzueta | Reading, PA |
| 43. | Irma | Medina | Reading, PA |
| 44. | Ramon | Mejia | Reading, PA |
| 45. | Miguel | Mercado Vega | Reading, PA |
| 46. | Ydalia | Moncion | Reading, PA |
| 47. | Jesus | Morales | Reading, PA |
| 48. | Gregorio | Mota-Sanchez | Reading, PA |
| 49. | Mercedes | Nunez | Reading, PA |
| 50. | Mirtzaida | Oliveras | Ansonia, CT |
| 51. | Edurigis | Pagan | Reading, PA |
| 52. | Luis | Pallero | Reading, PA |
| 53. | Mauricio | Paulino | Reading, PA |
| 54. | Catalina | Perez | Lebanon, PA |
| 55. | Gertrudis | Perez | Reading, PA |
| 56. | Maria | Perez | Reading, PA |
| 57. | Nereyda | Perez | Reading, PA |
| 58. | Nem | Phath | Lebanon, PA |
| 59. | Domingo | Pucheu | Philadelphia, PA |
| 60. | Ada | Ramos | Reading, PA |
| 61. | Alexander | Rivera | Reading, PA |
| 62. | Carmen | Rivera | Reading, PA |
| 63. | Elba | Rivera | Reading, PA |
| 64. | Jesus | Rivera | Lebanon, PA |
| 65. | Maritza | Rivera | Reading, PA |
| 66. | Jose | Robles | Reading, PA |
| 67. | Rosario | Rodriguez | Reading, PA |
| 68. | Angel | Rosa Luna | Reading, PA |
| 69. | Edwin | Rosa | Reading, PA |
| 70. | Jessica | Rosario | Sabana Hoyos, PR |
| 71. | Mercedes | Rosario | Reading, PA |
| 72. | Nhar | Ros | Lebanon, PA |
| 73. | Kenia | Salvador | Reading, PA |
| 74. | Ana | Sanchez | Reading, PA |
| 75. | Pablo | Sanchez Mota | Reading, PA |
| 76. | Yoahanny | Santana | Reading, PA |
| 77. | Milciades | Santana P | Reading, PA |
| 78. | Edwin | Santiago | Susua Baja Sab, PR |
| 79. | Nestor | Santos | Lebanon, PA |
| 80. | Gustavo | Serrano | Reading, PA |
| 81. | Rochelle | Sissen | Lebanon, PA |
| 82. | Faustino | Suarez | Reading, PA |
| 83. | Joanna | Suss | Lebanon, PA |

| | | | |
|---|---|---|---|
| 84. | Johanna | Tavarez | Reading, PA |
| 85. | Ana Maria | Torres | Reading, PA |
| 86. | Lucilla | Trejo | Reading, PA |
| 87. | Felix | Unena | Reading, PA |
| 88. | Juan Carlos | Valerio | Reading, PA |
| 89. | Jose | Vasquez | Reading, PA |
| 90. | Dannesa | Velazquez | Lebanon, PA |
| 91. | Luz | Villar | Reading, PA |

### 2. *Defendant Liability Witnesses*

Plaintiffs intend to call current and former Farmers Pride management, supervisory and hourly employees in their case-in-chief to establish Defendant's liability. Plaintiffs may also call any witnesses and expert witnesses disclosed by Defendant. Furthermore, Plaintiffs reserve the right to call additional persons as rebuttal witnesses.

| | | | |
|---|---|---|---|
| 1. | Anita | Comasta | Fredricksburg, PA |
| 2. | Barbara | Rhodes | Fredricksburg, PA |
| 3. | Barbara | Seabold | Fredricksburg, PA |
| 4. | Bruno | Schmalhoffer | Fredricksburg, PA |
| 5. | Chad | Merrell | Fredricksburg, PA |
| 6. | Diane | Mehalko | Fredricksburg, PA |
| 7. | Gladys | Boyer | Fredricksburg, PA |
| 8. | J. Michael | Good | Fredricksburg, PA |
| 9. | James | Tobias | Fredricksburg, PA |
| 10. | Joe | Gardner | Pinehurst, NC |
| 11. | Judith | Eby | Fredricksburg, PA |
| 12. | Justin | Sherwood | Fredricksburg, PA |
| 13. | Lizabeth | Cruz | Fredricksburg, PA |
| 14. | Lummy | Ythier | Fredricksburg, PA |
| 15. | Scott | Sechler | Fredricksburg, PA |
| 16. | Sherry | Gundrum | Fredricksburg, PA |
| 17. | Susan | Ranck | Lancaster, PA |
| 18. | William | Gruber | Fredricksburg, PA |

**B.   Damages Witnesses**

To establish damages, Plaintiffs will present the following expert witnesses:

1. Kenneth Mericle, Ph.D.
   University of Wisconsin at Madison
   21 Pinehurst Circle

16

      Madison, WI 53717-1142

2. Andrew Verzilli
   Verzilli & Verzilli and Consultants, Inc.
   411 North Broad Street
   Lansdale, PA 19446-2413

## VI. SCHEDULE OF EXHIBITS

Plaintiffs' Schedule of Exhibits is attached as Exhibit "A" to this Pretrial Memorandum.

## VII. NUMBER OF DAYS REQUIRED FOR TRIAL

Plaintiffs anticipate that the time required for trial will be 10-15 days.

Dated: April 22, 2011                                    Respectfully submitted,


                                                          /s/
                                         TODD M. SCHNEIDER
                                         CLINT J. BRAYTON
                                         SCHNEIDER WALLACE
                                         COTTRELL BRAYTON KONECKY LLP
                                         180 Montgomery Street, Suite 2000
                                         San Francisco, CA  94104
                                         Telephone No.: (415) 421-7100
                                         Facsimile No.: (415) 421-7105


                                         BERGER & MONTAGUE, P.C.
                                         SHANON J. CARSON
                                         JAMES A. WELLS
                                         1622 Locust Street
                                         Philadelphia, PA  19103
                                         Telephone No.: (215) 875-3000
                                         Facsimile No.: (215) 875-4604

                    PHILIP A. DOWNEY
                    The Downey Law Firm, LLC
                    P.O. Box 1021
                    Unionville, PA  19375
                    Telephone No.: (610) 324-2848
                    Facsimile No.: (610) 813-4579

*Attorneys for Plaintiffs and Opt-In Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2011, I served a true and correct copy PLAINTIFFS' PRETRIAL MEMORANDUM, and all supporting papers, on the following:

### **By ECF**

George C. Werner, Esq.
Barley Snyder LLC
126 East King Street
Lancaster, PA 17602
Telephone: (717) 399-1511
Email: gwerner@barley.com

Jill S. Welch, Esq.
Barley Snyder LLC
126 East King Street
Lancaster, PA 17602
Telephone: (717) 399-1521
Email: jwelch@barley.com

Michael J. Mueller
Hunton & Williams LLP
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 419-2116
Email: mmueller@hunton.com

Ryan A. Glassgow
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8791
Email: rglassgow@hunton.com

                                      /s/
                                  Clint J. Brayton