IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| LUZ LUGO, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 07-CV-00749 |
| | : | |
| v. | : | |
| | : | |
| FARMERS PRIDE, INC., | : | |
| | : | |
| Defendant. | : | |

_____:

**PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFFS'
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiffs submit the following responses to each assertion in Defendant's Statement of

Undisputed Material Facts[1]:

1.      Defendant Farmers Pride operates a poultry processing plant in Fredericksburg,

Pennsylvania. Def.'s Ans. (Dkt. 60) at ¶ 2; *see also* Defendant's Objections and

Responses to Plaintiffs' First Set of Requests for Admission ("Def. RFA") Nos. 1-

2, Ex. 1; Ythier Testimony at Evidentiary Hearing ("Ythier Test.") at 79:3-6, Ex.

34.

Defendant's Response:        Undisputed.

Plaintiffs' Reply:      N/A

2.      The "Class," as defined by the Court's December 10, 2010 Order consists of those

Plaintiffs who worked in the Deboning Department on the Third Shift from the

---

[1] Pursuant to the Court's Order dated December  2010, this trial encompasses Plaintiffs from the Third Shift of the Deboning Department.

period of February 23, 2004 to December 31, 2007 (with respect to their claim for off-the-clock work before and after their shifts), as well as those Plaintiffs who worked in the Deboning Department on the Third Shift from the period of February 23, 2004 to the present, with respect to Plaintiffs' claim for not being paid for meal periods. *See Lugo v. Farmers Pride, Inc.*, No. 07-CV-00749, Dkt. Nos. 504-505 (E.D. Pa. Dec. 10, 2010) (Memorandum and Order certifying subclass).

Defendant's Response:          Undisputed.

Plaintiffs' Reply:      N/A

3.      Employees in the Deboning Department remove bones from chicken breasts, thighs and legs, trim the chicken, process the chicken, and package it for shipment to customers. The Department consists of breast deboning lines, a thigh deboning line and a leg deboning line.

Defendant's Response:          Undisputed for the purposes of Plaintiffs' Motion.

Plaintiffs' Reply:      N/A

4.      Defendant maintained an Employee Handbook throughout the relevant time period which set forth mandatory policies that applied to all workers. Def. RFA Resp. 6, Ex. 1, *see also* Ythier Test. at 82:25-83:2, Ex. 34. All hourly employees are given a copy of the Employee Handbook in English (and Spanish if that is their primary language). *See* Def RFA Resp. 6 & 7, Ex. 1; *see also* Castillo Tr. at 67, 78, Ex. 3; Hernandez Tr. at 54, Ex. 12; Marco Tr. Vol. I at 45-46, Ex. 14; Blanco Maya Tr. at 73-74, Ex. 16; Polanco Tr. at 76-78, Ex. 19; Torres Tr. at 75-76; 80-81, Ex. 23; Vicente Tr. at 99, Ex. 24.

2

Defendant's Response:       Defendant disputes that every policy in the Employee Handbook applied to "all workers" or even all Third Shift Deboning Department employees. Tobias 4/22/11 Decl. at ¶ 1 (Ex. 6). Instead, many of the policies' application was limited to certain groups of employees depending on their job classification and/or department or administrative segment. Id.

Plaintiffs' Reply:  Defendant's response does not dispute Plaintiffs' fact that the handbook set forth mandatory policies that applied to all workers.

5.      The Handbooks included detailed policies regarding straight time, overtime, lunch and break time, as well as safety, attendance, and disciplinary policies, including:

a)      All employees will be given thirty minutes (unpaid) for lunch. D00008, Ex. 26; D011508, Ex. 28; D011220, Ex. 30; D011112, Ex. 27; D030628, Ex. 29.

b)      "The company will deduct one-half (1/2) hour for lunch break, unless otherwise noted." D00007, Ex. 26; D011508, Ex. 28; D011219, Ex. 30; D011111, Ex. 27.

c)      "The Company will assign employees a locker." D00015, Ex. 26; D011520, Ex. 28; D011232, Ex. 30; D011023, Ex. 30; see also D030643, Ex. 29; Custodio Tr. at 162, Ex. 5; Gundrum Tr. at 165, Ex. 11; Marco Vol. II. Tr. at 118, Ex. 15; Def. RFA No. 73, Ex. 1 (admitting lockers are made available to hourly production employees); Marco Test. at 12:7-11, Ex. 35; Ythier Test. Vol. I at 105:10-12, Ex. 34.

d)      "It is the policy of the Company that anyone working in the plant and coming into contact with product must have good personal hygiene. For your safety, you will be expected to wear the following equipment in some of our work areas: hearing protection, hairnets, rubber gloves, mesh gloves, liners, rubber aprons, smocks, boots." D-00021, Ex. 26; D011526, Ex. 28; D011240, Ex. 30; D011131, Ex. 27; D030650, Ex. 29.

e)      "Employees will receive a clean smock daily. One hairnet/beardnet will be issued to you at the beginning of the week. If an employee loses his/her hairnet he/she must purchase one. Rubber gloves may be exchanged in the supply room when needed. Liners will be exchanged at the beginning of the week only. Your supervisor when required will issue mesh gloves to you. Rubber boots are available for purchase unless you have a suitable

3

pair." *See* D0011527, Ex. 28; D011240, Ex. 30; D011131, Ex. 27; D00021, Ex. 26; D030650, Ex. 29 (noting existence of procedures but not providing information as to how more information can be obtained).

Defendant's Response:        Undisputed, except that Farmers Pride notes that the Employee Handbook makes clear that "Farmers Pride provides lockers for the voluntary use by the employees." Donning and Doffing Handbook Excerpt (Ex. 17 to MSJ) (emphasis added); 5/18/10 Tr. at 131 (Ythier).

Plaintiffs' Reply:        Defendant's qualification is not supported by the handbook.  The excepts from the Employee Handbook "Donning and Doffing" section indicate, "Farmers Pride provides lockers for the voluntary use by the employees, but employees can opt to take boots home if they so desire as long as boots are clean when entering department.  Plaintiffs' Index of Evidence, Ex. 26, Bates No. D-00021, Ex. 27, Bates No. D-011131, Ex. 28, Bates No. D-011527, Ex. 29, Bates No. 30650, Ex. 30, D-011240.  The clear implication of these policy documents is that other items of PPE other than boots were not permitted to be taken home.

6.    Defendant required all new hourly employees to undergo a uniform in-person training and orientation session with Defendant's Human Resources Department. Ythier Tr. at 161-62, Ex. 25; Ythier Test. at 89:12-23, Ex. 34.

Defendant's Response:        Undisputed for purposes of Plaintiffs' Motion.

Plaintiffs' Reply:     N/A

7.    During the training, Defendant discussed the topic of PPE and what equipment employees were required to wear. Vargas Gomez Tr. at 99-105, Ex. 9; Hernandez Tr. at 65- 66, Ex. 12; Maldonado Tr. at 111-113, Ex. 13; Blanco Maya Tr. at 80-82, 116-117, 120-12, Ex. 16; Polanco Tr. at 73-75, 86-87, Ex. 19; Torres Tr. at

70-72, Ex. 23; Vicente Tr. at 90-91, Ex. 24.

<u>Defendant's Response:</u>        Farmers Pride disputes that employees are told during new employee training and orientation what equipment they are required to wear. Instead, employees are told generally about the various items of equipment that could be required depending on what position they are assigned to work and are further informed that their supervisors will inform them of the specific clothing and equipment items required for their particular position. 5/17/10 Tr. at 134-37 (Ythier); 5/18/10 Tr. at 245-49 (Rhoades).

<u>Plaintiffs' Reply:</u>  Defendant's response does not dispute Plaintiffs' fact and the evidence supporting it, but instead attempt to qualify that fact.

8.        Plaintiffs were also given a standard safety training, instructed as to how to use Defendant's time clocks, and told "what items of sanitary and protective clothing and equipment are required to be worn in various departments in the Fredericksburg Facility." Def. RFA Resp. 7-11, Ex. 1; *see also* Garcia Tr. at 87-89, Ex. 7; Vargas Gomez Tr. at 122-125, Ex. 9.

<u>Defendant's Response:</u>        Undisputed for purposes of Plaintiffs' Motion.

<u>Plaintiffs' Reply:</u>        N/A

## C.        <u>Personal Protective Equipment</u>

9.        Production line workers at the Fredericksburg facility were required to use PPE that was essential to the work they performed in their jobs. *See* Def. RFA Nos. 30-33, Ex. 1; *see also* Tobias Decl. at ¶¶ 13-14, Ex. 36; D30778-801, Ex. 29; D011651, Ex. 32; D011659, Ex. 33 (manager).

Defendant's Response:        For the reasons set forth in Defendant's Brief In Opposition to Plaintiffs' Motion for Partial Summary Judgment, Farmers Pride disputes that the personal protective equipment (i.e., the arm guard, mesh gloves, and earplugs) Third Shift Deboning Department employees wear is essential to their production work. Only employees who use knives or scissors are required by Farmers Pride to wear an arm guard on their non-knife/scissor forearm and a cut-resistant glove on their non-knife/scissor hand. See infra Statement of Additional Facts ("SAF") at ¶ 10. These items are for the benefit of Third Shift Deboning Department employees. Prior to 2007, Farmers Pride required Third Shift Deboning Department employees to wear earplugs to protect their hearing. SAF at ¶ 5. Farmers Pride no longer requires Third Shift Deboning Department employees to wear earplugs. Id. As set forth in Defendant's Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment, none of these items are essential to their work because the items are not necessary to completion of their work.

Plaintiffs' Reply:  Defendant does not dispute that the use of the items was required.

10.     Defendant's Employee Handbook contained a section entitled "Donning and Doffing" that set forth Defendant's donning and doffing policy for PPE. *See* Ythier Test. at 82:25-83:2, Ex. 35 (human resources manager discussing Employee handbook); *id.* at 91:4-13 (noting the donning and doffing section and policy).

Defendant's Response:        Undisputed, except that Farmers Pride clarifies that that Donning and Doffing policy contains a general listing of the types of clothing and equipment that may be required in certain positions (including non-production positions) rather than the clothing and equipment required for every employee. 5/17/10 Tr. at 132 (Ythier); Tobias 4/25/11 Decl. at ¶ 2.

Plaintiffs' Reply:  This does not dispute Plaintiffs' fact that the handbook contained a section regarding donning and doffing.  Additionally, the excerpts from the Employee Handbook "Donning and Doffing" section indicate do not list PPE.  Plaintiffs' Index of Evidence, Ex. 26, Bates No. D-00021, Ex. 27, Bates No. D-011131, Ex. 28, Bates No. D-011527, Ex. 29, Bates No. 30650, Ex. 30, D-011240.  The clear implications of these policy documents is that other items of PPE other than boots were not permitted to be taken home.

11.     The use of mesh gloves, plastic gloves, cotton gloves, hairnets, arm guards, plastic sleeves, safety glasses, plastic aprons, and smocks was required by sanitation and safety concerns and **was standard in the poultry industry**. *See*, *e.g.*, Def. RFA Nos. 30-34, Ex. 1; *see also* Marco Vol. II Tr. at 85, Ex. 15 (plastic gloves worn to keep "the meat from getting contaminated); Polanco Tr. at 132, Ex. 19 (stating his hands would freeze without cotton gloves); Torres Maldonado Tr. at 111-112, 122-123, 202-221, Ex. 13; Garcia Tr. at 73-74, Ex. 7; Marco Vol. I Tr. at 10, Ex. 15 (deboning line wore cotton gloves, nylon protection gloves, rubber gloves, coat, plastic sleeve, arm protector, apron, hairnet, boots, ear protection); *id.* at 16-19 (all deboning employees wore plastic sleeves, coats, and apron); Gundrum Tr. at 54-55, Ex. 11 (Deboning supervisor testifying that all knife-wielding deboning employees wore same PPE); id at 54-55, 89-93 (Deboning supervisor testifying that employees wear protective mesh gloves, arm guards, smocks, latex gloves, cotton gloves and hairnets); Ranck Tr. at 206-209, Ex. 20 (Quality Assurance manager testifying that "Employees will maintain clean hands, aprons, boots, gloves, knives, scabbards, scissors, and smocks during work" was a non-optional standard for the plant and how PPE is part of "Good Manufacturing Practices" to prevent cross contamination).

Defendant's Response:        Farmers Pride disputes that it required Third Shift

Deboning employees to wear plastic gloves, cotton gloves, plastic sleeves, safety glasses, or plastic aprons. Instead, all such clothing items are worn at the employees' choosing based on their personal preferences and for their personal comfort and convenience. SAF at ¶ 8. Defendant requires Third Shift Deboning employees who use knives or scissors to wear arm guards and mesh gloves because of Farmers Pride's analysis of workplace hazards to satisfy OSHA's general duty imposed on employers to ameliorate risks. Id. at ¶ 10; see also 29 U.S.C. § 654(a). Defendant requires Third Shift Deboning employees to wear hairnets and smocks for sanitary purposes, and those items also help keep employees' street clothes clean and dry and chicken products out of their hair. SAF at ¶¶ 3, 4. Defendant disputes that all of the items listed in ¶ 11 are or were "standard in the poultry industry," particularly in light of the fact that most of the items are not even required by Farmers Pride or used by all of its employees.

    Plaintiffs' Reply:  Defendant made these items available to Plaintiffs and thus controlled the wearing of these items.  (Plaintiff's Fact ¶ 22). Such donning and doffing activities occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work. 29 C.F.R. § 785.11.

    12.    Defendant's own customers also required that Defendant's employees wear PPE **to protect the product from contamination**. These customers commission annual audits of Defendant's facility and employees to ensure that the production process is sanitary. Ranck Tr. at 234-235, 238-239, Ex. 20 (Quality Assurance manager testifying regarding annual audits); *see also* Merrell Tr. at 214-218, 229-231, Ex. 18 (manager testifying regarding audits and admitting that one customer's standards require employees to wear gloves when coming into contact with the product).

    Defendant's Response:    Farmers Pride disputes that its customers require that employees wear PPE to protect its products from contamination. Tobias 4/25/11 Decl. at ¶ 3.

None of the PPE worn by Plaintiffs makes Farmers Pride's safer or more wholesome. Id.

Plaintiffs' Reply:  Tobias' self-serving declaration is an after the fact statement that contradicts his employees charged with personally addressing the issue of annual audits.

13.    Defendant required clean PPE to be worn **to ensure processing was "sanitary" and to "prevent direct and cross-contamination."** *See* Def. RFA No. 34, Ex. 1; Merrell Tr. at 113-114, Ex. 18 (manager testifying that a smock is required "to ensure a sanitary outer garment … [employees are] required to maintain a sanitary outer garment as part of our food safety program."); *id* at 126-127, Ex. 18; Ranck Tr. at 196-199, Ex. 20 (Quality Assurance manager testifying regarding PPE used to avoid cross contaimination); Torres-Maldonado Tr. at 121-123, 207-208, 216-220, Ex. 13 (testifying that he was trained that PPE helps protect the product from contamination); Hernadez Tr. at 46-47, 133-134, Ex. 12 (testifying that employees could not work without plastic aprons, sleeves and gloves); Garcia Tr. at 90, Ex. 7 (testifying that he wore a plastic apron to avoid contamination); Blanco Maya Tr. at 117-119, 126, Ex. 16 (testifying he had to wear an apron and hairnet to protect the product); Gomez Vargas Tr. at 162-164, 166-167, Ex. 9 (testifying she had to wear the apron and sleeves to protect the product).

Defendant's Response:        Farmers Pride disputes that the PPE worn by Plaintiffs contributes to sanitation or prevents direct and cross-contamination. Tobias 4/25/11 Decl. at ¶ 3; Ranck Dep. at 198-99 (noting that only the smock and hairnet are required to prevent cross-contamination) (Ex. 7); Tobias Dep. at 242 (same) (Ex. 8); Merrell Dep. at 132-33 (explaining that gloves are not used to avoid cross-contamination) (Ex. 9).

<u>Plaintiffs' Reply:</u>  Tobias' self-serving declaration is an after the fact statement that is contradicted by the evidence cited by Plaintiffs.

14.    Defendant's Quality Assurance manager, Susan Ranck, testified that federal standards required that items that are likely to come in contact with meat must be kept sanitary. Ranck Tr. at 38-39, 213-214, Ex. 20 (Quality Assurance manager testifying that from a "regulatory perspective" PPE likely to contact meat must be kept in a sanitary condition). For instance, cotton gloves were not permitted to touch the product and were required to be covered by a plastic glove because cotton is not an easily sanitized or cleaned surface. Ranck Tr. at 108-110, 114, Ex. 20. Members of the USDA's Food Safety Inspection Service (FSIS) were also present at the plant and worked with the Quality Assurance department, supervisors and managers to ensure that production was conducted in a clean and sanitary manner. *Id.* at 118-121. Both Farmers Pride Quality Assurance department and members of the FSIS had the power to stop the line if there were PPE violations. *Id.* at 128 (testifying that both the USDA and Quality assurance could stop the line if someone was not wearing a smock or hairnet).

<u>Defendant's Response:</u>        Farmers Pride does not dispute that its Quality Assurance Department and the USDA had the authority to stop a production line if employees were not wearing smocks or hairnets. Ranck Dep. at 118-21. Farmers Pride disputes that its Quality Assurance Department or the USDA could stop the lines if employees were not wearing other forms of clothing or equipment, including PPE. Tobias 4/25/11 Decl. at ¶ 4. The testimony Plaintiffs cite does not support this allegation.

<u>Plaintiffs' Reply:</u>  Tobias' self-serving declaration is an after the fact statement that contradicts Defendant's employee.

15.     Defendant's supervisors and Quality Assurance employees inspected Plaintiffs to make sure that they were wearing the proper PPE, that it was being worn correctly, and that it was clean and sanitary. *See* Garcia Tr. at 149, Ex. 7 ("[Your PPE] had to be clean. [Supervisors] would actually stand right [by the department], check the gloves. Sometimes the USDA would be standing there, too, making sure boots didn't have chicken on there and your apron and the gloves and the sleeves."); Cedeno-Gibson Tr. at 235, Ex. 8; Marco Vol. I Tr. at 12, Ex. 15; Hernandez Tr. at 203, Ex. 12 (stating the USDA watched employees enter the department to make sure equipment was sanitized); Ranck Tr. at 86-87, 39-40, 45-46, Ex. 20 (Quality Assurance manager testifying that there were two quality assurance inspectors assigned to the Deboning Department who would inspect employees as they entered the department); Gundrum Tr. at 32, Ex. 11 (Deboning supervisor testifying that when she worked in Quality Assurance, she would stand at the entrance to the Deboning department at the beginning of the shift to monitor "employee hygiene").

Defendant's Response:      Farmers Pride disputes that Quality Assurance employees inspected Plaintiffs to make sure they were wearing proper PPE. Tobias 4/25/11 Decl. at ¶ 4. None of the evidence offered by Plaintiffs supports this allegation.

Plaintiffs' Reply:  Tobias' self-serving declaration is an after the fact statement that is contradicted by the production workers statements.  Additionally, there is no foundation showing Tobias has personal knowledge of the matter.

16.     Plaintiffs would be disciplined if they were not wearing the proper PPE, if it was not being worn correctly, or if was not clean and sanitary. *See, e.g.*, Custodio Tr. at 59, Ex. 5 ("[I]f we would enter with our dirty smock [the supervisor] would yell."); Blanco Maya Tr. at 152-53, Ex. 16; Gundrum Tr. at 138, 299, Ex. 11

11

(Deboning supervisor); Ranck Tr. at 86-87, 242-244, Ex. 20 (Quality Assurance manager testifying that "if an employee was noted to have dirty boots, they would be asked to step off the line and wash their boots); Boyer Tr. at 191, Ex. 2 (Deboning supervisor testifying that she disciplined employees who were not wearing proper PPE); Eby Tr. at 167-173, 218-223, Ex. 6 (assistant supervisors had the authority to have a "discussion" with employees for not wearing proper PPE).

Defendant's Response:      Farmers Pride disputes that Plaintiffs were always disciplined if they were not wearing required PPE, if it was not being worn correctly, or if was not clean and sanitary, though it does not dispute that discipline could be issued for such issues. Tobias 4/25/11 Decl. at ¶ 5.

Plaintiffs' Reply:  Tobias' self-serving declaration is an after the fact statement that is contradicted by the evidence cited by Plaintiffs.  Additionally, there is no foundation showing Tobias has personal knowledge of the matter.

17.      Some items of PPE, including ear plugs, arm guards, and mesh gloves were mandated by federal regulations. Def RFA Nos. 37, 60, Ex. 1.

Defendant's Response:      Prior to 2007, Farmers Pride required Deboning Department employees to wear earplugs in order to comply with OSHA regulations. SAF at ¶ 5. Thereafter, Deboning Department employees were not required to wear earplugs. Id. The arm guards and mesh gloves are required because of Farmers Pride's analysis of workplace hazards to satisfy OSHA's general duty imposed on employers to ameliorate risks. Id. at ¶ 10; see also 29 U.S.C. § 654(a). Farmers Pride disputes that any of the other clothing and equipment Plaintiffs claim to have worn was mandated by federal regulations. See 29 C.F.R. § 1910.132(a) and .138(a).

Plaintiffs' Reply:  The evidence cited by Defendant does not dispute Plaintiffs' fact.

18.     The temperature in the deboning room was kept at 50 degrees Fahrenheit, and at some point was raised to 52-55 degrees. Gundrum Tr. at 99, Ex. 11 (Deboning supervisor testifying that the temperature in the Deboning room was not permitted to exceed 55 degrees); Merrill Tr. at 219-220, Ex. 18 (manager); Ranck Tr. at 68-69, Ex. 20 (Quality Assurance manager); *see also* Def. RFA No. 49, Ex. 1 (admitting "that the Packing, Cut-Up, and Deboning Departments maintain a certain temperature"). Employees wore cotton gloves supplied by Defendant to keep their hands warm and work efficiently during a normal eight hour shift. Polanco Tr. at 132:9, Ex. 19 (stating his hands would freeze without cotton gloves). Employees also wear sweaters, jackets and sweatshirts to stay warm during their shift. Gundrum Tr. at 240-241, Ex. 11 (Deboning supervisor testifying that employees wear warm clothes "all the time"); Blanco-Maya Tr. at 121, Ex. 16 (testifying that he wore cotton gloves, sweater and sweatshirt to stay warm).

Defendant's Response:        Undisputed, except that Farmers Pride disputes that cotton gloves allow employees to work more efficiently. Tobias 4/25/11 Decl. at ¶ 6. The cotton gloves, sweaters, jackets, and sweatshirts were worn at Plaintiffs' option and were not required by Farmers Pride or by the nature of their work. Id.

Plaintiffs' Reply:  Tobias' self-serving declaration is an after the fact statement that is contradicted by the evidence cited by Plaintiffs above.  Additionally, there is no foundation showing Tobias has personal knowledge of the matter.

19.     The nature of the poultry processing work environment also requires that Plaintiffs wear the items of PPE. For example, employees wore aprons to "avoid

the meat from having contact with the person's clothes." Marco Vol. II Tr. at 83-85, Ex. 15 (plastic gloves worn to keep "the meat from getting contaminated); Merrell Tr. at 113-114, Ex. 18 (manager testifying that a smock required "to ensure a sanitary outer garment … [employees are] required to maintain a sanitary outer garment as part of our food safety program."); Eby Tr. at 60-63, Ex. 6 (Deboning supervisor discussing the wet conditions when she worked on the debone lines in 2004-2005).

Defendant's Response:        Disputed. Employees wear aprons to keep their smocks and street clothes dry and clean. SAF at ¶ 8. The aprons do not make the products more sanitary. Id.

Plaintiffs' Reply:  Defendant's response to paragraph 13 indicates the smock does serve to prevent cross-contamination and maintain a sanitary environment.

Farmers Pride disputes that the PPE worn by Plaintiffs contributes to sanitation or prevents direct and cross-contamination. Tobias 4/25/11 Decl. at ¶ 3; **Ranck Dep. at 198-99 (noting that only the smock and hairnet are required to prevent cross-contamination) (Ex. 7)**; Tobias Dep. at 242 (same) (Ex. 8); Merrell Dep. at 132-33 (explaining that gloves are not used to avoid cross-contamination) (Ex. 9).

20.    Defendant made available to hourly production employees the items worn  throughout the plant such as: **smocks** (see Def. RFA Nos. 32, 78, Ex. 1), **rubber/latex (plastic) gloves** (see Def. RFA No. 43, *id.*), **plastic/vinyl aprons** (see Def. RFA Nos. 51, 61, *id.*), **plastic sleeves** (see  Def.  RFA  No. 54,  *id.*). *See also* Def. RFA Nos. 30 & 64, Ex. 1 (admitting Defendant required employees to wear **hairnets** and, when applicable, **beard nets**); Def. RFA No. 31, 60, 66, Ex. 1 (admitting Defendant required employees to wear **earplugs**); Def. RFA No. 32, Ex. 1 (admitting  Defendant  required  employees  to  wear **cut-resistant  gloves**  or **Whizzard gloves** and **hard plastic arm guards** when they used a knife); Def. RFA No. 67, Ex. 1 (admitting Defendant required certain

hourly employees to wear **safety glasses**).

<u>Defendant's Response:</u>        Undisputed, except that Farmers Pride disputes that all of these items were worn throughout the plant. SAF at ¶¶ 3-11.

<u>Plaintiffs' Reply:</u>       Defendant's response does not dispute Plaintiffs' fact that the items were made available to Plaintiffs.

21.     Employees may be disciplined for failing to comply with work rules and hourly employees can be terminated for failure to comply with work rules. *See* Def. RFA No. 110, Ex. 1.

<u>Defendant's Response:</u>        Undisputed.

<u>Plaintiffs' Reply:</u>  N/A.

## D.     <u>Pre-Shift Activities</u>

22.     Production line workers were required to "obtain and don the sanitary and protective clothing and equipment required by Farmers Pride and were supposed to clock in" prior to the start of their shift on the line. *See* Def. RFA No. 72, Ex. 1; Marco Test. at 9:22-10:7, 63:17-25, Ex. 35; Hernandez Tr. at 84-85, Ex. 12; Comasta Tr. at 70 (manager), Ex. 4; Garcia Tr. at 17-29, Ex. 7; Vicente Tr. at 169, Ex. 24.

<u>Defendant's Response:</u>        Undisputed. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paid time prior to the start of the production line to compensate them for the time it reasonably took them to engage in pre-shift donning- and doffing-related activities. SAF at ¶¶ 18-28.

Plaintiffs' Reply:  Defendant's response does not dispute Plaintiffs' fact.  Further, Defendant has not submitted any evidence that its compensation schedules were followed. Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

23.   Defendant's policy required Deboning employees to be dressed and ready to work by the start time of the department. *See* Comasta Testimony at Evidentiary Hearing ("Comasta Test.") Vol. II at 239-242, Ex. 37; Comasta Tr. at 104, Ex. 4; Gundrum Tr. at 150-51, 164, Ex. 11 (Deboning supervisor testifying that "[A]s long as they could be in deboning and have their stuff on, they can arrive 15 seconds before [shift start time.]"); Eby Tr. at 50-51, Ex. 6 (Deboning supervisor testifying that prior to 2007 "you can punch in anytime, but starting time was 9:00 o'clock"); Hernandez Tr. at 84-85, Ex. 12; Torres Maldonado Tr. at 75-76, Ex. 13; Garcia Tr. at 41-42, 48-49, Ex. 7; Marco Vol. I Tr. at 31, 57, Ex. 14; Marco Vol. II Tr. at 229-30, Ex. 15; Blanco Maya Tr. at 135-36, Ex. 16.

Defendant's Response:        Disputed. Farmers Pride required employees to be dressed and ready to work by the time the product arrived at their position on the line. Tobias 4/25/11 Decl. at ¶ 7. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paid time prior to the start of the production line to compensate them for the time it reasonably took them to engage in pre-shift donning- and doffing-related activities. SAF at ¶ 18-28.

Plaintiffs' Reply:  Tobias' self-serving declaration is an after the fact statement that is contradicted by the evidence cited by Plaintiffs.  Additionally, there is no foundation showing Tobias has personal knowledge of 3rd Shift Deboning.  (See Tobias declaration indicating he has held the "First Processing Manager" position with Defendant for 11 years.).

Defendant's response does not dispute Plaintiffs' fact.  Further, Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff

disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

24.     Employees stored much of their PPE in their lockers and would go to the lockers **before their shift start time**. *See* e.g., Marco Test. at 12-13, Ex. 35 (testifying she stored, cotton gloves, arm guard, plastic sleeves, plastic apron, and plastic gloves in her locker); Torres Maldonado Tr. at 241-243, Ex. 13; Garcia Tr. at 119-120, Ex. 7; Gundrum Tr. at 113, Ex. 11 (Deboning supervisor testifying that most employees kept their arm guards in their lockers prior to 2007). They had to retrieve these items and don them prior to the start of production and had to stow it in their lockers prior to leaving the plant. *See*, *e.g.*, Marco Test. at 13:20-14:18, Ex. 35; Garcia Tr. at 137-138, Ex. 7; Boyer Tr. at 22, Ex. 2 (supervisor testifying that all employees assigned a locker by the company); *see also* Def. RFA No. 75, Ex. 1 (admitting that hourly employees chose to store their PPE in their lockers); Def. RFA. No. 72, Ex. 1 (admitting employees had to obtain and don PPE prior to the start of their shift on the line); Def. RFA Nol. 109, Ex. 1 (admitting employees stored PPE in their lockers at the end of their shift except on the day before lockers were to be cleaned). The locker area was often crowded before the shift start time. Torres Maldonado Tr. at 300-301, Ex. 13; Garcia Tr. at 136-136, Ex. 7.

Defendant's Response:        It is undisputed that some Plaintiffs stored some items of sanitary and protective clothing and equipment in their lockers. The lockers were provided to Plaintiffs at their request to use at their option. 5/17/10 Tr. at 131 (Ythier); Tobias 4/25/11 Decl. at ¶ 8. Farmers Pride disputes that Plaintiffs were required by Farmers Pride to store these items in their lockers prior to leaving the plant or that Plaintiffs were required by Farmers Pride to obtain these items from their lockers at the beginning of their shift. Tobias 4/25/11 Decl. at ¶ 8. With the exception of their smocks and the clothing that they discarded each day, Plaintiffs could

wear and or take all other clothing and equipment to and from home. Id.; SAF at ¶¶ 4, 5, 7. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paid time prior to the start of Plaintiffs' shift on the production line and after the end of their shift to compensate them for the time it reasonably took them to engage in pre- and post-shift donning- and doffing-related activities. SAF at ¶¶ 18-28.

Plaintiffs' Reply:  The excepts from the Employee Handbook "Donning and Doffing" section indicate, "Farmers Pride provides lockers for the voluntary use by the employees, but employees can opt to take boots home if they so desire as long as boots are clean when entering department.  Plaintiffs' Index of Evidence, Ex. 26, Bates No. D-00021, Ex. 27, Bates No. D-011131, Ex. 28, Bates No. D-011527, Ex. 29, Bates No. 30650, Ex. 30, D-011240.  The clear implications of these policy documents is that other items of PPE other than boots were not permitted to be taken home.

Tobias' self-serving declaration is an after the fact statement that is contradicted by the evidence cited by Plaintiffs.  Additionally, there is no foundation showing Tobias has personal knowledge of 3rd Shift Deboning.  (See Tobias declaration indicating he has held the "First Processing Manager" position with Defendant for 11 years.).

Further, Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

25.     Plaintiffs were also required to obtain clean smocks from a central supply room **before the start of every shift**. Eby Tr. at 84-85, Ex. 6 (Deboning supervisor); Gundrum Tr. at 112-116, Ex. 11 (Deboning supervisor testifying that employees obtained their smocks and other PPE at the supply room at the start of the shift). Plaintiffs would also exchange items at the supply room such as plastic aprons, plastic gloves, plastic sleeves, cotton gloves, earplugs and hairnets. *See* Marco Test. 13:20-14:2, Ex. 35 (testifying she walked from her locker to a central supply

room to receive and exchange additional equipment needed for each work day). These items were used for several days, then had to be exchanged for new ones. Torres Maldonado Tr. at 166-167, Ex. 13; Merrell Tr. at 70-80, Ex. 18 (Farmers Pride manager discussing what PPE employees obtained from the supply room at the beginning of the shift); Boyer Tr. at 51-56, Ex. 2 (Deboning supervisor testifying that employees obtained and exchanged PPE at the supply room prior to the shift); Mehalko Tr. at 108-111, Ex. 17 (supply room clerk describing distribution of PPE at the beginning of the week); Gundrum Tr. at 131-136, Ex. 11 (Deboning supervisor describing distribution of PPE at the beginning of the workweek); Def. RFA No. 77, Ex. 1 (admitting that from February 2004 to February 2007 "most hourly production employees obtained from the supply room some of the sanitary and protective clothing and equipment that they were required to wear and/or chose to wear, but not necessarily every day"); *see also* Def. RFA Nos. 78, 79, Ex. 1.


    Defendant's Response:       It is undisputed that, prior to December 2007, Plaintiffs had to obtain a smock from the supply room on a daily basis. Farmers Pride does not dispute that, prior to December 2007, Plaintiffs could exchange plastic sleeves, plastic gloves, plastic aprons, hairnets, or earplugs at the supply room and that they did not do so on a daily basis. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paid time prior to the start of Plaintiffs' shift on the production line to compensate them for the time it reasonably took them to engage in pre-shift donning- and doffing-related activities, including time spent obtaining clothing and equipment from the supply room. SAF at ¶¶ 18-28.

    Plaintiffs' Reply:  Defendant's response does not dispute Plaintiffs' fact. Further, Defendant has not submitted any evidence that its compensation schedules were followed. Finally, Plaintiff disputes the compensation schedules were followed. See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

26.     The supply room area was usually crowded and employees were required to line up outside the supply room to obtain the materials they would need for the day. Marco Test. 13-14, Ex. 35; Torres Maldonado Tr. at 241-242, Ex. 13; Garcia Tr. at 50-51, 117-118, Ex. 7; Mehalko Tr. at 89-106, 123-124, Ex. 17 (supply room clerk describing the process for distributing PPE to employees); Gundrum Tr. at 119, Ex. 11 (Deboning supervisor testifying that "on occasion" it would get congested outside of the supply room).

Defendant's Response:     It is undisputed that, prior December 2007, that, as most, there were only "a few people in line" at the supply room. Mehalko Dep. at 137 (Ex. 10); see also Eby Dep. at 85 (Ex. 11); Tobias 4/25/11 Decl. at ¶ 8.

Plaintiffs' Reply:  Defendant's response does not dispute Plaintiffs' fact but rather attempts to qualify that fact.

27.     Only one person typically waited on employees from all production departments. Garcia Tr. at 50-51, 117-118, Ex. 7; Marco Test. 13:20-14:4, Ex. 35; Mehalko Tr. at 21-23, Ex. 17 (supply room clerk testifying that there was one attendant on duty at the beginning of the third shift).

Defendant's Response:     Undisputed, except that Farmers Pride disputes that all production department employees used the supply room at the same time because the various production departments had staggered start times. Tobias 4/25/11 Decl. at ¶ 8.

Plaintiffs' Reply:  Defendant's response does not dispute Plaintiffs' fact.

28.     At the beginning of the workweek, lines were usually longer at the supply room because employees would collect PPE they would keep and use throughout the

week. Garcia Tr. at 117-118, Ex. 7; Torres Maldonado Tr. at 224-225, 241-242, Ex. 13; Hernandez Tr. at 23-24, Ex. 12; Mehalko Tr. at 16-20, 125-132, Ex. 17 (supply room clerk).

Defendant's Response:      It is undisputed that, prior to December 2007, at the beginning of the week, Plaintiffs obtained clothing and equipment at the supply room that they could use throughout the week and that there were short lines at the supply room consisting of less than 15 people at a time. Mehalko Dep. at 137-38.

Plaintiffs' Reply:  Defendant's response does not dispute Plaintiffs' fact.

29.    In either 2005 or 2006, Defendant split the Deboning department into two groups: Breast Deboning and Thigh & Leg Deboning. *See* D-00431 Ex. 39, D_011078, Ex. 41; Eby Tr. at 16-21, Ex. 6 (Deboning supervisor testifying as to split in the Deboning department). In order to reduce crowding when employees were entering and leaving the department, Breast Deboning was put on a schedule fifteen minutes behind Thigh & Leg Deboning. Boyer Tr. at 42-43, Ex. 2 (Deboning supervisor testifying that the departments were split to reduce crowds).

Defendant's Response:      Undisputed.

Plaintiffs' Reply:  N/A.

30.    In the Fall of 2007, after the filing of this suit, Defendant changed its policies and procedures such that "most of the sanitary and protective clothing and equipment worn by hourly production employees … is obtained inside the entrances to the various production departments [and not at the supply room] …." Def. RFA No. 103, Ex. 1. Now, most PPE, including mesh gloves, arm protectors, plastic gloves, plastic sleeves, and plastic aprons are distributed inside the department at the start

21

of the shift, and returned or discarded inside the department at the end of the shift. *See* Boyer Tr. at 23-24, Ex. 2 (supervisor). Employees no longer store most of their PPE in their lockers. Gundrum Tr. at 102-112, Ex. 11 (Deboning supervisor describing how PPE has been distributed in Deboning since 2007). These changes illustrate how Defendant has always had control of the donning and doffing engaged in by Plaintiffs because Defendant provides the PPE at issue and sets company policies and procedures regarding the distribution, donning and doffing of PPE. Defendant has amply demonstrated its ability to control these activities since the filing of this suit.

Defendant's Response:     It is disputed that, prior to December 2007, Farmers Pride controlled the donning and doffing activities of Plaintiffs. Instead, Plaintiffs had nearly unlimited flexibility with respect to their donning and doffing routines and activities. They were not required to arrive at the facility at a particular time. Tobias 4/25/11 Decl. at ¶ 9. They were not required to perform donning and doffing activities in any particular order or at a particular location. Id. Plaintiffs' own testimony demonstrates wildly varying donning and doffing routines and activities. See Def.'s Brief In Support of Decert. Motion (Doc. 433) at ¶¶ 34-42. Farmers Pride disputes that the December 2007 changes were in any way related to the filing of this lawsuit. Tobias 4/25/11 Decl. at ¶ 10.

Plaintiffs' Reply:  Tobias self-serving declaration is contradicted by the evidence submitted by Plaintiffs at ¶¶ 22-24.  Additionally, there is no foundation showing Tobias has personal knowledge of 3rd Shift Deboning.  (See Tobias declaration indicating he has held the "First Processing Manager" position with Defendant for 11 years.).

E.      **Unpaid Meal Period**

31.     Defendant deducted thirty minutes from Plaintiffs' daily total hours worked
        to account for an unpaid and allegedly *bona fide* meal period. Tobias Tr. at 122-
        123, Ex. 22 (manager); Boyer Tr. at 77, Ex. 2 (Deboning supervisor); Seabold Tr.
        at 46, Ex. 21 (payroll clerk); Gundrum Tr. at 189, Ex. 11 (supervisor); Ythier Tr.
        at 20, 54, Ex. 25 (human resources manager); *see also* Employee Handbooks at
        D-00007, Ex. 26; D011508, Ex. 28; D011219, Ex. 30; D011111, Ex. 27.

Defendant's Response:        Undisputed.

Plaintiffs' Reply: N/A.

32.     Employees did not clock out and back in during their unpaid meal period unless
        they were leaving the premises of the Fredericksburg Facility. Def. RFA No. 87,
        Ex. 1; Boyer Tr. at 76-77, Ex. 2 (Deboning supervisor); Tobias Tr. at 122, Ex. 22
        (manager).

Defendant's Response:        Undisputed.

Plaintiffs' Reply: N/A.

33.     Defendant's supervisors or their designees notified hourly production employees
        when the production line would stop for the start of their meal periods. Def. RFA
        No. 95, Ex. 1; *see also* Eby Tr. at 157, Ex. 6 (Deboning supervisor); Boyer Tr. at
        36-37, Ex. 2 (Deboning supervisor testifying that either she or her assistant would
        call out to employees when the break started); Merrell Tr. at 116-117, Ex. 18
        (manager testifying that supervisors controlled when the lines ran); Garcia Tr. at
        34, 150, Ex. 7; Vargas Gomez Tr. at 209-210, Ex. 9; Hernandez Tr. at 102, Ex.

12; Torres Maldonado Tr. at 254, Ex. 13; Marco Vol. II Tr. at 144, Ex. 15; Marco Test. at 23-24, Ex. 35; Blanco Maya Tr. at 154, Ex. 16; Polanco Tr. at 190, Ex. 19; Vicente Tr. at 224-25, Ex. 24.

Defendant's Response:      It is undisputed that Farmers Prides' supervisors or their designees notified hourly production employees when it was time to leave the production line to prepare for the start of their meal periods. Tobias 4/25/11 Decl. at ¶ 11.

Plaintiffs' Reply:  N/A.

34.      The 30 minute meal period began running as soon as the production line stopped. *See* Blanco Maya Tr. at 89-91, 155-157, Ex. 16; Vargas Gomez Tr. at 142, Ex. 9; Marco Vol. II Tr. at 140-41, 144, Ex. 15 (line stopped for 30 minutes).

Defendant's Response:      Farmers Pride disputes that the 30-minute meal period began running as soon as the production line stopped. Instead, under Farmers Pride's compensation schedules, after the production line stopped, Plaintiffs and all other hourly production employees were given additional paid time to engage in doffing- and washing-related activities and leave their respective production departments before their 30-minute meal period began. SAF at ¶ 18-28. This additional paid time can be determined by comparing the "Line Stop For Lunch" column on the compensation schedules to the "Lunch Start" column on the schedules. Id. The 30-minute meal period did not begin until the "Lunch Start" time reflected on the schedules. Id.

Plaintiffs' Reply:  Defendant's response does not dispute Plaintiffs' fact.  Rather, it attempts to qualify it.  Further, Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed. See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

35.     Likewise, Defendant's supervisors or their designees notified hourly production employees when it was time to return to the production area and prepare for the recommencement of production. *See*, *e.g.*, Garcia Tr. at 170-72, Ex. 7; Cedeno Gibson Tr. at 240-42, Ex. 8; Vargas Gomez Tr. at 233-34, Ex. 9; Hernandez Tr. at 104-11, Ex. 12; Torres Maldonado Tr. at 88-89, 305-06, Ex. 13; Marco Vol. II Tr. at 158, Ex. 15; Blanco Maya 89, 170, Ex. 16; Polanco Tr. at 214, Ex. 19.

<u>Defendant's Response:</u>     Farmers Pride disputes that its supervisors or their designees notified hourly production employees when it was time to return to the production area at the conclusion of their meal periods. Tobias 4/25/11 Decl. at ¶ 11; Merrell Dep. at 183-85; Eby Dep. at 157-59. Instead, employees were responsible for determining when to return to the production area after their meal period by keeping track of the time. Tobias 4/25/11 Decl. at ¶ 11; Eby Dep. at 154-55, 157-59.

<u>Plaintiffs' Reply:</u>  Tobias' self-serving declaration is an after the fact statement that is contradicted by the evidence cited by Plaintiffs.  Additionally, there is no foundation showing Tobias has personal knowledge of 3rd Shift Deboning.  (See Tobias declaration indicating he has held the "First Processing Manager" position with Defendant for 11 years.).

36.     Defendant required employees to doff their PPE during their unpaid meal period. *See* Garcia Tr. at 150, 153-57, Ex. 7; Torres Tr. at 167-68, 170, Ex. 23; Vargas Gomez Tr. at 210-11, Ex. 9; Hernandez Tr. at 101, Ex. 12; Blanco Maya Tr. at 157-58, 160-64, Ex. 16; Polanco Tr. at 191, Ex. 19; Marco Test. 23-24, Ex. 35; Marco Vol. II Tr. at 240, Ex. 15 ("We couldn't leave the equipment to be mixed with the meat. You had to take it out of the line."); Gundrum Tr. at 215, Ex. 11 (supervisor); Merrell Tr. at 174, Ex. 18 (manager testifying that "We required them to leave their gloves in the room …. We required them to leave aprons in the room . . . .").

<u>Defendant's Response:</u>      Farmers Pride disputes that it required hourly production employees to doff PPE during their meal period. Instead, under Farmers Pride's compensation schedules, Plaintiffs and all other hourly production employees were given additional paid time after the production line stopped to engage in doffing- and washing-related activities and leave their respective production departments before their meal period began. SAF at ¶ 18-28. This additional paid time can be determined by comparing the "Line Stop For Lunch" column on the compensation schedules to the "Lunch Start" column on the schedules. <u>Id.</u> The 30-minute meal period did not begin until the "Lunch Start" time reflected on the schedules. <u>Id.</u>

<u>Plaintiffs' Reply:</u>  Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work.  29 C.F.R. § 785.11.

Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

37.     There was often a line at the wash station where employees would wash their PPE at the beginning of the lunch break. *See*, *e.g.*, Garcia Tr. at 150-155-57, Ex. 7; Cedeno Gibson Tr. at 240-42, Ex. 8; Hernandez Tr. at 24, Ex. 12; Torres Maldonado Tr. at 255-57, 303, 306, Ex. 13 ; Marco Vol. I Tr. at 36, 40, Ex. 14; Marco Vol. II Tr. at 149, 151-52, Ex. 15; Blanco Maya Tr. at 164-65, Ex. 16; Polanco Tr. at 194, Ex. 19; Boyer Tr. at 155-156, Ex. 2 (Deboning supervisor testifying that employees could wash their mesh gloves at the beginning of the break); Gundrum Tr. at 216, Ex. 11 (Deboning supervisor testifying that protective Whizzard gloves had to be washed at lunch break).

<u>Defendant's Response:</u>      Farmers Pride disputes that it required hourly production employees to wash their PPE (i.e., mesh glove, arm guard, and earplugs) before leaving the

production area for their meal period, disputes that there was only one wash station in a given production department, and disputes that there were "often" lines at the wash stations. Camasta Dep. at 218-20 (Ex. 12); Eby Dep. at 148-55; Rhoads Dep. at 183-84 (Ex. 13); Tobias Dep. at 124-33, 174-77; Merrell Dep. at 176-78; Tobias 4/25/11 Decl. at ¶ 11. To the extent Plaintiffs chose to wash their PPE, there were multiple wash stations in each of the production departments for them to do so, and Farmers Pride's compensation schedules provided additional paid time after the production line stopped for them to do so before the beginning of their 30-minute meal period. Tobias 4/25/11 Decl. at ¶ 11; SAF at ¶¶ 18-28.

Plaintiffs' Reply:  Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work.  29 C.F.R. § 785.11.

Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

38.     After washing their PPE, Plaintiffs had to find a hook or other location on which to hang it. Garcia Tr. at 153-54, Ex. 7; Vargas Gomez Tr. at 210-11, Ex. 9; Torres Maldonado Tr. at 258, Ex. 13; Polanco Tr. at 202, Ex. 19; *see also* Marco Test. at 24:11-25:5, Ex. 35 (testifying that workers had to put their equipment on hangers before they could take their breaks).

Defendant's Response:        Farmers Pride disputes that it required Plaintiffs to wash their PPE (i.e., mesh gloves, arm guards, and earplugs) before leaving the production area for their meal period and disputes that Plaintiffs had to hang the PPE on a hook or other location before leaving the production area for their meal period. Camasta Dep. at 218-20; Eby Dep. at 148-55; Rhoads Dep. at 183-84; Tobias Dep. at 124-33, 174-77; Tobias 4/25/11 Decl. at ¶ 11. Instead, Plaintiffs were supposed to leave their mesh gloves and arm guards at the work stations and could take their earplugs with them when they left the production area for their meal period.

Id. Farmers Pride's compensation schedules provided additional paid time after the production line stopped for Plaintiffs who chose to do so to wash their clothing and equipment before the beginning of their 30-minute meal period. SAF at ¶¶ 18-28.

Plaintiffs' Reply:  Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work.  29 C.F.R. § 785.11.  Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

39. Plaintiffs also had to clean their boots at lunch. Torres Maldonado Tr. at 255, Ex. 13. Quality control inspectors on occasion would require Plaintiffs to re-wash their equipment if its cleaning was unsatisfactory. *See* Marco Vol. I Tr. at 39, Ex. 14; Ranck Tr. at 86-87, 242-244, Ex. 20 (Quality Assurance manager testifying that "if an employee was noted to have dirty boots, they would be asked to step off the line and wash their boots"); Gundrum Tr. at 34, Ex. 11 (Deboning supervisor testifying that when she was in the Quality Assurance department, she checked employees' boots to make sure they did not have "hunks of chicken" or a "thick grease buildup").

Defendant's Response:      Farmers Pride disputes that Plaintiffs had to clean their boots at lunch and disputes that Plaintiffs were required "to re-wash their equipment if its cleaning was unsatisfactory." Tobias Dep. at 124-33; Tobias 4/25/11 Decl. at ¶ 11. Instead, Farmers Pride's Quality Assurance Department employees could require Plaintiffs to wash (not re-wash) their cut-resistant glove or arm guard if either item was unusually dirty beyond what normally was expected from normal production work. Tobias 4/25/11 Decl. at ¶ 4. The management testimony cited by Plaintiffs in ¶ 39 is only related to the optional boots worn by Plaintiffs and is not related to Plaintiffs' equipment.

Plaintiffs' Reply:  Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work.  29 C.F.R. § 785.11.  Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

40.     Defendant did not permit employees to wear mesh or protective gloves, arm guards, plastic aprons, plastic gloves, or plastic sleeves in the restrooms or cafeteria. Def. RFA No. 107, Ex. 1; *see also* Comasta Tr. at 216-217, Ex. 4 (manager); Garcia Tr. at 173, Ex. 7; Vargas Gomez Tr. at 99, 226, Ex. 9.

Defendant's Response:        Undisputed.

Plaintiffs' Reply:  N/A.

41.     Employees could go to the supply room during the lunch break if they needed new PPE. Garcia Tr. at 123-124, Ex. 7; Mehalko Tr. at 145-146, Ex. 17 (supply room clerk); Eby Tr. at 110-111, Ex. 6 (Deboning supervisor).

Defendant's Response:        Undisputed.

Plaintiffs' Reply:  N/A.

42.     At the end of the unpaid meal period, Plaintiffs were required to sterilize their hands, retrieve their PPE, re-don their PPE, and walk back to their workstations within the 30 minute meal period. Garcia Tr. at 175, Ex. 7; Torres Maldonado Tr. at 269-76, 305-06, Ex. 13; Blanco Maya Tr. at 171, Ex. 16; Polanco Tr. at 218, Ex. 19; C. Torres Tr. at 193-94, Ex. 23; Marco Test. 25:23-27:4, Ex. 35.

<u>Defendant's Response:</u>         Farmers Pride disputes that Plaintiffs were required to do any of these activities during their 30-minute meal period. Instead, under Farmers Pride's compensation schedules, Plaintiffs and all other hourly production employees were given additional paid time to engage in donning- and sanitizing-related activities after their 30-minute meal period ended but before the production line began. SAF at ¶¶ 18-28. This additional paid time can be determined by comparing the "Lunch Stop" column on the compensation schedules to the "Line Start After Lunch" column on the schedules. <u>Id.</u> The 30-minute meal period ended at the "Lunch Stop" time but the production line did not begin after the meal period until, at the earliest, the "Line Start After Lunch" time on the schedules. <u>Id.</u> Many times, the production lines started later than the "Line Start After Lunch" time, thus allowing Plaintiffs additional paid time for post-meal period donning and doffing activities. Gundrum Dep. at 324-25 (Ex. 14); Boyer Dep. at 158-59 (Ex. 15). Farmers Pride also disputes that Plaintiffs were required "to sterilize their hands." Tobias 4/25/11 Decl. at ¶ 12.

<u>Plaintiffs' Reply:</u>  Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work.  29 C.F.R. § 785.11.  Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

Additionally, there is no foundation showing Tobias has personal knowledge of 3rd Shift Deboning.  (See Tobias declaration indicating he has held the "First Processing Manager" position with Defendant for 11 years.).

43.     Quality Assurance inspectors observed employees as they re-entered the department after lunch. Ranck Tr. at 97-98, 143-144, Ex. 20 (Quality Assurance manager).

<u>Defendant's Response:</u>         Undisputed.

Plaintiffs' Reply:  N/A.

44.    Plaintiffs were required to be back at their workstations, fully dressed when the 30 minute meal period expired. *See*, *e.g.*, Garcia Tr. at 34, 83-84, Ex. 7; Marco Test. at 26:3-18, Ex. 35. There was congestion in the department as employees donned their PPE at the end of the lunch period. Gundrum Tr. at 249-256, Ex. 11 (Deboning supervisor testifying that there was crowding at the end of the lunch period).

Defendant's Response:    Farmers Pride disputes that Plaintiffs were required to be back at their workstations, fully dressed when the meal period expired. Instead, at the end of the 30-minute meal period, Farmers Pride provided additional paid time for employees to return to re-don their clothing and equipment and return to their workstation before the production line began. SAF at ¶¶ 18-28. Farmers Pride does not dispute that there was sometimes congestion in the department as the employees donned their PPE <u>after</u> their 30-minute meal period was over and that this congestion sometimes caused the production line to start up <u>later</u> than the "Line Start After Lunch" time reflected in the compensation schedules. Gundrum Dep. at 324-25; Boyer Dep. at 158-59. In other words, any congestion that occurred after the meal period as employees returned to their workstations did not impede on the employees' 30-minute meal period and instead caused the production line to start late, thus allowing employees additional paid time to engage in post-meal period donning- and sanitizing-related activities. <u>Id.</u>

Plaintiffs' Reply:  Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work.  29 C.F.R. § 785.11.  Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

45.    If Plaintiffs were late getting back to the line after lunch, they were reprimanded or disciplined by their supervisors. Garcia Tr. at 83-84, Ex. 7; Cedeno Gibson Tr. at 253, Ex. 8; Vicente Tr. at 123-24, Ex. 24; Gundrum Tr. at 307-308, Ex. 11 (Deboning supervisor testifying regarding discipline for tardiness at meal breaks).

Defendant's Response:        It is undisputed that, if Plaintiffs were not back at their workstations at or within a reasonable period of time after the "Line Start After Lunch" time on the compensation schedules, they could be reprimanded or disciplined by their supervisors. As an example, Plaintiff Marco issued a written warning to Plaintiff Blanco for repeatedly returning to the line 5 minutes after the "Line Start After Lunch" time on the Deboning compensation schedule: "Your break time for lunch is 1:28 till 2:02 not till 2:07." Ex. 16.

Plaintiffs' Reply:  Defendant's response does not dispute Plaintiffs' fact.


F.    **Post-Shift Activities**

46.    After Defendant stopped the production line for the day, Defendant required Plaintiffs to perform significant additional work in connection with their donning and doffing activities.


Defendant's Response:        For the reasons set forth in Farmers Pride's Brief In Opposition To Plaintiffs' Motion for Partial Summary Judgment, Farmers Pride disputes that Plaintiffs' post-shift donning and doffing activities were work and/or significant.

Plaintiffs' Reply:  Defendant's response does not dispute Plaintiffs' fact.


47.    Production line workers were notified by their supervisors that their shifts had concluded. Marco Test. at 27:10-12, Ex. 35.


Defendant's Response:        Undisputed.

32

Plaintiffs' Reply:  N/A.

48.     At the end of the shift, Defendant required or permitted hourly employees to remove their PPE, wait in line to use hoses and sinks to clean themselves and their PPE, and put dirty PPE into laundry bags or return it to their lockers. *See*, *e.g.*, Custodio Tr. at 202, 206. Ex. 5; Marco Vol. II Tr. at 170-71, 224, Ex. 15; *see also* Def. RFA No. 99, Ex. 1 (admitting Defendant required employees to clean some items of PPE they wore); Merrell Tr. at 242-243, Ex. 18 (manager admitting that employees were permitted to wash their PPE at the end of the shift, and that the company did not monitor this time); Boyer Tr. at 46-50, Ex. 2(Deboning supervisor testifying that employees were permitted to wash PPE at the end of the shift).

Defendant's Response:       Farmers Pride disputes that it required employees to wait in line to use hoses and sinks to clean themselves and their arm guards, cut-resistant gloves, and earplugs at the end of their shifts, disputes that it required or permitted them to put their arm guards or cut-resistant gloves into laundry bags or their lockers, and disputes that it required employees to put their earplugs in their lockers. Tobias 4/25/11 Decl. at ¶ 13; Eby Dep. at 56-63, 176-82; Gundrum Dep. at 219-28, 240-43. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paidtime at the end of their shift to compensate them for the time it engage reasonably took them to in-post shift donning-related activities. SAF at ¶¶ 18-28.

Plaintiffs' Reply:  Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work.  29 C.F.R. § 785.11.  Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

Additionally, there is no foundation showing Tobias has personal knowledge of 3rd Shift Deboning.  (See Tobias declaration indicating he has held the "First Processing Manager" position with Defendant for 11 years.).

49.     Specifically, when the production line stopped, Plaintiffs walked to a washing station and waited in line for access to a hose or sink where they washed their mesh gloves, arm protectors, plastic aprons, plastic sleeves, plastic gloves and boots. They then dried their PPE with paper towels so that it was not wet when they put it in their lockers. *See* Custodio Tr. at 202, 206, Ex. 5; Garcia Tr. at 179-81, 183-86, Ex. 7; Hernandez Tr. at 238, 272, Ex. 12; Torres Maldonado Tr. at 280-83, 306, Ex. 13; Marco Vol. II Tr. at 175, Ex. 15; Polanco Tr. at 220-226, Ex. 19; C. Torres Tr. at 200-05, 210-18, Ex. 23; Vicente Tr. at 258-59, Ex. 24; Marco Test. at 27:15-28:30, Ex. 35; Gruber Tr. at 154-56 (manager), Ex. 10; Merrell Tr. at 198-200, Ex. 18 (manager confirming that employees were trained on washing PPE during orientation).

Defendant's Response:      It is undisputed that some employees engaged in one or more of these activities. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paid time at the end of their shift to compensate them for the time it reasonably took them to engage in post-shift donning- and doffing-related activities. SAF at ¶¶ 18-28.

Plaintiffs' Reply:  Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work.  29 C.F.R. § 785.11.  Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

50.     Plaintiffs spent more time washing their PPE at the end of the shift than during their meal period because they washed it more thoroughly at the end of the day. Since Plaintiffs stored their PPE in their lockers overnight and the PPE had to be sterile, Plaintiffs had to be more thorough in ensuring their PPE was completely clean and dried. *See*, *e.g.*, Gruber Tr. at 154-56 (manager), Ex. 10; *see also* Vargas Gomez Tr. at 249, Ex. 9; Hernandez Tr. at 238-39, Ex. 12; Blanco Maya Tr. at 173-76, Ex. 16; Polanco Tr. at 220, Ex. 19; C. Torres Tr. at 205-06, Ex. 23; Vicente Tr. at 304-05, Ex. 24.

Defendant's Response:     Farmers Pride disputes that Plaintiffs were required to store their PPE in their lockers and disputes that the PPE had to be "sterile" before Plaintiffs stored it in their locker, or even before using the PPE the following day. Tobias 4/25/11 Decl. at ¶ 13; Tobias Dep. at 157-59, 267, 272; Eby Dep. at 61; Camasta Dep. at 41-42, 138-39, 199, 245; SAF at ¶¶ 4, 5, 7. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paid time at the end of their shift to compensate them for the time it reasonably took them to engage in post-shift donning- and doffing-related activities. SAF at ¶¶ 18-28.

Plaintiffs' Reply: Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work. 29 C.F.R. § 785.11. Defendant has not submitted any evidence that its compensation schedules were followed. Finally, Plaintiff disputes the compensation schedules were followed. See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

Additionally, there is no foundation showing Tobias has personal knowledge of 3rd Shift Deboning. (See Tobias declaration indicating he has held the "First Processing Manager" position with Defendant for 11 years.).

51.     Plaintiffs washed their equipment at the end of the shift because they were required to have clean equipment when they re-entered the department at the

beginning of their next shift. *See* Ranck Tr. at 163-168, Ex. 20 (Quality Assurance manager testifying that employees washed their mesh gloves at sinks at the end of their shift, and that the mesh gloves were individually inspected when employees entered the department at the beginning of the shift); Garcia Tr. at 147-149, Ex. 7 (testifying that he had to wash his PPE at the end of the shift so it would be clean at the start of the next shift).

Defendant's Response:       It is undisputed that, prior to December, some Plaintiffs washed some items of clothing and equipment at the end of their shift and that Plaintiffs were required to have reasonably clean clothing and equipment at the beginning of their shift. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paid time at the end of their shift to compensate them for the time it reasonably took them to engage in post-shift donning- and doffing-related activities, including washing their clothing and equipment if they chose to do so. SAF at ¶¶ 18-28.

Plaintiffs' Reply:  Such work occurred after the beginning of the continuous work day and/or Defendant suffered or permitted this work.  29 C.F.R. § 785.11.  Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

52.   Plaintiffs placed smocks in a laundry bag or hamper located near the laundry area. Gundrum Tr. at 116, Ex. 11 (Deboning supervisor); Hernandez Tr. at 241, Ex. 12; Marco Vol. II Tr. at 180, Ex. 15.

Defendant's Response:       It is undisputed that Plaintiffs placed smocks in a hamper located inside or directly outside of their production department. Tobias Dep. at 282. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paid time at the end of

their shift to compensate them for the time it reasonably took them to engage in post-shift donning- and doffing-related activities, including doffing their smocks and dropping them in the hampers. SAF at ¶¶ 18-28.

Plaintiffs' Reply:   Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed. See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.


53.   After washing and drying their PPE, Plaintiffs exited the department's production area and walked to the locker room so they could change and store PPE in their locker, including, without limitation: mesh gloves, arm protectors, plastic aprons, plastic gloves, plastic sleeves, cloth gloves, hairnets, beard nets, earplugs, and boots. *See*, *e.g.*, Custodio Tr. at 163-64, Ex. 5; Garcia Tr. at 186-89, Ex. 7; Hernandez Tr. at 240, Ex. 12; Marco Vol. I Tr. at 21, 41-42, Ex. 14; Blanco Maya Tr. at 179, Ex. 16; Polanco Tr. at 227, Ex. 19; Marco Test. at 28:17-23, Ex. 35; Merrell Tr. at 224, Ex. 18 (manager).


Defendant's Response:        Farmers Pride disputes that Plaintiffs used a locker room. Tobias 4/25/11 Decl. at ¶ 14; Camasta Dep. at 156-59; Gundrum Dep. at 223-28. Farmers Pride disputes that it required Plaintiffs to store any of the items listed above in their lockers. Tobias Decl. at ¶ 14; Tobias Dep. at 157-59, 267, 272; Eby Dep. at 61; Camasta Dep. at 41-42, 138-39, 199, 245; SAF at ¶¶ 4, 5, 7. Pursuant to its compensation schedules, Farmers Pride provided Plaintiffs additional paid time at the end of their shift to compensate them for the time it reasonably took them to engage in post-shift donning- and doffing-related activities. SAF at ¶¶ 18-28.

Plaintiffs' Reply:  The excepts from the Employee Handbook "Donning and Doffing" section indicate, "Farmers Pride provides lockers for the voluntary use by the employees, but employees can opt to take boots home if they so desire as long as boots are clean when entering

department.  Plaintiffs' Index of Evidence, Ex. 26, Bates No. D-00021, Ex. 27, Bates No. D-011131, Ex. 28, Bates No. D-011527, Ex. 29, Bates No. 30650, Ex. 30, D-011240.  The clear implication of these policy documents is that other items of PPE other than boots were not permitted to be taken home.

Defendant has not submitted any evidence that its compensation schedules were followed.  Finally, Plaintiff disputes the compensation schedules were followed.  See Plaintiff's Reply regarding Defendant's Statement of Additional Facts, SAF ¶¶18-28.

Additionally, there is no foundation showing Tobias has personal knowledge of 3rd Shift Deboning.  (See Tobias declaration indicating he has held the "First Processing Manager" position with Defendant for 11 years.).

54.  The locker area was often crowded during this time. *See* Merrell Tr. at 171-72, Ex. 18 (manager testifying that Farmers Pride was concerned about crowding at the end of the shift); *see also* Torres Maldonado Tr. at 300-303, Ex. 13.

Defendant's Response:       Farmers Pride disputes that the locker areas were crowded at the end of shift. Id. at ¶ 8; Eby Dep. at 180. Moreover, the testimony Plaintiffs cite does not support their allegation. Mr. Merrell's testimony related to lines within the department and at the time clocks after December 2007 when Farmers Pride began paying employees from punch-in to punch-out.  Thus, the lines referenced in that testimony occurred during paid time while employees were on the clock. Plaintiff Torres Maldonado's testimony related to alleged crowds at "the beginning of [his] shift," not at the end of shift. Torres Maldonado Dep. at 300:20.

Plaintiffs' Reply:  The fact can be inferred from Merrel's testimony that dismissing 100 people at the same time created lines and crowding at time clocks and Plaintiff's fact number 53, that after exiting the department, Plaintiffs returned to their lockers to doff PPE.

55.  Plaintiffs clocked out at some point after the line stopped for the day. Seabold Tr.

at 65-66, Ex. 21 (payroll clerk); Garcia Tr. at 188-89, Ex. 7; Polanco Tr. at 227, Ex. 19.

Defendant's Response:        Undisputed.

Plaintiffs' Reply:  N/A.

## DEFENDANT'S STATEMENT OF ADDITIONAL FACTS[2]

1. The typical hourly production employee at the Farmers Pride facility is not exposed to toxic or caustic substances during the workday. Tobias 3/29/11 Decl. at ¶ 12.

    Plaintiffs' Reply:  Undisputed

2. All Plaintiffs are required to wear a smock, hairnet, and beardnet (if applicable) when on production floor. Id. at ¶ 7; Garcia Dep. At 133; Hernandez Dep. At 181-82; Lugo Dep. at 162.

    Plaintiffs' Reply:  Undisputed

3. The smock is functionally similar to smocks worn in a variety of other professions, such as lab coats and doctor's coats, with wide openings at the wrist. Tobias 3/29/11 Decl. at ¶ 7. The smock benefits Plaintiffs by keeping their street clothers clean and dry. Garcia Dep. at 90-91; Tobias 3/29/11 Decl. at ¶ 7.

    Plaintiffs' Reply:  Disputed in part.  Defendant requires smocks so that it can maintain an sanitary environment to avoid contamination in areas of the plant where meat is exposed.  Defendant washed the smocks daily and required Plaintiffs to wear clean smocks every day.   See D0011527, Ex. 28; D011240, Ex. 30; D011131, Ex. 27; D00021, Ex. 26. The smocks covered street clothes which,

---

[2] Defendant's Statement of Additional Facts incorporates many facts Defendant submitted in support of its Motion for Summary Judgment.  (Docket # 511 ).  In Plaintiffs' responses to these additional facts, Plaintiffs submit the same responses as they did in opposition to that motion.  However, in the interests of judicial economy, Plaintiff is not re-submitting the index of evidence supporting the responses, but instead incorporates it by reference.  (Docket # 518-1).

if left uncovered, could expose meat to contaminates.  Torres Maldonado Dep. at 208, Ex 15; Vargas Gomez Dep. at 161, Ex 10; Polanco Ramos Dep. at 113-114, Ex 21; Def. RFA No. 34, Ex. 2; Merrell Dep. at 113-114, Ex 20.   Members of the USDA's Food Safety Inspection Service (FSIS) were also present at the plant and worked with the Quality Assurance department, supervisors and managers to ensure that production was conducted in a clean and sanitary manner.  Ranck Dep. at 38-39, 118-121, 128, 213-214, Ex 22; Def. RFA No. 37, Ex 2. Maintaining a sanitary environment benefits Defendant by keeping it in compliance with federal standards and regulations, and permitting it to continue to sell its product to the public.  *Id.*  Furthermore, Plaintiffs dispute that white cotton smocks did anything to keep Plaintiffs dry.

4. Plaintiffs can wear their hairnet and beardnet to and from home. Caba Dep. at 115-16; Garcia Dep. at 104-05; Gomez Dep. at 171; Hernandez Dep. at 141, 170; Lugo Dep. at 128; Mercado Dep. at 112; C. Torres Dep. at 119-20. The hairnet and beardnet help keep chicken products out of Plaintiffs' hair and facial hair. Blanco Dep. at 125-26; Caba Dep. at 116-18; C. Torres Dep. at 120; Vicente Dep. at 156-58; Tobias 3/29/11 Decl. at ¶ 7.

> Plaintiffs' Reply: Disputed.  The excepts from the Employee Handbook "Donning and Doffing" section indicate, "Farmers Pride provides lockers for the voluntary use by the employees, but employees can opt to take boots home if they so desire as long as boots are clean when entering department.  Plaintiffs' Index of Evidence, Ex. 26, Bates No. D-00021, Ex. 27, Bates No. D-011131, Ex. 28, Bates No. D-011527, Ex. 29, Bates No. 30650, Ex. 30, D-011240.  The clear implication of these policy documents is that other items of PPE other than boots were not permitted to be taken home.
>
> While there was no per se restriction on taking hairnets and beardnets home, the vast majority of employees kept them in their lockers.  Torres Maldonado Dep. at 221, Ex 15; Hernandez Dep. at 141, Ex. 14; Polanco Ramos Dep. at 90-91, Ex 21;

Castillo Dep. at 121-123.   Furthermore, hairnets and beardnets benefited Defendant by allowing it to maintain a sanitary environment.   The nets prevented employees' hair from falling into the exposed meat while they worked, thus protecting the meat from contamination.   Torres Maldonado Dep. at 219-220, Ex 15; Hernandez Dep. at 122-123, Ex 14; Polanco Ramos Dep. at 263-264, Ex 21; Castillo Dep. at 125.

5. Plaintiffs working in the Live Receiving, Evisceration, Cut-Up, and Packing Departments are required to wear earplugs when on the production floor. Id. at ¶ 9; Caba Dep. at 116-18. Since approximately 2007, employees in the Deboning Department have not been required to wear earplugs due to the installation of quieter-running processing equipment. Vicente Dep. at 155; J. Torres Dep. at 194; Gomez Dep. at 158-59; Tobias 3/29/11 Decl. at ¶ 9. The earplugs protect Plaintiffs' hearing and can be worn to and from home. Blanco Dep. at 125-26; Caba Dep. at 116-18; Collazo Dep. at 143; Gomez Dep. at 174; Hernandez Dep. at 122-23; Lugo Dep. at 131; Mercado Dep. at 112; Perez Dep. at 178 ; Polanco Dep. at 138-40; Rubendall Dep. at 145; C. Torres Dep. at 10; J. Torres Dep. at 211-13; Vicente Dep. at 156-58; Tobias 3/29/11 Decl. at ¶ 9.

> Plaintiffs' Reply: Disputed in part.   While there was no restriction against taking earplugs home, the vast majority of employees kept them in their lockers. Hernandez Dep. at 166, Ex. 14; Polanco Ramos Dep. at 90-91, Ex 21; Garcia Dep. at 120-121, Ex 8.

6. Plaintiffs working in the Live Hang portion of the Live Receiving Department are required to wear safety glasses and a disposable dust mask. Tobias 3/29/11 Decl. at ¶ 10. The disposable dust mask is identical to masks worn by individuals with allergies and benefits Plaintiffs by keeping dust and other debris found in the Live Hang portion of the Live Receiving Department out of their mouth and nose. Id. The safety glasses benefit Plaintiffs by preventing foreign objects from entering Plaintiffs' eyes. Id.; Caba Dep. at 116-18; Vicente Dep. at 156-58.

> Plaintiffs' Reply: Disputed in part.  While Plaintiffs benefited from keeping
> foreign objects out of their eyes and avoiding breathing dust into their mouths and
> lungs, Defendant benefited from having productive employees who are not
> incapacitated by impaired sight or breathing.

7. Plaintiffs are required to wear closed-toe shoes. Tobias 3/29/11 Decl. at ¶ 8. Some
   Plaintiffs wear tennis shoes and leather work boots, while other employees choose to
   purchase rubber boots from Farmers Pride. Caba Dep. at 98-99, 107-08, 111-12; Collazo
   Dep. at 134; Mercado Dep. at 107-09; Perez Dep. at 169-70; Polanco Dep. at 104.
   Plaintiffs can wear their shoes, including the rubber boots, to and from home. Caba Dep.
   at 113-14; Collazo Dep. at 142-43; Garcia Dep. at 104-05; Gomez Dep. at 160;
   Hernandez Dep. at 127-28; Lugo Dep. at 128, 198; Mercado Dep. at 107-09; Marco
   1/24/08 Dep. at 21-22; Perez Dep. at 169-70; Polanco Dep. at 106; Rubendall Dep. at
   128-29; C. Torres Dep. at 119; Tobias 3/29/11 Decl. at ¶ 8; see also Handbook Excerpt at
   39 ("[E]mployees can opt to take boots home if they so desire as long as boots are clean
   when entering department.").

> Plaintiffs' Reply: Disputed in part.  While there was no restriction on taking boots
> home, the vast majority of employees kept them in their lockers.  Hernandez Dep.
> at 166, Ex 14; Polanco Ramos Dep. at 90-91, Ex 21; Garcia Dep. at 109, Ex 8;
> Castillo Dep. at 108.

8. Some Plaintiffs wear a plastic or vinyl apron, plastic sleeves, and/or rubber gloves.
   Tobias 3/29/11 Decl. at ¶ 11. Some Plaintiffs claim that Farmers Pride required them to
   wear some or all of these items, whereas other Plaintiffs admit that Farmers Pride did not
   require them to wear these items. J. Torres Dep. at 216-18; Caba Dep. at 84, 95-99;
   5/18/10 Tr. at 180-81 (Caba); Cruz De Leon Resp. to Interrogs. at ¶¶ 2, 3, and 8; Rivera
   Resp. to Interrogs. at ¶¶ 2, 3, and 8; Hernandez Dep. at 121-28, 131-36. Plaintiffs admit
   that these items kept them and their street clothes clean and dry. Blanco Dep. at 125-26;
   Caba Dep. at 84, 95-99, 103-04; Collazo Dep. at 136-37; Garcia Dep. at 90-93; Gomez

Dep. at 163; Hernandez Dep. at 122-23, 130-32, 135-36; Lugo Dep. at 129-30; Perez

Dep. at 173, 176; Polanco Dep. at 112, 138-40; Rubendall Dep. at 132; C. Torres Dep. at

113-14, 120; J. Torres Dep. at 219; Vicente Dep. at 131-32, 156-58. Farmers Pride

derives no benefit from these items. Tobias 3/29/11 Decl. at ¶ 11.

> Plaintiffs' Reply: Disputed.  The nature of the work of chicken production
> required plastic gloves, sleeves and aprons to maintain a sanitary, hygienic
> environment in which to process chicken.  *See* D-00021, Ex. 26; D011526, Ex.
> 28, D011240, Ex. 30, D011131, Ex. 27; *see also* D030650, Ex. 29.  The non-
> porous material of the gloves prevented any germs from employees' hands from
> contaminating the exposed meat while they worked.  Torres Maldonado Dep. at
> 200, Ex 15; Hernandez Dep. at 124-126, 137-138, Ex 14; Vargas Gomez Dep. at
> 159, Ex 10; Marco Vol. II Dep. at 83-85, Ex 17; Ranck Dep. at 108-110, 114, Ex
> 22.  A plastic/rubber/vinyl apron provided a non-porous, easily washable surface
> which prevented any contaminates from the cloth smock, such as lint, from
> contaminating the meat.  Torres Maldonado Dep. at 216-219, Ex. 15; Hernandez
> Dep. at 128-131, 136, Ex. 14; Vargas Gomez Dep. at 103-104, 161-163, Ex 10;
> Polanco Ramos Dep. at 112-114; 115-117, 263-264, 282-283, Ex 21; Garcia Dep.
> at 90, Ex. 8; Marco Vol. II Dep. at 83-85, Ex. 17; Blanco Maya Dep. at 117-119,
> 126, Ex 18; Castillo Dep. at 109-110; Ranck Dep. at 108-110, 114, Ex 22.
> Likewise, most Plaintiffs also wore plastic sleeves which, in addition to keeping
> Plaintiffs dry, also promoted a sanitary environment by protecting the meat from
> any contaminates on the cotton smock sleeves and employees' exposed arms.
> Torres Maldonado Dep. at 207-208, Ex. 15; Hernandez Dep. 131-135, Ex 14;
> Vargas Gomez Dep. at 162-167, Ex 10; Polanco Ramos Dep. at 121-124, 263-
> 264, 278-279, Ex 21.  Plastic gloves, aprons and sleeves allowed Defendant to
> maintain the hygienic and sanitary environment required by federal law to process
> and sell chickens products.  Ranck Dep. at 38-39, 118-121, 128, 213-214, Ex 22.

Waterproof gloves, aprons and sleeves also kept Plaintiffs dry, which benefitted Defendant by having dry, healthy employees who could avoid getting sick in a cold, wet environment and remain productive while processing chicken products for Defendant to sell to the public.

9. Some Plaintiffs in the Cut-Up, Packing, and Deboning Departments wear cotton gloves to keep their hands warm. Blanco Dep. at 125-26; Caba Dep. at 83-84, 98-99; Collazo Dep. at 135; Garcia Dep. at 90-91; Gomez Dep. at 167-68; Lugo Dep. at 131; Mercado Dep. at 107-09; Perez Dep. at 170-71; C. Torres Dep. at 108-09.   Farmers Pride derives no benefit from the cotton gloves.   Tobias 3/29/11  Decl. at ¶ 11.

> Plaintiffs' Reply:     Disputed in part.  While employees were not required to wear cotton gloves by the company, the nature of working in the cold environment necessary for chicken production in the Deboning Department required gloves to keep Plaintiffs' hands warm while they worked.  Hernandez Dep. at 122-23, 139, Ex. 14; Vargas Gomez Dep. at 167-168, Ex. 10; Polanco Ramos Dep. at 130-131, Ex. 21; Garcia Dep. at 73-74, Ex. 8; Gundrum Dep. at 99, Ex. 13; Merrill Dep. at 219-220, Ex. 20; Ranck Dep. at 68-69, Ex. 22.  This benefitted Defendant by allowing Plaintiffs to work effectively and productively for a full shift in a cold environment.  *Id.*

10. Plaintiffs who use knives or scissors are required to wear one or two additional, non-standard clothing and equipment items, such as a mesh cut-resistant glove, whizzard cut-resistant glove, and/or a plastic arm guard. See Tobias 3/29/11 Decl. at ¶¶ 12-13.

> Plaintiffs' Reply:     Undisputed

11. Plaintiffs receive a 30-minute unpaid meal period every day. Vicente Dep. at 223-24; Tobias 3/29/11 Decl. at ¶ 16.

> Plaintiffs' Reply:     Disputed in part.  While Plaintiffs agree that Defendant deducted 30-minutes of pay from Plaintiffs' paychecks for a purported meal break, Plaintiffs dispute that they received a bona fide 30-minute meal break.  *See*

*infra* ¶¶ 23-26.

12. During the 30-minute meal period, no additional chickens are placed on the production line, and Plaintiffs who work on the line are free to leave their workstations on the production lines as soon as they finish working on the last piece of product that passes in front of their workstations. Id.; Caba Dep. at 158; Blanco Dep. at 160; Custodio Dep. at 182.

> Plaintiffs' Reply:    Plaintiffs do not dispute this assertion, but note that it directly contradicts the contention that there is a precise "line stop for lunch" time to which Defendant adheres in its schedules. *See* Schedules from 2001-2006, Ex 32-35.

13. Plaintiffs have testified that before and after the unpaid meal period, they must take off certain items of clothing and equipment before leaving the production floor for the meal period and put those items back on when they return from their meal period. Gomez Dep. at 210-17, 224-27, 236-37; Mercado Dep. at 148-51; Rubendall Dep. at 195-99. Plaintiffs have testified that, during the meal period, they do not have to remove all of their sanitary and protective items before leaving the production department floor or before entering the cafeteria. Caba Dep. at 175, 180; Garcia Dep. at 173; Gomez Dep. at 238; Hernandez Dep. at 211-12, 236-37; Mercado Dep. at 163-64; Perez Dep. at 233; C. Torres Dep. at 192-93; see also Tobias 3/29/11 Decl. at ¶ 15.

> Plaintiffs' Reply:    Plaintiffs do not dispute Defendant's factual allegation, but note that Defendant did not permit employees to wear mesh or protective gloves, arm guards, plastic aprons, plastic gloves, or plastic sleeves in the restroom or cafeteria areas.  Def. RFA No. 107, Ex. 2; *see also* Comasta Dep. at 216-217, Ex. 5 (manager); Garcia Dep. at 173, Ex. 8; Vargas Gomez Dep. at 99, 226, Ex. 10.

14. Plaintiffs use their 30-minute meal period for their own purposes, including purchasing and eating food in the cafeteria or outside of the facility on picnic tables provided by Farmers Pride; using the vending machines; eating a meal they have brought into the

cafeteria from outside the plant; socializing; smoking outside the plant; reading; playing cards, dominoes, or other games; using phones; hosting birthday parties or baby showers for co-workers; and going to their cars. Blanco Dep. at 167-69 (smoked during meal break; observed others eating outside during meal break; used phone during meal break; observed employees reading during meal break); Caba Dep. at 187-90 (went outside during meal break; observed employees smoking and using phones during meal break; once the meal break started, it was uninterrupted); Collazo Dep. at 190-91 (ate meal outside; used phone during meal break); Garcia Dep. at 166-68 (left the facility during meal period; observed others leaving the facility during meal period; read a magazine during meal period; saw employees smoking during meal period; used phone during meal period); Hernandez Dep. at 217-20 (purchased meals from cafeteria during meal period; was allowed to leave the building during meal period; smoked during meal period); Lugo Dep. at 188-90 (ate in the cafeteria and talked with coworkers during meal period; observed employees leaving the building during meal period); Marco 10/8/09 Dep. at 153-55 (ate food, smoked, went to car, used phone, and talked with coworkers during meal period); Tobias 3/29/11 Decl. at ¶ 17 (noting that employees routinely play dominoes and card games during their meal periods and also host birthday parties, baby showers, and other celebratory events for coworkers during the meal period).

> Plaintiffs' Reply:      Disputed in part.  Plaintiffs did not have the entire 30 minute unpaid meal break completely relieved of work duties.  Plaintiffs spent time doffing, waiting, washing, walking and re-donning  within their 30 minute meal break.  *See* Garcia Dep. at 150, 153-57, Ex. 8; Torres Maldonado Dep. at 167-68, 170, Ex. 15; Vargas Gomez Dep. at 210-11, Ex. 10; Hernandez Dep. at 101, Ex. 14; Blanco Maya Dep. at 157-58, 160-64, Ex. 18; Polanco Dep. at 191, Ex. 21; Marco Test. 23-24, Ex. 31;  Marco Vol. II Dep. at 240, Ex. 17 ("We couldn't leave the equipment to be mixed with the meat.  You had to take it out of the line."); Gundrum Dep. at 215, Ex. 13 (supervisor).  Defendant required

employees to doff their PPE during their unpaid meal period.  Merrell Dep. at 174, Ex. 20 (manager testifying that "We required them to leave their gloves in the room . . . .   We required them to leave aprons in the room . . . .").

There was often a line at the wash station where employees would wash their PPE at the beginning of the lunch break.  *See, e.g.*, Garcia Dep. at 150-155-57, Ex. 8; Cedeno Gibson Dep. at 240-42, Ex. 9; Hernandez Dep. at 24, Ex. 8; Torres Maldonado Dep. at 255-57, 303, 306, Ex. 15; Marco Vol. I Dep. at 36, 40, Ex. 16; Marco Vol. II Dep. at 149, 151-52, Ex. 17; Blanco Maya Dep. at 164-65, Ex. 18; Polanco Dep. at 194, Ex. 21; Boyer Dep. at 155-156, Ex. 3 (Deboning supervisor testifying that employees could wash their mesh gloves at the beginning of the break); Gundrum Dep. at 216, Ex. 13 (Deboning supervisor testifying that protective Whizzard gloves had to be washed at lunch break).

After washing their PPE, Plaintiffs had to find a hook or other location on which to hang it.  Garcia Dep. at 153-54, Ex. 8; Vargas Gomez Dep. at 210-11, Ex. 10; Torres Maldonado Dep. at 258, Ex. 15; Polanco Dep. at 202, Ex. 21; *see also* Marco Test. at 24:11-25:5, Ex. 31  (testifying that workers had to put their equipment on hangers before they could take their breaks).

Plaintiffs also had to clean their boots at lunch.  Torres Maldonado Dep. at 255, Ex. 15.  Quality control inspectors on occasion would require Plaintiffs to re-wash their equipment if its cleaning was unsatisfactory.  *See* Marco Vol. I Dep. at 39, Ex. 16; Ranck Dep. at 86-87, 242-244, Ex. 22 (Quality Assurance manager testifying that "if an employee was noted to have dirty boots, they would be asked to step off the line and wash their boots"); Gundrum Dep. at 34, Ex. 13 (Deboning supervisor testifying that when she was in the Quality Assurance department, she checked employees' boots to make sure they did not have "hunks of chicken" or a "thick grease buildup").

At the end of the unpaid meal period, Plaintiffs were required to sterilize their hands, retrieve their PPE, re-don their PPE, and walk back to their workstations within the 30 minute meal period.  Garcia Dep. at 175, Ex. 8; Torres Maldonado Dep. at 269-76, 305-06, Ex. 15; Blanco Maya Dep. at 171, Ex. 18; Polanco Dep. at 218, Ex. 22; C. Torres Dep. at 193-94, Ex. 2; Marco Test. 25:23-27:4, Ex. 31.

Plaintiffs were required to be back at their workstations, fully dressed when the 30-minute meal period expired.  *See, e.g.*, Garcia Dep. at 34, 83-84, Ex. 8; Marco Test. at 26-27, Ex. 31.  Marco estimated she spent 10 minutes donning and doffing during the meal period.  *Id.*  There was congestion in the department as employees donned their PPE at the end of the lunch period.  Gundrum Dep. at 249-256, Ex. 13 (Deboning supervisor testifying that there was crowding at the end of the lunch period).

15. Plaintiffs testified that they ate meals during their meal period. Blanco Dep. at 167-68; Caba Dep. at 169; Garcia Dep. at 165; Lugo Dep. at 188-90; C. Torres Dep. at 178-81; J. Torres Dep. at 261-62.

Plaintiffs' Reply:       Disputed in part.  Plaintiffs did not have the entire 30 minute unpaid meal break completely relieved of work duties.  Plaintiffs spent time doffing, waiting, washing, walking and re-donning  within their 30 minute meal break.  *See* Garcia Dep. at 150, 153-57, Ex. 8; Torres Maldonado Dep. at 167-68, 170, Ex. 15; Vargas Gomez Dep. at 210-11, Ex. 10; Hernandez Dep. at 101, Ex. 14; Blanco Maya Dep. at 157-58, 160-64, Ex. 18; Polanco Dep. at 191, Ex. 21; Marco Test. 23-24, Ex. 31;  Marco Vol. II Dep. at 240, Ex. 17 ("We couldn't leave the equipment to be mixed with the meat.  You had to take it out of the line."); Gundrum Dep. at 215, Ex. 13 (supervisor).   Defendant required employees to doff their PPE during their unpaid meal period.  Merrell Dep. at

174, Ex. 20 (manager testifying that "We required them to leave their gloves in the room . . . .   We required them to leave aprons in the room . . . .").

There was often a line at the wash station where employees would wash their PPE at the beginning of the lunch break.  *See, e.g.*, Garcia Dep. at 150-155-57, Ex. 8; Cedeno Gibson Dep. at 240-42, Ex. 9; Hernandez Dep. at 24, Ex. 8; Torres Maldonado Dep. at 255-57, 303, 306, Ex. 15; Marco Vol. I Dep. at 36, 40, Ex. 16; Marco Vol. II Dep. at 149, 151-52, Ex. 17; Blanco Maya Dep. at 164-65, Ex. 18; Polanco Dep. at 194, Ex. 21; Boyer Dep. at 155-156, Ex. 3 (Deboning supervisor testifying that employees could wash their mesh gloves at the beginning of the break); Gundrum Dep. at 216, Ex. 13 (Deboning supervisor testifying that protective Whizzard gloves had to be washed at lunch break).

After washing their PPE, Plaintiffs had to find a hook or other location on which to hang it.  Garcia Dep. at 153-54, Ex. 8; Vargas Gomez Dep. at 210-11, Ex. 10; Torres Maldonado Dep. at 258, Ex. 15; Polanco Dep. at 202, Ex. 21; *see also* Marco Test. at 24:11-25:5, Ex. 31  (testifying that workers had to put their equipment on hangers before they could take their breaks).

Plaintiffs also had to clean their boots at lunch.  Torres Maldonado Dep. at 255, Ex. 15.  Quality control inspectors on occasion would require Plaintiffs to re-wash their equipment if its cleaning was unsatisfactory.  *See* Marco Vol. I Dep. at 39, Ex. 16; Ranck Dep. at 86-87, 242-244, Ex. 22 (Quality Assurance manager testifying that "if an employee was noted to have dirty boots, they would be asked to step off the line and wash their boots"); Gundrum Dep. at 34, Ex. 13 (Deboning supervisor testifying that when she was in the Quality Assurance department, she checked employees' boots to make sure they did not have "hunks of chicken" or a "thick grease buildup").

At the end of the unpaid meal period, Plaintiffs were required to sterilize their hands, retrieve their PPE, re-don their PPE, and walk back to their

49

workstations within the 30 minute meal period. Garcia Dep. at 175, Ex. 8; Torres
Maldonado Dep. at 269-76, 305-06, Ex. 15; Blanco Maya Dep. at 171, Ex. 18;
Polanco Dep. at 218, Ex. 22; C. Torres Dep. at 193-94, Ex. 2; Marco Test. 25:23-
27:4, Ex. 31.

Plaintiffs were required to be back at their workstations, fully dressed
when the 30-minute meal period expired. *See, e.g.*, Garcia Dep. at 34, 83-84, Ex.
8; Marco Test. at 26-27, Ex. 31. Marco estimated that she spent 10 minutes
donning and doffing during the meal period. *Id*. Ms. Marco indicated that one of
the reasons that she did not receive a full meal period was that production workers
on the shift had to line up and wash at the beginning of the meal period and there
were only 8 faucets and about 70 employees in the department. Marco Test. at
23-24. There was congestion in the department as employees donned their PPE at
the end of the lunch period. Gundrum Dep. at 249-256, Ex. 13 (Deboning
supervisor testifying that there was crowding at the end of the lunch period).

Dr. Mericle's Supplemental Report on Third Shift Deboning finding that
employees spent 19.04 minutes performing donning and doffing activities,
including during the meal period. Mericle Report II at 8-9, Ex. 37.

16. Plaintiffs do not perform production work during their meal period and are not "on-call"
once they leave the production floor for their meal period. Caba Dep. at 190 (testifying
that meal break was uninterrupted); C. Torres Dep. at 181-82 (noting that she has 30
minutes to herself at meal break); J. Torres Dep. at 268 (testifying that he had 25 minutes
to himself during meal break); Tobias 3/29/11 Decl. at ¶ 16.

Plaintiffs' Reply: Disputed in part. Plaintiffs did perform uncompensated
donning and doffing work within the unpaid 30-minute meal break. Plaintiffs did
not have the entire 30 minute unpaid meal break completely relieved of work
duties. Plaintiffs spent time doffing, waiting, washing, walking and re-donning
within their 30 minute meal break. *See* Garcia Dep. at 150, 153-57, Ex. 8; Torres

Maldonado Dep. at 167-68, 170, Ex. 15; Vargas Gomez Dep. at 210-11, Ex. 10;

Hernandez Dep. at 101, Ex. 14; Blanco Maya Dep. at 157-58, 160-64, Ex. 18;

Polanco Dep. at 191, Ex. 21; Marco Test. 23-24, Ex. 31;  Marco Vol. II Dep. at

240, Ex. 17 ("We couldn't leave the equipment to be mixed with the meat.  You

had to take it out of the line."); Gundrum Dep. at 215, Ex. 13 (supervisor).

Defendant required employees to doff their PPE during their unpaid meal period.

Merrell Dep. at 174, Ex. 20 (manager testifying that "We required them to leave

their gloves in the room . . . .  We required them to leave aprons in the room . . .

.").

There was often a line at the wash station where employees would wash

their PPE at the beginning of the lunch break.  *See, e.g.*, Garcia Dep. at 150-155-

57, Ex. 8; Cedeno Gibson Dep. at 240-42, Ex. 9; Hernandez Dep. at 24, Ex. 8;

Torres Maldonado Dep. at 255-57, 303, 306, Ex. 15; Marco Vol. I Dep. at 36, 40,

Ex. 16; Marco Vol. II Dep. at 149, 151-52, Ex. 17; Blanco Maya Dep. at 164-65,

Ex. 18; Polanco Dep. at 194, Ex. 21; Boyer Dep. at 155-156, Ex. 3 (Deboning

supervisor testifying that employees could wash their mesh gloves at the

beginning of the break); Gundrum Dep. at 216, Ex. 13 (Deboning supervisor

testifying that protective Whizzard gloves had to be washed at lunch break).

After washing their PPE, Plaintiffs had to find a hook or other location on

which to hang it.  Garcia Dep. at 153-54, Ex. 8; Vargas Gomez Dep. at 210-11,

Ex. 10; Torres Maldonado Dep. at 258, Ex. 15; Polanco Dep. at 202, Ex. 21; *see

also* Marco Test. at 24:11-25:5, Ex. 31  (testifying that workers had to put their

equipment on hangers before they could take their breaks).

Plaintiffs also had to clean their boots at lunch.  Torres Maldonado Dep. at

255, Ex. 15.  Quality control inspectors on occasion would require Plaintiffs to re-

wash their equipment if its cleaning was unsatisfactory.  *See* Marco Vol. I Dep. at

39, Ex. 16; Ranck Dep. at 86-87, 242-244, Ex. 22 (Quality Assurance manager

testifying that "if an employee was noted to have dirty boots, they would be asked to step off the line and wash their boots"); Gundrum Dep. at 34, Ex. 13 (Deboning supervisor testifying that when she was in the Quality Assurance department, she checked employees' boots to make sure they did not have "hunks of chicken" or a "thick grease buildup").

At the end of the unpaid meal period, Plaintiffs were required to sterilize their hands, retrieve their PPE, re-don their PPE, and walk back to their workstations within the 30 minute meal period.  Garcia Dep. at 175, Ex. 8; Torres Maldonado Dep. at 269-76, 305-06, Ex. 15; Blanco Maya Dep. at 171, Ex. 18; Polanco Dep. at 218, Ex. 22; C. Torres Dep. at 193-94, Ex. 2; Marco Test. 25:23-27:4, Ex. 31.

Plaintiffs were required to be back at their workstations, fully dressed when the 30-minute meal period expired.  *See, e.g.*, Garcia Dep. at 34, 83-84, Ex. 8; Marco Test. at 26-27, Ex. 31.  There was congestion in the department as employees donned their PPE at the end of the lunch period.  Gundrum Dep. at 249-256, Ex. 13 (Deboning supervisor testifying that there was crowding at the end of the lunch period).

Dr. Mericle's Supplemental Report on Third Shift Deboning finding that employees spent 19.04 minutes performing donning and doffing activities, including during the meal period.+  Mericle Report II at 8-9, Ex. 37.

17. Plaintiffs' time study expert, Dr. Mericle, has opined that the meal period activities for which Plaintiffs are seeking compensation take an average of 7.94 minutes in the Live Receiving Department, an average of 5.24 minutes in the Evisceration Department, an average of 4.89 minutes in the Cut-Up and Packing Departments, and an average of 7.47 minutes in the Deboning Department. Mericle 11/25/09 Report at 16. This calculation included time for washing clothing and equipment before and after the meal period. Id.

Plaintiffs' Reply:      Disputed in part.  Plaintiffs do not dispute that Dr. Mericle found that Plaintiffs spent a certain amount of minutes performing donning and doffing activities during their unpaid meal break.  But Dr. Mericle noted that his findings substantially underestimated the actual time it took Plaintiffs to perform donning and doffing activities because of changes in plant layout, shift procedures and materials used for various items of PPE.  *See supra* ¶¶ 17, 23.

18. In the Spring of 2001, Farmers Pride developed a compensation schedule that provided additional compensation to employees for donning- and doffing-related activities at the beginning and end of the shift and at the beginning and end of the thirty-minute unpaid meal period. Ythier Decl. at ¶ 4, Ex. A.

Plaintiffs' Reply:      Disputed.  Defendant developed a schedule, but Plaintiffs dispute that it was a "compensation" schedule, or that the "schedule" was actually followed.  Dr. Mericle's first report concluded that employees in the Deboning Department spent an average of 17.44 minutes performing donning and doffing activities, he points out that his study necessarily excluded certain activities that otherwise would have been included because of changes to the plant structure and procedures in 2007.  Mericle Report I at 3, Ex. 36.  Changes such as moving pre- and post-shift donning and doffing locations and reorganizing the physical layout of the plant meant that some activities which would have added time to his findings could not be measured.  *Id.*  Dr. Mericle's Supplemental Report on Third Shift Deboning finding that employees spent 19.04 minutes performing donning and doffing activities.  Mericle Report II at 8-9, Ex. 37.  He also identified additional changes that resulted in a substantial underestimation of time, such as:

- Defendant now distributes most PPE inside the department as opposed to the supply window so Plaintiffs no longer wait in lines at the window to obtain their PPE;

- Plaintiffs spend less time at their lockers now to obtain PPE because most gear is distributed inside the department;

- donning of some PPE now takes place in the cafeteria and was not captured in Dr. Mericle's study;

- because Defendant substituted disposable PPE for items that had previously been washed and reused by employees, less employees spend time washing;

- there is less congestion due to lockers being relocated. *Id.*

As a result of these changes, Plaintiffs no longer wait and obtain supplies at the supply room window at the beginning of the shift. *See* Eby Dep. at 84-85, Ex. 7 (Deboning supervisor); Gundrum Dep. at 112-116, Ex. 13 (Deboning supervisor testifying that employees obtained their smocks and other PPE at the supply room at the start of the shift). Plaintiffs would also exchange items at the supply room such as plastic aprons, plastic gloves, plastic sleeves, cotton gloves, earplugs and hairnets. *See* Marco Test. 13:20-14:2, Ex. 31 (testifying she walked from her locker to a central supply room to receive and exchange additional equipment needed for each work day). These items were used for several days, then had to be exchanged for new ones. Torres Maldonado Dep. at 166-167, Ex. 15; Merrell Dep. at 70-80, Ex. 20 (Farmers Pride manager discussing what PPE employees obtained from the supply room at the beginning of the shift); Boyer Dep. at 51-56, Ex. 3 (Deboning supervisor testifying that employees obtained and exchanged PPE at the supply room prior to the shift); Mehalko Dep. at 108-111, Ex. 19 (supply room clerk describing distribution of PPE at the beginning of the week); Gundrum Dep. at 131-136, Ex. 13 (Deboning supervisor describing distribution of PPE at the beginning of the workweek); Def. RFA No. 77, Ex. 2 (admitting that from February 2004 to February 2007 "most hourly production employees obtained from the supply room some of the sanitary and protective clothing and equipment that they were required to wear and/or chose to wear, but not necessarily every day"); *see also* Def. RFA Nos. 78, 79, Ex. 2. The

supply room area was usually crowded and employees were required to line up outside the supply room to obtain the materials they would need for the day.  Marco Test. 13-14, Ex. 31; Torres Maldonado Dep. at 241-242, Ex. 15; Garcia Dep. at 50-51, 117-118, Ex. 8; Mehalko Dep. at 89-106, 123-124, Ex. 19 (supply room clerk describing the process for distributing PPE to employees); Gundrum Dep. at 119, Ex. 13 (Deboning supervisor testifying that "on occasion" it would get congested outside of the supply room).  At the beginning of the workweek, lines were usually longer at the supply room because employees would collect PPE they would keep and use throughout the week.  Garcia Dep. at 117-118, Ex. 8; Torres Maldonado Dep. at 224-225, 241-242, Ex. 15; Hernandez Dep. at 23-24, Ex. 14; Mehalko Dep. at 16-20, 125-132, Ex. 19 (supply room clerk).

Since Defendant relocated the distribution of most PPE inside the departments in 2007, Plaintiffs obtain less PPE at their lockers.  *See e.g.*, Def. RFA No. 73, Ex. 2; Marco Test. at 12-13, Ex. 31 (testifying she stored, cotton gloves, arm guard, plastic sleeves, plastic apron, and plastic gloves in her locker); Torres Maldonado Dep. at 241-243, Ex. 15; Garcia Dep. at 119-120, Ex. 8; Gundrum Dep. at 113, Ex. 13 (Deboning supervisor testifying that most employees kept their arm guards in their lockers prior to 2007).  Plaintiffs had to retrieve these items and don them prior to the start of production and had to stow them in their lockers prior to leaving the plant. *See, e.g.,* Marco Test. at 13:20-14:18, Ex. 31; Garcia Dep. at 137-138, Ex. 8; *see also* Def. RFA No. 75, Ex. 2 (admitting that hourly employees chose to store their PPE in their lockers); Def. RFA. No. 72, Ex. 2 (admitting employees had to obtain and don PPE prior to the start of their shift on the line); Def. RFA Nol. 109, Ex. 2 (admitting employees stored PPE in their lockers at the end of their shift except on the day before lockers were to be cleaned).  The locker area was often crowded before the shift start time.  Torres Maldonado Dep. at 300-301, Ex. 15; Garcia Dep. at 136-137, Ex. 8.  Defendant assigned all employees a locker.  Boyer Dep. at 22, Ex. 3

(supervisor testifying that all employees assigned a locker by the company).  This time was not accounted for in Dr. Mericle's study.  Indeed, Plaintiffs have estimated they spent up to 30 minutes performing pre-shift donning and doffing activities.  *See* Marco Test. at 22, Ex. 31.

Likewise, because Defendant replaced reusable gloves, sleeves and aprons which had previously been washed and stored in Plaintiffs' lockers with disposable materials, Dr. Mericle's study did not include the time spent washing these items at the end of the meal break or at the end of the shift.  *See, e.g.*, Garcia Dep. at 150-155-57, Ex. 8; Cedeno Gibson Dep. at 240-42, Ex.  9; Hernandez Dep. at 24, Ex. 14; Torres Maldonado Dep. at 255-57, 303, 306, Ex. 15; Marco Vol. I Dep. at 36, 40, Ex. 16; Marco Vol. II Dep. at 149, 151-52, Ex. 17; Blanco Maya Dep. at 164-65, Ex. 18; Polanco Dep. at 194, Ex. 21; Boyer Dep. at 155-156, Ex. 3 (Deboning supervisor testifying that employees could wash their mesh gloves at the beginning of the break); Gundrum Dep. at 216, Ex. 13 (Deboning supervisor testifying that protective Whizzard gloves had to be washed at lunch break); *see also* Custodio Dep. at 202, 206. Ex. 6; Marco Vol. II Dep. at 170-71, 224, Ex. 17; *see also* Def. RFA No. 99, Ex. 2 (admitting Defendant required employees to clean some items of PPE they wore); Merrell Dep. at 242-243, Ex. 20 (manager admitting that employees were permitted to wash their PPE at the end of the shift, and that the company did not monitor this time); Boyer Dep. at 46-50, Ex. 3 (Deboning supervisor testifying that employees were permitted to wash PPE at the end of the shift).

Specifically, when the production line stopped, Plaintiffs walked to a washing station and waited in line for access to a hose or sink where they washed and dried their mesh gloves, arm protectors, plastic aprons, plastic sleeves, plastic gloves and boots.  *See* Custodio Dep. at 202, 206, Ex. 6; Garcia Dep. at 179-81, 183-86, Ex. 8; Hernandez Dep. at 238, 272, Ex. 14; Torres Maldonado Dep. at 280-83, 306, Ex. 15; Marco Vol. II Dep. at 175, Ex. 17; Polanco Dep. at 220-226, Ex. 21; C. Torres Dep.

at 200-05, 210-18, Ex. 24; Vicente Dep. at 258-59, Ex. 25; Marco Test. at 27:15-28:30, Ex. 31; Gruber Dep. at 154-56 (manager), Ex. 12; Merrell Dep. at 198-200, Ex. 20 (manager confirming that employees were trained on washing PPE during orientation).  Plaintiffs spent more time washing their PPE at the end of the shift than during their meal period because they washed it more thoroughly at the end of the day.  Since Plaintiffs stored their PPE in their lockers overnight and the PPE had to be sterile, Plaintiffs had to be more thorough in ensuring their PPE was completely clean and dried.  *See, e.g.*, Gruber Dep. at 154-56 (former vice president of production), Ex. 12; *see also* Vargas Gomez Dep. at 249, Ex. 10; Hernandez Dep. at 238-39, Ex. 14; Blanco Maya Dep. at 173-76, Ex. 18; Polanco Dep. at 220, Ex. 21; C. Torres Dep. at 205-06, Ex. 24; Vicente Dep. at 304-05, Ex. 25.  Again, this additional time employees spent washing their reusable PPE was not accounted for in Dr. Mericle's study.

19. The schedule was broken down into two shifts (Third Shift and First Shift), and each shift was broken down by department. Ythier Decl. at Ex. A.

     Plaintiffs' Reply:     Undisputed

20. The schedule for each department on each shift contained eight specific times applicable to that department and shift. Id. The "Shift Punch In Time" indicated the time that the employees in that department and on that particular shift began to be paid. Ythier Decl. at ¶4; Tobias Dep. at 96-97, 261; Rhoads Dep. at 126-28; Ythier Dep. at 83. To be clear, hourly production employees were not required to clock in at the "Shift Punch In Time" for their particular department on their particular shift. Instead, employees could clock in at any time prior to when the production line in their particular department started because the time that an hourly production employee clocked in did not typically affect his or her compensation. Ythier Decl. at ¶ 4. Instead, with a few exceptions, an employee's pay began at the "Shift Punch In Time" regardless of when he or she clocked in. Id.

Plaintiffs' Reply:        Disputed.  Plaintiffs were required clock in ***prior to*** lining

up outside of the Deboning Department entrance, and ***prior to*** the "Shift Punch In

Time."  *See* Marco Test. at 16-19, Ex. 31; Hernandez Dep. at 83-85, 196-197, Ex.

14; Garcia Dep. at 41-42, 48-49, Ex. 8; Torres Maldonado Dep. at 188, Ex. 15;

Marco Vol. I Dep. at 31, 57, Ex. 16; Marco Vol. II Dep. at 229-30, Ex. 17; Blanco

Maya Dep. at 135-36, Ex. 18.  Defendant's policy required Deboning employees

to be dressed and ready to work by the start time of the department.  *Id., see also*

Comasta Test. at 239-242, Ex. 39; Comasta Dep. at 104, Ex. 5; Gundrum Dep. at

150-51, 164, Ex. 13 (Deboning supervisor testifying that "[A]s long as they could

be in deboning and have their stuff on, they can arrive 15 seconds before [shift

start time.]"); Eby Dep. at 50-51, Ex. 7 (Deboning supervisor testifying that prior

to 2007 "you can punch in anytime, but starting time was 9:00 o'clock").

Defendant has always required all of its hourly production employees to punch in

and out on time clocks, which, until late 2007, were located near the entrance of

the plant.  However, until December 2007 (after litigation was filed), the time

clocks served no other purpose than to monitor attendance because Defendant

paid employees in a way that ignored the actual times that employees began and

ended their work.  Def. RFA Nos. 59, 68, 70, Ex. 2 ("[D]efendant admits that,

from February 2004 to Fall 2007, most hourly production employees were not

paid according to their clock-in and clock-out times.").

        Also, starting approximately in 2006, Plaintiffs were also not permitted to

clock in before fifteen minutes before the "Shift Punch In Time."  Blanco Maya

Dep. at 45, 94-95, Ex. 18; Garcia Dep. at 106-107, Ex. 8;  Torres Maldonado Dep.

at 225-226, Ex 15.  Tobias Dep. at 94-95, Ex. 23.  Thus Plaintiffs dispute that they

could punch in "at any time" prior to the line starting.

21. The "Line Start" time indicated the time that the production line in that department and

   on that particular shift was scheduled to begin operating.  Id.; Tobias Dep. at 97-98;

Rhoads Dep. at 126-28; Ythier Dep. at 85. There is a temporal gap between the "Shift Punch In Time" (i.e., when an employee in a particular department started getting paid) and the "Line Start" time (i.e., when the production line in a particular department actually began), which was designed to compensate employees in that particular department and on that particular shift for pre-shift donning, walking, waiting, and sanitizing activities. Ythier Decl. at ¶ 4; Tobias Dep. at 253-54.

> Plaintiffs' Reply:     Disputed.  Plaintiffs did not spend the time between the "Shift Punch In Time" and the "Line Start Time" performing donning and related activities.  *See supra* ¶ 36.  Rather, Plaintiffs were required to be fully dressed and clocked in ***prior to*** the "Shift Punch In Time."  *Id.*

22. The "Line Stop For Lunch" time indicated the time that the production line in that department and on that particular shift was scheduled to stop for the meal period. Ythier Decl. at ¶ 4; Rhoads Dep. at 126-28. The "Lunch Start" time indicated the time that the employees' thirty-minute meal period actually began for a particular department on a particular shift. Ythier Decl. at ¶ 4; Rhoads Dep. at 126-28. Again, there is a temporal gap between these two entries, which was designed to compensate employees in that particular department and on that particular shift for pre-meal period doffing, waiting, and washing activities and to ensure that employees received a full, uninterrupted thirty-minute meal period. Ythier Decl. at ¶ 4.

> Plaintiffs' Reply:     Disputed.  The lines actually stopped at the "Lunch Start Time," not the "Line Stop For Lunch" time as indicated on Defendant's schedules.  Blanco Maya Dep. at 89-91, 155-157, Ex 18; Marco Vol. II Dep. at 140-144, Ex. 17.

23. The "Lunch Stop" time indicated the time that the employees' thirty-minute meal period ended, and the "Line Start After Lunch" time indicated the time that the production line in a particular department was scheduled to begin after the meal period. Id.; Rhoads Dep. at 126-28. The temporal gap between the "Lunch Stop" time and the "Line Start After

Lunch" time was designed to ensure that employees in that particular department and on that particular shift received compensation for post-meal period donning and washing activities. Ythier Decl. at ¶ 4.

> Plaintiffs' Reply:      Disputed.  The lines actually started again at the "Lunch Stop" time, not the "Line Start After Lunch" time indicated on Defendant's schedules.  Garcia Dep. at 34, 82, Ex. 8; Torres Maldonado Dep. at 144-147, Ex. 15.

24. Finally, the "Line Stops End of Shift" time was the time that the production line in a particular department on a particular shift was scheduled to stop at the end of the shift. Id.; Rhoads Dep. at 126-28. The "Shift End Punch Out Time" indicated the time that employees stopped being paid in that particular department on that particular shift. Ythier Decl. at ¶ 4; Tobias Dep. at 261; Rhoads Dep. at 126-28; Ythier 8/18/09 Dep. at 86-87. Again, there is a gap between the two entries, which compensated employees for post-shift doffing, waiting, washing, and walking activities. Ythier Decl. at ¶ 4. Much like the start of the shift, hourly production employees were not required to punch out on the time clocks at the "Shift End Punch Out Time." Instead, employees could punch out at any time after the production line in their particular department on their particular shift stopped for the day. Id.

> Plaintiffs' Reply:      Disputed.  The lines actually stopped at the "Shift End Punch Out Time" at the end of the shift, not the "Line Stops End of Shift" time indicated on Defendant's schedules.  Vargas Gomez Dep. at 244, Ex. 10; Hernandez Dep. at 24, Ex. 14; Torres Maldonado Dep. at 160-162, Ex. 15.

25. Farmers Pride first implemented the schedule nine days later on May 13, 2001. Ythier Decl. at ¶ 5. It posted the schedule on the bulletin board at the plant. 5/17/10 Tr. at 32 (Marco) and 127-28 (Ythier); 5/18/10 Tr. at 29 (Schmalhofer) and 175 (Caba); Ythier Decl. at ¶5.

> Plaintiffs' Reply:    Disputed.  While the schedule may have been posted at the Farmers Pride plant, Plaintiffs dispute that it was actually implemented or compensated Plaintiffs for performing donning and doffing activities.  *See supra* ¶¶ 36-40.

26. Upon implementation of the schedule, Farmers Pride revised its employee handbook to reflect the fact that employees would now be receiving additional compensation for donning and doffing activities:

### DONNING AND DOFFING

> Farmers Pride has procedures that are followed for Shift Start, Lunchtime, and Shift End. These procedures are to allow employees time for putting on their work equipment before entering the departments. Some of these times may vary depending on the employees' assigned position on the line and our weekly production schedule. Farmers Pride provides lockers for the voluntary use by the employees, but employees can opt to take boots home if they so desire as long as boots are clean when entering department. (See bulletin boards for times.)

Ex. 17 at 39; 5/17/10 Tr. at 130-32 (Ythier).

> Plaintiffs' Reply:    Disputed.  While Defendant did alter its handbook language, Plaintiffs dispute that the schedule was actually implemented or that Plaintiffs received any additional compensation for donning and doffing activities. *See supra* ¶¶ 36-40.

27. Thereafter, Farmers Pride periodically reviewed the compensation schedules to ensure that the start times and times allotted for donning- and doffing-related activities were accurate and sufficient in light of changes in the production process and renovations to the facility's layout. Ythier Dep. at 150-52, 156-57; Tobias Dep. at 102-03; 5/18/10 Tr. at 31-32 (Schmalhofer), 77-78 (Ythier), and 202-05 (Tobias); see Tobias 3/29/11 Decl. at ¶ 5 and Tobias Dep. at 111-14, 133-37 (discussing renovations at the plant). As a result, Farmers Pride revised and republished the schedules on May 9, 2002, June 1, 2004, May

23, 2005, December 21, 2005, and December 10, 2006. <u>See</u> Ythier Decl. at ¶ 6, Exs. B-F.

> Plaintiffs' Reply:          Disputed.  Defendant did not "periodically" review the
> actual times it took employees to perform donning and doffing activities.  Jim
> Tobias, Farmers Pride First Shift Processing Manager for the past eleven years,
> testified that he performed ***exactly one*** "time study" in 2005, at Mr. Gruber's
> behest.  Tobias Dep. at 77, 103-106, Ex. 23.  He was not aware of any other time
> studies conducted at the plant, nor can Defendants point to any other time studies
> conducted at the plant for the purpose of "reviewing" the compensation schedules.
> *Id.* at 87-89, 109-111.   Mr. Tobias's "study" was as flawed and incomplete as
> Mr. Gruber's:

- Mr. Tobias chose to conduct this study by donning PPE *himself* instead of timing actual employees under real circumstances, thus building a bias directly into his study.  *Id.* at 78-82.  The study consisted of him obtaining a hairnet and smock at the supply room, walking to a department, and donning other PPE in that department while another manager timed him.  *Id.*  He did this for each department.  *Id.*

- Mr. Tobias only conducted his study of the first shift, and Defendant cannot point to any study being conducted of the third shift in any department.  *Id.* at 86.

- Mr. Tobias chose to conduct his study after the other hourly employees were already working on their shift, and not amidst the pre-shift crowding to obtain and don PPE, so his results fail reflect the real circumstances in which employees obtain and don their PPE.  *Id.* at 78-80.

- Mr. Tobias completely omitted time employees spend at their lockers in the beginning of the shift or at the end of the shift.  *Id.* at 86.

- Mr. Tobias omitted all waiting times from his study.  *Id.* at 78-82.

- Mr. Tobias simply wrote times down on a piece of paper.  *Id.* at 78.  There is no evidence that he used a standardized form and any sort to organize his data, or that he repeated the procedure to ensure the accuracy of his results.  *Id.*

- Mr. Tobias did not time doffing PPE at lunch or the end of the shift, and thus omitted the walking, waiting and washing times associated with doffing PPE.  *Id.* at 284.

- There is no evidence that Mr. Tobias used standardized beginning or end points for the timing in his study, nor that there was any process to ensure consistency in timing.  *Id.* at 78-85.

- The study was performed before plant renovations were complete and did not account for the affects future renovations would have on donning and doffing times.  *Id.* at 115-116.

- This was the only time study Mr. Tobias had ever conducted.  *Id.* at 77.

> Much like Mr. Gruber's study, Mr. Tobias' unscientific, ad hoc study was incomplete and utterly failed to account, measure or calculate the actual time employees' spent donning and doffing throughout the day.  Like Mr. Gruber's 2001 study, Defendant cannot point to any processes implemented by Mr. Tobias to ensure the data he collected was accurate and complete.   Defendant's mantra that it "periodically" reviewed the allowances in the schedules stands in stark contrast to the evidence.

28. Farmers Pride management also periodically observed each of the production departments to ensure that the supervisors were following the schedules. 5/18/10 Tr. at 113-16 (Good) and 202-04 (Tobias); Tobias 3/29/11 Decl. at ¶ 18. Farmers Pride management sent written reminders to supervisors underscoring the importance of following the schedules. Tobias 3/29/11 Decl. at ¶ 18; 5/18/10 Tr. at 202-04 (Tobias); see, e.g., Ex. 37 to Def.'s Mot. for S.J. ("Please insure all departments are adhering to the donning and doffing times posted.").

> Plaintiffs' Reply:      Disputed.  Plaintiffs disputed that the schedules were followed.  See supra ¶¶36-40.  Plaintiffs were required clock in ***prior to*** lining up outside of the Deboning Department entrance, and ***prior to*** the "Shift Punch In Time."  *See* Marco Test. at 16-19, Ex. 31; Hernandez Dep. at 83-85, 196-197, Ex. 14; Garcia Dep. at 41-42, 48-49, Ex. 8; Torres Maldonado Dep. at 188, Ex. 15; Marco Vol. I Dep. at 31, 57, Ex. 16; Marco Vol. II Dep. at 229-30, Ex. 17; Blanco Maya Dep. at 135-36, Ex.  18.  Defendant's policy required Deboning employees

to be dressed and ready to work by the start time of the department.  *Id., see also*
Comasta Test. at 239-242, Ex. 39; Comasta Dep. at 104, Ex. 5; Gundrum Dep. at
150-51, 164, Ex. 13 (Deboning supervisor testifying that "[A]s long as they could
be in deboning and have their stuff on, they can arrive 15 seconds before [shift
start time.]"); Eby Dep. at 50-51, Ex. 7 (Deboning supervisor testifying that prior
to 2007 "you can punch in anytime, but starting time was 9:00 o'clock").
Defendant has always required all of its hourly production employees to punch in
and out on time clocks, which, until late 2007, were located near the entrance of
the plant.  However, until December 2007 (after litigation was filed), the time
clocks served no other purpose than to monitor attendance because Defendant
paid employees in a way that ignored the actual times that employees began and
ended their work.  Def. RFA Nos. 59, 68, 70, Ex. 2 ("[D]efendant admits that,
from February 2004 to Fall 2007, most hourly production employees were not
paid according to their clock-in and clock-out times.").

Also, starting approximately in 2006, Plaintiffs were also not permitted to
clock in before fifteen minutes before the "Shift Punch In Time."  Blanco Maya
Dep. at 45, 94-95, Ex. 18; Garcia Dep. at 106-107, Ex. 8;  Torres Maldonado Dep.
at 225-226, Ex 15.  Tobias Dep. at 94-95, Ex. 23.  Thus Plaintiffs dispute that they
could punch in "at any time" prior to the line starting.

The lines actually stopped at the "Lunch Start Time," not the "Line Stop
For Lunch" time as indicated on Defendant's schedules.  Blanco Maya Dep. at
89-91, 155-157, Ex 18; Marco Vol. II Dep. at 140-144, Ex. 17.

The lines actually stopped at the "Shift End Punch Out Time" at the end of
the shift, not the "Line Stops End of Shift" time indicated on Defendant's
schedules.  Vargas Gomez Dep. at 244, Ex. 10; Hernandez Dep. at 24, Ex. 14;
Torres Maldonado Dep. at 160-162, Ex. 15.

29. At that time, the Fredericksburg facility was undergoing substantial renovations that

64

were ultimately completed in December 2007. Tobias 3/29/11 Decl. at ¶¶ 5, 6. As a result of the renovations, Farmers Pride began distributing all required (and most optional) sanitary and protective clothing and equipment inside each production department and also moved the locations of the time clocks to the entrances of each department such that employees clocked in immediately prior to picking up and donning required clothing and equipment. Id. at ¶ 6; Polanco Dep. at 157-58, 228-29; Gomez Dep. at 181-82, 201, 203, 268. In conjunction with these changes, Farmers Pride also changed the manner in which it compensated hourly production employees. Specifically, Farmers Pride began paying production employees according to the time that the employees punched in and punched out on the time clocks. Tobias 3/29/11 Decl. at ¶ 6; Tobias Dep. at 36; Ythier Dep. at 27-28; Merrell Dep. at 271-72; Camasta Dep. at 114-15; Gundrum Dep. at 41-42. Because employees clock in before picking up and donning required clothing and equipment, and because they clock out after doffing and washing such clothing and equipment, all such activities occur during paid time. Tobias 3/29/11 Decl. at ¶ 6.

> Plaintiffs' Reply:      Disputed in part.  Plaintiffs  dispute  that  the  equipment  it began distributing inside the department was "optional."

30. As was the case before December 2007, employees continue to receive additional time before and after the thirty-minute meal period for donning- and doffing-related activities. Id.

> Plaintiffs' Reply:      Disputed.  Dr. Mericle's Supplemental Report on Third Shift Deboning finding that employees spent 19.04 minutes performing donning and doffing activities, including during the meal period.  Mericle Report II at 8-9, Ex. 37.  Plaintiffs did not have the entire 30 minute unpaid meal break completely relieved of work duties.  Plaintiffs spent time doffing, waiting, washing, walking and re-donning  within their 30 minute meal break.  *See* Garcia Dep. at 150, 153-57, Ex. 8; Torres Maldonado Dep. at 167-68, 170, Ex. 15; Vargas Gomez Dep. at 210-11, Ex. 10; Hernandez Dep. at 101, Ex. 14; Blanco Maya Dep. at 157-58,

160-64, Ex. 18; Polanco Dep. at 191, Ex. 21; Marco Test. 23-24, Ex. 31;  Marco Vol. II Dep. at 240, Ex. 17 ("We couldn't leave the equipment to be mixed with the meat.  You had to take it out of the line."); Gundrum Dep. at 215, Ex. 13 (supervisor).  Defendant required employees to doff their PPE during their unpaid meal period.  Merrell Dep. at 174, Ex. 20 (manager testifying that "We required them to leave their gloves in the room . . . .  We required them to leave aprons in the room . . . .").

There was often a line at the wash station where employees would wash their PPE at the beginning of the lunch break.  *See, e.g.*, Garcia Dep. at 150-155-57, Ex. 8; Cedeno Gibson Dep. at 240-42, Ex. 9; Hernandez Dep. at 24, Ex. 8; Torres Maldonado Dep. at 255-57, 303, 306, Ex. 15; Marco Vol. I Dep. at 36, 40, Ex. 16; Marco Vol. II Dep. at 149, 151-52, Ex. 17; Blanco Maya Dep. at 164-65, Ex. 18; Polanco Dep. at 194, Ex. 21; Boyer Dep. at 155-156, Ex. 3 (Deboning supervisor testifying that employees could wash their mesh gloves at the beginning of the break); Gundrum Dep. at 216, Ex. 13 (Deboning supervisor testifying that protective Whizzard gloves had to be washed at lunch break).

After washing their PPE, Plaintiffs had to find a hook or other location on which to hang it.  Garcia Dep. at 153-54, Ex. 8; Vargas Gomez Dep. at 210-11, Ex. 10; Torres Maldonado Dep. at 258, Ex. 15; Polanco Dep. at 202, Ex. 21; *see also* Marco Test. at 24:11-25:5, Ex. 31  (testifying that workers had to put their equipment on hangers before they could take their breaks).

Plaintiffs also had to clean their boots at lunch.  Torres Maldonado Dep. at 255, Ex. 15.  Quality control inspectors on occasion would require Plaintiffs to re-wash their equipment if its cleaning was unsatisfactory.  *See* Marco Vol. I Dep. at 39, Ex. 16; Ranck Dep. at 86-87, 242-244, Ex. 22 (Quality Assurance manager testifying that "if an employee was noted to have dirty boots, they would be asked to step off the line and wash their boots"); Gundrum Dep. at 34, Ex. 13 (Deboning

supervisor testifying that when she was in the Quality Assurance department, she checked employees' boots to make sure they did not have "hunks of chicken" or a "thick grease buildup").

At the end of the unpaid meal period, Plaintiffs were required to sterilize their hands, retrieve their PPE, re-don their PPE, and walk back to their workstations within the 30 minute meal period.  Garcia Dep. at 175, Ex. 8; Torres Maldonado Dep. at 269-76, 305-06, Ex. 15; Blanco Maya Dep. at 171, Ex. 18; Polanco Dep. at 218, Ex. 22; C. Torres Dep. at 193-94, Ex. 2; Marco Test. 25:23-27:4, Ex. 31.

Plaintiffs were required to be back at their workstations, fully dressed when the 30-minute meal period expired.  *See, e.g.*, Garcia Dep. at 34, 83-84, Ex. 8; Marco Test. at 26-27, Ex. 31.  There was congestion in the department as employees donned their PPE at the end of the lunch period.  Gundrum Dep. at 249-256, Ex. 13 (Deboning supervisor testifying that there was crowding at the end of the lunch period).

The lines actually started again at the "Lunch Stop" time, not the "Line Start After Lunch" time indicated on Defendant's schedules.  Garcia Dep. at 34, 82, Ex. 8; Torres Maldonado Dep. at 144-147, Ex. 15.

Dated: May 5, 2011                          Respectfully submitted,

                                            SCHNEIDER WALLACE
                                            COTTRELL BRAYTON
                                            KONECKY LLP


                                               /s/
                                            _____
                                            CLINT J. BRAYTON
                                            TODD M. SCHNEIDER
                                            180 Montgomery Street, Suite 2000
                                            San Francisco, CA  94104
                                            Telephone No.: (415) 421-7100
                                            Facsimile No.: (415) 421-7105

                                            BERGER & MONTAGUE, P.C.
                                            SHANON J. CARSON
                                            JAMES A. WELLS
                                            1622 Locust Street
                                            Philadelphia, PA  19103
                                            Telephone No.: (215) 875-3000
                                            Facsimile No.: (215) 875-4604

                                            PHILIP A. DOWNEY
                                            The Downey Law Firm, LLC
                                            P.O. Box 1021
                                            Unionville, PA  19375
                                            Telephone No.: (610) 324-2848
                                            Facsimile No.: (610) 813-4579

                                            *Attorneys for Plaintiffs and Opt-In
                                            Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 5, 2011, I served a true and correct copy of Plaintiffs'

Statement of Disputed and Undisputed Facts in Opposition to Defendant's Motion for

Summary Judgment, and all supporting papers, on the following:

### <u>By ECF</u>

George C. Werner, Esq.
Barley Snyder LLC
126 East King Street
Lancaster, PA 17602
Telephone: (717) 399-1511
Email: gwerner@barley.com

Jill S. Welch, Esq.
Barley Snyder LLC
126 East King Street
Lancaster, PA 17602
Telephone: (717) 399-1521
Email: jwelch@barley.com

Ryan A. Glassgow
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8791
Email: rglassgow@hunton.com

### <u>By E-Mail</u>

Michael J. Mueller
Hunton & Williams LLP
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 419-2116
Email: mmueller@hunton.com

_____/s/_____
Clint J. Brayton